# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANET F. JEFFRIES | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 06-707-JJF |
| v. | : | |
| | : | |
| JOHN E. POTTER, POSTMASTER | : | |
| GENERAL, UNITED STATES POSTAL | : | |
| SERVICE | : | |
| | : | |
| Defendant. | : | |
| | : | |


## BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


COLM F. CONNOLLY
United States Attorney

By: Seth M. Beausang (I.D. No. #4071)
Assistant United States Attorney
1007 N. Orange Street, Suite 700
Wilmington, Delaware 19801
(302) 573-6277


Dated: February 21, 2008.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    The Incident Between Plaintiff And Thomas.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    The USPS Investigates The Incident... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.    The USPS Completes Its Investigation And Takes
      No Action Against Plaintiff Or Thomas... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

E.    Plaintiff Files Her EEOC Complaint And Alleges Only Color Discrimination.. . . . . . . . 7

F.    Williams Investigates Another Incident Involving
      Plaintiff And Again Does Not Discipline Plaintiff... . . . . . . . . . . . . . . . . . . . . . . . . . 8

G.    Plaintiff Thinks Her Supervisors Begin Nitpicking Her... . . . . . . . . . . . . . . . . . . . . 8

H.    Plaintiff Asks For A Transfer Away From Thomas.. . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    Plaintiff Is Promoted And Moved To The Night Shift... . . . . . . . . . . . . . . . . . . . . . . 9

J.    Plaintiff Confirms That She Is *Not* Raising A
      Hostile Work Environment Claim Before The EEOC.. . . . . . . . . . . . . . . . . . . . . . . . 11

K.    Plaintiff Admits During Her Deposition That The
      USPS Disciplines Both Black And White Employees For Workplace Misconduct. . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    APPLICABLE LEGAL STANDARDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Standard Of Review On A Motion Pursuant To Fed. R. Civ. P. 56.. . . . . . . . . . . 14

      B.    The McDonnell Douglas Burden-Shifting Framework. . . . . . . . . . . . . . . . . . . . 14

PAGE

II.  PLAINTIFF'S HOSTILE WORK ENVIRONMENT, RETALIATION,
     AND DISCRIMINATORY TRANSFER CLAIMS, AND HER GENDER
     AND NATIONAL ORIGIN DISCRIMINATION CLAIMS, SHOULD
     ALL BE DISMISSED FOR LACK OF EXHAUSTION.... . . . . . . . . . . . . . . . . . . . . . . . 15

     A.   Title VII's Exhaustion Requirement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.   Plaintiff Failed To Exhaust Her Hostile Work Environment,
          Retaliation, And  Discriminatory Transfer Claims, And Her
          Gender, and National Origin Discrimination Claims.. . . . . . . . . . . . . . . . . . . 16

III. PLAINTIFF'S RACE, GENDER, AND NATIONAL ORIGIN
     DISCRIMINATION CLAIMS, AND RETALIATION CLAIMS,
     SHOULD ALL BE DISMISSED BECAUSE PLAINTIFF HAS
     NOT PRODUCED EVIDENCE OF A PRIMA FACIE CASE OF
     DISCRIMINATION OR RETALIATION.... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.   Plaintiff Has The Burden To Produce Evidence Of A Prima
          Facie Case of Discrimination And Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.   Plaintiff's Discrimination Claims Should Be Dismissed
          Because She Has Failed To Show That The USPS Took
          Any "Adverse Employment Action" Against Her.. . . . . . . . . . . . . . . . . . . . . . . 19

     C.   Plaintiff's Retaliation Claim Should Be Dismissed
          Because She Has Failed To Show That The USPS Took
          Any "Materially Adverse Action" Against Her.. . . . . . . . . . . . . . . . . . . . . . . . 24

     D.   Plaintiff's Discrimination And Retaliation
          Claims Should Also Be Dismissed Because She
          Has Also Failed To Show That Similarly Situated Employees
          Of A Different Race Received Preferential Treatment... . . . . . . . . . . . . . . . . . . 24

IV.  PLAINTIFF'S HOSTILE WORK ENVIRONMENT
     CLAIM SHOULD ALSO BE DISMISSED BECAUSE
     THERE IS NO EVIDENCE TO SUPPORT IT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Antol v. Perry,
    82 F.3d 1291 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Atkinson v. LaFayette Coll.,
    460 F.3d 447 (3d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Breaux v. City of Garland,
    205 F.3d 150 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Burlington Northern & Santa Fe Ry. Co. v. White,
    126 S.Ct. 2405 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

Burns v. Potter,
    No. 1:04-CV-2793, 2007 WL 406201 (M.D. Pa. Feb. 2, 2007). . . . . . . . . . . . . . . . 17-18

Calloway v. E.I. DuPont de Nemours & Co.,
    No. 98-669-SLR, 2000 WL 1251909 (D. Del. Aug. 8, 2000). . . . . . . . . . . . . . . . . . . . 27

Caver v. City of Trenton,
    420 F.3d 243 (3d Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DeMars v. O'Flynn,
    287 F. Supp. 2d 230 (W.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
    983 F.2d 509 (3d Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26

Fitzhugh v. Topetzes,
    No. 1:04-CV-3258-RWS, 2006 WL 2557921 (N.D. Ga. Sept. 1, 2006). . . . . . . . . . . . . 22

Griffin v. Potter,
    356 F.3d 824 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**CASES**                                                     **PAGE**

Hewlett v. Waffle House, Inc.,
  No. 3:04-CV-111(CDL), 2006 WL 1582423 (M.D. Ga. June 5, 2006).. . . . . . . . . . . . . 22

Holifield v. Reno,
  115 F.3d 1555 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Kidd v. MBNA America Bank, N.A.,
  224 F. Supp. 2d 807 (D. Del. 2002),
  aff'd by 93 Fed. App'x. 399 (3rd Cir. Mar 25, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 27

Mayes v. Potter,
  418 F. Supp. 2d 1235 (D. Colo. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Mondzelewski v. Pathmark Stores, Inc.,
  162 F.3d 778 (3d Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Morrison v. Carpenter Tech. Corp.,
  No. 05-1922, 193 Fed. App'x. 148 (3d Cir. Aug. 22, 2006). . . . . . . . . . . . . . . . . . . . . . 24

National R.R. Passenger Corp. v. Morgan,
  536 U.S. 101 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,
  60 F.3d 153 (3d Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Ogden v. Keystone Residence,
  226 F. Supp. 2d 588 M.D. Pa. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Red v. Potter,
  No. 05-5256, 211 Fed. App'x. 82 (3d Cir. Nov. 20, 2006). . . . . . . . . . . . . . . . . . . . . . . 25

Peltier v. United States,
  388 F.3d 984 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Singh v. Wal-Mart Stores, Inc.,
  No. 98-1613, 1999 WL 374184 (E.D. Pa. June 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . 25

**CASES** **PAGE**

Speer v. Rand McNally & Co.,
    123 F.3d 658 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Storey v. Burns Intern. Sec. Servs.,
    390 F.3d 760 (3d Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22-23

Texas Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan,
    439 F. Supp. 2d 337 (D. Del. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Van Zant v. KLM Royal Dutch Airlines,
    80 F.3d 708 (2d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Wehunt v. R.W. Page Corp.,
    352 F. Supp. 2d 1342 (M.D. Ga. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Weston v. Pa.,
    251 F.3d 420 (3d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Williams v. Phila. Hous. Auth. Police Dep't,
    380 F.3d 751 (3d Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Williams v. Runyon,
    130 F.3d 568 (3d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

Witcher v. Sodexho, Inc.,
    478 F. Supp. 2d 663 (D. Del. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Witcher v. Sodexho, Inc.,
    No. 07-2166, 247 Fed. App'x 328 (3d Cir. Sept. 6, 2007). . . . . . . . . . . . . . . . . . . 20, 23

Wright v. Pepsi Cola Co.,
    243 F. Supp. 2d 117 (D. Del. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**OTHER AUTHORITIES** **PAGE**

42 U.S.C. § 2000e-16(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

FED. R. CIV. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Janet F. Jeffries filed the instant Complaint on November 22, 2006.  (Doc. No. 1.)  The Defendant is the Postmaster General of the United States Postal Service ("Defendant" or the "USPS").  Plaintiff alleges that the USPS:  discriminated against her on the basis of her race, gender, and national origin, and that the discrimination was "severe and pervasive and created a hostile and harassing environment . . . ." (Count I); retaliated against Plaintiff after she complained about the discrimination (Count II); and violated Delaware laws prohibiting employment discrimination (Count III).  (Doc. No. 1 at 6-7.)  Plaintiff seeks compensatory and punitive damages.  (Id.)

On February 27, 2007, the USPS moved to dismiss Plaintiff's state law claims (Count III) and punitive damages claim for lack of subject matter jurisdiction.  (Doc. No. 6.)  Plaintiff responded to the USPS's Motion to Dismiss on April 2, 2007.  (Doc. No. 14.)  Plaintiff did not defend her state law claims, but argued that the Court should allow her punitive damages claim to proceed.  (Id.)  The USPS's Motion to Dismiss remains pending.

On March 12, 2007, the Court ordered discovery to be completed by January 8, 2008.  (Doc. No. 12.)  Defendant served its First Set of Interrogatories and Document Requests on August 8, 2007.  (Doc. Nos. 16, 17.)   Plaintiff did not respond to those requests.  On November 29, 2007, the parties jointly requested a sixty-day extension of the discovery deadline.  (Doc. No. 21.)  The Court granted the parties' request and ordered all discovery to be completed by March 10, 2008.  (Doc. No. 22.)  Plaintiff finally responded to Defendant's written discovery requests in early January, 2008.  On January 28, 2008, Defendant took Plaintiff's deposition.  Plaintiff has not served any discovery requests whatsoever.

This is Defendant's opening brief in support of its Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.      Plaintiffs in Title VII cases are required to exhaust their administrative remedies for each claim they wish to bring in federal court, and their failure to do so "is an affirmative defense in the nature of statute of limitations."  Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997); see also 42 U.S.C. § 2000e-16(c).  Here, the only claim that Plaintiff raised in her EEOC complaint was a color discrimination claim.  Plaintiff did not raise her retaliation, hostile work environment, and discriminatory transfer claims, or her gender and national origin discrimination claims, during her EEOC proceedings.  All of those claims should therefore be dismissed for lack of exhaustion.

2.      Plaintiff's race, gender, and national origin discrimination claims, and her retaliation claim, should also be dismissed because there is no evidence – indeed, not even an allegation – that Plaintiff suffered an "adverse employment action" or a "materially adverse action."  Almost all of the harms that Plaintiff complains about do not, as a matter of law, qualify as adverse employment or materially adverse actions.  The only alleged harm that possibly could qualify is the supposed discriminatory transfer, and Plaintiff failed to exhaust that claim.  Moreover, Plaintiff's transfer to the night shift can hardly be considered a "materially adverse action" given all the benefits Plaintiff received from the transfer:  a guarantee of eight hours a day with two days off, medical insurance and vacations, and the ability to bid on other jobs at the USPS.  For these reasons also, all of Plaintiff's claims should be dismissed.

3.      Plaintiff's discrimination claims, and her retaliation claim, should also all be dismissed because Plaintiff has not met her burden to show a prima facie case of discrimination.  Specifically, Plaintiff failed to show that the USPS treated similarly situated employees

2

differently based on their race. Indeed, Plaintiff's testimony shows that the USPS treats employees of different races the same. Plaintiff also failed to show that the USPS retaliated against her. Even though Plaintiff was unhappy about being temporarily moved to the night shift, she admitted that the USPS moved **all** its newly promoted employees to the night shift.

4.    Plaintiff's hostile work environment claim should also be dismissed because there is no evidence to support it. To state a claim for the imposition of a hostile work environment based on race discrimination, a plaintiff must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). Here, there is no evidence to show that Plaintiff suffered "pervasive and regular" race discrimination, and no evidence to hold the USPS vicariously liable for any discrimination.

## STATEMENT OF FACTS

**A.    Background.**

Plaintiff, a white female, has worked for the USPS since 1993, and at the USPS Delaware

Processing and Distribution Center, or the plant, since approximately 1998.  (Compl. ¶¶ 4, 6;

Pl.'s Dep. at 3, 8; App'x at 2-3.)  On November 11, 2003, Plaintiff was involved in an altercation

at work with another employee, Delores Thomas, who is a black female.  (Compl.¶ 7, Pl.'s Dep.

at 18; App'x at 6.)  Plaintiff claims that the plant's Manager of Distribution Operations, John

Williams, a black male, failed to properly investigate the incident between her and Thomas.

(Compl. ¶¶ 11-12.)  Williams also allegedly obstructed Plaintiff's attempt to transfer away from

Thomas.  (Id. ¶ 18.)  Plaintiff also claims that the USPS later placed her on an overnight,

"graveyard" shift, an action that Plaintiff claims was discriminatory and retaliatory.  (Id. ¶ 24.)

Plaintiff also claims that the USPS generally tolerates acts of violence by black

employees, but vigorously reviews acts of violence by white employees.  (Id. ¶ 21.)  Plaintiff

claims that the USPS holds white employees to much higher standards of job performance than

their black co-workers.  (Id. ¶ 23.)  Finally, Plaintiff claims that the USPS tolerates abusive

language by black employees.  (Id. ¶ 22.)  Specifically, Plaintiff claims that Thomas called her a

"bitch" countless times during the days following the incident, a "baby" more than once, and that

someone standing behind Plaintiff said "white honky bitch" one time.  (Pl.'s Dep. at 58-60;

App'x at 16.)

**B.    The Incident Between Plaintiff And Thomas.**

On November 11, 2003, Plaintiff was working on an automation mail sorter machine with

Thomas.  (Id. at 18; App'x at 6.)  Plaintiff claims she said something inocuous to Thomas and

4

Thomas "blew up into a tirade of cussing and screaming" and "pushed in to [Plaintiff] with a tub [of mail] in the mid-section." (Id. at 19; App'x at 6.) Plaintiff claims four USPS employees witnessed the incident: Lynette Marrow, Karen Bayard, Bobby Ford, and Frank Frisby. (Id. at 19-20; App'x at 6.) Plaintiff reported the incident to Angelo Lambert, a black male supervisor. (Id. at 21-22; App'x at 6-7.) Lambert "looked a little alarmed and said he was going to speak to [Thomas]." (Id. at 22; App'x at 7.) Plaintiff felt that Lambert was receptive to her complaint. (Id.)

Plaintiff then went to the ladies' locker room to take a break. (Id. at 21-22; App'x at 6-7.) Plaintiff claims Thomas entered and told Plaintiff she was a "big baby" and a "bitch" and "it got really vulgar." (Id. at 23; App'x at 7.) Plaintiff claims Thomas wanted to physically fight Plaintiff. (Id.) Thomas then "stormed out cussing and screaming." (Id. at 24; App'x at 7.)

## C.    The USPS Investigates The Incident.

Another supervisor then told Plaintiff to go see Lambert. (Id. at 25; App'x at 7.) Plaintiff went to Lambert's office and met with Lambert and Thomas. (Id. at 25-26; App'x at 7-8.) Plaintiff claims Thomas "started screaming and yelling and cussing again." (Id. at 26; App'x at 8.) Plaintiff had an opportunity during the meeting to give her side of the story to Lambert, who told her to also write a statement. (Id. at 27; App'x at 8.) Plaintiff gave Lambert names of witnesses. (Id.) Plaintiff still felt that Lambert was handling the incident in an appropriate manner. (Id.) Plaintiff then left work for the day. (Id. at 29; App'x at 8.)

Plaintiff had the next two days scheduled off and accordingly did not return to work until November 14, 2003. (Id. at 30; App'x at 9.) Soon after Plaintiff arrived at work on November 14 she was asked to go to Williams' office. (Id. at 31-32; App'x at 9.) Plaintiff met privately

5

with Williams and told him about the incident.  (Id. at 32; App'x at 9.)  Plaintiff also gave

Williams her written statement.  (Id.)  Williams said "he was going to look into the witnesses and

see about statements from them."  (Id.)  Plaintiff thought Williams seemed "concerned."  (Id.)

Plaintiff believes Williams began collecting statements from witnesses the next day.  (Id.

at 34; App'x at 10.)  Plaintiff believes all of the witnesses she identified spoke to Williams.  (Id.

at 35; App'x at 10.)  As of November 15, 2003, Plaintiff still had no concerns about the way the

USPS was handling the incident.  (Id. at 35-36; App'x at 10.)

Plaintiff claims that on November 16, 2003, USPS employees on the floor of the plant

began talking about the incident.  (Id. at 36; App'x at 10.)  Plaintiff "was a little embarrassed and

upset about that" and "didn't like answering the questions."  (Id.)  Plaintiff claims that Williams

told her that Lambert had told people on the floor of the plant about the incident, although she

acknowledges many people already knew about the incident because they witnessed it.  (Id. at 37-

39; App'x at 10-11.)

**D.    The USPS Completes Its Investigation And Takes No Action Against Plaintiff Or Thomas.**

Plaintiff did not formally meet with anyone from the USPS about the incident again until

November 26, 2003.  (Id. at 40; App'x at 11.)  On that day Williams called Plaintiff away from

her work station and told her "I'm finished my investigation and no one supported any of your

claims, nothing, zero."  (Id.)  Williams said he had spoken to all of the witnesses.  (Id. at 41;

App'x at 11.)  Plaintiff asked Williams if she could meet with her union representative, one of

the witnesses (Bobby Ford), and Williams.  (Id.)  Williams said, "No problem."  (Id.)

The requested meeting took place that evening.  (Id. at 42; App'x at 12.)  Plaintiff,

Plaintiff's union representative Doris Perry, Ford, and Williams were present.  (Id.)  Plaintiff asked Ford why he had claimed not to see anything, and Ford announced that he wanted to change his statement.  (Id. 43; App'x at 12.)  Ford then wrote a statement claiming that he had heard an argument between Plaintiff and Thomas, that the only thing Plaintiff had said to Thomas was "what's the problem," and that Thomas kept cursing and yelling at Plaintiff.  (App'x at 60.)  Ford **did not** allege that Thomas physically assaulted Plaintiff.  (Id.)

The rest of the meeting was "tense."  (Pl.'s Dep. at 43; App'x at 12.)  Plaintiff claims that Williams told her that if she had acted like Thomas, he would have fired Plaintiff.  (Id.) Williams also told Plaintiff to stay away from Thomas.  (Id. at 45; App'x at 12.)  Williams did not formally discipline Plaintiff.  (Id. at 46; App'x at 13.)  Williams also did not discipline Thomas because the union contract prohibited management from disciplining an employee more than two weeks after alleged misconduct, and by November 26 the two-week window had expired.  (Id. at 123-24; App'x at 32.)

**E.    Plaintiff Files Her EEOC Complaint And Alleges Only Color Discrimination.**

Plaintiff filed her formal complaint with EEOC on February 20, 2004.  (App'x at 41.) Plaintiff's formal complaint alleged that Plainitff was "verbally and physically assaulted and management did nothing in response."  (Id.)  The formal complaint also incorporated the written statement that accompanied Plaintiff's pre-complaint questionnaire.  (Id.; see also App'x at 51.) Plaintiff's formal complaint alleged that the USPS discriminated against her on the basis of her color only.  (App'x at 41.)  Plaintiff could have easily checked boxes to allege that the USPS discriminated against her on the basis of her national origin or gender, or a box to allege that the USPS retaliated against her, but she did not do so.  (Id.)

7

**F.    Williams Investigates Another Incident Involving Plaintiff And Again Does Not Discipline Plaintiff.**

On January 2, 2004, Plaintiff was called into a meeting in Williams' office.  (Pl.'s Dep. at 51; App'x at 14.)  Present were several USPS supervisors and employees, including Williams. (Id.)  Williams told Plaintiff that she had been called to the meeting because someone reported to him that she had pushed Tasha Palmer.[1]  (Id.)  Plaintiff looked at Palmer, who was present, and asked if she thought Plaintiff had pushed her.  (Id. at 52; App'x at 14.)  Palmer said Plaintiff had not.  (Id.)  The meeting concluded after fifteen minutes, and Williams did not discipline Plaintiff. (Id. at 53-54; App'x at 14-15.)

**G.    Plaintiff Thinks Her Supervisors Begin Nitpicking Her.**

Plaintiff began to feel like she was "on the spotlight with a bull's eye" with respect to her supervisors.  (Id. at 61; App'x at 16.)  When Plaintiff would go to the ladies' room she would be paged immediately to return to her work station.  (Id.)  According to Plaintiff, Thomas "was all over the floor socializing" and nothing was said to her.  (Id.)  Plaintiff was also yelled at for going to the water fountain to fill up her bottle with water.  (Id. at 62; App'x at 17.)  Plaintiff kept a diary of events from November, 2003 until January, 2005, which she claims are examples of how her supervisors nitpicked her work.  (Id. at 63; App'x at 68-82.)  Although Plaintiff claims her supervisors nitpicked her work, she admits that no one at the USPS has formally disciplined her since at least November, 2003, i.e., prior to any of the events relevant to this case. (Pl.'s Dep. at 136-37; App'x at 35.)

---

[1]At first Plaintiff thought the person's name was "Tasha Bryant," but later she stated that it was "Tasha Palmer."  (Id. at 99; App'x at 26.)

**H.      Plaintiff Asks For A Transfer Away From Thomas.**

In January, 2004, Plaintiff sought assistance from an employee assistance program counselor (an "EAP" counselor).  (<u>Id.</u> at 55; App'x at 15.)  Plaintiff told the EAP counselor that Thomas had called her "baby," "bitch," and "white honkey bitch," and that Thomas was making Plaintiff feel very uncomfortable.  (<u>Id.</u>)  The EAP counselor suggested that Plaintiff work in an area away from Thomas, and offered to suggest that to Williams.  (<u>Id.</u> at 56; App'x at 15.)

In January, 2004, Plaintiff also told Williams about the things Thomas was saying.  (<u>Id.</u> at 60; App'x at 16.)  Williams "wanted to know who heard it, who saw it.  He wanted witnesses, but there [were] no witnesses."  (<u>Id.</u>)  Plaintiff asked Williams to transfer her from Tour 3, the afternoon shift, to Tour 2, the day shift, which Plaintiff admits is the most desirable shift among USPS employees.  (<u>Id.</u> at 71; App'x at 19.)  Williams did not transfer Plaintiff.  (<u>Id.</u>)  Simply because Williams asked Plaintiff for witnesses to the harassment, Plaintiff decided to give up going to all of her supervisors for help.  (<u>Id.</u> at 120-21; App'x at 31.)  Since January, 2004, Plaintiff has not complained to anyone about her treatment at the USPS.  (<u>Id.</u>)

**I.      Plaintiff Is Promoted And Moved To The Night Shift.**

On September 18, 2004, Plaintiff and four others were promoted from part-time flexible clerks ("PTFs") to full-time regular clerks ("FTRs").  (<u>Id.</u> at 12-13; App'x at 4.)  Under the contract between the union and the USPS, PTFs may or may not get two days off each week, are not given insurance benefits, and are not guaranteed forty hours per week.  (<u>Id.</u> at 8; App'x at 3.)  FTRs, by contrast, receive numerous benefits, including, a guarantee of eight hours each day with two days off, medical insurance and vacations, and the ability to bid on other jobs at the USPS.  (<u>Id.</u> at 12; App'x at 4.)

Prior to September, 2004, Plaintiff was working on Tour 3, the afternoon shift. (Id. at 64; App'x at 17.) Immediately upon her promotion to FTR, Plaintiff was moved to Tour 1, the night shift. (Id.) Plaintiff claims that the contract requires the USPS to keep newly promoted FTRs on the person's prior job and shift for three bidding cycles, which enables the new FTR to bid for and receive a permanent job. (Id. at 67; App'x at 18.) She also claims that the USPS customarily allows new FTRs to remain on their prior job and shift until the FTR bids for and receives a permanent job, even if that takes longer than three weeks. (Id. at 65; App'x at 17.) Plaintiff filed a grievance against management, alleging that the USPS violated the contract by immediately placing her on the night shift, but Plaintiff does not know what became of the grievance. (Id. at 68; App'x at 18.) She does not know if any of the other employees who were also moved to the night shift filed grievances. (Id. at 69-70; App'x at 18-19.)

Even though Plaintiff's move to the night shift allowed Plaintiff to work in a location separated from Thomas, and even though she was now a FTR with all the corresponding benefits, Plaintiff was not happy about the move. (Id. at 70; App'x at 19.) Plaintiff claims the transfer was discriminatory and retaliatory. Plaintiff claims that one of her co-workers, Debbie Callahan, told her that someone else said Plaintiff should consider her move to the night shift a "punishment." (Id.) Plaintiff speculates that the person who said that was a management-level employee, but she does not know if that is true. (Id. at 77-78; App'x at 20-21.) Nevertheless, Plaintiff readily admits that in September, 2004, the USPS moved **all five** of the newly promoted FTRs from the afternoon shift to the night shift. (Id. at 14-15; App'x at 5.) At least three of the employees who were moved to the night shift with Plaintiff were black females. (Id. at 15-16; App'x at 5.) Plaintiff was able to bid back on to the afternoon shift after nine or ten months.

10

(<u>Id.</u> at 121-22; App'x at 31-32.)

**J.    Plaintiff Confirms That She Is *Not* Raising A Hostile Work Environment Claim Before The EEOC.**

On March 31, 2004, the USPS's Office of EEO Compliance and Appeals wrote Plaintiff

and told her that her EEOC complaint had been accepted for an investigation and that it would be

referred to the national EEO Services Office.  (App'x at 56-59.)  The letter cautioned Plaintiff

that the scope of the investigation would include the follow issue only:

> The complainant alleged discrimination based on color (Caucasian) when: on
> November 11, 2003, she was verbally and physically assaulted by another
> employee and management failed to take any action.

(<u>Id.</u> at 56.)  Plaintiff was instructed to reply in writing if she disagreed with the scope of the

investigation.  (<u>Id.</u>)  Plaintiff admits that she did not do so.  (Pl.'s Dep. at 88; App'x at 23.)

Plaintiff's EEOC case was assigned to Administrative Law Judge Lystra A. Harris.  Judge

Harris issued Plaintiff a Notice of Intent To Issue a Decision Without a Hearing (the "Notice").

(App'x at 37.)[2]  Judge Harris mischaracterized Plaintiff's claim as whether Plaintiff "was subject

to hostile work environment harassment based on race on November 11, 2003."  (<u>Id.</u> at 38.)

Plaintiff, through counsel, responded by fling a brief with the agency that made it crystal clear

that Plaintiff was **not** raising a hostile work environment claim.  (<u>Id.</u> at 37-40.)  Specifically,

Plaintiff wrote:

> Further, **the Notice's characterization of [Plaintiff's] claim as being "subject
> to hostile work environment harassment based on race on November 11,
> 2003" is, unfortunately, not the particular claim which [Plaintiff] has
> specifically raised in her Complaint**.  Although [Plaintiff] stated in a submission

---

[2]The actual Notice cannot be located, but the Notice is referenced and quoted in the brief
Plaintiff filed, through counsel, in opposition to the Notice.  Relevant portions of Plaintiff's brief
are included in the Appendix.

11

to the Agency's Manager, EEO Dispute Resolution, South Jersey District, that
"from 11/11/03 until present I continue to work in a hostile environment," the
claim which was accepted for investigation involves her allegation of being
treated differently than similarly situated employees of a different race than her
who were involved in similar incidents in the work place but had their complaints
of the alleged incidents promptly investigated and received lenient discipline or no
discipline whatsoever while the employees of [Plaintiff's] race were severely
disciplined if not removed. . . . **Accordingly, [Plaintiff] contends, as the record
supports, that [Plaintiff's] Complaint of Discrimination is based on the claim
of disparate treatment and not "hostile work environment harassment" as
referenced in the Notice** . . . .

(Id. at 38-40 (emphasis added).)

Accordingly, on October 7, 2005, Judge Harris issued an Order to Show Cause in which

she accepted that Plaintiff was not raising a hostile work environment claim.  (Id. at 63-65.)  On

December 9, 2005, Judge Harris issued her decision dismissing Plaintiff's EEOC Complaint

without considering a hostile work environment claim.  (Id. at 61-62.)  Judge Harris concluded

that Plaintiff's disparate treatment discrimination claims had no merit because Plaintiff had not

alleged that she was aggrieved within the meaning of Title VII.  (Id. at 62.)  Judge Harris's

decision was affirmed by the Commission on September 9, 2006.  (Jeffries v. Potter, Appeal No.

01A61779 (EEOC-OFO Aug. 25, 2006) ("Neither complainant nor the coworker were

disciplined for the incident.  Accordingly, the agency's final decision dismissing complainant's

complaint is affirmed."), App'x at 66.)  On November 22, 2006, Plaintiff filed the instant action.

(Doc. No. 1.)

**K.     Plaintiff Admits During Her Deposition That The USPS Disciplines Both Black And
White Employees For Workplace Misconduct.**

Plaintiff's EEOC complaint alleged that the USPS treats similarly situated white and

black employees differently.  (App'x at 41.)  During her deposition, however, Plaintiff admitted

that the USPS disciplines both black and white employees.  Indeed, two of the five incidents that

Plaintiff cited in her pre-complaint questionnaire as examples of how the USPS treats blacks

better than whites actually are examples of how the USPS treats blacks and whites the same.  For

example, Plaintiff recounted an incident where USPS employee Felicia Camper, a black female,

verbally attacked Bo Driggers, a white male.  (Pl.'s Dep. at 82; App'x at 22.)  According to

Plaintiff, Camper and Driggers were ordered to leave the building, and Camper was given a

verbal warning.  (Id. at 82-83; App'x at 22.)  No discipline was taken against Driggers.  (Id. at

83; App'x at 22.)

　　　Plaintiff also recalled that USPS employee Mike Potalek assaulted one of his coworkers,

Bill Landis, a white male.  (Id.)  Plaintiff alleged that the USPS fired Potalek as a result of that

incident.  (Id. at 84; App'x at 22.)  Accordingly, Plaintiff's testimony shows that, contrary to her

allegations, the USPS is willing to discipline a black female (Camper) for abusing a white male

(Driggers), and willing to protect a white employee (Landis) by firing those who abuse them

(Potalek).

13

**ARGUMENT**

I.   **APPLICABLE LEGAL STANDARDS.**

    A.   **Standard Of Review On A Motion Pursuant To Fed. R. Civ. P. 56.**

Summary judgment is appropriate where – as here – the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party," here, the Plaintiff. Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan, 439 F. Supp. 2d 337, 339 (D. Del. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id..

    B.   **The McDonnell Douglas Burden-Shifting Framework.**

Under the familiar McDonnell Douglas burden-shifting framework – which applies to Plaintiff's Title VII discrimination and retaliation claims – Plaintiff has the burden at the summary judgment stage to produce prima facie evidence of discrimination or retaliation. See, e.g., Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157-58 (3d Cir. 1995). If Plaintiff meets that burden, the Defendant can still prevail on summary judgment if it

14

articulates a legitimate, non-discriminatory reason for its acts.  McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802-04 (1973).  The burden would then shift back to Plaintiff to prove that

the Defendant's  explanation is merely a pretext for discrimination or retaliation.  Id. at 804.  It is

important to note that although "the burden of production may shift" during the McDonnell

Douglas inquiry, the "'ultimate burden of persuading the trier of fact that the [employer]

intentionally discriminated against the [employee] remains at all times with the [employee]. "

Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 n.3 (3d Cir. 2004).

## II.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT, RETALIATION, AND DISCRIMINATORY TRANSFER CLAIMS, AND HER GENDER AND NATIONAL ORIGIN DISCRIMINATION CLAIMS, SHOULD ALL BE DISMISSED FOR LACK OF EXHAUSTION.

### A.    Title VII's Exhaustion Requirement.

Plaintiffs in Title VII cases are required to exhaust their administrative remedies, and

their failure to do so "is an affirmative defense in the nature of statute of limitations."  Williams,

130 F.3d at 573; 42 U.S.C. § 2000e-16(c); Wright v. Pepsi Cola Co., 243 F. Supp. 2d 117, 122

(D. Del. 2003) (dismissing Title VII claims for lack of exhaustion).

The test for determining whether a plaintiff exhausted her administrative remedies "is

whether the acts alleged in the subsequent [district court complaint] . . . are fairly within the

scope of the prior EEOC complaint, or the investigation arising therefrom."  Antol v. Perry, 82

F.3d 1291, 1295 (3d Cir. 1996) (internal quotation marks omitted).  An EEOC complaint does

not encompass a given claim merely because investigation would reveal facts that could support

the given claim.  Id. at 1296.  Rather, "the parameters of the civil action in the district court are

defined by the scope of the EEOC investigation which can reasonably be expected to grow out of

15

the charge of discrimination."  Atkinson v. LaFayette Coll., 460 F.3d 447, 453 (3d Cir. 2006)

(internal quotation marks omitted).

### B. Plaintiff Failed To Exhaust Her Hostile Work Environment, Retaliation, And Discriminatory Transfer Claims, And Her Gender, and National Origin Discrimination Claims.

Plaintiff's EEOC complaint alleges only color discrimination.  (App'x at 41.)  Her EEOC

complaint does not allege that anyone retaliated against her for complaining about

discrimination.  Nor does it allege discrimination based on gender or national origin.  Plaintiff

easily could have checked boxes on her EEOC complaint form to allege illegal retaliation, or

gender or national origin discrimination, but she chose not do so.  As a result, Plaintiff's

retaliation and gender and national origin discrimination claims should all be dismissed for lack

of exhaustion.[3]

Plaintiff's hostile work environment claim is also unexhausted.  During her EEOC

proceedings, Plaintiff specifically denied that she was raising a hostile work environment claim,

going so far as to correct the Administrative Law Judge who thought she had raised such a claim.

As a result, the Judge did not consider a hostile work environment claim.  For this reason alone,

---

[3]Plaintiff's pre-complaint questionnaire alleged national origin, race, and gender discrimination (but not retaliation).  (App'x at 42.)  However, allegations in a pre-complaint do not suffice to exhaust Title VII claims.  See, e.g., Park v. Howard Univ., 71 F.3d 904, 908 (D.C. Cir. 1995) ("[T]he pre-complaint questionnaire is not the same as an EEOC charge . . . ."); Yang v. Astrazeneca, No. 04-4626, 2005 WL 327539, at *3 (E.D. Pa. Feb. 10, 2005) (("[M]aking allegations on the questionnaire is insufficient to exhaust administrative remedies.  Rather, the allegations must appear in the formal charge signed by the claimant and served on the respondent.") (citations omitted); Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 787-88 (W.D. Pa. 2000) (same).  Furthermore, even if the boxes for retaliation, or race, national origin, or gender discrimination had been checked, that still be insufficient to exhaust those claims without supporting allegations in the narrative section of the charge.  See, e.g., Johnson v. Chase Home Fin., 309 F. Supp. 2d 667, 672 (E.D. Pa. 2004).

this Court should conclude that Plaintiff's hostile work environment claim is not within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Atkinson, 460 F.3d at 453 (3d Cir. 2006).

Moreover, Plaintiff's only mention of a hostile work environment is one fleeting reference buried in a statement that otherwise focuses exclusively on Plaintiff's allegation that Thomas verbally and physically assaulted her, and that the USPS failed to adequately respond. (App'x at 51.) Nowhere does Plaintiff mention in that statement her allegations that Thomas continued to call her names, or that other employees and supervisors mistreated her, and those are the allegations that form the basis of Plaintiff's purported hostile work environment claim. Presented only with a single fleeting reference to a hostile environment, the EEOC could not reasonably be expected to investigate such a claim.

Another court within this circuit has concluded that a plaintiff's fleeting reference to a hostile work environment claim during EEOC proceedings is not enough to exhaust such a claim where the rest of the plaintiff's allegations focus on other kinds of discrimination. In Burns v. Potter, the plaintiff's discrimination claims focused on his allegations that the USPS failed to treat him equally when it flunked him out of a sixteen-week training program after only eight weeks. No. 1:04-CV-2793, 2007 WL 406201, at *2-3 (M.D. Pa. Feb. 2, 2007). The plaintiff in Burns claimed that the instructors for the program were prejudiced against him on the basis of his gender and age. Id. In his pre-hearing statement before the EEOC, plaintiff also stated that certain sexist comments by the instructors corroborated his allegations "that a hostile environment was created and maintained." Id. at *4 n.17. The court concluded that this "fleeting reference [was] insufficient to put defendant on notice of Burns' intent to bring a hostile

17

environment claim." Id.

For the same reasons, this Court should hold that Plaintiff's fleeting reference about a "hostile environment" in her EEOC statement was not sufficient to put the USPS on notice that the Plaintiff was pursuing a hostile work environment claim. This is especially true because the rest of Plaintiff's statement focused exclusively on the incident with Thomas and the USPS's response to that incident, and because Plaintiff did not mention any of the allegations in her EEOC complaint that she now claims form the basis of her purported hostile work environment claim. For all of these reasons, this Court should find that Plaintiff failed to exhaust her hostile work environment and retaliation claims, and those claims should be dismissed.

Plaintiff also failed to exhaust her claim that the USPS discriminated against her when it promoted Plaintiff to FTR and assigned her to the night shift. Plaintiff alleges that she was assigned to the night shift for nine or ten months beginning on September 18, 2004. Plaintiff filed her EEOC complaint on February 20, 2004, nearly seven months before she was transferred. As a result, obviously, the EEOC could not reasonably be expected to investigate Plaintiff's claim that the USPS discriminated against her when it transferred her to the night shift. See, e.g., National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 -14 (2002) (holding that "discrete discriminatory acts" must be independently exhausted and explaining that "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify").

III.    **PLAINTIFF'S RACE, GENDER, AND NATIONAL ORIGIN DISCRIMINATION CLAIMS, AND RETALIATION CLAIMS, SHOULD ALL BE DISMISSED BECAUSE PLAINTIFF HAS NOT PRODUCED EVIDENCE OF A PRIMA FACIE CASE OF DISCRIMINATION OR RETALIATION.**

A.    **Plaintiff Has The Burden To Produce Evidence Of A Prima Facie Case of Discrimination And Retaliation.**

To prove a prima facie case of race discrimination, Plaintiff must show: (1) that she is a member of a protected class; (2) that she was qualified for the position in question; (3) that she suffered an adverse employment action; and (4) that similarly situated employees, not of the protected class, received more favorable treatment. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 n. 6 (1981). Plaintiff need not show an adverse employment action to prove a prima facie case of retaliation, but she still must point to a "materially adverse action." <u>See</u> <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2415 (2006). Here, Plaintiff has not shown or even alleged that she suffered an adverse employment action or a materially adverse action (except possibly with respect to her unexhausted discriminatory transfer claim). Also, Plaintiff's testimony shows that the USPS does not discriminate between black and white employees with respect to transfers and workplace discipline. For both of these reasons, Plaintiff's race, gender, and national origin discrimination claims, and retaliation claims, should all be dismissed.[4]

B.    **Plaintiff's Discrimination Claims Should Be Dismissed Because She Has Failed To Show That The USPS Took Any "Adverse Employment Action" Against Her.**

Almost all of the harms that Plaintiff complains about are, as a matter of law, not

_____

[4]During her deposition, Plaintiff abandoned her gender and national origin discrimination claims. (Pl.'s Dep. at 138; App'x at 36.)

"adverse employment actions."  As a result, Plaintiff's discrimination claims should be dismissed.

For example, Plaintiff alleges that the USPS failed to properly investigate her allegation that Thomas assaulted her.  (Compl. ¶¶ 7, 9-15.)  That allegation, even if it is true, does not show that Plaintiff suffered an adverse employment action.  See, e.g., Wehunt v. R.W. Page Corp., 352 F. Supp. 2d 1342, 1352-53 (M.D. Ga. 2004) (holding that an employer's alleged failure to discipline black co-employees, which caused their white co-worker's workload to increase, was not an adverse employment action); see generally Storey v. Burns Intern. Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (explaining that "'an adverse employment action' under Title VII is an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment'").

In Witcher v. Sodexho, Inc., for example, the plaintiff alleged that his employer discriminated against him on the basis of his age when it suspended him with pay for cursing. 478 F. Supp. 2d 663, 669 (D. Del. 2007).  The plaintiff alleged that his company tolerated cursing by younger employees.  Id.  The Honorable Sue L. Robinson concluded that the plaintiff had not shown an adverse employment action because "Plaintiff was paid for his week-long suspension, and suffered no additional consequences as a result of the incident."  Id. at 674.  The Third Circuit affirmed in a non-precedential opinion.  See Witcher v. Sodexho, Inc., No. 07-2166, 247 Fed. App'x 328, 331 (3d Cir. Sept. 6, 2007) (holding that plaintiff had not shown a prima facie case of age discrimination because "[e]ven accepting as true appellant's contention that Sodexho's policies governing language use and confronting supervisors were unevenly enforced, and even if he could show that he was singled out because of his age, in the end, the

company did not discipline him, suspend him without pay, or otherwise sanction him").  Thus, even if the USPS applies its disciplinary policies unevenly as the Plaintiff claims, her discrimination claims should still be dismissed because the USPS never disciplined or took any other adverse employment action against her.

Also, Plaintiff alleges that the USPS discriminated against Plaintiff when Williams briefly investigated Plaintiff for pushing a co-worker in the ladies room, even though Williams concluded after fifteen minutes that the charge was unsupported and took no action against Plaintiff.  (Compl. ¶ 19; Pl.'s Dep. at 53; App'x at 14.)  It is well settled, however, that an employee who is disciplined does not suffer an adverse employment action if the discipline is temporary and does not affect the employee's duties, hours, pay, or status.  See, e.g., Weston v. Pa., 251 F.3d 420, 430-431 (3d Cir. 2001) (holding that two written reprimands, temporary in nature and not affecting duties, hours, pay, or status, are not adverse employment actions); Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004) (holding "that a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action"); Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir. 2000) (holding that a police officer suffered no adverse employment action where he was temporarily placed on paid administrative leave during an internal investigation).  If temporary, minor disciplinary measures are not adverse employment actions, then a fifteen-minute investigation of an employee that results in no discipline whatsoever – which is all that occurred here – cannot be an adverse employment action.

Also, Plaintiff alleges that she is subjected to "excessive corrective instructions" and "nitpicking," unlike, she claims, other USPS employees who are black.  (Compl. ¶¶ 23-24.)

21

Even if that were true, Plaintiff's claims should still be dismissed because corrective instructions and nitpicking are not adverse employment actions.  See, e.g., Weston, 251 F.3d at 430-431; Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 n. 3 (2d Cir. 1996) (holding that a supervisor's "nastiness" is not an adverse employment action); Hewlett v. Waffle House, Inc., No. 3:04-CV-111(CDL), 2006 WL 1582423, at *7 (M.D. Ga. June 5, 2006) ("Although performance nitpicking and a cold relationship with a supervisor might cause an employee to lose some self-esteem, the federal employment laws are not a 'general civility code,' and they do not make actionable the 'ordinary tribulations of the workplace.'"); Speer v. Rand McNally & Co., 123 F.3d 658, 664 (7th Cir. 1997) (holding that plaintiff did not suffer a materially adverse employment action when her boss "yelled at her [and] did not make her feel as if she was part of the work group"); Fitzhugh v. Topetzes, No. 1:04-CV-3258-RWS, 2006 WL 2557921, at *7 (N.D. Ga. Sept. 1, 2006) (holding that "increased supervision cannot reasonably be considered [an] adverse [employment action].").

Plaintiff also alleges that the USPS does not thoroughly investigate acts of workplace violence when those acts are committed by blacks, even though the USPS "vigorously" investigates acts and threats of violence by whites.  (Compl. ¶¶ 20-21.)  However, as explained above, it is not an adverse employment action to investigate an employee, see, e,.g., Peltier, 388 F.3d at 988, nor is it an adverse employment action to fail to discipline an employee's co-workers, see, e.g., Wehunt, 352 F. Supp. 2d at 1352-53.  Also, an employer does not commit an adverse employment action merely by applying its disciplinary rules unevenly – to make out a prima facie case of discrimination a plaintiff must still point to some "action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or

22

privileges of employment'" Storey, 390 F.3d at 764; see also Witcher, 247 Fed. App'x at 331

(holding that a plaintiff's mere allegation that his or her employer enforces its rules unevenly

does not show an adverse employment action).

Finally, Plaintiff appears to allege that she suffered an adverse employment action when

she was allegedly improperly placed on the overnight "graveyard" shift for a period of

approximately nine months beginning in September, 2004. (Compl. ¶ 24.) Many courts have

found that a temporary change in work hours is not an adverse employment action. See, e.g.,

DeMars v. O'Flynn, 287 F. Supp. 2d 230, 245-46 (W.D.N.Y. 2003) (holding a transfer of an

employee between the day and night shifts was not an adverse employment action). Courts have

specifically held that the USPS does not commit an adverse employment action when it assigns

an employee to a different shift. See, e.g., Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004)

(holding that the USPS did not commit an adverse employment action when it changed an

employee's shift); Mayes v. Potter, 418 F. Supp. 2d 1235, 1242 n.7 (D. Colo. 2006) (same).

The Third Circuit, however, has concluded that changing an employee's shift could be an

adverse employment action, if the change-in-shift leaves the employee with less free time and

requires the employee to work weekends. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d

778, 787-88 (3d Cir. 1998). Here, there is no evidence that the change in Plaintiff's shift had any

affect on  Plaintiff except to require her to adjust her sleeping patterns. (See Pl.'s Dep. at 70.)

Moreover, Plaintiff's transfer to the night shift was accompanied by a promotion and substantial

benefits. Accordingly, Mondzelewski does not apply. Also, as explained above, even if the

alleged discriminatory transfer did qualify as an adverse employment action, Plaintiff's

discriminatory transfer claim should still be dismissed because Plaintiff did not exhaust that

claim.  That claim should also be dismissed because, as explained below, Plaintiff cannot show

that the USPS treats similarly situated employees differently based on their race with respect to

shift transfers.

**C.    Plaintiff's Retaliation Claim Should Be Dismissed Because She Has Failed To Show That The USPS Took Any "Materially Adverse Action" Against Her.**

To prove a prima facie case of illegal retaliation, Plaintiff need not show an adverse

employment action, but she still must show that the USPS took some "materially adverse" action,

i.e., action that is "likely to deter victims of discrimination from complaining to the EEOC."

Burlington Northern, 126 S.Ct. at 2415.  "And normally petty slights, minor annoyances, and

simple lack of good manners will not create such deterrence."  Id.  Here, the retaliation against

Plaintiff allegedly consisted of increased supervision, nitpicking, and rudeness – i.e., just the sort

of petty slights, minor annoyances, and lack of good manners the Supreme Court held were not

materially adverse actions.  Plaintiff's retaliation claim should be dismissed for this reason also.

See also Morrison v. Carpenter Tech. Corp., No. 05-1922, 193 Fed. App'x. 148, 154 (3d Cir.

Aug. 22, 2006) (holding that an employee did not suffer a materially adverse action from a

"corrective performance review" because the employee failed to "identify, much less establish,

any harm or injury produced by the corrective performance review").

**D.    Plaintiff's Discrimination And Retaliation Claims Should Also Be Dismissed Because She Has Also Failed To Show That Similarly Situated Employees Of A Different Race Received Preferential Treatment.**

The third element of Plaintiff's prima facie case requires that she show that similarly

situated employees of a different race received preferential treatment.  Burdine, 450 U.S. at 253

n. 6.  Plaintiff must compare her situation to other USPS employees who were "similarly situated

in all relevant respects." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1556 (11th Cir. 1997); <u>see also</u> <u>Red</u>

<u>v. Potter</u>, No. 05-5256, 211 Fed. App'x. 82, 84 (3d Cir. Nov. 20, 2006) (same); <u>Singh v.</u>

<u>Wal-Mart Stores, Inc.</u>, No. 98-1613, 1999 WL 374184, at *7 (E.D. Pa. June 10, 1999) (collecting

cases).  Here, Plaintiff claims that the USPS discriminates against whites because it applies its

disciplinary rules to whites and blacks unevenly.  Plaintiff also claims that the USPS

discriminated and retaliated against her when it promoted her to FTR and assigned her to the

night shift in September, 2004.  Plaintiff's claims have no merit because her own testimony

shows that the USPS does not discriminate or retaliate.

First of all, Plaintiff testified that the USPS disciplines both black and white employees

for workplace misconduct.  For example, according to Plaintiff, USPS employee Felicia Camper,

a black female, verbally attacked Bo Driggers, a white male.  (Pl.'s Dep. at 82; App'x at 22.)

Camper and Driggers were ordered to leave the building, and Camper was given a verbal

warning.  (<u>Id.</u> at 82-83; App'x at 22-23.)  No discipline was taken against Driggers.  (<u>Id.</u> at 83;

App'x at 23.)

Plaintiff also recalled that USPS employee Mike Potalek assaulted one of his coworkers,

Bill Landis, a white male.  (<u>Id.</u>)  Potalek was fired as a result of that incident.  (<u>Id.</u> at 84; App'x at

23.)  Accordingly, Plaintiff's testimony shows that, contrary to her allegations, the USPS is

willing to discipline a black female (Camper) for abusing a white male (Driggers), and willing to

protect a white employee (Landis) by firing those who abuse them (Potalek).  Thus, with respect

to Plaintiff's claim that the USPS applies its disciplinary rules unevenly, Plaintiff cannot prove a

prima facie case of discrimination.  <u>See, e.g.</u>, <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983

F.2d 509, 538-39 (3d Cir. 1992) (holding that evidence that the plaintiff's employer treated two

male employees the same as plaintiff precluded her gender discrimination claim).

Plaintiff also claims that the USPS discriminated and retaliated against her when it assigned her to the night shift in September, 2004. However, Plaintiff admits that in September, 2004, the USPS moved **all five** of the newly-converted FTRs from the afternoon shift to the night shift. (Pl.'s Dep. at 14-15; App'x at 5.) At least three of the employees who were moved to the night shift with Plaintiff were black females. (Id. at 15-16; App'x at 5.) Plaintiff was able to bid back on to the afternoon shift after nine or ten months. (Id. at 121-22; App'x at 31-32.) Because Plaintiff admits that in September, 2004, the USPS moved all the relevant employees to the night shift, including both black and white employees, Plaintiff has failed to raise an inference that the USPS was motivated by either a discriminatory or retaliatory animus when it moved Plaintiff to the night shift. For all of these reasons, Plaintiff has failed to raise a prima facie case of discrimination or retaliation, and all of her claims should be dismissed.

## IV.   PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM SHOULD ALSO BE DISMISSED BECAUSE THERE IS NO EVIDENCE TO SUPPORT IT.

To state a claim for the imposition of a racially hostile work environment, a plaintiff must show that:  (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Caver, 420 F.3d at 262. The harassment must be so extreme as to amount to a change in the terms and conditions of employment. Id.

As explained above, the nitpicking and rudeness that Plaintiff experienced do not constitute an adverse employment action. In addition, the hostile comments that Plaintiff

allegedly heard were not pervasive and regular enough to create a hostile work environment.

Plaintiff testified that Thomas called her a "bitch" countless times during the days following the

incident, a "baby" more than once, and that someone standing behind Plaintiff said "white honky

bitch" one time.  (Pl.'s Dep. at 58-60; App'x at 16.)  Those allegations do not suffice.  See, e.g.,

Kidd v. MBNA America Bank, N.A., 224 F. Supp. 2d 807, 813-14 (D. Del. 2002) (holding that

two comments disparaging to plaintiff's national origin did not create a hostile work

environment), aff'd by 93 Fed. App'x. 399 (3rd Cir. Mar 25, 2004); Calloway v. E.I. DuPont de

Nemours & Co., No. 98-669-SLR, 2000 WL 1251909, at *6 (D. Del. Aug. 8, 2000) ("At most,

the evidence shows that over a two-month period plaintiff was subjected to sporadic, unwelcome

conduct and disparaging utterances.  In sum, a rational factfinder could not reasonably conclude

that the conduct complained of amounts to the 'pervasive and regular' harassment that Title VII

was enacted to redress.").  For all of these reasons, Plaintiff has failed to show that she

experienced "pervasive and regular" harassment, and her hostile work environment claim should

therefore be dismissed.

Plaintiff's hostile work environment claim should also be dismissed because Plaintiff

admits that she did not complain to anyone about the vast majority of the incidents that she

claims created a hostile environment.  Plaintiff claims that when she complained to her

supervisor in January, 2004, that someone had called her a "white honky bitch," Williams wanted

to know if there were any witnesses.  (Pl.'s Dep. at 59; App'x at 16.)  Simply because Williams

asked Plaintiff if there were any witnesses to the harassment, Plaintiff "totally" gave up going to

her supervisors for help.[5]  (Id.)  As a result, the USPS cannot be liable for any alleged harassment

after January, 2004.  See, e.g., Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 601-02 (M.D.

Pa. 2002) (dismissing hostile work environment claim because the plaintiff did not complain to

her supervisors about the alleged harassment).  For all of these reasons, Plaintiff's hostile work

environment claim should be dismissed.

---

[5]Given the bad blood between Plaintiff and Thomas, and the fact that Williams had
already determined that Plaintiff's prior claim of an assault by Thomas was unfounded, it was
perfectly reasonable for Williams to ask Plaintiff if there were any witnesses to this new charge
of harassment by Thomas.

## CONCLUSION

For all of the above reasons, the Defendant respectfully requests that summary judgment be entered in its favor and that Plaintiff's claims be dismissed.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By:    /s/ Seth M. Beausang
Seth M. Beausang (De. I.D. No. 4071)
Assistant United States Attorney
The Nemours Building
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

Attorney for Defendant

29

# Defendants' Appendix

# Part 1

Jeffries  v. Potter, Postmaster General, United States Postal Service

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JANET F. JEFFRIES,                    )
                                      )
              Plaintiff,              )
                                      )    Civil Action
v.                                    )    No. 06-CV-707
                                      )
JOHN E. POTTER, POSTMASTER GENERAL,)
UNITED STATES POSTAL SERVICE,         )
                                      )
              Defendants.             )


            Deposition of JANET F. JEFFRIES taken
pursuant to notice at the offices of the United States
Attorney's Office, 1007 N. Orange Street, Suite 700,
Wilmington, Delaware, beginning at 1:00 p.m. on
Monday, January 28, 2008, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        HERBERT G. FEUERHAKE, ESQUIRE
        LAW OFFICE OF HERBERT G. FEUERHAKE
          521 West Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SETH M. BEAUSANG, ASSISTANT UNITED STATES
                              ATTORNEY
        UNITED STATES ATTORNEY'S OFFICE
          1007 Orange Street, Suite 700
          Nemours Building
          Wilmington, Delaware  19801
          For the Defendants



                WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801

               (302) 655-0477

               www.wilfet.com

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

2

1      JANET F. JEFFRIES, the deponent herein,
2  having first been duly sworn on oath, was examined and
3  testified as follows:
4  BY MR. BEAUSANG:
5      Q.  Good afternoon, Ms. Jeffries, my name is Seth
6  Beausang and I'm an Assistant U.S. Attorney
7  representing the postal service in the lawsuit that
8  you filed against the postal service.
9      A.  Yes.
10     Q.  Have you ever given a deposition before?
11     A.  No.
12     Q.  It's not very hard.  There are a couple rules
13 that everyone tries to follow.  One of those is that
14 all of your responses have to be verbal because the
15 court reporter is taking down everything you say and
16 later on there will be a transcript of everything for
17 your attorney and myself to review.  Is that okay?
18     A.  Yes.
19     Q.  Another rule is along the same lines that we
20 should try not to interrupt each over because the
21 court reporter won't be able to take down that
22 clearly.  I'll wait until you finish giving your
23 answer before I ask another question and if you could
24 wait until I finish asking my question before you give
25 an answer.  Okay?

3

1      A.  Yes.
2      Q.  If at any time I ask a question that is
3  confusing to you and you don't understand, feel free
4  to interrupt me and ask me to explain it or ask any
5  question that you feel that is appropriate because if
6  I ask a question and you answer, then I'm going to
7  assume that you understood the question and are
8  responding to the question.  Okay?
9      A.  Yes.
10     Q.  Are you taking any kind of medication that you
11 think would interfere with your ability to testify
12 today?
13     A.  No.
14     Q.  Is there any reason that you can think of at
15 all that would affect your ability to testify clearly
16 and truthfully today?
17     A.  No.
18     Q.  During the deposition I'll be showing you a
19 number of exhibits and the first thing I want to do is
20 go through your employment history, but I see in one
21 of your declarations you have listed —
22     MR. BEAUSANG:  I will have this marked as
23 Exhibit 1.
24     (Jeffries Deposition Exhibit No. 1 was
25 marked for identification.)

4

1  BY MR. BEAUSANG:
2      Q.  Ms. Jeffries, before you you have a document
3  that has been marked as Jeffries-1.  Do you recognize
4  the document?
5      A.  Yes.
6      Q.  What is it?
7      A.  It's my decoration of I believe July '05.
8      Q.  If you turn to the last page, Bates number 10,
9  it has a date?
10     A.  Yes, July 20, '05.
11     Q.  On the first page of Exhibit Jeffries-1 I guess
12 paragraph three and going onto the second page there
13 is what looks like your employment history at the post
14 office, is that right?
15     A.  That's correct.
16     Q.  So, you started at the post office in December
17 of 1993, right?
18     A.  Yes.
19     Q.  What job were you?
20     A.  I was a Christmas casual clerk.
21     Q.  What is that?
22     A.  It's a temporary employment for the holiday,
23 which is very heavy.
24     Q.  Were you a window clerk or something else?
25     A.  No.  I worked in the Dover post office.  I was

5

1  a clerk sorting mail.
2      Q.  How many hours did you work a week, if you
3  remember?
4      A.  I think it was approximately five hours a day.
5      Q.  Did you hold that position until April of 1994?
6      A.  No.  That was only for the month of December.
7  Then, I re-applied.
8      Q.  In April of 1994?
9      A.  Yes.
10     Q.  What position were you hired for in April '94?
11     A.  That was an RCR carrier in Hartley.
12     Q.  What is a RCR carrier?
13     A.  That's a temporary carrier.
14     Q.  You were like a letter carrier delivering mail?
15     A.  Yes.
16     Q.  And appears you held that job for approximately
17 just shy of one year?
18     A.  Right.
19     Q.  Was that a full-time job?
20     A.  No.
21     Q.  What was it?
22     A.  That was a temporary position.
23     Q.  Is there a difference between a temporary
24 position and what is called a part-time flexible
25 position?

2 (Pages 2 to 5)

Jeffries  v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

**6**

1   A.  Yes.
2   Q.  Can you explain it?
3   A.  Well, temporary is just what it says,
4   temporary.  You have no further employment other than
5   the beginning and end that they told you, you would be
6   employed to this point.  PTF is semi-permanent.  You
7   don't really have any benefits, but you are employed
8   by the postal service until such time as they convert
9   you to full-time.
10  Q.  The temporary position that you were hired for
11  in April 1994 did they give you a specific end date
12  for that position?
13  A.  I'm not certain, but I did re-apply and take
14  the test, which would get me into the PTF position.
15  Q.  When did you do that?
16  A.  I'm not sure.
17  Q.  Do you think you did that in 1995 or sometime
18  later?
19  A.  I would say it was between April and March of
20  '95.
21  Q.  So, again, obviously all these questions are to
22  the best of your recollection.  Obviously this was a
23  long time ago?
24  A.  It really was.  It's a little blurry.
25  Q.  As you sit here today your best recollection is

**7**

1   that in '95 you think you were accepted into a
2   part-time flexible position?
3   A.  From April '94 to March '95 I worked at Hartley
4   as a CRC.  As to when I took the test I don't recall.
5   Q.  Explain what you mean when you say took the
6   test.  I don't understand.
7   A.  You have to take a test to get — even to work
8   at the postal service, you have to take certain oaths,
9   sanctity of the mail, and that you are qualified to do
10  the job.  I believe they changed the format of the
11  test so I had to take two of them, as I recall, and I
12  don't remember when I took it, but it was in that time
13  frame.
14  Q.  Your best recollection is that you were hired
15  for a temporary position and then sometime after that
16  you took a test?
17  A.  Yes.
18  Q.  And then as a result of that test you were
19  accepted into a part-time flexible position?
20  A.  As RCR.  They don't have PTF's as carriers.
21  Q.  You took a test and then you continued on in
22  your temporary RCR carrier position?
23  A.  Yes.
24  Q.  Do you recall when you became a part-time
25  flexible clerk?

**8**

1   A.  That would have been in '98, 1998, when I went
2   to the plant.
3   Q.  Can you describe for us what it means to be a
4   part-time flexible clerk.
5   A.  What it is you work as many hours as you are
6   required.  You may or may not get two days off.  You
7   have no insurance and you have no guarantees of a 40-
8   hour work week.
9   Q.  Are you guaranteed any minimum amount of hours
10  per day?
11  A.  Four hours a day.
12  Q.  You are guaranteed a minimum of four hours a
13  day, but you are not guaranteed 40 hours per week?
14  A.  Correct.
15  Q.  You may or may not get two days off so you
16  could have to work all seven days?
17  A.  Correct.
18  Q.  But you could work even less than that, right?
19  A.  Up to four hours a day, yes.
20  Q.  Do you work every day as a part-time flexible?
21  A.  Yes.
22  Q.  Even though you may or may not get two days off
23  some weeks you do get two days off, right?
24  A.  It's totally flexible.  If the mail volume
25  dictates that you are not needed, then you don't work,

**9**

1   but you are guaranteed four hours a day and that's
2   about it.
3   Q.  Do you know whether or not those characteris-
4   tics of a part-time flexible clerk are they set forth
5   in a collective bargaining agreement between the union
6   and the post office?
7   A.  I believe it is.
8   Q.  From looking back to Jeffries-1 from March '98
9   to January 2003 you worked at the plant you were a
10  part-time flexible clerk, right?
11  A.  Yes.
12  Q.  And you were a flat sorter?
13  A.  Yes.
14  Q.  What is that?
15  A.  The machine sorts magazine size mail and
16  depending on how you score on the test it decides
17  whether you are going to be a regular automation clerk
18  or flat sorter.  I was deemed a flat sorter.
19  Q.  As a flat sorter you are standing before a
20  machine doing what?
21  A.  Feeding the mail and dispatching the tubs and
22  pushing out the equipment to the trucks.
23  Q.  And this job we are talking about looking back
24  to Jeffries-1, there is an indication that says T-3,
25  what does that mean?

3 (Pages 6 to 9)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

10

1    A.  Tour 3.
2    Q.  What is tour 3?
3    A.  That's during the day, but not early day,
4  middle afternoon to evening.
5    Q.  There are three shifts at the post office,
6  right?
7    A.  That's right.
8    Q.  Tour 1, 2 and 3?
9    A.  That's right.
10    Q.  And tour 3 I think you just said is sometime in
11  the afternoon to sometime at night, is that right?
12    A.  That's right.
13    Q.  And what is tour 1?
14    A.  Tour 1 is overnight, basically six p.m. all
15  through the night.
16    Q.  And then tour 2 obviously is?
17    A.  Daylight, six in the morning until two in the
18  afternoon.
19    Q.  When you were hired as a part-time flexible
20  clerk in 1998, did you have any choice as to what
21  shift you were going to work?
22    A.  No, I don't think so.
23    Q.  I'm aware there is a bidding system at the post
24  office, is that right?
25    A.  Yes.

---

11

1    Q.  Did you bid for that job?
2    A.  No.  You can't bid unless you are a full-time
3  regular.
4    Q.  Part-time clerk they just assign you to a job?
5    A.  Right, that's right.
6    Q.  In January 2003 looks like you switched jobs,
7  what did you do then?
8    A.  That's when they decided that automation and
9  the flats were going to be level five.  Before that
10  automation was level four and flat sorters were levels
11  five, which is a higher rate of pay.  When that
12  occurred all the PTF's were put into the automation
13  pool.  I was taken off the flat sorter and put into
14  the regular letter automation pool with the rest of
15  the PTF's.
16    Q.  Which job was a level four and which was a
17  level five?
18    A.  Level four was letter automation.  Level five
19  was flat sorter automation.
20    Q.  So, in January 2003 if you had continued on as
21  a flat sorter, you would have been a level five?
22    A.  Right, I was a level five.
23    Q.  But they put you into an automation job, which
24  was a level four?
25    A.  No.  They brought up automation to level five,

---

12

1  which was across the board.  Everyone became a level
2  five.
3    Q.  You continued on as level five?
4    A.  Yes.
5    Q.  But instead of doing flat sorter you now worked
6  in automation?
7    A.  Correct.
8    Q.  And you stayed on tour 3?
9    A.  Yes.
10    Q.  Again, did you bid for that job or were you
11  just assigned to it?
12    A.  No, I was a PTF, no bidding involved.
13    Q.  September 18, 2004 looks like something
14  happened, what happened on that day?
15    A.  That was the conversion to full-time regular.
16    Q.  What is a full-time regular?
17    A.  Then you are guaranteed eight hours a day,
18  vacations, medical insurance, you can bid a job.
19    Q.  Are you also guaranteed a certain number of
20  days off at that point?
21    A.  Two days off, yes.
22    Q.  When you say as a full-time regular you can bid
23  a job, what does that mean?
24    A.  That means you are not held into the position
25  that you started in.  You can now look at the board

---

13

1  and see what is available and see.  If you can bid it
2  according to your seniority, you may get it, something
3  that is more preferable to you.
4    Q.  Do you know why on September 18, 2004 you were
5  converted from a part-time flexible to a full-time
6  regular?
7    A.  Yes.  I believe they fulfilled the criteria as
8  far as work hours for each PTF.  They filled the
9  criteria that would require them to convert because
10  that showed the workload was there and the amount of
11  work hours per PTF mandated that they convert.
12    Q.  My understanding, and I'll ask you if you agree
13  with me, is that if a PTF works 40 hours a week for a
14  sufficient amount of time then under the union
15  contract the post office is required to convert that
16  job into a full-time regular, is that right?
17    A.  Well, not that job in particular, but they look
18  at it, you know, as a group.  Yes, you're right.
19    Q.  At that time they're not required to convert
20  that job in particular, but they're required to create
21  a full-time regular job, is that right?
22    A.  Yes, and whoever is top of seniority is
23  converted.
24    Q.  So, it's your understanding in September 18,
25  2004 that some number of part-time flexible employees

---

4 (Pages 10 to 13)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

**14**

1  had worked a sufficient amount of hours per week for a
2  sufficient amount of weeks that the post office was
3  required to convert?
4      A.  That's correct.
5      Q.  Were you the only person converted at that
6  time?
7      A.  No, it was a group.  I believe there were five
8  of us.
9      Q.  Do you know who they were?
10     A.  Latreese, I don't know her last name.  Ruthie
11 Dillard, Karen Bayard, myself and there may have been
12 one other person.
13     Q.  When you were converted it looks like you were
14 assigned a different job, is that right?
15     A.  I was assigned a different tour.
16     Q.  And you were assigned tour 1?
17     A.  That's right.
18     Q.  Do you know of the other four people that you
19 think were converted do you know what tours they were
20 working on prior to their conversion?
21     A.  We were all tour 3.
22     Q.  Do you know of those four people when they were
23 converted to full-time regulars were they put on tour
24 1 or some other tour?
25     A.  We were all moved to tour 1, that group right

---

**15**

1  there.
2      Q.  And when you say you were moved to tour 1, did
3  that become your assigned job?
4      A.  Yes.
5      Q.  And then now that you were a full-time regular
6  did you then have an opportunity to bid on other jobs?
7      A.  Yes.
8      Q.  Employees are awarded jobs through the bidding
9  system based on seniority, right?
10     A.  Yes.
11     Q.  You had worked at the post office since 1994,
12 right?
13     A.  Right.
14     Q.  But not as a full-time regular?
15     A.  Correct.
16     Q.  How does that factor into your seniority when
17 you try to go and bid on a job?
18     A.  There is a PTF list also and that's a seniority
19 list that they go by.
20     Q.  The people that were converted in 2004 were
21 someone named Latreese, Ruthie Dillard, Karen Bayard,
22 yourself and possibly some other person you can't
23 remember?
24     A.  Right.
25     Q.  Do you know their races and genders?

---

**16**

1      A.  Yeah.  Latreese is black, female.  Karen Bayard
2  is black, female.  Ruthie Dillard is black, female.
3      Q.  Do you know the other person that you can't
4  remember?
5      A.  I really can't.  I cannot remember.
6      Q.  Were you happy or unhappy that you were
7  assigned tour 1 in September 2004?
8      A.  Very unhappy.
9      Q.  Did you attempt to bid on any other jobs to get
10 yourself back -- away from tour 1?
11     A.  Immediately.
12     Q.  Were you successful in bidding?
13     A.  No.
14     Q.  Why is that?
15     A.  Well, there were very few jobs on the board and
16 other people bid them who had far more seniority as
17 regulars.
18     Q.  It looks like on November 26, 2004 your job
19 changed even though you remained on tour 1, is that
20 right?
21     A.  What was the question again?
22     Q.  Looks like on -- September 2004 to November
23 2004 you worked in automation on tour 1, right?
24     A.  Right.
25     Q.  On November 26, 2004 did your job change?

---

**17**

1      A.  Oh, I bid a job there to an ISS clerk.
2      Q.  Do you remember why you bid that job?
3      A.  Took me off the regular letter automation.
4  It's a better job.
5      Q.  Then, January 2005 looks like your job changed
6  again?
7      A.  Yes, I bid that job.
8      Q.  Do you remember why you bid that job?
9      A.  Yes, I was very interested in the stats
10 program.
11     Q.  In June 2005 looks like your job changed again
12 and now you get on tour 3?
13     A.  Yes.
14     Q.  And you bid that job?
15     A.  Yes, I did.
16     Q.  Looking at Jeffries-1 on page 2 in paragraph
17 five you have listed a number of people here, Karen
18 Bayard, Lynette Marrow, Bobby Ford and Frank Frisby?
19     A.  Yes.
20     Q.  Who are those people?
21     A.  They're clerks.
22     Q.  And were they clerks working on the same tour
23 as you on November 11, 2003?
24     A.  Yes.
25     Q.  Were any of them your superiors?

---

5 (Pages 14 to 17)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

18

1    A.  No.
2    Q.  Were they working the same job as you?
3    A.  On that night, yes.
4    Q.  And so would they be in close proximity to you?
5    A.  Not during the operation, but at the time when
6    we were tying the machine out, yes.
7    Q.  Back up a little bit.  One of your claims in
8    this lawsuit is that there was an incident between you
9    and Ms. Delores Thomas on November 11, 2003 that you
10   allege that the post office didn't investigate
11   properly, correct?
12   A.  Correct.
13   Q.  Why don't you just describe what happened, the
14   incident that happened that you think the post office
15   didn't investigate properly.
16   A.  We were at the end of this run, this mail run,
17   and it was my job to pull the tubs, roll them down the
18   conveyor belt and tie the machine out.  She was at the
19   end, her job was to take the tubs, Delores Thomas --
20   Q.  When you say "she --"
21   A.  Yes, I'm sorry, Delores Thomas was at the end
22   of that roller belt and it was her job to take those
23   tubs and put them in the assigned equipment.  Now,
24   prior to rolling those tubs down they're about five
25   slots that I could pull if I wanted to be nice, which

19

1    I wanted to be nice, and I started pulling them.  She
2    was very upset that I would even do such a thing.  I
3    tried to explain to her this will save you some time
4    because the equipment that corresponds to these tubs
5    is right next to where I'm standing.  She insisted I
6    push them, I did, make her happy.
7         The man at the end of the run that was
8    helping her was very upset because he had to pick them
9    up and walk all the way back with them, put them in
10   the corresponding equipment.
11   Q.  Who was that man?
12   A.  That was Frank Frisby.  He made a comment like,
13   Who did this, who rolled these down?  I think Delores
14   spoke to him and I said, "Well, Frank, this is the way
15   Delores wanted it done."  She blew up into a tirade of
16   cussing and screaming and other people came around to
17   see what was going on and she pushed in to me with a
18   tub in the mid-section.  A couple people tried to
19   diffuse her and I just was totally upset and I spoke
20   to MDO Angelo Lambert about it, I said, "This is
21   crazy."
22   Q.  Was this the beginning of your shift, end of
23   shift, middle?
24   A.  Towards the end.
25   Q.  Do you know who were the people that came

20

1    around to try to diffuse the situation?
2    A.  Lynette Marrow and Karen Bayard came over.
3    Q.  And then you also have listed Bobby Ford as an
4    eyewitness, how was he involved?
5    A.  He was the mail handler.  He was upset because
6    she had piled the mail sky high, which is a safety
7    hazard, and he was trying to tell her in the middle of
8    her screaming, "What you did is wrong, why don't you
9    just calm down."  No one could control her at that
10   point.  No one knew really what was wrong.  He was
11   there, he heard it.  I don't know if he saw, but he
12   heard.  Frank Frisby was there and the two women that
13   I mentioned.
14   Q.  Prior to that night had you ever worked in the
15   vicinity of Delores Thomas before?
16   A.  Yes.
17   Q.  Did you ever have any problems with her?
18   A.  No.
19   Q.  How many times do you think you had worked with
20   her before November 11, 2003?
21   A.  A dozen times.
22   Q.  Had you ever had any verbal or physical
23   altercations with anyone prior to November 11, 2003 at
24   the post office?
25   A.  No.

21

1    Q.  Had you ever had to complain to management
2    prior to the November 11, 2003 about a fellow
3    employee?
4    A.  I think there has been minor things that I
5    reported just because that's what they tell you to do
6    in the event things go wrong they have some sort of
7    baseline.
8    Q.  Do you remember specifically any of the
9    complaints you may have made?
10   A.  No, not really.
11   Q.  Did you ever feel prior to November 11, 2003
12   that management wasn't listening to your complaints?
13   A.  No.
14   Q.  So, I think you said -- how long was the tirade
15   from Ms. Thomas?
16   A.  It was the whole time we were tying out, about
17   ten, 15 minutes, and then I went to the locker room to
18   take a break and she came in there also and started
19   over.
20   Q.  Was that before or after you went to Angelo
21   Lambert?
22   A.  I went to see Angelo Lambert after we tied the
23   machine out, gave him a brief review of what took
24   place and then I took a break.
25   Q.  And went to the ladies locker room?

6 (Pages 18 to 21)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

|  | 22 |
|---|---|
| 1 | A. Ladies locker room. |
| 2 | Q. Who is Angelo Lambert? |
| 3 | A. That was the acting MDO. |
| 4 | Q. What is an MDO? |
| 5 | A. A manager of the office. |
| 6 | Q. Is he your immediate supervisor on the floor? |
| 7 | A. No, he is above the supervisors. |
| 8 | Q. Describe what you remember about your |
| 9 | conversation with Mr. Lambert that you had immediately |
| 10 | after tying down the machine. |
| 11 | A. I described to him what I described to you. Of |
| 12 | course, he looked a little alarmed and said he was |
| 13 | going to speak to her and that was good enough for me. |
| 14 | I said, "I would like to talk to her with you. I |
| 15 | would like to find out what is wrong because I thought |
| 16 | we were friends." I left it at that and, of course, I |
| 17 | went to the locker room. |
| 18 | Q. Angelo Lambert, do you know what race he is? |
| 19 | A. He is black. |
| 20 | Q. Did you feel that he was receptive to your |
| 21 | complaint at that time? |
| 22 | A. Yes. |
| 23 | Q. Did he say whether or not he was going to try |
| 24 | to meet with you or Ms. Thomas or both? |
| 25 | A. Well, he led me to believe that he would. |

|  | 23 |
|---|---|
| 1 | Q. After you met with Mr. Lambert is that when you |
| 2 | went to the ladies locker room? |
| 3 | A. After I spoke with him and told him what |
| 4 | happened I went to the locker room. |
| 5 | Q. What happened then? |
| 6 | A. I was just sitting there and Delores came in |
| 7 | and her intention was to talk to me, gave me a few |
| 8 | names, told me what a big baby I was for reporting |
| 9 | this and what a bitch I am and then it got really |
| 10 | vulgar and I told her so. The two people that were |
| 11 | there were like, you know, trying to diffuse her again |
| 12 | and she wanted to fight, she wanted to physically |
| 13 | fight. |
| 14 | Q. Who were the two people that were there? |
| 15 | A. Lynette Marrow and Karen Bayard. |
| 16 | Q. And when you say you told her that she was |
| 17 | being vulgar, did you make any curses to her or |
| 18 | anything like that? |
| 19 | A. No, I did not curse. |
| 20 | Q. Was this a heated conversation on both parts? |
| 21 | A. No. It was heated on her end. She was |
| 22 | standing as soon as you walk in the door and I was |
| 23 | sitting at the table, drinking water. I think I was |
| 24 | going to eat something, but changed my mind on that. |
| 25 | I basically was the recipient of all that she wanted |

|  | 24 |
|---|---|
| 1 | to get off her chest. |
| 2 | Q. This incident was just a verbal? |
| 3 | A. Right. |
| 4 | Q. Harassment, I guess? |
| 5 | A. And she challenged me to fight. |
| 6 | Q. And, again, you didn't in the ladies locker |
| 7 | room did you raise your voice? |
| 8 | A. No, I did not. |
| 9 | Q. You said you remained calm? |
| 10 | A. I did. |
| 11 | Q. Did you say any angry words to her? |
| 12 | A. Anything I responded was in a very peaceful |
| 13 | tone. I was trying to keep it as sedated as possible. |
| 14 | Q. How did the incident end? |
| 15 | A. She stormed out cussing and screaming. |
| 16 | Q. Back to Jeffries-1 on page two in paragraph |
| 17 | five you write that you had a meeting with Mr. Lambert |
| 18 | and then you heard a knock on the door and you heard |
| 19 | Karen Bayard speaking to Angelo Lambert. Was this |
| 20 | meeting with Mr. Lambert the meeting that occurred |
| 21 | immediately after you finished tying down the machine? |
| 22 | A. Yes. |
| 23 | Q. That was before the second incident with Ms. |
| 24 | Thomas? |
| 25 | A. No. The first meeting that I spoke to him I |

|  | 25 |
|---|---|
| 1 | explained what took place. He said he would talk to |
| 2 | her, somehow get us together that night. Took a |
| 3 | break. Anne Thomas came in at one point and said, |
| 4 | "Are you okay?" I said, "I guess so." She said, "Do |
| 5 | you feel threatened?" I said, "Yes, I do." |
| 6 | Q. Who is Anne Thomas? |
| 7 | A. She is a supervisor. |
| 8 | Q. When you say come in, come into where? |
| 9 | A. Into the ladies locker room. I think she told |
| 10 | me to go into the office to see Angelo Lambert. |
| 11 | Q. You had already seen Angelo Lambert, but she |
| 12 | told you to go see him again? |
| 13 | A. I had spoken to him on the floor. This was a |
| 14 | formal meeting in his office with Delores and myself. |
| 15 | Q. First time you spoke with Mr. Lambert was not |
| 16 | in the office, it was on the floor? |
| 17 | A. Yes. |
| 18 | Q. Then, you went into the ladies locker room |
| 19 | where you had another incident with Ms. Thomas? |
| 20 | A. That's right. |
| 21 | Q. And then Anne Thomas came in and told you you |
| 22 | should have a formal meeting with Mr. Lambert? |
| 23 | A. Yes. |
| 24 | Q. Did you do that? |
| 25 | A. Yes. |

7 (Pages 22 to 25)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

|  | 26 |
|---|---|
| 1 | Q. Was that the next thing you did after the |
| 2 | incident with Ms. Thomas? |
| 3 | A. That's the next thing I did after that break. |
| 4 | Q. Tell me what happened. What did you do? Who |
| 5 | was there? What did you say? |
| 6 | A. Angelo Lambert was there, myself and Delores |
| 7 | Thomas. |
| 8 | Q. How did it come to be that Delores Thomas was |
| 9 | there? |
| 10 | A. I asked she be there. |
| 11 | Q. When you walked into Mr. Lambert's office, was |
| 12 | she sitting there? |
| 13 | A. Yes. |
| 14 | Q. Then, what happened next? |
| 15 | A. We spoke about the incident. I tried to find |
| 16 | out what was going on in her head, which I never found |
| 17 | out. She started screaming and yelling and cussing |
| 18 | again. I asked him to please stop her. I don't feel |
| 19 | I need to sit and listen to this all over again. She |
| 20 | told him -- he asked her to do a statement, I believe. |
| 21 | She refused. She just got up and said no, but asked |
| 22 | if she could see him privately. |
| 23 | Q. Now, when you say -- it's Delores Thomas asked |
| 24 | Mr. Lambert if she could meet with him privately? |
| 25 | A. That's correct. |

|  | 27 |
|---|---|
| 1 | Q. All right. |
| 2 | A. And he said, "Not right now, but come in |
| 3 | tomorrow and I'll see you then." |
| 4 | Q. Did you have an opportunity during this meeting |
| 5 | to give your side of the story? |
| 6 | A. Yes. |
| 7 | Q. Did you feel like Mr. Lambert was handling the |
| 8 | incident in an appropriate manner? |
| 9 | A. Yes. |
| 10 | Q. Did you ask him to do anything specifically at |
| 11 | that time? |
| 12 | A. More specifically? |
| 13 | Q. Did you make any requests that Mr. Lambert do |
| 14 | anything specifically to Ms. Thomas or to you? |
| 15 | A. No. |
| 16 | Q. Did you ask that she be given any discipline or |
| 17 | anything like that? |
| 18 | A. No. |
| 19 | Q. Did Mr. Lambert ask you if you wanted to give a |
| 20 | formal statement? |
| 21 | A. I think he told me to write a statement. |
| 22 | Q. And he also told Delores Thomas to write a |
| 23 | statement? |
| 24 | A. That's right. |
| 25 | Q. Did you tell Mr. Lambert the names of any |

|  | 28 |
|---|---|
| 1 | witnesses to the incident? |
| 2 | A. Yes. |
| 3 | Q. How did he respond to that? |
| 4 | A. I don't remember a response from him. |
| 5 | Q. And it was during this meeting that Karen |
| 6 | Bayard interrupted you? |
| 7 | A. I heard the conversation at the door. |
| 8 | Q. Someone knocked on the door? |
| 9 | A. Right. |
| 10 | Q. And Mr. Lambert opened it? |
| 11 | A. Yes. |
| 12 | Q. Then, there was a conversation between him and |
| 13 | Ms. Bayard? |
| 14 | A. Yes. |
| 15 | Q. What do you remember from that conversation? |
| 16 | A. I remember her telling him she saw the whole |
| 17 | thing and she would like to write it. Mr. Lambert |
| 18 | said, "I don't know who told you to come up here, I'm |
| 19 | not taking any statements." |
| 20 | Q. Then, did Ms. Bayard leave then? |
| 21 | A. I think so. |
| 22 | Q. Did you ever ask Mr. Lambert what he meant by |
| 23 | -- when he said I'm not taking any statements? |
| 24 | A. No. |
| 25 | Q. Did you have any belief in your mind as to what |

|  | 29 |
|---|---|
| 1 | he meant by that? |
| 2 | A. I was too upset. I couldn't think any further |
| 3 | than what I had just endured. Really I don't know. |
| 4 | Q. Up until this second meeting, formal meeting, |
| 5 | in Mr. Lambert's office did you have any complaints |
| 6 | about how the post office was handling this incident? |
| 7 | A. No. |
| 8 | Q. Did anything else happen on November 11, 2003 |
| 9 | regarding this incident after the meeting with Mr. |
| 10 | Lambert? |
| 11 | A. You mean with Delores Thomas? |
| 12 | Q. Did you have any further contact with Ms. |
| 13 | Thomas? |
| 14 | A. No. |
| 15 | Q. Did you have any other conversations with |
| 16 | anybody in post office management about the incident? |
| 17 | A. No. |
| 18 | Q. Did you have any conversations with anybody at |
| 19 | work about the incident? |
| 20 | A. No. We were sent home. |
| 21 | Q. When you say "we were sent home," who was that? |
| 22 | A. He told Delores Thomas to go home and told |
| 23 | myself to go home. |
| 24 | Q. And do you know if you worked the next day? |
| 25 | A. I did not. |

8 (Pages 26 to 29)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

**30**

1    Q. So, that was November 12th you did not work.
2    What about November 13th?
3    A. Did not work.
4    Q. What about November 14th?
5    A. I worked.
6    Q. On November 12th and November 13th even though
7    you didn't work did you have any conversations with
8    anybody either management or non-management at
9    the post office about this incident?
10    A. No.
11    Q. The next thing that happened you arrived back
12    to work on November 14th?
13    A. No, I went to see a doctor --
14    Q. Tell me about that.
15    A. -- on the 12th or 13th. I had an appointment
16    with a doctor in Rehoboth for a medical problem, but
17    turns out she is a counselor also so it turned into a
18    counseling meeting while I was there.
19    Q. Is this Kim Wayman?
20    A. Kim Furtado, M.D.
21    Q. You said she is down in Rehoboth?
22    A. Yes.
23    Q. Is that close to where you live?
24    A. I live in Dover, so it's about a 30-minute
25    drive.

---

**31**

1    Q. You had a previously scheduled appointment with
2    Kim Furtado on either the 12th or 13th and in that
3    appointment you said it turned into a counseling
4    session?
5    A. Yes.
6    Q. I guess the next thing that happened is
7    November 14th you arrived back to work?
8    A. That's right.
9    Q. What did you do when you got back to work on
10    the 14th?
11    A. You know, was placed on a machine and was
12    called out by Mr. Williams.
13    Q. At the beginning of your shift?
14    A. I'm not certain, but I could guess that it was.
15    I'm not certain exactly when I was called out.
16    Q. Before that happened did you see Delores
17    Thomas?
18    A. Not that I recall.
19    Q. So, you are placed on the machine and someone
20    named John Williams comes up and asks to speak to you?
21    A. That's right.
22    Q. Who is John Williams?
23    A. He is the lead MDO at that time on that tour.
24    Q. Is he above Mr. Lambert?
25    A. Yes.

---

**32**

1    Q. Did you and Mr. Williams go to an office?
2    A. Yes.
3    Q. Where did you go?
4    A. To his office.
5    Q. Just the two of you?
6    A. Yes.
7    Q. And what happened there?
8    A. I told him what took place on the 11th and
9    everything up to that point, witnesses, my statement.
10    Q. When you say "my statement," had you already
11    written a statement?
12    A. Yes.
13    Q. Did you give that to him?
14    A. Yes.
15    Q. What race is John Williams?
16    A. Black.
17    Q. What was his reaction to what you were saying?
18    A. He seemed concerned.
19    Q. When you say "seemed concerned," do you
20    remember specifically anything that he said that led
21    you to believe he was concerned?
22    A. No.
23    Q. Did he say what he was going to do next?
24    A. I believe he said that he was going to look
25    into the witnesses and see about statements from them.

---

**33**

1    Q. Do you remember anything else about the
2    conversation with Mr. Williams?
3    A. No.
4    Q. Did you then return to job?
5    A. Yes.
6    Q. At that point did you have any complaint with
7    how Mr. Williams had handled the investigation?
8    A. No.
9    Q. What happened next after you returned to your
10    position on the 14th?
11    A. Nothing.
12    Q. You worked your whole shift?
13    A. I believe I did.
14    Q. Did you have any conversations with anybody
15    about this incident?
16    A. No.
17    Q. And then after your shift you went home?
18    A. Yes.
19    Q. Did you work on the 15th?
20    A. Yes.
21    Q. Did you speak to anybody on the 15th about the
22    incident?
23    A. No.
24    Q. Did you have any contact with Delores Thomas on
25    the 15th?

---

9 (Pages 30 to 33)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

34

1  A. No.
2  Q. Looking back to Jeffries-1 on page three,
3  paragraph nine, you state that Karen Bayard wrote a
4  statement on November 11, 2003, but was not allowed to
5  submit it to MDO Williams until November 15, 2003.
6  A. Yes.
7  Q. Why did you write that?
8  A. I believe that's when she submitted her
9  statement. After the meeting with John Williams he
10 collected them. He probably told me who he had seen.
11 Q. When you say after the meeting with John
12 Williams are you talking about the meeting between you
13 and John Williams on the 14th?
14 A. Right.
15 Q. You met with John Williams on the 14th and you
16 believe on the 15th he began collecting statements?
17 A. I think so.
18 Q. You seem to state for sure that he collected a
19 statement from Ms. Bayard on the 15th, right?
20 A. Right.
21 Q. Do you know whether or not he collected any
22 other statements on the 15th?
23 A. I don't know.
24 Q. You don't know one way or the other.
25 A. I don't know when they were called into the

35

1  office, but I think Karen was called in on the 15th.
2  I'm not certain when the others were called in.
3  Q. When you say "the others," are you talking
4  about Lynette Marrow, Bobby Ford and Frank Frisby?
5  A. Yes.
6  Q. You don't know exactly when they were called
7  in, but you think they spoke to Mr. Williams at some
8  point?
9  A. Yes.
10 Q. So, did you know that Karen Bayard had -- did
11 you know on the 15th that Karen Bayard had submitted a
12 statement to Mr. Williams?
13 A. I think I know that she was called into the
14 office for that purpose.
15 Q. How did you know that?
16 A. I think I was her partner on the machine.
17 Q. You think maybe she told you?
18 A. I think maybe she was called off the machine
19 like I was called off with John Williams and I know
20 what it pertained to.
21 Q. On the 15th up until the 15th did you have any
22 complaints or any concerns about how the post office
23 was handling this incident?
24 A. No.
25 Q. Did you go to work on the 16th?

36

1  A. Yes.
2  Q. And did you have any conversations with anybody
3  about this incident or the investigation?
4  A. I don't actually remember anything in
5  particular, but I know that the atmosphere on the
6  floor was people were talking about it, it was all
7  over the floor, and it was all over the floor because
8  Delores Thomas had talked about it and I was a little
9  embarrassed and upset about that. Also, Angelo
10 Lambert had spoke about it to people on the floor,
11 which was humiliating. I didn't like answering the
12 questions.
13 Q. You described how the atmosphere changed, did
14 that happen on the 16th or --
15 A. Seems like it was building up from the time I
16 got back.
17 Q. When you say people were talking about the
18 incident, do you remember what they were saying?
19 A. No, but I can tell you the gist of the
20 conversation was that incident.
21 Q. Were they talking about it directly to you or
22 did you overhear it?
23 A. You know, people would make comments like, What
24 happened? Were you fighting? Things like that. As
25 to an exact statement made to me I cannot recall.

37

1  Q. Do you remember who were the people who were
2  talking to you about the incident?
3  A. No.
4  Q. And you say you were embarrassed about it?
5  A. Very much so.
6  Q. Why were you embarrassed?
7  A. It just felt very demeaning to me. I had
8  endured quite a bit and I did not engage and maybe I
9  was a little frustrated that I didn't. In the plant
10 that looks a little bad on you when you don't engage.
11 It would look better if I had fought back maybe, but I
12 chose to follow the rules.
13 Q. You were embarrassed because you didn't -- you
14 sort of backed down from Ms. Thomas?
15 A. Well, I was hit by a person, I was screamed at,
16 my kids were called names that were pretty bad and all
17 I tried to do was calm her down.
18 Q. I think you also said that on the 16th you had
19 some concern about whether Angelo Lambert had told
20 people about the incident?
21 A. I know he did.
22 Q. How do you know that?
23 A. Mr. Williams told me.
24 Q. I assume some people knew about the incident
25 without anybody having to tell them, right?

10 (Pages 34 to 37)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

38

1    A. I don't know.
2    Q. Well, Karen Bayard knew about the incident?
3    A. Well, she was there, she was a witness.
4    Q. All the people that were witnesses to it,
5    nobody had to tell them about it, right?
6    A. Correct.
7    Q. Other people besides the witnesses eventually
8    found out about the incident?
9    A. Sure.
10   Q. And you believe they found out about it through
11   Mr. Lambert?
12   A. I know that they found out, most of the people
13   found out through him.
14   Q. How do you know that?
15   A. I spoke to John Williams and I said, "I don't
16   understand how the details of this conversation that
17   we had were on the floor."
18   Q. When did you speak to him?
19   A. Mr. Williams?
20   Q. Yes.
21   A. I guess on the 14th, 15th. It was quite a few
22   intermittent things. He would come up to the machine
23   and say something and I was concerned because I didn't
24   understand why people were knowing things that were
25   just told in the meeting. I said, "Did you talk to

39

1    people?" He said, "No, but I know that Angelo did."
2    So, how he knows that Angelo did I don't know.
3    Q. When you say that you were concerned about that
4    people knew what happened in the meeting, what meeting
5    are you talking about?
6    A. The meeting with Angelo Lambert. Anything
7    further that took place, who the witnesses were,
8    things like that.
9    Q. So --
10   A. And who wrote statements, who didn't.
11   Q. Did you ask Mr. Williams why Angelo Lambert had
12   told people about what happened in the meeting?
13   A. No.
14   Q. Were you curious why?
15   A. I thought it was obvious. He just wanted to
16   blab and he did.
17   Q. This conversation with Mr. Williams happened
18   after your formal meeting with him on the 14th, right?
19   A. What meeting are you talking about?
20   Q. You said that you had a formal meeting with Mr.
21   Williams in his office on the 14th?
22   A. Right.
23   Q. The conversation with Mr. Williams where he
24   told you that Angelo Lambert was telling people things
25   did that happen during that formal meeting in Mr.

40

1    Williams' office or somewhere else?
2    A. No, that was later, but I don't know the date.
3    I think it's in my notes somewhere.
4    Q. I think you said you had a number of other
5    conversations with Mr. Williams?
6    A. Yes.
7    Q. Do you remember the substance of those
8    conversations?
9    A. I was back in 127 and I believe it was November
10   26th and Mr. Williams came back and asked me to come
11   out of the operation --
12   Q. You said it were back on 127?
13   A. Yes, that's an operation where you are sorting
14   flats by hand. I was in a group of like five people.
15   He called me out into the aisle and he said, "I'm
16   finished my investigation and no one supported any of
17   your claims, nothing, zero."
18   Q. You say this was on November 26, 2003?
19   A. Yes.
20   Q. Between your meeting with Mr. Williams on
21   November 14th and this conversation with Mr. Williams
22   on November 26th do you recall any other meetings with
23   Mr. Williams?
24   A. Not really, no.
25   Q. Do you recall any other meetings with Mr.

41

1    Lambert or anybody else in management between November
2    14th and November 26th about the incident?
3    A. Not the particular date, but Mr. Lambert came
4    up to the machine once and spoke to me and I think Mr.
5    Williams did also while I was working. Nothing
6    formal, just a few comments or questions, things like
7    that. Nothing really that I recall.
8    Q. In the meeting on November 26, 2003 with Mr.
9    Williams was that more formal?
10   A. Primarily we started talking out in the aisle
11   on the floor. That's when he told me there was no one
12   that substantiated my claim. He was finished, he
13   checked everyone out, spoke to everyone, we're done.
14   He said the last statement he took was Bobby Ford and
15   Bobby Ford saw nothing. So, I said that was very
16   upsetting. I said, "I would like to see the union rep
17   and I would like to have a minute with Bobby Ford, I
18   have a couple questions to ask." He said, "No
19   problem."
20   Q. I guess up until that time, up until November
21   26, 2003, had you had any concerns about how the post
22   office was investigating the incident?
23   A. You mean prior to November 26?
24   Q. Yes.
25   A. Yes, I did.

11 (Pages 38 to 41)

Jeffries  v.  Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

42

1    Q.  What were those concerns?
2    A.  I was a little concerned because no one had
3    gotten back to me.  No one spoke formally and told me,
4    We took these statements, this is what is being done,
5    this occurred, nothing.  I had to ask.  You know, try
6    to hail him down, please, can I talk to you?  What is
7    going on?  Yes, I did have concerns that they were
8    sweeping it under the rug.
9    Q.  On November 26, 2003 you told Mr. Williams you
10   were upset, you wanted to speak with Mr. Ford and you
11   also wanted to talk to your union rep?
12   A.  Yes.
13   Q.  How did he respond to that?
14   A.  He said, "Okay."
15   Q.  What is the next thing you can remember about
16   conversations with Mr. Williams or Mr. Lambert or
17   anyone about the incident?
18   A.  We had that meeting, November 26, that evening.
19   Q.  With who?
20   A.  Doris Perry was my union rep, Bobby Ford was
21   there with his union rep and Mr. Williams was there.
22   Q.  And is this in Mr. Williams' office?
23   A.  Yes.
24   Q.  And what happened at that meeting?
25   A.  He explained to Bobby Ford that he was there

43

1    because of my request and he said, "Do you have
2    anything to say to Bobby Ford?"  I said, "I just have
3    a question for him.  I just want to know why you asked
4    me if I was okay and how sorry you were for what took
5    place and am I going to be all right?"  He said, "Mr.
6    Williams, I want to change my statement."
7         So, Mr. Williams gave him a piece of paper
8    and a pen and Bobby Ford wrote a different statement
9    other than I didn't see anything.  The conversation
10   got a little confrontational between my union rep and
11   Mr. Williams because he was trying to tell me what
12   Delores Thomas meant by her remarks about my kids, my
13   family.  Delores told him that it was basically out of
14   line.
15        He said he knew what I was saying and that
16   I was to stay away from Delores.  In the event I
17   should even see her in the ladies room I was to leave
18   and that if I acted in any manner in the way that she
19   did he would fire me.  He asked me, "Do you know how
20   hard it would be for you to get a job, Mrs. Jeffries?"
21   I said, "No, I don't."  It was very -- it was tense.
22        MR. FEUERHAKE:  Can I interject one thing?
23   When you say "he" there you are talking about Mr.
24   Williams?
25        THE WITNESS:  Mr. Williams.

44

1         MR. FEUERHAKE:  And Doris Perry is the
2    union rep?
3         THE WITNESS:  For me, yes.
4    BY MR. BEAUSANG:
5    Q.  When Mr. Williams said that if you had acted as
6    Delores Thomas did that he would fire you, I take it
7    he wasn't saying at that time that he had agreed that
8    Delores Thomas had done what you alleged, right?
9    A.  What is the question?
10        MR. FEUERHAKE:  Object to the form.
11        MR. BEAUSANG:  It was bad.
12   BY MR. BEAUSANG:
13   Q.  Mr. Williams had already told you that none of
14   the witnesses substantiated what you said, right?
15   A.  Correct.
16   Q.  So, he didn't believe that Ms. Thomas had done
17   the things you said, right?
18   A.  I don't know that.
19        MR. FEUERHAKE:  Well, I'll object to the
20   form.
21   A.  I don't know what he believed.
22   Q.  Well, regardless of what he believed he told
23   you he didn't believe that Mrs. Thomas had done the
24   things you had said because none of the witnesses
25   substantiated?

45

1    A.  He told me none of the witnesses substantiated,
2    yet he tried to explain what she meant by what she
3    said.  So, I think he knew what she said.
4    Q.  He told you to stay away from Ms. Thomas?
5    A.  Yes.
6    Q.  Was that going to be possible?  Were you going
7    to be assigned to work with her on the same machine?
8    A.  Well, that's exactly right.  It was a quandary.
9    How do I stay away from a person that I have to work
10   near?
11   Q.  I take it you did not work near her every
12   shift, right?
13   A.  We were both automation clerks.  We both had
14   the same breaks, same lunch.
15   Q.  Did you work in close proximity to her on every
16   shift?
17   A.  Yes.
18   Q.  Even though you told me on the 14th you didn't
19   see her?
20   A.  I don't see her as a friend.  I don't talk to
21   her.  I work.  I don't see her like we did that night.
22   We were back on automation.  We weren't working on the
23   flat sorter anymore, a different job.
24   Q.  Did you ask Mr. Williams how you could stay
25   away from her if you were working the same shift?

12 (Pages 42 to 45)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

46

1    A. No.
2    Q. Did he say whether or not he had given Ms.
3  Thomas this same instructions?
4    A. He did not.
5    Q. He didn't say one way or the other?
6    A. He did not.
7    Q. Turning to page six on Jeffries-1, in the first
8  paragraph you say that Mr. Williams told you that you
9  would receive a disciplinary action, a letter of
10  warning?
11    A. Yes.
12    Q. Did he say that during this meeting on November
13  26, 2003?
14    A. I think he did.
15    Q. Did you, in fact, get a letter of warning?
16    A. No.
17    Q. Do you know why not?
18    A. I believe he said because I put in the EEO
19  complaint.
20    Q. Did you get any other discipline at all about
21  this incident?
22    A. Me?
23    Q. Yes.
24    A. No.
25        MR. BEAUSANG: Could we mark this Exhibit

47

1  2.
2        (Jeffries Deposition Exhibit No. 2 was
3  marked for identification.)
4  BY MR. BEAUSANG:
5    Q. I'm going to direct you -- first of all, before
6  you is a document marked Jeffries-2. Do you recognize
7  that document?
8    A. Yes.
9    Q. What is that document?
10    A. Declaration, dated November 10, 2005.
11    Q. Is it your declaration?
12    A. Yes.
13    Q. Turning to pages Bates numbered 17 and 18,
14  paragraph six at the bottom of page 17 reads that you
15  state --
16    A. I don't have a page 17.
17        MR. FEUERHAKE: He is talking about Bates
18  numbers.
19  BY MR. BEAUSANG:
20    Q. Based on 17 on Jeffries-2 there is a paragraph
21  six where you said, "Although I made repeated requests
22  to MDO Williams to investigate the November 11, 2003
23  incident involving Ms. Thomas, no such investigation
24  took place despite the availability of eyewitnesses
25  who were willing to offer statements regarding the

48

1  incident." Do you see that?
2    A. Yes.
3    Q. Why do you say that no investigation took
4  place?
5    A. I don't know when I said that, what date I'm
6  referring to.
7    Q. Back to page Bates 17 you say you made repeated
8  requests to MDO Williams to investigate the November
9  11, 2003 incident, right?
10    A. Right. I think I asked him a couple times and
11  he was not finished. He did not have a chance to get
12  everyone's statements. I think the only one that I
13  knew of that he took on the 15th was Karen Bayard, but
14  after that it was to the 26th, I believe, and the
15  union had to basically get involved with that.
16    Q. So, you know that he took a statement from
17  Karen Bayard on November 15th, right?
18    A. Yes.
19    Q. And then you say you don't think he took any
20  other statements until maybe November 26?
21    A. I think so.
22    Q. So, when you say that no investigation took
23  place I guess that's not entirely accurate, right?
24    A. Well, he did not talk to me about it, he did
25  not come back to me and keep me notified as to

49

1  anything that was going on. So, my assumption was
2  nothing was going on.
3    Q. When you say no investigation took place, what
4  you really mean is he did not come back and talk to
5  you?
6    A. No. What I mean is he did not come back and
7  talk to me to tell me that there was an investigation
8  going on, if any. I know of one statement, Karen
9  Bayard.
10    Q. You are saying you didn't know that an
11  investigation was going on other than the one
12  statement from Karen Bayard?
13    A. That's the only one I knew he spoke to.
14    Q. But then on November 26, 2003 you learned that
15  he had spoken to more people, right?
16    A. That's right.
17    Q. Do you know how many people he spoke to?
18    A. He only mentioned Bobby Ford.
19    Q. Do you know whether he spoke to Ms. Thomas?
20    A. I don't know.
21        MR. FEUERHAKE: Which Ms. Thomas?
22  BY MR. BEAUSANG:
23    Q. Delores Thomas, do you know whether he spoke to
24  Delores Thomas?
25    A. I don't know.

13 (Pages 46 to 49)

Jeffries  v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

50

1   Q.  Do you know whether he spoke to Angelo Lambert?
2   A.  I think he did.
3   Q.  Do you know whether he spoke to Lynette Marrow?
4   A.  On November 26th I didn't know.
5   Q.  Do you now know?
6   A.  I know.
7   Q.  Did he speak to her?
8   A.  I don't know, I mean, when he spoke to her I
9   don't know.
10  Q.  But you do know that he spoke to her?
11  A.  At this point in time he did because there are
12  statements in the record.
13  Q.  Turning back to Jeffries-2 in paragraph seven
14  on page 18 in this paragraph you say, "On January 2,
15  2004 MDO Williams had a meeting for all PTF clerks at
16  the Delaware P&DC." Do you see that?
17  A.  Yes.
18  Q.  Were you at that meeting?
19  A.  Yes.
20  Q.  And you say that Doris Perry was also there?
21  A.  Yes.
22  Q.  What was the meeting about?
23  A.  It began as a meeting on -- I put it in
24  here? I think it was like a plan five to begin with,
25  which is they give you safety talks and just updates

51

1   in the plant. The whole time I was sitting there
2   Delores Thomas was sitting in the back making comments
3   or something. I was sitting in the front and she was
4   back there making comments about everything.
5   Q.  When you say "making comments about
6   everything," what do you mean?
7   A.  Comments like, let's see how you feel, yeah,
8   you know, things like we were talking about treating
9   people with dignity and she was making comments like
10  that.
11  Q.  Did you think those comments were directed to
12  you?
13  A.  No, I didn't. I thought she was just being,
14  you know, loud in the meeting. I had no idea it was
15  directed at me. I was totally oblivious. Meeting was
16  over, I went to break. I was popping popcorn. I got
17  paged to come into the office. I did not have a clue.
18  Q.  Which office?
19  A.  The same office I had just left. At that time
20  I looked in and I saw Doris Perry, Chiquita Conkey
21  with a tablet and pen, Angelo Lambert and Mr. Williams
22  standing above me. They asked me to sit down, stood
23  next to me and there were a few clerks to my left,
24  which was Antoinette Rowser, Latreese and Tasha
25  Bryant.

52

1   Q.  Antoinette Rowser, Latreese and Bryant are all
2   clerks?
3   A.  Yes.
4   Q.  Who is Chiquita Conkey?
5   A.  That is a supervisor.
6   Q.  Is she above or below Angelo Lambert?
7   A.  Below.
8   Q.  She also below John Williams?
9   A.  Yes.
10  Q.  And also Doris Perry, your union rep, was
11  there?
12  A.  That's right.
13  Q.  What happened at that meeting?
14  A.  Chiquita Conkey was taking notes and Mr.
15  Williams asked me -- he told me that I was brought in
16  because someone reported to him that I had pushed
17  Tasha Bryant.
18  Q.  And what happened next?
19  A.  I said I did not. I looked at Tasha and I
20  said, "Tasha, did I push you?" She said, "No." She
21  said, "I did not report this." And with that Latrese
22  stood up and said, "I'm not going to be a part of
23  this," and she stood up and left. I guess that was
24  about it.
25  Q.  When Tasha Bryant said that you had not pushed

53

1   her, what was the reaction from Mr. Williams, if any?
2   A.  I don't know.
3   Q.  Did you receive any discipline for that
4   incident?
5   A.  For not pushing Tasha Bryant? No.
6   Q.  Was there any other investigation that you were
7   aware of about that incident?
8   A.  No.
9   Q.  How long did that meeting last?
10  A.  Maybe 15 minutes.
11  Q.  When you write in Jeffries-2 on page 18,
12  paragraph seven, you say, "Ms. Perry has informed me
13  that MDO Williams conducted what appeared to be a
14  witch hunt against me, repeatedly asking employees for
15  statements involving an incident reported to him by
16  Ms. Delores Thomas."
17  A.  I didn't know all that. That's from the union
18  rep. She told me that. That was prior to me getting
19  to that meeting. That's what took place in my
20  absence.
21  Q.  Ms. Perry told you that she thought Mr.
22  Williams was conducting a witch hunt against you?
23  A.  Yes.
24  Q.  When did she tell you that?
25  A.  I don't remember.

14 (Pages 50 to 53)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

54

1    Q.  Was it before the meeting on January 2, 2004
2  where you were accussed of —
3    A.  No, I think she made that statement because of
4  that meeting.  Whatever took place in there she
5  described it as a witch hunt.
6    Q.  And she said that Mr. Williams was repeatedly
7  asking for statements involving an incident reported
8  to him by Ms. Delores Thomas?
9    A.  Yes.
10    Q.  Was the incident reported to him by Delores
11  Thomas the alleged incident between you and Tasha
12  Bryant?
13    A.  Yes.
14    Q.  Do you have any personal knowledge about Mr.
15  Williams asking people for statements involved in that
16  incident?
17    A.  Can you repeat that?
18    Q.  Ms. Perry told you Mr. Williams was asking
19  people for statements about that incident, right?
20    A.  At that meeting, yes.
21    Q.  Do you know apart from what you learned from
22  Ms. Perry do you have any other information that Mr.
23  Williams was asking employees about that incident?
24    A.  No.
25    Q.  After the 15-minute meeting on January 2, 2004

55

1  did anything else happen to you as far as discipline
2  or investigation involving the incident with Tasha
3  Bryant?
4    A.  No.
5    Q.  Turning to page 19 on Jeffries-2, paragraph
6  nine, you write, "On January 5, 2004, MDO Williams
7  called me into his office to inform me that he had
8  scheduled an appointment with an employee assistance
9  program counselor for me, adding that it was voluntary
10  on my part."  Do you see that?
11    A.  Yes.
12    Q.  What is an employee assistance program
13  counselor?
14    A.  It's a counselor that is employed by the postal
15  service for workplace problems.
16    Q.  Had you ever seen an employee assistance
17  program counselor before?
18    A.  No.
19    Q.  And you write further in that paragraph that
20  you told him you had already scheduled an appointment
21  with an EAP counselor?
22    A.  Yes.
23    Q.  When did you make that appointment?  Do you
24  remember?
25    A.  No.

56

1    Q.  Do you remember why you made the appointment?
2    A.  Yes.
3    Q.  Why?
4    A.  Was unbearable to work there.  I needed someone
5  to help, to help me to stay there.
6    Q.  The EAP counselor is someone that you thought
7  could counsel you on how to do what?
8    A.  How to survive.
9    Q.  How did you take the fact that MDO Williams was
10  saying he was going to schedule an appointment with an
11  EAP counselor?
12    A.  I didn't take it any way.
13    Q.  You didn't consider that like discipline or
14  anything like that, right?
15    A.  I didn't consider it.
16    Q.  Further on 19, page 19 of Jeffries-2, you
17  described a meeting with Kim Wayman, who is the EAP
18  counselor?
19    A.  Yes.
20    Q.  Tell me about that meeting.
21    A.  With Kim Wayman?
22    Q.  Yes.
23    A.  I explained to her what took place and she said
24  she thought it would be best if I worked in a
25  different area.  I said that would be good.  She said,

57

1  "Would you allow me to speak to Mr. Williams?"  I
2  said, "Yes."  So, I figured that at least that much
3  could be done.  That's really the major point other
4  than she was very sympathetic to what had taken place
5  and gave a certain amount of comfort.
6    Q.  Why did you want to work somewhere away from
7  Ms. Thomas?
8    A.  The whole time that I was on the floor any time
9  I was in eyeshot of her or me and her she started
10  posturing in front of me with other employees.  I felt
11  at a disadvantage.  Of course, as I said before, I did
12  not engage and I had to endure a lot of somewhat
13  accusations from other people.  So, I thought it would
14  be better if I could just be away from her and try to
15  recover.
16    Q.  What do you mean by she was posturing?
17    A.  She would come away from the machine with other
18  people looking at me talking like this looking
19  directly like this.
20        MR. FEUERHAKE:  You have to describe that.
21    A.  Put her hand on her mouth.
22    Q.  Concealing her mouth?
23    A.  Yes, looking directly at me, her and the person
24  she is talking to.  So, trying to convey something to
25  me.

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

58

1    Q.  And you also said you had to endure accusations
2    by her?
3    A.  Baby, the white honky bitch and all the other
4    things I've heard passing her, working near her or her
5    talking with her friends.
6    Q.  When you say accusations by Ms. Thomas you are
7    referring to statements by her, quote, baby, and,
8    quote, white honky bitch?
9    A.  Right.
10   Q.  Regarding the statement baby did she say that
11   directly to you?
12   A.  To me.
13   Q.  How many times did that happen?
14   A.  I don't know.  More than once.
15   Q.  More than ten times?
16   A.  I don't know.
17   Q.  And this was all between the time that the
18   incident occurred on November 11, 2003 and January 9,
19   2004?
20   A.  Yes.
21   Q.  Did you complain to anybody about that?
22   A.  I talked to the EAP counselor.
23   Q.  On January --
24   A.  Yeah, I told her everything.
25   Q.  Did you complain to anybody else about it

59

1    before that?
2    A.  I had given all my complaints to Mr. Williams.
3    When I told him I think about the white honky bitch
4    thing he wanted to know who saw it, do I have a
5    witness?  I gave up at that point totally.
6    Q.  At some point prior to January 9, 2004 you went
7    to Mr. Williams and told him what about white honky
8    bitch?
9    A.  About the general atmosphere, about her talking
10   with her hand on her mouth and looking at me and I
11   felt very uncomfortable.  A whole myriad of things
12   that was going on.
13   Q.  I'm just trying to understand what the myriad
14   of things were.
15   A.  Yes.
16   Q.  One thing that you described is that when you
17   see Ms. Thomas she would talk with her hands over her
18   mouth, right?
19   A.  Yes.
20   Q.  And you also said that more than once she
21   called you directly to you baby?
22   A.  Oh, yes.
23   Q.  And did she say directly to you that you were a
24   white honky bitch?
25   A.  She called me a bitch to my face and behind me

60

1    and I cannot swear to it I've heard white honky bitch.
2    Whether it came out of her lips I don't know, but she
3    was in the group behind me when it was said.
4    Q.  How many times did she call you a bitch
5    directly to you?
6    A.  Oh, when it took place, 15, 20 times.  In the
7    locker room another ten times.  In the course of a few
8    days countless times.
9    Q.  And who did you go to to complain about -- you
10   went to Mr. Lambert about the incident on November 11,
11   2003, right?
12   A.  Yes.
13   Q.  You are saying even after that date she
14   continued to call you a bitch to you?
15   A.  I heard it from behind me.  If she was working
16   the machine on the side of me I would hear it.  As far
17   as looking at her face and seeing the word come out of
18   her mouth, sometimes, not every time.
19   Q.  Did you complain to anybody about that?
20   A.  I talked to the EAP counselor about all of it.
21   Q.  Did you go to anybody else besides the EAP
22   counselor?
23   A.  Just Mr. Williams.  I tried to tell him.  He
24   wanted to know who heard it, who saw it.  He wanted
25   witnesses, but there are no witnesses.

61

1    Q.  You also said you overheard Ms. Thomas, Delores
2    Thomas, say white honky bitch?
3    A.  From behind me I heard it.
4    Q.  How many times did you hear her say that?
5    A.  I think I heard that once.
6    Q.  When you described the atmosphere was difficult
7    for you to work in after November 11, 2003 you told us
8    about how Ms. Thomas talked with her hand over her
9    mouth, how she called you baby and how you overheard
10   her calling you both bitch and white honky bitch.  Was
11   there anything else?
12   A.  I had a lot of problems with supervisors all of
13   a sudden.  Like if I went to the ladies room I would
14   be paged immediately, get back to my work area.  In
15   contrast Delores Thomas was all over the floor
16   socializing.  Nothing was said to Delores Thomas.  It
17   just felt like I was on the spotlight, with a bull's
18   eye and I believe there was collusion, with the
19   supervisors.
20   Q.  When you say you think there was collusion with
21   the supervisors one example would be when you would go
22   to the bathroom you would be paged immediately to rush
23   to your work station?
24   A.  Um-hum.
25   Q.  Are there any other examples?

16 (Pages 58 to 61)

Jeffries  v.  Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

**62**

1    A.  There is plenty in my diary, but I don't
2  remember each and every thing off the top of my head.
3  I could give you a few.
4    Q.  Okay.
5    A.  I was yelled at for going to the water fountain
6  to fill my bottle up with water when my partner was
7  not even there.
8    Q.  Were you yelled at because that was not allowed
9  or --
10    A.  Because I left the work area and went ten feet
11  away.
12    Q.  Try to wait until I finish my question --
13    A.  I'm getting into the moment and I'm thinking
14  back and I'm sorry.
15        MR. FEUERHAKE:  Could we take a break for a
16  few minutes?
17        MR. BEAUSANG:  Sure.
18        (Brief recess.)
19  BY MR. BEAUSANG:
20    Q.  Ms. Jeffries, we left off before the break and
21  I believe you were telling me about some incidents
22  that made it uncomfortable for you to work in the
23  proximity of Delores Thomas?
24    A.  Yes.
25    Q.  And you mentioned that you kept a diary of

---

**63**

1  these instances?
2    A.  Yes, I did.
3        MR. FEUERHAKE:  Can we mark this as 3.
4        (Jeffries Deposition Exhibit No. 3 was
5  marked for identification.)
6  BY MR. BEAUSANG:
7    Q.  Ms. Jeffries, before you is a document marked
8  as Jeffries-3.  Do you recognize this document?
9    A.  Yes.
10    Q.  What is it?
11    A.  It is some of the thoughts I wrote down at
12  work.
13    Q.  Is this the diary you were speaking about?
14    A.  You can call it a diary, yes.
15    Q.  On Bates number 34 of Jeffries-3 looks like you
16  have paragraphs that begin with dates.  There is a
17  paragraph beginning November 27 and then December 2,
18  2003, December 8, December 9.  Do you see that?
19    A.  Yes.
20    Q.  And then what is in that paragraph is what you
21  remember happening on those days?
22    A.  That's what I jotted down those days.
23    Q.  Are the instances that you describe in
24  Jeffries-3 are these the incidents that made it
25  uncomfortable for you to work closely with Delores

---

**64**

1  Thomas?
2    A.  That and in addition to that just the memory of
3  what had taken place.  It's very hard to be next to a
4  person who has caused you so much anger and humilia-
5  tion and all of the things that a person feels when
6  they're treated that way, just that and this.  It's a
7  total culmination that was uncomfortable for me.
8    Q.  I would like to go back, if I can, to
9  Jeffries-2, on Bates 25.  On Bates 25 and 26 of
10  Jeffries-2 there is paragraph 18 and continues onto
11  Bates 26.  In paragraph 18 it looks like you are
12  describing the time when you were converted from a
13  part-time flexible to a full-time flexible in 2004.
14    A.  Yes.
15    Q.  You write in paragraph 18 of Jeffries-2 that
16  the fact that you were taken from your assignment on
17  tour 3 and placed as an unassigned regular on tour 1
18  had -- that was something that had not occurred in the
19  seven years prior to your conversion to a full-time
20  flexible?
21    A.  That's right.
22    Q.  So, I take it in the seven years prior to your
23  conversion other people had been converted from
24  part-time flexible to full-time flexible?
25    A.  Yes.

---

**65**

1    Q.  Do you know how many people?
2    A.  Not total number, but I could approximate 25,
3  30.
4    Q.  It's your belief and knowledge that all of
5  those people during that seven-year period of time
6  what happened to them when they were converted from
7  part-time flexible to full-time flexible?
8    A.  It's customary that you stay on the same
9  tour.  You get three bidding cycles according to the
10  union, slash, management agreement.  At such time
11  management has the right to place you, but that's
12  usually not what happens.  It's customary that they're
13  just left unassigned until such time they bid a job
14  wherever they prefer.
15        MR. FEUERHAKE:  Can I get some
16  clarification for the record.  What parameters of what
17  you are talking about when you say 25 people?
18  Obviously there is full-time flexibles and part-time
19  flexibles all over the country, many in Delaware.
20  What unit are we talking about just so that the record
21  is comprehensive?
22        THE WITNESS:  I'm talking about PTF's being
23  converted to regulars.
24        THE WITNESS:  In the Delaware P&DC.  As far
25  as the country I would not know.

---

17 (Pages 62 to 65)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

66

1    MR. FEUERHAKE: It's a big facility. You
2  are talking about the whole facility during that
3  period of time or just your area?
4    THE WITNESS: In the clerk category. The
5  mail handlers are a different category in that same
6  building and they have their own union, their own
7  criteria to be fulfilled before someone is converted.
8    MR. FEUERHAKE: We are talking about clerks
9  in the P&DC facility?
10    THE WITNESS: That's right.
11  BY MR. BEAUSANG:
12    Q. Along those same lines at the P&DC facility
13  there is clerks and there is mail handlers?
14    A. That's right.
15    Q. Are there any other non-management positions?
16    A. No.
17    Q. All you know is that with respect to the clerks
18  at the Delaware P&DC facility that the seven years
19  prior to September 18, 2004 you believe 25 or so
20  employees were converted from part-time flexible to
21  full-time flexible?
22    A. Yes.
23    Q. You said it's customary when an employee is
24  converted from part-time flexible to full-time
25  flexible that they are given three bidding cycles to

67

1  bid on a job?
2    A. That's right.
3    Q. During those three bidding cycles do they stay
4  on the same job and the same tour?
5    A. Yes.
6    Q. Or just the same tour?
7    A. Everything remains the same.
8    Q. Then, if they are not successful in bidding a
9  job that's when management assigns them a job?
10    A. They have the option that they can assign them,
11  but in the time that I've been there they allow them
12  to remain the same until they find something, until
13  they are successful bidding a job. I have never seen
14  anyone converted and put on tour 1 as long as I've
15  been there.
16    Q. So, it's your belief that under the union
17  contract that when management converts an employee
18  from part-time flexible to full-time flexible that
19  they have the option consistent with the contract to
20  assign that employee to some other job or some other
21  tour?
22    A. Only after three bidding cycles.
23    Q. And it's your experience that even though
24  management has that option to do that after three
25  bidding cycles they don't do that?

68

1    A. You're right.
2    Q. Did management when they converted you in
3  September of 2004 did they give you three bidding
4  cycles before they assigned you to a different tour?
5    A. No.
6    Q. Did you file a union grievance about that?
7    A. Yes.
8    Q. And what happened?
9    A. Nothing.
10    Q. What do you mean?
11    A. I submitted it and that was the end of it. I
12  never heard another thing. I went to tour 1 and I
13  stayed on tour 1.
14    Q. When you say nothing happened can you describe
15  generally the process, what happens to a grievance
16  after it's filed?
17    A. You submit the grievance and I believe the
18  person taking the grievance has a meeting with the
19  supervisor, whoever, I don't really know who, but
20  someone.
21    Q. Let me stop you there, the person taking the
22  grievance is a --
23    A. Stop steward, yes.
24    Q. You think after submitting a grievance the shop
25  steward meets with management?

69

1    A. Yes.
2    Q. Do you know what happened after that?
3    A. If management and union do not agree, then it
4  goes to an arbitration hearing.
5    Q. You submitted a grievance to your shop steward?
6    A. Yes.
7    Q. Do you remember who that was?
8    A. No.
9    Q. And do you know whether or not whoever you
10  submitted it to, whatever shop steward you submitted
11  your grievance to, whether that person had a meeting
12  with anybody from management?
13    A. I don't know.
14    Q. You don't know one way or the other?
15    A. No, I don't.
16    Q. But you do know that you never heard anything
17  back about the grievance?
18    A. That's right.
19    Q. There are other people who are also converted
20  on September 18, 2004, right?
21    A. Yes.
22    Q. And they were also just like you assigned from
23  tour 3 to tour 1, right?
24    A. Yes.
25    Q. Do you know if they filed grievances?

18 (Pages 66 to 69)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

70

1    A. I don't know.
2    Q. September 18, 2004 when you were moved from
3    tour 3 to tour 1 did that have the effect of moving
4    you away from Delores Thomas?
5    A. Yes.
6    Q. Were you happy about that?
7    A. No.
8    Q. Why not?
9    A. I did not relish the idea of staying up all
10   night and changing my entire sleeping patterns to
11   sustain my job.
12   Q. What I take that to mean is that even though
13   you wanted to be away from Ms. Thomas it was more
14   important for you to remain on a non-overnight shift?
15   A. Well, the thing is to be put on tour 1 is not
16   desirable and that's common knowledge. That is not a
17   desirable tour, not by any stretch of the imagination.
18   I think it was done in contrast to my request to go to
19   tour 2. That's really what I asked him to do for me
20   at least in the -- that time frame until things were
21   settled down or at least he could do something, check
22   into it, the investigation, whatever was going to
23   occur. I just wanted to be out of the picture for a
24   little while and I asked for tour 2, which is the
25   desireable tour.

---

71

1    Q. This request to be on tour 2 this happened
2    when?
3    A. That November 26th meeting with Mr. Williams.
4    Q. And, like you said, tour 2 is the most
5    desirable shift?
6    A. Yes.
7        MR. FEUERHAKE: For the record that's
8    November 26, 2003, correct?
9        THE WITNESS: Yes.
10       MR. BEAUSANG: Yes.
11   BY MR. BEAUSANG:
12   Q. Do you know whether anyone else had ever asked
13   to be moved to a different tour to get away from an
14   employee they were having a problem with?
15   A. No.
16   Q. Turning to page 26 of Jeffries-2 to the top of
17   the page you write that you suffered a financial loss
18   because the employees still working on tour 3 were
19   given penalty time which is the equivalent of double
20   time. Do you see that?
21   A. Yes.
22   Q. First of all, what is penalty time?
23   A. It's double time. They worked past ten hours,
24   I believe.
25   Q. A clerk works past ten hours on a shift and any

---

72

1    time over that is penalty time?
2    A. I think so.
3    Q. And is paid double the pay rate?
4    A. That's right.
5    Q. Now, do you know how many employees had to work
6    penalty time after September -- how many employees on
7    tour 3 had to work penalty time after September 18,
8    2004?
9    A. No.
10   Q. But you do know that some employees had to work
11   penalty time?
12   A. Well, it's a voluntary thing. If you want the
13   overtime, they had plenty of it at that point. Prior
14   to that they did not.
15   Q. So, after you and other employees were shifted
16   off tour 3 the post office had available penalty time
17   that employees could volunteer for?
18   A. Yes, they also had plant failure quite a bit.
19   Q. What is that?
20   A. That means they did not get the mail out for
21   dispatch time on tour 3 minus a whole crew, four or
22   five people, that were placed on tour 1 and they said
23   they didn't need us.
24   Q. Back to penalty time before September 18, 2004,
25   it's your understanding that there was no penalty time

---

73

1    available on tour 3?
2    A. Correct.
3    Q. Afterwards there was penalty time available?
4    A. Yes.
5    Q. And you know that some employees took advantage
6    of that and worked penalty time after September 18,
7    2003 on tour 3?
8    A. Yes.
9    Q. Do you know any of those employees' names?
10   A. I think Mildred Cherry was one. I think Debbie
11   Callahan was one. Tiketa -- I can't remember her last
12   name. T-I-K-E-T-A it is. I'm not sure of anybody
13   else.
14   Q. Do you know for what period of time after
15   September 18, 2004 that there was penalty time
16   available on tour 3?
17   A. No, I don't know.
18   Q. Do you know if it was -- do you know if it was
19   a year after that?
20   A. I wasn't on tour 1 for a year. I was there for
21   nine months, but I don't know how long it took.
22   Q. Back to you said there was also plant failure
23   after you left tour 3?
24   A. Yes. May I say something?
25   Q. Sure.

---

19 (Pages 70 to 73)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

74

1    A. They had nothing for us to do on tour 1,
2    nothing at all. We stood around asking for work and
3    the supervisors were totally confused. They said, "We
4    don't have anything for you to do." So, it was very
5    confusing to say the least why we were taken from a
6    tour that was abundant in work and work hours and put
7    on a tour that we had nothing to do.
8    Q. When you say we had nothing to do, you are
9    speaking about yourself and the other employees who
10   were converted in September 2004 from part-time
11   flexible to full-time flexible and were shifted to
12   tour 1?
13   A. Yes.
14   Q. Did you do anything on tour 1?
15   A. Stood around for a little while at the
16   supervisor's desk and they were scratching their head
17   trying to find a place to put us. Eventually during
18   the night they would find something for us to do.
19   Q. And did that situation where you were
20   struggling to find something to do on tour 1 did that
21   last the entire time you were on tour 1?
22   A. No.
23   Q. How long did it last?
24   A. At least a month or so we had problems every
25   night.

---

75

1    Q. Did anyone ever tell you that John Williams had
2    said that -- did anyone ever tell you that John
3    Williams had said that your move from tour 3 to tour 1
4    was a punishment?
5    A. They did not tell me who said it, they would
6    not tell me, but they did tell me that you can
7    consider this and, I quote, as a punishment.
8    Q. When you say "they," who are you talking about?
9    A. One person, one clerk, who is -- would never
10   want her name exposed, but she told me in my face and
11   just not long ago because I thought, you know, it was
12   her and I wanted to remember and she said, "Yes, I did
13   tell you that and I cannot tell you who told me," but
14   it was a supervisor told her that. Now, that was my
15   suspicion, but when she said that to me it was no
16   longer a suspicion.
17   MR. FEUERHAKE: Can we take a break for
18   just a minute?
19   MR. BEAUSANG: Sure.
20   (Brief recess.)
21   BY MR. BEAUSANG:
22   Q. Ms. Jeffries, before we took a short break I
23   was asking you about how you learned that someone in
24   post office management had said that your transfer
25   from tour 3 to tour 1 was a punishment?

---

76

1    A. I was told that by another clerk.
2    Q. Who told you that?
3    A. Debbie Callahan.
4    Q. When did she tell you that?
5    A. She told me that shortly after I arrived on
6    tour 1, within that first week I was told.
7    Q. She was the tour 3 employee, right?
8    A. Yes.
9    Q. Did your shifts overlap?
10   A. She was on tour 1 because she bid the job. She
11   was a tour 1 clerk at that time.
12   Q. I thought you told me that Debbie Callahan was
13   one of the people on tour 3 who was getting paid
14   penalty time?
15   A. She was on tour 3 -- I'm not sure now that you
16   bring that up. We'll have to ask her. I'm not sure,
17   but I remember her telling me that.
18   Q. She told you that shortly after September 18,
19   2004?
20   A. Yes.
21   Q. What exactly did she say?
22   A. She said, "Janet, someone told me that you can
23   consider this as a punishment." And I said, "Who told
24   you that?" She said, "Well, I can't tell you."
25   Q. Did you say that you had a more recent

---

77

1    conversation with her to confirm this conversation?
2    A. I asked her that a few days ago. I said, "Are
3    you the one that I was talking to that night?" She
4    said, "Yeah, I was." I said, "Well, I don't remember
5    who you told me you were talking to." She said, "I
6    can't tell you."
7    Q. Did you ever learn who it was that had told her
8    that this was a punishment?
9    A. No.
10   MR. FEUERHAKE: Can I ask something for
11   purposes of clarification and I don't mean to step on
12   your deposition, but did she tell you what status the
13   person had in terms of level in the hierarchy?
14   THE WITNESS: She alluded to the fact that
15   it was a supervisor.
16   MR. FEUERHAKE: Okay, that's all.
17   BY MR. BEAUSANG:
18   Q. When you say she alluded to the fact it was a
19   supervisor, did she say it was a supervisor?
20   A. She did not.
21   Q. How did she allude to the fact it was a
22   supervisor?
23   A. If it was an employee, she would have
24   definitely told me, but there are certain relation-
25   ships that clerks have with supervisors that they

---

20 (Pages 74 to 77)

Jeffries  v.  Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

78

1    don't want to jeopardize. It would not be a jeopardy
2    to tell for another clerk.
3        Q. The fact that she didn't tell you who made the
4    statement led you to believe it was a supervisor?
5        A. Yes.
6            MR. BEAUSANG: Exhibit 4, please.
7            (Jeffries Deposition Exhibit No. 4 was
8    marked for identification.)
9    BY MR. BEAUSANG:
10       Q. Ms. Jeffries, before you is a document marked
11   Jeffries-4. Do you recognize the document?
12       A. Yes.
13       Q. What is it?
14       A. This looks like my EEO complaint of
15   discrimination from the postal service.
16       Q. And it's dated February 10, 2004?
17       A. Yes.
18       Q. Did you make any other formal EEO complaints
19   that you are aware of?
20       A. For this one complaint?
21       Q. Did you make any other formal EEO complaints
22   other than this one involving anything to do with Ms.
23   Thomas or the post office's failure to investigate Ms.
24   Thomas or the retaliation against you in connection
25   with that?

79

1        A. As far as I know I only put in one and one was
2    retaliation. The first complaint was in reference to
3    the incident that took place and Mr. Williams not
4    investigating it because of my color. Then, I put in
5    a complaint for discrimination because of the EEO
6    complaint.
7        Q. Is this the complaint for discrimination?
8        A. I believe it is.
9        Q. In the remedy section, paragraph 17 on
10   Jeffries-4, you say you want permanent tour 2
11   reassignment and guaranteed eight hours, right?
12       A. Yes.
13       Q. At the time you made this complaint you were a
14   part-time flexible, right?
15       A. Yes.
16       Q. So, you were only guaranteed four hours?
17       A. Right.
18       Q. But you wanted -- did you want to be converted
19   to a full-time flexible as a result of this complaint?
20       A. I don't think so, no.
21       Q. You wanted to be guaranteed eight hours, right?
22       A. I guess because I was working eight hours on
23   tour 2 I didn't want to be put on tour 2 and sent home
24   after four.
25       Q. But you wanted to be guaranteed eight, right?

80

1        A. Just like the other clerks, not guaranteed, but
2    working eight hours.
3            MR. BEAUSANG: Jeffries-5.
4            (Jeffries Deposition Exhibit No. 5 was
5    marked for identification.)
6    BY MR. BEAUSANG:
7        Q. Ms. Jeffries, before you is a series of
8    documents Bates labeled 100 to 113 and it has been
9    labeled Jeffries-5. Take a look through the document
10   and tell me if you recognize these documents.
11       A. Yes, I do.
12       Q. First document on Jeffries-5 Bates labeled 100
13   is a form that says "Information for Pre-Complaint
14   Counseling," do you see that?
15       A. No.
16       Q. It's at the top of Bates number 100 on
17   Jeffries-5?
18       A. Um-hum.
19       Q. Is this a form that you filled out?
20       A. Yes.
21       Q. Was this the other complaint, EEO complaint,
22   that you were talking about?
23       A. This is the initial complaint.
24       Q. So, you filed the initial complaint, which is
25   Bates 100 on Jeffries-5?

81

1        A. Yes.
2        Q. And you also filed the formal complaint, which
3    is Jeffries-4?
4        A. This is discrimination for the EEO that I first
5    submitted, yes.
6        Q. Did you file any other EEO complaints besides
7    these two?
8        A. No.
9        Q. On Bates 100 on Jeffries-5 in section C you
10   refer to a summary of an incident that is attached.
11   Do you see that?
12       A. Yes.
13       Q. And then turn to Bates 106, is that the summary
14   you are talking about?
15       A. Yes.
16       Q. Take a look at Bates 101 and 102 and you have
17   on Bates 101 and 102 looks like you have identified
18   five employees. Do you see that?
19       A. Yes, I do.
20       Q. And what was the purpose of identifying these
21   employees?
22       A. That's what they asked for. They want to know
23   similarly situated employees that were treated
24   differently than you.
25       Q. These five employees are similarly situated

21 (Pages 78 to 81)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

|  | 82 |
|---|---|
| 1 | employees that you think were treated -- |
| 2 | A. Yes, different. |
| 3 | Q. -- different than you? |
| 4 | A. Based on color. |
| 5 | Q. On Bates 102 you have listed Felicia Camper, do |
| 6 | you see that? |
| 7 | A. Yes. |
| 8 | Q. Who is Felicia Camper? |
| 9 | A. She is a clerk that was working at the plant. |
| 10 | You want me to go into this? |
| 11 | Q. What is her race? |
| 12 | A. She is black. |
| 13 | Q. And you have described an incident where she |
| 14 | verbally attacked a while male named Bo Driggers. Do |
| 15 | you see that? |
| 16 | A. Yes. |
| 17 | Q. Do you know when that incident happened? |
| 18 | A. I don't see the date, no, I don't. |
| 19 | Q. How do you know about that incident? |
| 20 | A. Bo was a union rep and he may have told me or |
| 21 | Doris Perry. Most of my information comes from the |
| 22 | union. |
| 23 | Q. And you were told that Felicia Camper had |
| 24 | verbally attacked Bo Driggers? |
| 25 | A. Yes. |

|  | 83 |
|---|---|
| 1 | Q. And you were also told that both employees were |
| 2 | immediately removed from the building? |
| 3 | A. Yes. |
| 4 | Q. And then you were told that Ms. Camper was |
| 5 | verbally warned? |
| 6 | A. That's right. |
| 7 | Q. Were you told whether or not there was any |
| 8 | discipline taken against Mr. Driggers? |
| 9 | A. Mr. Driggers was the one that was being |
| 10 | verbally attacked. |
| 11 | Q. He was not disciplined because of this |
| 12 | incident? |
| 13 | A. No. He was the one that was on the receiving |
| 14 | end. |
| 15 | Q. And Bo Driggers -- well, he is a white male, |
| 16 | right? |
| 17 | A. Yes. |
| 18 | Q. You also have listed on 102 on Jeffries-5 an |
| 19 | employee named Mike Potalak? |
| 20 | A. Potalak. |
| 21 | Q. And you said he is a white male, right? |
| 22 | A. Yes. |
| 23 | Q. And he a salaried employee named Bill Landis? |
| 24 | A. Yes. |
| 25 | Q. Who is also a white male? |

|  | 84 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. You say both employees were immediately removed |
| 3 | from the building? |
| 4 | A. Yes. |
| 5 | Q. And Mike Potalak was fired? |
| 6 | A. That's right. |
| 7 | Q. Do you know any discipline taken against Bill |
| 8 | Landis as a result of this? |
| 9 | A. I don't know. |
| 10 | Q. Did you also learn about this from -- |
| 11 | A. The union. |
| 12 | MR. BEAUSANG: Mark this, please. |
| 13 | (Jeffries Deposition Exhibit No. 6 was |
| 14 | marked for identification.) |
| 15 | BY MR. BEAUSANG: |
| 16 | Q. Ms. Jeffries, before you is a document that has |
| 17 | been marked Jeffries-6, actually a series of documents |
| 18 | Bates labeled 118 through 129. Take a look through |
| 19 | these and tell me if you recognize these documents. |
| 20 | A. Yes. |
| 21 | Q. On Bates 127 there is a postal slip that seems |
| 22 | to indicate that these documents were received by you, |
| 23 | is that right? |
| 24 | A. Yes. |
| 25 | Q. Do you recall receiving these documents? |

|  | 85 |
|---|---|
| 1 | A. Nope, I do not. |
| 2 | Q. Do you have any reason to doubt that you |
| 3 | received them, though? |
| 4 | A. No doubt. |
| 5 | Q. On Bates 118 of Jeffries-6 in the first |
| 6 | paragraph, first of all, Bates 118 is a letter from |
| 7 | the Equal Employment Opportunity office of the postal |
| 8 | service to you, right? |
| 9 | A. Yes. |
| 10 | Q. And in the first paragraph of Bates 118 the |
| 11 | post office writes, "In your request you --" referring |
| 12 | to you, Ms. Jeffries "-- allege that you were |
| 13 | discriminated against based on race (Italian- |
| 14 | American) color (Caucasian) and sex (Female) when on |
| 15 | November 11, 2003, you were verbally assaulted and |
| 16 | management did nothing about that." Do you see that? |
| 17 | A. Yes. |
| 18 | Q. And its says, "The above cited issue is the |
| 19 | only issue that will be addressed during the |
| 20 | processing of this complaint." |
| 21 | A. Yes. |
| 22 | Q. Do you recall whether or not you responded to |
| 23 | the EEO office to ask them to investigate additional |
| 24 | issues? |
| 25 | A. Yes, I do, in writing. |

22 (Pages 82 to 85)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

86

1    Q.  And I direct you to Bates 120 in Jeffries-6 and
2  that appears to be a letter, dated February 13, 2004,
3  from you?
4    A.  That's right.
5    Q.  Is that your response?
6    A.  Yes, it is.
7    Q.  What was the purpose of writing this response?
8    A.  I wrote it because they omitted physical
9  assault and I wanted that to be included in my
10  complaint because it specifically says any new
11  allegations you can't do that so I wrote that.
12        MR. BEAUSANG:  Jeffries-7.
13        (Jeffries Deposition Exhibit No. 7 was
14  marked for identification.)
15  BY MR. BEAUSANG:
16    Q.  Ms. Jeffries, before you is a document labeled
17  Jeffries-7.  It's a series of documents Bates 114 to
18  117.  Do you recognize these documents?
19    A.  Yes.
20    Q.  On Bates 117 of Jeffries-7 there is a
21  certificate of service that indicates that these
22  documents were sent to you by regular mail.  Do you
23  see that?
24    A.  Yes.
25    Q.  Do you recall receiving these documents?

87

1    A.  No.
2    Q.  Do you have any reason to doubt that you did
3  receive them?
4    A.  No doubt.
5    Q.  Also says here it was sent to the claimant's
6  representative who is identified as Louise Brinson?
7    A.  Yes.
8    Q.  Who is that?
9    A.  That is a clerk who used to be -- I think she
10  was just a union rep at one point.
11    Q.  Turning back to Bates 114 of Jeffries-7, Bates
12  114, appears to be a letter from the postal service
13  EEO department to you, dated March 31, 2004, is that
14  right?
15    A.  Yes.
16    Q.  And the letter says that your complaint has
17  been accepted for investigation, right?
18    A.  Yes.
19    Q.  And then it identifies a specific issue that is
20  going to be investigated, right?
21    A.  Yes.
22    Q.  And now the specific issue includes both the
23  verbal and physical assault, right?
24    A.  Yes.
25    Q.  Do you know if you ever wrote to the post

88

1  office to say whether you wanted anything else
2  investigated besides the specific issue identified in
3  114?
4    A.  No, I don't.
5    Q.  You don't recall if --
6    A.  I don't know of any other writings.
7    Q.  Okay.
8        MR. FEUERHAKE:  For the record, I mean, the
9  specific issue as identified in that letter speaks for
10  itself, but it also refers to the fact that management
11  failed to take any action.
12        MR. BEAUSANG:  Absolutely.  Jeffries-8.
13        (Jeffries Deposition Exhibit No. 8 was
14  marked for identification.)
15  BY MR. BEAUSANG:
16    Q.  Ms. Jeffries, before you is a document marked
17  Jeffries-8 and it's labeled Bates 168.  Do you
18  recognize the document?
19    A.  Yes.
20    Q.  What is it?
21    A.  This is Bobby Ford's statement.
22    Q.  What is the date of it?
23    A.  11/17/03.
24    Q.  The date is 11/26/03 in the top right-hand
25  corner, do you see that?

89

1    A.  Oh, yes.
2    Q.  And it also says, "Change of statement from
3  11/17/03"?
4    A.  Yes.
5    Q.  Is this the statement that you were talking
6  about that was taken at that meeting between you and
7  Mr. Williams and Ms. Perry and Mr. Ford was there with
8  his representative?
9    A.  Yes.
10        MR. BEAUSANG:  Next four pages are going to
11  be Jeffries-9.
12        (Jeffries Deposition Exhibit No. 9 was
13  marked for identification.)
14  BY MR. BEAUSANG:
15    Q.  Ms. Jeffries, before you is a document marked
16  Jeffries-9, it's four pages, Bates 160 to 163.  Do you
17  recognize this document?
18    A.  Looks like a statement by Delores Thomas.
19    Q.  And what is the date of the statement?
20    A.  November 11th.
21    Q.  And feel free to read through it, but is this
22  the statement about the incident that you had with Ms.
23  Thomas on November 11, 2003?
24    A.  Well, it's kind of weird because on the
25  November 11 she refused to do a statement, but this is

23  (Pages 86 to 89)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

**90**

1  dated November 11th. So, I don't know. I guess this
2  is her rendition of what took place.
3      MR. BEAUSANG: Next three pages will be
4  Jeffries-10.
5      (Jeffries Deposition Exhibit No. 10 was
6  marked for identification.)
7  BY MR. BEAUSANG:
8   Q.  Ms. Jeffries, before you is a document marked
9  Jeffries-10. It's a three-page document Bates 157 to
10  159. Do you recognize the document?
11   A.  Yes.
12   Q.  What is it?
13   A.  This is my statement of what took place on
14  November 11th, '03.
15   Q.  And Bates 159 looks like the statement is dated
16  November 12, 2003?
17   A.  Yes, it is.
18   Q.  Did anybody ask you to write this statement?
19   A.  Yes.
20   Q.  Who?
21   A.  Angelo Lambert.
22   Q.  Did you give Mr. Lambert this statement?
23   A.  Yes.
24   Q.  Do you remember when?
25   A.  I gave him a statement that night under duress.

**91**

1  I was hysterical.
2   Q.  That night is November 11, 2003?
3   A.  I don't see it here, though. Yes.
4   Q.  And it was a written statement?
5   A.  Yes, it was.
6   Q.  You said you gave him a written statement under
7  duress?
8   A.  Yeah, it was right after the incident took
9  place, I was shaking. I was close to tears. Plus, I
10  was angry at the same time. I was pretty well wore
11  out that night.
12   Q.  Did you not want to give a statement on
13  November 11?
14   A.  I did want to give a statement, but I don't
15  think it was complete.
16   Q.  When you say under duress, you are not saying
17  that Mr. Lambert pressured you into giving a statement
18  you didn't want to give, right?
19   A.  You're right.
20   Q.  What you mean is you were very emotional --
21   A.  I was physically duressed, emotionally
22  duressed.
23   Q.  And the statement you gave on Jeffries-10, why
24  did you go ahead and give a second statement?
25   A.  I wrote it because I went home, I calmed down

**92**

1  and I wanted to put exactly what took place, give him
2  a better view and more detailed view of what happened
3  that night.
4   Q.  And have you ever seen the statement you gave
5  Mr. Lambert on November 11, 2003?
6   A.  No. I don't know where it is.
7      MR. BEAUSANG: Next two pages will be
8  Jeffries-11.
9      (Jeffries Deposition Exhibit No. 11 was
10  marked for identification.)
11  BY MR. BEAUSANG:
12   Q.  Ms. Jeffries, you have a document before you
13  that is Jeffries-11, 165 to 166, do you recognize the
14  document?
15   A.  Yes.
16   Q.  What is it?
17   A.  Karen Bayard's statement.
18   Q.  Dated?
19   A.  11/11/02.
20   Q.  Turning to Bates 166 at the bottom there is
21  another date that says November 15, 2003?
22   A.  Yes.
23   Q.  Do you know whether she wrote this on the 15th
24  or on November 11th?
25   A.  She wrote it on 11/11/03.

**93**

1   Q.  Do you know why she put November 15, 2003 on
2  Bates 166?
3   A.  I know that she wrote it when it happened. She
4  told Doris Perry that, but was not able to give it and
5  submit it. This is the date she submitted it.
6      MR. BEAUSANG: Next exhibit is going to be
7  Jeffries-12.
8      (Jeffries Deposition Exhibit No. 12 was
9  marked for identification.)
10  BY MR. BEAUSANG:
11   Q.  Ms. Jeffries, before you is a document labeled
12  Jeffries-12 and it's Bates number 167. Do you
13  recognize this document?
14   A.  Yes.
15   Q.  And this is another statement by Karen
16  Bayard --
17   A.  Yes, it is.
18   Q.  -- about the incident between you and Ms.
19  Thomas on November 11th?
20   A.  Yes.
21   Q.  And this statement is dated December 28, 2003?
22   A.  Yes.
23   Q.  Do you know why Ms. Bayard gave this statement?
24   A.  I know that she was asked by Doris Perry for
25  another statement because Mr. Williams could not find

---

24 (Pages 90 to 93)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

94

1  her original statement.
2      Q.  And her original statement is Jeffries-11?
3      A.  Yes.
4      Q.  Do you know whether Ms. Bayard gave another
5  written statement besides this one?
6      A.  In total I believe she gave three.
7      Q.  Do you know what dates she gave the third
8  statement?
9      A.  No, I don't.  It's written on here somewhere.
10  I don't know.
11     Q.  Have you seen the third written statement?
12     A.  I've seen them all.
13     Q.  Do you know why she gave a third written
14  statement?
15     A.  He lost the statement three times.
16     Q.  And when you say "he" --
17     A.  Mr. John Williams.
18     Q.  And I guess he must have found them, right,
19  because they are in the record?
20     A.  Eventually, yes, they were found.
21     Q.  Do you know when they were found?
22     A.  No.
23          MR. BEAUSANG:  This is Jeffries-13.
24          (Jeffries Deposition Exhibit No. 13 was
25  marked for identification.)

95

1  BY MR. BEAUSANG:
2      Q.  Ms. Jeffries, before you is a document
3  identified as Jeffries-13 and it's Bates number 156.
4  Do you recognize this document?
5      A.  Yes.
6      Q.  What is it?
7      A.  This is a letter written by Angelo Lambert.
8      Q.  And it's dated November 27, 2003?
9      A.  Yes.
10     Q.  You say it's a letter, but the first line of it
11  says, "I, Angelo Lambert, do hereby make the following
12  statement."
13     A.  Yes.
14     Q.  Is this yet another statement about the
15  incident on November 11, 2003?
16     A.  It appears to be.
17     Q.  Angelo Lambert was the person that you went to
18  first to complain about Ms. Thomas on November 11,
19  2003, right?
20     A.  Yes.
21     Q.  Do you know why Mr. Lambert wrote this
22  statement?
23     A.  No, I don't.
24          MR. BEAUSANG:  Make this Jeffries-14.
25          (Jeffries Deposition Exhibit No. 14 was

96

1  marked for identification.)
2
3  BY MR. BEAUSANG:
4      Q.  Ms. Jeffries, before you is a document labeled
5  Jeffries-14 and it's Bates number 169.  Do you
6  recognize what Jeffries-14 is?
7      A.  Yes.
8      Q.  What is it?
9      A.  This is a note from Lynette Marrow.
10     Q.  And what is the note about?
11     A.  This is what she remembers regarding the
12  incident on Veterans Day.
13     Q.  Veterans Day 2003 between you and Ms. Thomas?
14     A.  Yes.
15     Q.  And Jeffries-14 has a date in the upper
16  right-hand corner says November 11, 2003?
17     A.  Yes.
18     Q.  Do you know whether Lynette Marrow wrote this
19  on November 11, 2003?
20     A.  I think I remember she left the date as the
21  date it occurred, but not the date she submitted it.
22  She was not called in on 11/11/03.
23     Q.  The first sentence in Jeffries-14 begins, "This
24  note is in response to MDO John Williams' request to
25  provide more of my rememberances regarding the

97

1  Veterans Day incident on the FSM 100 involving Ms.
2  Jeffries and Ms. Thomas," and then it goes on.  Do you
3  see that?
4      A.  Yes.
5      Q.  Do you know when John Williams requested that
6  Lynette Marrow provide more of her rememberances about
7  the incident?
8      A.  I don't know.
9      Q.  Do you have any reason to doubt that he did
10  actually ask her to provide more of her rememberances
11  about the incidents?
12     A.  Do I doubt that he asked her?
13     Q.  Right.
14     A.  I don't doubt that.
15          MR. BEAUSANG:  Finally this is Jeffries-15.
16          (Jeffries Deposition Exhibit No. 15 was
17  marked for identification.)
18  BY MR. BEAUSANG:
19     Q.  Ms. Jeffries, before you is a document labeled
20  Jeffries-15, do you recognize this document?
21     A.  Yes.
22     Q.  And is this another statement by Lynette
23  Marrow?
24     A.  Looks that way, yes.
25     Q.  Again, it's dated November 11, 2003, but do you

25  (Pages 94 to 97)

Jeffries  v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

98

1  know whether or not that means that the statement was
2  written on that date or not?
3    A.  I don't know.
4    Q.  And this is a statement about the incident
5  between you and Ms. Delores Thomas on November 11,
6  2003?
7    A.  Yes.
8    Q.  And Lynette Marrow, she was one of the
9  witnesses to the incident?
10   A.  Yes.
11   Q.  I think you would agree with me that there is
12  nothing in this statement that says there was any
13  physical contact between you and Ms. Thomas, right?
14      MR. FEUERHAKE:  I'm going to -- well, the
15  document speaks for itself.  Go ahead, you can answer.
16   A.  What is the question?
17   Q.  Will you agree with me that nothing in
18  Jeffries-15, Lynette Marrow's statement, says there
19  was any physical contact between you and Ms. Delores
20  Thomas?
21   A.  Yes, I agree.
22   Q.  Ms. Marrow also writes in the second paragraph,
23  to her that it just seemed like the incident between
24  you and Ms. Thomas seemed like another emotional
25  incident between two women.  "It was nothing unusual

99

1  to me.  It happens all the time at the Delaware P&DC."
2    A.  Yes.
3    Q.  Do you agree with that statement?
4    A.  I haven't seen much bickering.  She must have
5  been exposed to more than I was.
6    Q.  Do you think it was an unusual incident that
7  happened between you and Ms. Thomas?
8    A.  I thought it was extremely different than what
9  she was talking about here.  This was not a usual
10  thing.
11      MR. BEAUSANG:  Make this Jeffries-16.
12      (Jeffries Deposition Exhibit No. 16 was
13  marked for identification.)
14      MR. BEAUSANG:  Why don't we take a short
15  break.
16      (Brief recess.)
17      MR. BEAUSANG:  Is there something we should
18  do on the record about a name?
19      THE WITNESS:  Yes, she was asking me
20  spellings of names and she asked about Tasha Bryant.
21  It's not Bryant, it's Palmer.  There are two Tashas
22  that are in the plant.
23  BY MR. BEAUSANG:
24   Q.  Is Tasha Palmer the person you were falsely
25  accused of assaulting?

100

1    A.  That's right.
2      MR. BEAUSANG:  Mark this 17.
3      (Jeffries Deposition Exhibit No. 17 was
4  marked for identification.)
5  BY MR. BEAUSANG:
6    Q.  Ms. Jeffries, before you is a document marked
7  Jeffries-17.  It's a document that you actually handed
8  to me today, it's not Bates numbered.  Do you
9  recognize the document?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's a statement from Kim Bayard.
13   Q.  Looks like it's dated January 3, 2004?
14   A.  Yes.
15   Q.  And I think this is now the third statement we
16  have talked about today from Ms. Bayard, right?
17   A.  Yes.
18   Q.  I think you told me before that the reason why
19  she wrote three statements is because John Williams
20  lost the first two statements?
21   A.  That's right.
22   Q.  How do you know that that's so?
23   A.  Doris Perry.  She is the one that asked Mr.
24  Williams for the statements, she wanted to read them
25  to see if there was any substance to my complaint and

101

1  every time she asked him he didn't have them.  He
2  said, "I lost it."  She would request another one from
3  her.  To the best of my knowledge that's why there is
4  three.  That's as many times as he lost them.
5    Q.  When you say she would have requested another
6  one --
7    A.  Doris Perry.
8    Q.  Would request from Ms. Bayard that she write
9  another statement?
10   A.  Yes.
11   Q.  Do you know whether Mr. Williams ever was able
12  to give Ms. Doris Perry all three statements from Ms.
13  Bayard?
14   A.  I think he did eventually give them all to her.
15  They're all here now.
16   Q.  When Ms. Perry would ask Mr. Williams for
17  statements, did he ever give any statements to Ms.
18  Perry do you know?
19   A.  In the beginning, no.  She was trying to find
20  out how far this investigation was going, was he
21  investigating it and trying to push him along.  It
22  seemed that he all of a sudden couldn't find something
23  and just gave him a lot of excuses and she was really
24  trying to get him to do something to look at this
25  thing and to do something.

26 (Pages 98 to 101)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

102

1  Q. This is all things you learned from Doris
2  Perry, right?
3  A. Yes.
4  Q. Did you know Doris Perry was asking Mr.
5  Williams about the investigation and asking him for
6  statements?
7  A. Well, I'm not really sure. As it went along
8  she may have mentioned to me, you know, we don't have
9  any statements from Karen Bayard or something and he
10 is taking too long with this. At one point I think
11 when it was all said and done he said he didn't have
12 anything. He didn't believe the statements at one
13 point I think he told her. She advised me to put it
14 into EEO because in her opinion he was not going to do
15 a thing about it.
16 Q. Obviously you were very interested in whether
17 there was an investigation and how that investigation
18 was proceeding?
19 A. Yes, but I was very naive. I truly believed
20 everything he said and truth is he wasn't telling the
21 truth.
22 Q. I'm just interested were you asking Doris Perry
23 to talk to John Williams or was she doing that on her
24 own?
25 A. She was doing it on her own trying to get him

103

1  to do something.
2  Q. And you don't remember whether or not she was
3  going back and telling you what he said every time?
4  A. No. I think finally she told me I had to get
5  her to do three statements, told me the whole thing.
6  Q. Now we'll back up. Do you have a document in
7  front of you labeled Jeffries-16?
8  A. Yes, I do.
9  Q. And this is a series of a several page document
10 not Bates labeled. Do you recognize the document?
11 A. Yes.
12 Q. What does it appear to be?
13 A. Appears to be the Answers to Interrogatories
14 that you requested.
15 Q. And if you flip through it I think you also see
16 answers to document requests on page nine?
17 A. Okay, yes.
18 Q. Last three pages appear to be an attachment to
19 Interrogatory number 20?
20 A. Yes.
21 Q. Going back to the first page of Jeffries-16 in
22 response to Interrogatory Number 1, which asks you to
23 identify each and every adverse employment action
24 which forms the basis of your complaint, you reference
25 your declarations, dated July 20, 2005 and November

104

1  10, 2005, right?
2  A. Yes.
3  Q. And you also identify a number of other things
4  and then you wrote, "In general, she continues to be
5  victimized by the ongoing hostility in the workplace
6  requiring that Ms. Jeffries be careful at all times,
7  for example, always having a witness with her in case
8  an incident develops and the failure to supply her
9  with a transfer to a facility away from Delores Thomas
10 and John Williams." First of all, regarding the
11 ongoing hostility is that still ongoing?
12 A. Yes.
13 Q. What is still happening now?
14 A. Well, in January '07 Mr. Williams called me in
15 the office --
16 Q. We are still in January '07. Do you remember
17 what date it was?
18 A. This is '08.
19 Q. Sorry, you're right, my apology.
20 A. It was in reference to working in a specific
21 area. I had the union rep with me and another
22 supervisor and Mr. Keith Murphy, who was the lead MDO,
23 had made a directive for me to work in a certain
24 section. Mr. Williams decided he was going to change
25 that. That was the preliminary reason why I was

105

1  there, but it ended up him yelling and screaming about
2  he said, "I know you hate me," and all this, "We go
3  way back and I don't care how you feel about me and I
4  will do what I want to do because I can because I'm
5  the MDO." It got quite heated. It was very hostile.
6  I remained calm and just tried to calm him
7  down and asked him try to calm down, that, "Yes, we do
8  go back, but I don't hate you. I basically hate what
9  took place, but I don't hate you as a person so you
10 are wrong." That was the gist of that. That was
11 quite hostile to me. It was very upsetting. It was
12 totally uncalled for.
13 Q. Again, this happened in January of '07 --
14 A. Yes.
15 Q. -- about a year ago? And you were called into
16 the office because you were being transferred from one
17 job to another, is that right?
18 A. He wanted me to do something different and
19 another MDO had given me a directive for my benefit
20 and he said, "Well, that was '06, this is '07." I
21 said, "Well, I don't understand the logic behind
22 that." Then, he went into this tirade, very upset.
23 Q. Can you explain in more detail what he wanted
24 you to do and what you had been allowed to do in '06
25 and what he wanted you to do in '07?

27 (Pages 102 to 105)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

106

1    A. I was working in a case doing Delaware mail and
2  that job was given to me by MDO Keith Murphy and John
3  Williams wanted me to go to 030 and case outgoing
4  mail.
5    Q. You were casing Delaware mail in '06?
6    A. Yes.
7    Q. Was that a job you bid?
8    A. No. This was a job Keith Murphy asked me to do
9  and that was because the people in 030 do not take
10  kindly to people in their area, sort of sucks up their
11  overtime. So, they want overtime and they don't want
12  anybody in there doing that job.
13    Q. What tour is this on?
14    A. Tour 3.
15    Q. Again --
16    A. And lost the whole point because he got into
17  this personal thing, which was uncalled for. To me it
18  was hostile.
19    Q. I want to talk about the conversation you had
20  with Mr. Williams, but, first of all, I want to
21  understand what job you were working. At some point
22  you were able to bid back on tour 3, right?
23    A. Yes.
24    Q. And was that in June 2005? If you want to look
25  at Jeffries-1.

107

1    A. June 2005 I went back to tour 3.
2    Q. And you successfully bid back on a tour 3 job?
3    A. Right.
4    Q. And what job was that?
5    A. Dispatch clerk.
6    Q. Does that involve sorting mail?
7    A. Yes.
8    Q. Do you hold that job now?
9    A. Yes.
10    Q. So, when you were asked to do Delaware mail --
11  do you remember when you were asked to sort Delaware
12  mail?
13    A. I'm not really certain about the exact date, I
14  don't know.
15    Q. But whenever that happened that wasn't -- you
16  weren't switching jobs?
17    A. No.
18    Q. You remained at your bid job?
19    A. Yes.
20    Q. Then, when John Williams asked you to sort out-
21  going mail in January of '07, again, you were still
22  working the same job, just doing a different task,
23  right?
24    A. Right.
25    Q. And you said that the reason why you were

108

1  originally on Delaware mail is because the people who
2  were sorting outgoing mail didn't want a lot of people
3  doing that job?
4    A. They don't want anyone in there. It takes
5  their overtime away so they get a little hostile.
6    Q. Then, you were called in in January 2007 and
7  Mr. Williams said, "I'm going to switch you from
8  Delaware mail to out going mail."
9    A. Yes.
10    Q. And the conversation continued and got very
11  hostile you said?
12    A. Yes, on his part. He became very aggravated
13  and heated. He was snarling at one point.
14    Q. Do you remember why he got so angry?
15    A. I don't know other than he began -- his
16  demeanor changed and he said, "We go way back." I
17  said, "Okay." He said, "We go way back and I know you
18  hate me." And it went into that and that's how he got
19  into it and proclaimed to me that he is the MDO,
20  basically I can't question anything, you will do like
21  I tell you to do because I can tell you. He really
22  got into the personal stuff, which involves all of
23  this.
24    Q. Were you questioning why do I have to go to
25  outgoing mail, I've been on Delaware mail for a long

109

1  time?
2    A. No. I was questioning why did he wait for Mr.
3  Murphy to go on vacation to all of a sudden call me in
4  the office if he had a problem with it? Why didn't he
5  bring it up when Mr. Murphy was available?
6    Q. Who is Mr. Murphy?
7    A. He just recently passed away, he was the lead
8  MDO on tour 3.
9    Q. He was John Williams' supervisor?
10    A. Yes. That was my question. It was an innocent
11  question, but he couldn't handle the question.
12    Q. Back to Jeffries-16, page one, you write in
13  addition to the -- that you were victimized -- first
14  of all, are there any other ongoing examples of
15  ongoing hostility?
16    A. Yes.
17    Q. What is that?
18    A. Another person accused me of making racial
19  comments. Her name is Shawn Saunders. We were just
20  having a coffee break in the locker room and we were
21  talking about George Bush and how he misuses some of
22  his words. It was kind of funny. There was this girl
23  lurking in the back by the lockers, she looked very
24  perturbed, got up and left and I didn't think anything
25  of it. Next thing I know the people I had this

28 (Pages 106 to 109)

Jeffries  v.  Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

110

1   conversation with said, "Were you called into the
2   office?" I said, "No, why?" They said, "John
3   Williams interviewed all of us about you." I said,
4   "For what?" His question was over and over again did
5   Mrs. Jeffries make racial comments about black men? I
6   said, "I can't even understand where this would come
7   from," but apparently nothing was substantiated by
8   whatever this girl said about me.
9       I don't even know what she said, but they
10  were all interviewed because of me allegedly saying
11  something about black men. He must be very sensitive
12  to that point because he was ready again to call me
13  in. God forbid should anybody say I did this when, in
14  fact, I did not. I was totally blindsided by that
15  one.
16      Q. Do you remember when this happened?
17      A. That was May 16, '04.
18      Q. The woman that you said was perturbed is it
19  your belief that she was the one who accused you of
20  making racial comments about black men?
21      A. Yeah, she went to him and reported this.
22      Q. Do you know who that person was?
23      A. Who?
24      Q. Is that Shawn Saunders?
25      A. Shawn Saunders reported this, which she

111

1   believed to be racial slurs. I mean, it was about
2   George Bush. There were no black men involved in the
3   conversation.
4       Q. And your understanding is Mr. Williams
5   investigated this and decided that it was unfounded?
6       A. He promptly investigated within hours and I
7   don't know what he decided. All I know is he didn't
8   call me in.
9       Q. This was May 16, 2000 --
10      A. Four.
11      Q. What are other examples of --
12      A. I'm spoken to at times by supervisors in
13  demeaning tones and it is just off the wall stuff.
14  All of a sudden they turn on me. Like I would be
15  talking to them and all of a sudden they are mean and
16  hateful and I don't know what precipitates it, but I
17  deal with it every day. It's always something. And I
18  do not engage, I try my best to keep low-key, quiet,
19  and do what I'm told and I'm as complacent as possible
20  to avoid any confrontation.
21      I don't walk alone, I try to go on breaks
22  when everybody else is there to prevent things like
23  this because this seems to be something they could
24  throw at me. If I can't prove that I didn't do it,
25  I'll be out the door. My career hinges on what other

112

1   people want to bring up about me. I am so vulnerable
2   every day that I go to work. I don't know what
3   tomorrow holds. I don't know what today holds when I
4   go in there. All I know is I'm always having to
5   defend myself against people that come out of the
6   woodwork with these stories that are just absurd.
7       Q. One thing you just mentioned is that there are
8   comments, demeaning comments, made to you by
9   supervisors?
10      A. Yes.
11      Q. What other supervisors?
12      A. Just the other day Anton came over to me and
13  said, "Ms. Jeffries, where are you working?" And I
14  told him. "Who told you to go over there?" I feel
15  like I'm a child, I'm a grown woman. It would be
16  normal for me to say, Who do you think you are talking
17  to, but I have to keep my eyes down and be complacent
18  and say, I'm sorry, am I in the wrong place? And I
19  have to be submissive otherwise we'll be engaged in a
20  confrontation which will bring us to the office. I
21  feel like I'm baited all the time by certain things
22  like this. That's just one of many.
23      Q. What are some other examples?
24      A. Chiquita Conkey has yelled at me on several
25  occasions when I was on automation, If you were doing

113

1   your job, you would know why this program is not in
2   here when I was doing my job, when my partner wasn't
3   even present. I didn't engage because I would be
4   called into the office and be put out of the building.
5   Specifically, you want more? These are some of the
6   things that happened to me.
7       Q. I would like to know every single thing that
8   you can remember here today that supervisors have said
9   to you that is demeaning.
10      A. Owen Wallace screamed at me once because I went
11  to the wrong machine in front of other people like a
12  child. I did not engage. I humbly went to the
13  machine. I was, you know, demanded to go to. I don't
14  see other people being spoke to like that. I know
15  that most people wouldn't put up with it, but I kind
16  of know what the ultimate goal is because he told me,
17  "I will fire you." And those words are stuck in my
18  head, "I will fire you if you act like her." If I
19  respond in any way I can be assured I'll be out the
20  door because they can substantiate that kind of
21  behavior and they should, it's the rule.
22      Q. I asked you what supervisors have have said
23  demeaning things to you and you mentioned Anne Thomas,
24  Chiquita Conkey and Owen Wallace. Any other
25  supervisors that have made comments to you since

29 (Pages 110 to 113)

Jeffries  v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

114

1 November 2003?
2 A. Chiquita Conkey told me, and this was just a
3 flippant remark, you know, racial discrimination is
4 really hard to prove and she chuckled and walked past
5 me.
6 Q. When did she say that?
7 A. I don't know the date, I'm giving you
8 instances. This was within that time parameter. This
9 could have been last year sometime. Anne Thomas when
10 I was put on tour 1, every time that I came in, and I
11 mean every night I came in, she was standing at the
12 clock because she is on tour 3 and she is basically
13 looking toward her people. I would have to pass her.
14 There was always some kind of comment about me being
15 on tour 1. Are you going to be able to stay awake
16 tonight? Oh, my God, the holidays are coming up, Ms.
17 Janet, what are you going to do? Oh, you will be like
18 on that TV show, your face is going to fall into the
19 plate. Ha, ha, ha.
20      This is demeaning, that's my idea of
21 demeaning. I did not engage. I quietly walked to my
22 job and did my job.
23 Q. Any other supervisors you can think of that
24 made demeaning comments besides these three?
25      MR. FEUERHAKE: Do you need to take a break

115

1 for a minute?
2      THE WITNESS: I think I do.
3      (Brief recess.)
4 BY MR. BEAUSANG:
5 Q. I think before we took a break I had a pending
6 question, which was are there any other supervisors
7 you can remember that made demeaning comments?
8 A. I'm looking at my diary. On the first page I
9 remember talking to Chiquita Conkey about my card not
10 working. The same time I was being paged by my other
11 supervisor, Owen Wallace, mind you, I'm talking to a
12 supervisor, Lee Amos, who also approached me. So, I
13 had three supervisors at once talking at me. I tried
14 to explain to him why I was talking to Chiquita Conkey
15 and he said, Well, basically I was just hanging around
16 doing nothing and lunch is only a half hour, basically
17 remember that. Remember I'm not hearing anything you
18 say.
19      Owen Wallace watching me while other
20 people are just playing around on the machine on the
21 second page, 12/26, just stood there with his arms
22 crossed like this staring at me watching me,
23 critiquing my job. I'm working, the rest of the group
24 is socializing, but staring at me trying to intimidate
25 me.

116

1      They tried to put me on the machine with
2 Delores Thomas and I had to go see the MDO because the
3 supervisors wouldn't hear of it. They knew what took
4 place, but they insisted putting me on the very same
5 machine as Delores Thomas, which is absurd. I'm
6 telling you from my head.
7 Q. We are on page three of your diary?
8 A. Yes. I want to explain to you --
9 Q. Sure.
10 A. -- that I had to humiliate myself over and over
11 again to finally get the answer that would take me off
12 the same machine as Delores Thomas, yet Delores Thomas
13 her feelings were hurt because someone didn't want to
14 work with her and that person was threatened that they
15 would get a letter of warning that if they didn't go
16 to the machine that Delores Thomas is working. This
17 is hard to deal with.
18 Q. Let's back up to that incident. That's on page
19 three of your diary?
20 A. Yes. People didn't want to work with her, but
21 they were forcing me to work with her, but they
22 allowed other people to not have to work with her,
23 but, in this one instance Delores' feelings were hurt.
24 That girl that didn't want to work with her was
25 threatened. Now, Delores' feelings were terribly

117

1 important, mine were not.
2      At one point we were both told, me and
3 Lynette Marrow, were told to go to a different
4 operation, dispatch operation. They always waited for
5 me to have a comment other than yes, sir, yes, ma'am.
6 She spouted off and went crazy, Why do I have to go?
7 And the whole time he is looking at me waiting for
8 what I'm going to say. It's just very oppressive.
9 Q. Lynette Marrow, is she African American?
10 A. Yes.
11 Q. Who was the supervisor involved in that
12 incident?
13 A. That was Owen Wallace.
14 Q. If you don't mind let's just go through your
15 diary. Are these all instances you are remembering
16 from your diary?
17 A. And the others I just told you. If you look on
18 12/2 on page one this is what I mean by collusion. I
19 specifically remember Ed Odewa coming up to me and I
20 was always very pleasant with supervisors, I had no
21 problem, talk a lot. Came over to me and said, he
22 said, "This is why I'm prejudiced." I did not write
23 that in here, but this is what he said to me. "This
24 is why I'm prejudiced, Ms. Jan, because this guy over
25 here, Ron Ponchitilla, said I was gay." He said, "I

Jeffries  v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

**118**

1  am so upset," but Owen said, "Don't worry, I'm going
2  to take care of this for you." They work together.
3  If someone gets upset as in this case, Ed was quite
4  upset, but for him to do something to Ron would be
5  very blatant so Owen will take care of it. This is
6  the kind of atmosphere I work in.
7      Q.  I noticed before you were looking at
8  handwritten notes. Did you type this out from any
9  handwritten notes or did you type it out
10  contemporaneously?
11      A.  I had notes written down on pieces of paper
12  because I work on an automation machine. I really
13  could not substantiate me standing there writing. I
14  could write a quick note so that I could elaborate
15  later and I did it on computer.
16      Q.  Do you remember if you always wrote these notes
17  shortly after the incidents occurred?
18      A.  I wrote notes to myself on the machine. I
19  might write a few things, Lynette Marrow, what date it
20  was, what machines we were on, something to jog my
21  memory. When I was through, either on break or lunch
22  or when I left, I would write it, I would elaborate
23  exactly what happened because this would be against
24  the rules for me to stand around writing notes and I'm
25  sure they would notice.

**119**

1      Q.  What were the handwritten notes you were
2  looking at before?
3      A.  You mean just a minute ago?
4      Q.  Earlier in the deposition you were looking at
5  handwritten notes.
6      A.  This?
7      Q.  Yes.
8      A.  This I wrote for myself as to when I went to
9  the dates and what things occurred because quite a few
10  things happened at this meeting on November 22nd.
11          MR. FEUERHAKE:  One of the things he wants
12  to know is when did you create this document?
13          THE WITNESS:  I wrote this a few days ago
14  in reviewing my material.
15          MR. BEAUSANG:  Do you have any objection if
16  I take a copy of this?
17          MR. FEUERHAKE:  Can we go off the record
18  for a second?
19          (Brief discussion off the record.)
20          MR. BEAUSANG:  Let's mark this now and we
21  can talk about this later.
22          (Jeffries Deposition Exhibit No. 18 was
23  marked for identification.)
24  BY MR. BEAUSANG:
25      Q.  We were still talking about instances of

**120**

1  hostility between supervisors and yourself since 2004
2  and I think you have been looking at your diary which
3  I have as Bates labeled 34 to 48. I don't see any
4  numbers on your copy. Maybe take a look at
5  Jeffries-3. Is that the diary you have been looking
6  at?
7      A.  Yes.
8      Q.  Do you think there are other instances of
9  hostility that you didn't put down in your diary?
10      A.  Well, I stopped this diary in '04, I think.
11  That's a while ago. I discontinued writing or we
12  would probably have an enormous stack here, but this
13  was in the I guess when it was very, very real and new
14  and hot and I stopped writing. A lot of things have
15  transpired that I cannot call to mind, but I gave you
16  a few and one was quite heated and in my face in
17  January.
18      Q.  Of '07?
19      A.  Right.
20      Q.  Did you ever complain to any supervisors about
21  all these incidents of hostility?
22      A.  No.
23      Q.  Why not?
24      A.  Because I had people come before him with
25  testimony and they swore to it, they read it, he

**121**

1  didn't believe it. Why would they believe my word?
2  They would just laugh at me. Unless I have it on
3  video I don't see how I can prove anything.
4          MR. FEUERHAKE:  When you say "he," who are
5  you referring to?
6          THE WITNESS:  Mr. John Williams.
7  BY MR. BEAUSANG:
8      Q.  My understanding is that because he did not
9  believe you about the November 2003 incident that you
10  didn't think he would believe you if you complained
11  about any other instances, is that right?
12      A.  I know that he will not.
13      Q.  Why didn't you complain to someone above Mr.
14  Williams about the January '07 incident with Mr.
15  Williams?
16      A.  Because I have the EEO in place and I thought I
17  would have an opportunity to disclose everything that
18  goes on in there in this forum.
19      Q.  I guess getting back to Jeffries-16, which is
20  your Answers to Interrogatories, another example you
21  gave of how you were victimized you say the failure to
22  supply you with a transfer to a facility away from
23  Delores Thomas and John Williams. Do you see that?
24      A.  Yes.
25      Q.  I suppose for the nine or ten months in 2004,

31 (Pages 118 to 121)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

**122**

1  2005 you were working away from Delores Thomas and
2  John Williams, right?
3     A.  No.  He came to tour 1 shortly after I went to
4  tour 1.
5     Q.  You were working away from Delores Thomas, but
6  not away from John Williams?
7     A.  Correct.
8     Q.  Now, you are back on tour 3.  Is John Williams
9  back on tour 3?
10    A.  He is on tour 1 on a short-term basis.  He is
11 coming back to tour 3 any day.
12    Q.  In January 2007 was he on tour 3?
13    A.  Yes.
14    Q.  And you would want a transfer to some other
15 facility besides the plant down in New Castle?
16    A.  Somewhere south of the plant.
17    Q.  Have you ever tried bidding on any of those
18 jobs?
19    A.  They're not posted in the plant because they're
20 not within that facility.  I would have to start as a
21 PTF all over again.
22    Q.  Looking at page two of Jeffries-16 it's towards
23 the bottom you are talking about John Williams and you
24 are identifying what role he played in discriminating
25 against you.  You write that he lost witness

---

**123**

1  statements, otherwise impeded progress as admitted at
2  the EEO mediation.  When you say "lost witness
3  statements," are you referring to the Karen Bayard
4  witness statements?
5     A.  Yes.
6     Q.  Any other witness statements?
7     A.  I don't know what he lost, but I know those
8  were gone only because she had to re-write them.
9     Q.  When you say "impeded progress," what do you
10 mean by that?
11    A.  I mean if he had read those statements and
12 hadn't lost them he would have had to discipline her
13 according to the rules of the postal service.  So, he
14 would not let it progress.  He waited for the two-week
15 window to expire whereas anything he had to do would
16 be thrown out because two weeks you lose, after two
17 weeks there is no disciplinary action.  He held it
18 past that time and he admitted that he did that, that
19 he knew about it, two-week window, and he was waiting
20 for that to expire.
21    Q.  And he admitted that in EEO mediation?
22    A.  Yes.
23    Q.  Who was there?
24    A.  I think the woman's name was Sharon Letts and
25 Doris Perry was there, himself, myself.

---

**124**

1     Q.  Did he say he intentionally held on to this
2  investigation for longer than two weeks so he would
3  not be able to discipline anybody about it?
4     A.  He said he was aware of the two-week expiration
5  because she asked him that, Were you aware of this?
6  Giving him an opportunity to say, no, I don't know, it
7  was an accident, or, yes, I did know and it was an
8  accident.
9     Q.  And the two-week window is something out of the
10 union contract where if two weeks passes from an
11 incident you can no longer do any kind of discipline?
12    A.  That's correct.
13    Q.  Turn to page three of Jeffries-16 towards the
14 top of the page you write you were threatened by John
15 Williams twice?
16    A.  Yes.
17    Q.  What are you referring to there?
18    A.  The first time he told me that he would fire me
19 was back in that operation 127 when he initially told
20 me he took statements and no one substantiated my
21 claim, but if you ever act like her I will fire you.
22 He said it again at the 11/26 meeting with Doris
23 Perry, the union rep, the mail handler rep, Bobby Ford
24 and myself.
25    Q.  He said it at the November 26, 2003 meeting?

---

**125**

1  When was the first time he said it?
2     A.  The same day, 11/26, when he initially came
3  back to operation 127 and said, "I checked into these
4  people that you told me and nobody said basically what
5  you said and if you ever act like her, in other words,
6  don't even think about it, I'll fire you."
7     Q.  Is that Jeffries-18?
8     A.  Yes.
9     Q.  Ms. Jeffries, before you is a document marked
10 Jeffries-18, two-page document, handwritten notes, not
11 Bates labeled that you gave me today.  I take it you
12 recognize the document?
13    A.  Yes.
14    Q.  What is it?
15    A.  These are notes I wrote for myself to bullet
16 specific dates that I think are prominent.
17    Q.  Looking on the first page of Jeffries-18 you
18 have date of November 22nd and a note that says you
19 spoke to Angelo Lambert and he said no one
20 substantiated my claim.  Do you see that?
21    A.  Right, that's what he said.
22    Q.  Was that conversation taking place on the floor
23 of the plant?
24    A.  Yeah, that's one of those walk-by things.
25    Q.  On November 26 you write that Mr. Williams came

---

Jeffries   v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

126

1  by and said, "Will send to labor"?
2    A. Yes. On 11/26?
3    Q. Yes. What does that mean, "Will send to
4  labor"?
5    A. He said he was going to send it to labor. I
6  don't know, that's all he said to me. He didn't want
7  to deal with it, I guess, I don't know.
8    Q. Is that labor relations?
9    A. Yes.
10    Q. Do you know what it means when somebody says
11  we're going to send it to labor relations?
12    A. I never heard of such a thing.
13    Q. Turn to page two of Jeffries-18 and towards the
14  middle you have some numbers, next to the first number
15  it says, "A, slash, L, 134 hours," is that annual
16  leave?
17    A. Yes.
18    Q. What does that mean?
19    A. It's how much time I took, annual leave for
20  doctor visits.
21    Q. And all those doctor visits were related to
22  this incident?
23    A. I took doctor visits and some of them were Kim
24  Furtado down in Rehoboth. I'm not certain. This is
25  just my notes, what I culminated to total things up.

127

1    Q. Under that, "LWOP 68 hours," is that leave
2  without pay?
3    A. That's right.
4    Q. "NS 48 hours"?
5    A. Non-scheduled. They were my days off.
6    Q. "SL" I take it is sick leave?
7    A. Right.
8    Q. Are all these hours things that you are
9  claiming are caused by the post office's actions in
10  this case?
11    A. Yes.
12    Q. Down near the bottom you have, "Legal fees
13  $38,089.86"?
14    A. Yes.
15    Q. Are those legal fees you are claiming?
16    A. They are legal fees, yes.
17    Q. Who did you pay those fees to?
18    A. Juan Laureda, L-A-U-R-E-D-A.
19    Q. Are those what you actually paid or if you are
20  successful you will pay?
21    A. I paid him approximately $38,000.00.
22    Q. You are out-of-pocket $38,000.00 to Juan
23  Laureda.
24    A. Yes, I paid them.
25    MR. BEAUSANG: Please mark this.

128

1    (Jeffries Deposition Exhibit No. 19 was
2  marked for identification.)
3  BY MR. BEAUSANG:
4    Q. Mrs. Jeffries, before you is Jeffries-19 which
5  is the complaint you filed in this action?
6    A. Yes. What is the date on this? November 22,
7  yes.
8    Q. Look at page four, paragraph 18.
9    A. Yes.
10    Q. You write -- you are talking about the
11  suggestion by the EAP counselor, Kim Wayman, that you
12  be transferred to a different tour, is that right?
13    A. Different area.
14    Q. Different area?
15    A. Yes.
16    Q. Again, Ms. Wayman, your understanding is Ms.
17  Wayman made that suggestion to Mr. Williams and he
18  said he wasn't going to do it?
19    A. That's correct.
20    Q. In paragraph 18 you say that he obstructed the
21  transfer. Did he do anything else besides not agree
22  to it?
23    A. There is nothing else he could do in my
24  opinion. He stopped it.
25    Q. Go back to Jeffries-16 and look at the last

129

1  three pages.
2    A. (Witness complies.)
3    Q. Again, this is an attachment to Interrogatory
4  20 and tell me what it is.
5    A. This looks like my expenses and all of my leave
6  that I took and monies out-of-pocket that I incurred
7  because of this.
8    Q. Look at page eight, Interrogatory 20.
9    A. Okay.
10    Q. I asked you to list in detail all the relief
11  you are seeking in connection with your claims
12  including back pay, other monetary damages you seek
13  and your method of calculating such amounts and in
14  response to that you refer to the attachment, right?
15    A. Yes.
16    Q. And you also listed recoverable attorney fees,
17  you said they are undetermined, but believed to be in
18  the range of $35,000.00?
19    A. Yes.
20    Q. If you paid these attorneys out of your pocket,
21  why are they undetermined?
22    A. I guess because I needed to pull all my slips
23  out and get you a total number. This is an
24  approximate amount and I didn't want to give the wrong
25  or incorrect amount without proof.

33 (Pages 126 to 129)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

---

130

1    Q.  Do you have receipts from your attorneys?

2    A.  Yes, I have checkstubs and I have to retrieve

3  all those to get the exact amount, but the number is

4  incorrect.

5    Q.  Will you do that and produce it to your

6  attorney?

7    A.  It's low. Yes, I sure will.

8    Q.  Back to the attachment, the last few pages of

9  Jeffries-16.

10    A.  Yes.

11    Q.  Kim Furtado I think we talked about. Edna

12  Yoder is a reflexologist?

13    A.  Yes.

14    Q.  What is a reflexologist?

15    A.  I'm not really sure what that technical term

16  means, but I basically went there to try to relieve

17  stress. It's like massage therapy.

18    Q.  Again you have listed a lot of hours under

19  annual leave, turn to the next page, sick leave,

20  non-scheduled days not paid?

21    A.  Right.

22    MR. FEUERHAKE: Can I make one statement

23  for the record? I'm not sure if those attorney fees

24  are actually discoverable yet. I'm not exactly sure

25  how that works. Obviously, it's going to be a

---

131

1  significant element of the claim and any mediation so

2  I want you to be aware of what her fees have been to

3  this point. I just don't know if they're technically

4  discoverable. So, I think -- I suspect we are going

5  to give you everything we have, but -- and I know she

6  just agreed to and I just want to add the caveat that

7  I don't know if they're discoverable and we are not

8  waiving the attorney/client issue on any issue.

9    We will probably give them to you -- I

10  think we will most certainly give them to you even if

11  they are not discoverable, but we're not waiving the

12  attorney/client privilege for any other purpose other

13  than to disclose the documents. I'm just trying to be

14  a little bit overly cautious. Technically they're not

15  due or recoverable until we are a prevailing party so

16  they might be protected by the attorney/client

17  privilege until then.

18    So, I just want to make it clear if we

19  agree to provide them, which I think it's in her

20  interest probably to provide them for purposes of

21  settling the case at some point, but we are not

22  waiving the attorney/client privilege for anything

23  other than the disclosure of those documents.

24    MR. BEAUSANG: That makes a lot of sense.

25

---

132

1  BY MR. BEAUSANG:

2    Q.  Jeffries-16, last three pages, I pointed you to

3  hours you list under annual leave, sick leave and

4  non-scheduled days not paid?

5    A.  Yes.

6    Q.  These are, again, I take it these are all hours

7  that you allege are directly related to the postal

8  service's conduct in this case?

9    A.  Yes.

10    Q.  Is this all the annual leave and sick leave

11  that you have taken during this period from December

12  2003 to February 2005?

13    A.  No.

14    Q.  So, you have taken other annual leave and sick

15  leave that you are claiming is not related to this?

16    A.  Correct.

17    Q.  Is it more than this that you have taken that

18  is not related?

19    A.  I don't know. I really don't know. I think

20  that would be in the postal records that we have all

21  that.

22    Q.  And how did you determine -- when you took this

23  annual leave, how did you determine it was related to

24  this lawsuit? Is it because there was a doctor

25  appointment you had to go to or some other way?

---

133

1    A.  No, I made notes on my calendar.

2    Q.  What does that mean?

3    A.  I made a note on the calendar what I was off

4  for, why, and how I felt, what was going on, but I had

5  no pleasure in this time. I wish I did, but I didn't.

6  All my leave was it was mostly recovery in order to

7  get back up and go back to work because my human

8  nature wanted me to just stay home and say goodbye.

9  Here is my badge, I'm finished, but I had two kids to

10  get through college. I had to do it and I did it any

11  means possible. This is recovery time that you are

12  looking at.

13    Q.  Just so I understand, for example, on May 1,

14  2004 looks like you are seeking to recover four hours

15  of annual leave and four hours unpaid?

16    A.  Um-hum.

17    Q.  On that day you think you wrote on your

18  calendar that you were taking the day off because you

19  were very stressed about what was going on here?

20    A.  Right, and some of these dates may correlate to

21  some of the instances that took place in this time.

22    Q.  For the non-scheduled days not paid explain to

23  me why -- how those are related to this lawsuit.

24    A.  Because these I'm certain either I had some

25  kind of a medical thing to deal with or a counselor,

---

34 (Pages 130 to 133)

Jeffries v. Potter, Postmaster General, United States Postal Service
Janet F. Jeffries

134

1  something that involved what was going on at work.
2     Q.  If you went to a doctor's appointment that you
3  claim as a direct result of this lawsuit on one of
4  your non-scheduled days not paid you are trying to
5  recover damages?
6     A.  Yes, and some of these days I was on medicine
7  that I didn't even know who I was, really, couldn't
8  drive, I had to be off.
9     Q.  What kind of medicines have you been prescribed
10  as a result of this lawsuit?
11     A.  I took Cymbalta, Celexa, I took herbal
12  remedies, de-stress, composure.
13     Q.  What is Cymbalta for?
14     A.  God knows, it's some mind-altering drug I'm
15  certain for depression and anxiety, anger.
16     Q.  What is Celexa?
17     A.  It's the same type of medicine.
18     Q.  Turn to the last page of Jeffries-16 and you
19  listed a number of intangible injuries?
20     A.  Yes, it's my emotional harm.  I don't remember
21  my family back then.  My kids were on their own
22  because I was there physically.
23     Q.  You said you don't remember your family back
24  then?
25     A.  No, I don't have much recollection.  This is

135

1  what I remember.
2     Q.  What time period are you referring to when you
3  say "back then"?
4     A.  When this took place I was in a survival mode.
5  I wasn't a mother and I wasn't a wife.  I went through
6  hell.
7         MR. BEAUSANG:  Do you want to take a quick
8  break?
9         MR. FEUERHAKE:  Yes.
10         (Brief recess.)
11  BY MR. BEAUSANG:
12     Q.  Ms. Jeffries, we just took a short break and I
13  want to say that I apologize for having to bring up
14  these obviously very emotional topics, but just so you
15  know I'm not -- I really have to ask you about this
16  because if this matter goes to trial I have to know
17  what you are claiming.  As far as emotional harm you
18  are saying that since this happened you weren't there
19  as a mother or wife you said?
20     A.  Right.
21     Q.  How long were you in that state do you think?
22     A.  I have no idea.  I have yet to recover.  It
23  just feels abusive and I really don't see an end to
24  it.  I hope to get healed when I leave and somehow get
25  back to who I was.

136

1     Q.  Your emotional harm has it gotten any better or
2  worse since this happened?
3     A.  As long as I push it down I'm okay and remain
4  complacent at work and not engage, but it's
5  humiliating.
6     Q.  Just try to tell me as best you can what effect
7  the emotional harm has had on your life.  When you say
8  you weren't there as a wife or mother can you explain
9  more what you mean.
10     A.  I spent a few years, quite a few years, writing
11  Answers to Interrogatories.  I've re-lived this so
12  many times.  I think I've damaged myself.  I have to
13  live like I have a dual personality.  I have to be
14  very tough and strong at work, but yet be a gentle
15  mother.  I can't hold it up much longer.  I cannot let
16  my guard down at work or I will probably have to
17  succumb to being fired.  I have to be very strong.
18     Q.  Just on that point besides the two times Kevin
19  Williams threatened to fire you has anybody else
20  threatened to fire you?
21     A.  Where they particularly said they were going to
22  fire me?
23     Q.  Yes.
24     A.  No.
25     Q.  But you feel if you do anything wrong that you

137

1  will get fired?
2     A.  I feel I am being watched all the time.  Where
3  am I?  What am I doing?  How long are my breaks?  Did
4  you go to lunch?  Do you have breaks?  These are the
5  questions they ask me all the time up until just the
6  other day because my clock rings didn't come out she
7  wanted to know did I leave.  In other words, are you
8  leaving early and making it look like the machines
9  don't work?  So, now I have to have a witness when I
10  clock out that I'm there.
11     Q.  Has anybody taken any formal discipline against
12  you since November 2003?
13     A.  You mean formal as in letter of warnings?  I've
14  done nothing wrong.  I haven't done anything.
15     Q.  So, the answer is no?
16     A.  No.
17     Q.  I don't know what other formal discipline there
18  is besides letter warnings, but you don't think
19  anybody has taken any formal discipline against you?
20     A.  No.
21     Q.  Have you heard any racial comments besides the
22  one time you heard Delores Thomas say white honky
23  bitch?
24     A.  In reference to this or just in general?  I
25  hear it all the time.  I hear the N word all the time,

35 (Pages 134 to 137)

138

1  but white people can't say it. There was a young man
2  that was just fired by John Williams for saying the N
3  word, but yet in conversations all the time you will
4  hear black employees calling each other the N word.
5      Q.  But no racial comments have been directed
6  towards you besides that one time you can remember?
7      A.  I put headphones on and I hear nothing anymore.
8      Q.  One question, Ms. Jeffries, I understand that
9  you feel like you were discriminated against on the
10  basis of your race in this lawsuit.  Do you also feel
11  like you are discriminated against based on your
12  gender?
13      A.  I don't know.  I think it's primarily color.
14      MR. BEAUSANG:  All right, I think that's
15  all I have.
16      MR. FEUERHAKE:  I have nothing.
17      (The deposition was concluded at 4:56 p.m.)
18      I N D E X
19

DEPONENT: Janet F. Jeffries      PAGE
20
Examination by Mr. Beausang      2
21
22      E X H I B I T S
23  JEFFRIES DEPOSITION EXHIBITS      MARKED
24  1  Document Bates stamped 00001
        through 00010      3
25

139

1      E X H I B I T S (Continued)

2  2  Document Bates stamped 00016
3      through 00026      47
4  3  Document Bates stamped 00034
        through 00048      63
5
4  Document Bates stamped 00099      78
6
5  Document Bates stamped 00100
7      through 00113      80
8  6  Document Bates stamped 00118
        through 00129      84
9
7  Document Bates stamped 00114
10      through 00117      86
11  8  Document Bates stamped 00168      88
12  9  Document Bates stamped 00160
        through 00163      89
13
10  Document Bates stamped 00157
14      through 00159      90
15  11  Document Bates stamped 00165
        through 00166      92
16
12  Document Bates stamped 00167      93
17
13  Document Bates stamped 00156      94
18
14  Document Bates stamped 00169      95
19
15  Document Bates stamped 00170      97
20
16  Document entitled "Plaintiff
21      Jeffries' Responses to Interroga-
        tories and Request for Production"      99
22
17  Handwritten statement, dated 1/3/04,
23      prepared by Karen Bayard      100
24  18  Two pages of handwritten notes
        prepared by Janet F. Jeffries      119
25

140

1      E X H I B I T S (Continued)
2
19  Document entitled "Complaint"      128
3
4
5
CERTIFICATE OF REPORTER      PAGE 141
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

141

1  State of Delaware  )
                        )
2  New Castle County  )
3
4      CERTIFICATE OF REPORTER

5      I, Christina M. Vitale, Certified Shorthand
    Reporter and Notary Public, do hereby certify that
    there came before me on Monday, January 28, 2008, the
6  deponent herein, JANET F. JEFFRIES, who was duly
    sworn  by me and thereafter examined by counsel for
7  the respective parties; that the questions asked of
    said deponent and the answers given were taken down by
8  me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
9  printer under my direction.
10      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
11  examination of said witness.
12      I further certify that reading and signing of
    the deposition were waived by the deponent and
13  counsel.
14      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17                          Christina M Vitale
18  Christina M. Vitale, CSR
19  Certification No. 261-RPR
20  (Expires January 31, 2008)
21
22  DATED:
23
24
25

# Defendants' Appendix

# Part 2

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE

| | | |
|---|---|---|
| JANET F. JEFFRIES, | : | EEOC HEARING NUMBER |
| Complainant | : | 170-2005-00177X |
| | : | |
| v. | : | |
| | : | |
| JOHN E. POTTER, POSTMASTER GENERAL, | : | |
| UNITED STATES POSTAL SERVICE, | : | AGENCY CASE NUMBER |
| Agency | : | 1-C-081-0017-04 |

COMPLAINANT'S OPPOSITION MEMORANDUM TO NOTICE OF
INTENT TO ISSUE A DECISION WITHOUT A HEARING

## I.    PRELIMINARY STATEMENT

Complainant, through her Counsel, herein submits "Complainant's Opposition Memorandum to Notice of Intent to Issue a Decision Without a Hearing" ("Complainant's Opposition Memorandum"). The referenced Notice of Intent to Issue a Decision Without a Hearing was received in Counsel's office on July 5, 2005. Complainant's Opposition Memorandum is herein filed with the Commission's Philadelphia District Office ("PDO") in accordance with 29 C.F.R. §1614.109(g)(3).

Complainant, a Flat Sort Machine Operator, PS-5, with the United States Postal Service ("USPS" or "Agency") at the Agency's Delaware Processing & Distribution Center ("PDC"), 147 Quigley Boulevard, New Castle, Delaware 19850-9997, completed on February 17, 2004, an EEO Complaint of Discrimination in the Postal Service (PS Form 2565) in Agency Case No. 1-C-081-0017-04. On February 20, 2004, the Agency's Manager

1

the non-moving party's favor there are justifiable bases to support Complainant's claim of

her being subjected to race based discrimination.  *See Yaccarino v. Postmaster General,*

EEOC Appeal No. 01A05735 (2001).

## III.    ARGUMENT

**A.**    *COMPLAINANT CAN ESTABLISH THAT SHE WAS DISCRIMINATED AGAINST BASED ON HER RACE WHEN SHE COMPLAINED TO THE AGENCY'S MANAGER THAT A CO-WORKER OF A DIFFERENT RACE VERBALLY AND PHYSICALLY ASSAULTED HER AND SHE WAS TREATED DIFFERENTLY THAN SIMILARLY SITUATED EMPLOYEES OF A DIFFERENT RACE WHO COMPLAINED TO THE SAME AGENCY'S MANAGER OF SIMILAR INCIDENTS CONCERNING WORK PLACE VERBAL AND/OR PHYSICAL ASSAULTS*

The "Notice of Intent to Issue a Decision Without a Hearing" ("Notice") states:

> The claim raised in the complaint before the Administrative Judge is as
> follows:   Whether the Complainant, Patricia Smith, a Caucasian PS-5
> Automation Clerk assigned to the Delaware Processing and Distribution
> Center ("PDC") of the United States Postal Service ("USPS" or "Agency"),
> was subject to hostile work environment harassment based on race on
> November 11, 2003.

Notice, at 1.    It appears that the Notice's reference to "Patricia Smith" is either a

typographical error or an inadvertent mistake as neither the Complainant nor any known

witness in this matter is so named.  Further, the Notice's characterization of Complainant's

claim as being "subject to hostile work environment harassment based on race on November

11, 2003" is, unfortunately, not the particular claim which the Complainant has specifically

raised in her Complaint.   Although the Complainant stated in a submission to the Agency's

Manager, EEO Dispute Resolution, South Jersey District, that "from 11/11/03 until present

8

I continue to work in a hostile environment," the claim which was accepted for investigation involves her allegation of being treated differently than similarly situated employees of a different race than her who were involved in similar incidents in the work place but had their complaints of the alleged incidents promptly investigated and received lenient discipline or no discipline whatsoever while the employees of Complainant's race were severely disciplined if not removed. *See* IF, "Formal Complaint," "Counselor's Report" pages 1-11 and 14, "Affidavits," Affidavit A, EEO Investigative Affidavit (Complainant) pages 1-10, Affidavit B, EEO Investigative Affidavit (Witness) pages 1-4, Affidavit C, EEO Investigative Affidavit (Witness) pages 1-11, and Exhibit 5, EEO Investigative Affidavit (Witness) pages 1-6. *See also* Declaration of Janet F. Jeffries ("Complainant's Declaration"), executed July 20, 2005, attached hereto as Exhibit 10; Written Statement of Karen A. Bayard ("Bayard's Statement"), dated July 15, 2005, attached hereto as Exhibit 11; and Written Statement of Doris M. Perry ("Perry's Statement"), dated July 15, 2005, attached hereto as Exhibit 12. That the nature of the Complainant's race based discrimination claim is grounded on the allegation that the Complainant was treated differently than similarly situated employees of a different race is supported by the scope of the EEO investigation which focused upon Complainant's specific examples of disparate treatment. *See, e.g.*, Information for Pre-Complaint Counseling, PS Form 2564-A, contained in the IF, "Counselor's Report" pages 1-4 and 14, where Complainant specifically described instances where similarly situated employees of a different race than her were treated

9

preferentially different by the same individuals who manage her work place. The record also shows that John R. Williams, Manager Distribution Operations ("MDO") at the Delaware PDC was required, during the EEO Investigation conducted by EEO Investigator Meryl Smith-Green, to address Complainant's allegation of disparate treatment involving at least eight (8) employees under Mr. Williams' management. *See* IF, Affidavit C, EEO Investigative Affidavit (Witness) pages 1-11. Accordingly, Complainant contends, as the record supports, that the Complainant's Complaint of Discrimination is based on the claim of disparate treatment and not "hostile work environment harassment" as referenced in the Notice, and the legal analysis in this case should be based on Complainant being treated differently than similarly situated employees of another race.

The "factual inquiry" in a Title VII case is "[w]hether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983) citing, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex or national origin.' " *Aikens*, 460 U.S. at 715 quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978), quoting *Teamsters v. United States*, 411 U.S. 792, 802 (1973) was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. *Aikens*, 460 U.S. at 715 quoting *Furness*, 438 U.S. at 577. In this framework, the U.S.

10

 **UNITED STATES POSTAL SERVICE®** **EEO Complaint of Discrimination in the Postal Service**
*(See Instructions and Privacy Act Statement on Reverse)*



| 1. Name JANET JEFFRIES | 2. SSN 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 | 3. Case No. 1C-081-0017-04 |
|---|---|---|

| 4a. Mailing Address – Street or PO Box 2148 SEENEY TOWN RD | 4b. City State & Zip +4 DOVER DE 19904-1653 |
|---|---|

| 5. Email Address* | 6. Home Phone (302) 653-5411 | 7. Work Phone (302) 323-2281 |
|---|---|---|

| 8. Position Title *(USPS Employees Only)* CLERK | 9. Grade Level *(USPS Employees Only)* 5 | 10. Do you have Veteran's Preference Eligibility? ☐ Yes ☒ No |
|---|---|---|

| 11. Installation Where You Believe the Discrimination Occurred *(Identify Installation, City, State, and Zip+4)* DELAWARE PROC. + DISTRIB. CTR. 147 QUIGLEY BLVD. NEW CASTLE DE 19720-4103 | 12. Name and Title of Person(s) Who Took the Action(s) You Allege was Discriminatory JOHN WILLIAMS A/MDO ANGELO LAMBERT A/MDO |
|---|---|

| 13a. Name of Your Designated Representative LOUISE BRINSON | 13b. Title EXPEDITER |
|---|---|

| 13c. Mailing Address *(Street or P.O .Box)* 248 CORNWELL DRIVE | 13d. City, State and Zip +4 BEAR DE 19701-3128 |
|---|---|

| 13e. Email Address* | 13f. Home Phone (302) 836-3518 | 13g. Work Phone (302) 323-2281 |
|---|---|---|

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.*

| 14. Type of Discrimination You Are Alleging | | 15. Date on which alleged act(s) of Discrimination Took Place 11/11/03 |
|---|---|---|
| ☐ Race *(Specify)* | ☐ Sex *(Specify)* | |
| ☒ Color *(Specify)* CAUCASIAN | ☐ Age (40+) *(Specify)* | |
| ☐ Religion *(Specify)* | ☐ Retaliation *(Specify)* | |
| ☐ National Origin *(Specify)* | ☐ Disability *(Specify)* | |

16. Explain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability. *Note that if your allegation is like or related to a previous complaint, that complaint may be amended. 29 C.F.R § 1614.106(d)*

- ATTN MAUREEN MCMANUS, AS PER OUR CONVERSATION OF 2/3/04, THE INCIDENT DESCRIBED ON 11/11/03 WAS INCOMPLETE. NB, I WAS VERBALLY AND PHYSICALLY ASSAULTED AND MANAGEMENT DID NOTHING IN RESPONSE. CERT# 7003 3110 0001 1866 7679

- PLEASE SEE ATTACHED SUMMARY OF ORIGINAL COMPLAINT FILED 12/10/03

RECEIVED FEB 20 2004 MGR EEO DISPUTE RESOLUTION SOUTH JERSEY DISTRICT

17. What Remedy Are You Seeking to Resolve this Complaint?
- PERMANENT T-2 RE-ASSIGNMENT GUARANTEED 8 HOURS
- ADMINISTRATIVE LEAVE 45 DAYS
- $150,000.00 COMPENSATORY AWARD
- "0" TOLERANCE TO APPLY TO ALL EMPLOYEES, REGARDLESS OF RACE

18. Did You Discuss Your Complaint with a Dispute Resolution Specialist or a REDRESS™ mediator?
☒ Yes  Via Certified Letter 7002 2410 0007 1983 2910 Dated 02/10/2004
☐ No
*(Date You Received the Notice of Final Interview)* 2/12/04

19. Signature of Dispute Resolution Specialist
*Maureen M. Manus.*

20. Signature of Complainant or Complainant's Attorney

Formal Complaint Page 1 of 1

| 21. Date of this Complaint 2/17/04 |
|---|

Feb. 10, 2004

CERT# 7003 1010 0004 7060 421

PS Form 2565, March 2001 *(page 1 of 2)*

DEPOSITION EXHIBIT JEFFRIES-4 CMV-1/28/08 PENGAD 800-631-6989

41

00099

| 3. Postal Service | Certified Mail No.<br>7001 2510 0001 1376 9201 | Date Mailed    or    Hand Delivered on<br>12/02/2003 |
|---|---|---|
| **Information for Pre-Complaint Counseling** | By (Initials)<br>MAZ | Case No.<br>*1C-081-0017-04* |

On  <u>December 2, 2003</u>  , you requested an appointment with a Dispute Resolution Specialist.
(Month, Day, Year)

**Important: Please read.** You should complete this form and return it to the EEO office *within 10 calendar days* of receipt. This is the only notification that you will receive regarding the necessity for you to complete this form.

### A. Requester Information

| Name (Last, First, MI)<br>JEFFRIES, JANET | Social Security No.<br>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 | Home Telephone No.<br>(302) 653-5411 |
|---|---|---|

Your Mailing Address
2148 SEENEYTOWN ROAD, DOVER, DE 19904-1653

| Name of Postal Facility Where You Work<br>*Delaware Processing & Distribution Center* | Office Telephone No.<br>*(302) 323-2281* |
|---|---|
| Address of Postal Facility<br>*147 Quigley Blvd. NewCastle DE 19720* | Email Address*<br> |

| Employment Status (Check One) | | | Position Title<br>*Clerk* | Grade Level<br>*5* |
|---|---|---|---|---|
| ☐ Applicant | ☐ Casual | ☐ TE  ☒ Career | | |

| Pay Location<br>*310* | Tour<br>*III* | Duty Hours<br>*330-1200* | Off Days (If Tour I, Show Nights Off)<br>*W/T* | Time in Current Position<br>*5* Years  *9* Months |
|---|---|---|---|---|

| Your Supervisor's Name<br>*Chiquita Conkey* | Supervisor's Title<br>*Automation Supervisor* | Supervisor's Telephone No.<br>*(302) 323-2285* |
|---|---|---|

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

### B. Discrimination Factors

Prohibited discrimination includes actions taken based on your *Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation (actions based on your participation in prior EEO activity). These categories are referred to on this form as factors.*
What factor(s) of Discrimination are you alleging? (Please be specific, i.e., Race-African American, Sex-Female).

*Race - Italian American   Color - Caucasion   Sex - Female*

For Retaliation Allegations Only. If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity that you feel caused you to be retaliated against.

1. On_____, I engaged in EEO activity. Case No.:_____
   (Month, Day, Year)

2. On_____, I engaged in EEO activity. Case No.:_____
   (Month, Day, Year)

### C. Description of Incident/Action

Please use the space below to briefly describe the incident or action that prompted you to seek EEO counseling at this time.

On  *11/11*  , 20 *03*
   Month, Day         Year

*Summary of incident is attached i*
*attached USPS policy on violence*

R E C E I V E D
DEC 1 7 2003
MGR EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT

Counselor's Report
Page _1_ of _1_

DEPOSITION
EXHIBIT
JEFFRIES-5

00100



_Richard Wilson_
NAME of EMployee

<u>WHT MALE / BLACK MALE</u>
FACTORS

ATTACHMENT
JT FIBIES 2
.22/50 1597

TREATED DIFFERANTIY ;

  RICHARD Wilson WHITE MALE, WAS ACCUSED
by OWEN WALLACE, BLACK MALE, of MAKING AN
" UNCALLED FOR STATEMENT", COMMENT To HIM.
  RICHARD WAS GIVEN AN IMMEDIATE
<u>7 DAY SUSPENSION</u> .


<u>Michele McGuire</u>  WHITE FEMALE VS BLK FEMALE

(TREATED DIFFERANTIY ;
  (WHTF) — Michele McGuire WAS ESCOURTED OUT
of THE BLDG immediately Following A VERBAL Complai
FROM A CO-WORKER THAT SHE FELT THREATENED by HER,
BLACK
because of A legal MATTER Michele M. WAS inVOLVED
in. Michele M. WAS out of THE BLDG PENDING
INVESTIGATION & UNTIL legal MATTER WAS SOLVED .



RECEIVED
DEC 1 1 2003
MGR i
SU Counselor's Report
 Page 2 of 14

43

00101

**D. Comparisons**

Explain why, based on the factors you cited in section B, you believe that you were treated differently than other employees or applicants in similar situations

1.
*Felicia Camper*                    Black Female vs White Male
(Name of Employee)                  Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)

was treated differently than I when: She verbally attacked white male - Bu Druggers.
Both were immediately removed from the bldg on C.O.P.
Pending investigation. Felicia Camper was verbally warned!
only

2.
*Mike Potalak* (Judd)              White Male vs White Male
(Name of Employee)                  Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)

was treated differently than I when: He pushed, assaulted employee Bill Landis.
Both were immediately removed from the bldg on C.O.P.
Pending investigation. Mike Potalak was fired.

3.
*Bill Skibicki*                    White male vs. Black Female
(Name of Employee)                  Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)

was treated differently than I when: He was accused by Black Female, Eugenia Ross
of bumping into her. He was immediately removed from
bldg. Pending investigation. Bill Skibicki was fired
                    See Attachment 2.

**E. Official(s) Responsible for Action(s)**

List the name(s) of the official(s) who took the action that prompted you to seek counseling at this time.

| 1a. Name | b. Title |
|---|---|
| John Williams | Acting  MDO |
| c. Office | d. Grade Level |
| De Processing & Distribution Ctr. | 21 |

| 2a. Name | b. Title |
|---|---|
| Angelo Lambert | Acting  MDO |
| c. Office | d. Grade Level |
| De Processing & Distribution Ctr | 21 |

*Retaliation Allegations Only:* Was/were the official(s) listed in Section D above aware of your prior EEO activity?

☐ No  ☐ Yes   If yes, explain how the official(s) became aware: _____

_____

_____

**F. Resolution**

What are you seeking as a resolution to your pre-complaint?
Justice
All reverse racism towards me to cease.
       Maximum allowed by Federal law.
Moved to different work area - permanently

**G. Grievance/MSPB Appeal**

On the incident that prompted you to seek EEO counseling, have you:

Counselor's Report
Page 3 of 14

1. Filed a grievance on the same issue?  ☒ No   ☐ Yes   If yes, _____ (Date)       (Current Step)

2. Filed a MSPB appeal on this issue?   ☒ No   ☐ Yes   If yes, _____ (Date Appeal Filed)

00102

## H. Anonymity

You have the right to remain anonymous during the pre-complaint process.

Do you desire anonymity? ☒ No   ☐ Yes

## I. Representation

You have the right to retain representation of your choice. *(check one)*

☐ I waive the right to representation at this time.   ☒ I authorize the person listed below to represent me.

| Name of Representative | Representative's Title |
| --- | --- |
| Doris M Perry | SHOP STEWARD |

| Organization | Telephone Number | Email Address* |
| --- | --- | --- |
| APWU | (302) 3249743 | SPERRY 996.§ D.AOL.Co |

Mailing Address (Street or P.P. Box, City, State and Zip +4)

116 W. FRANKLIN AVE NEW CASTLE DE 19720-2513

* Providing this information will authorize the U.S. Postal Service to send your representative important documents electronically.

## J. Documentation

Please attach any documentation you wish to submit to support your allegation(s). Include a copy of any written action(s) that caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, it is important for you to submit medical documentation of your disability during the pre-complaint process.

## K. Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## L. Authorization

I am aware that the claim(s) contained herein shall by-pass the pre-complaint process *if like or related to a formal complaint that I have already filed*, or *if the claim(s) constitutes a spin-off complaint.* (A spin-off complaint contests the manner in which a previously filed complaint is being processed.) In completing this PS Form 2564-A, *Information for Pre-complaint Counseling*, I recognize that the Manager, Dispute Resolution will review the claim(s) contained herein and determine how they shall be processed. I will be notified, in writing, if the Manager determines that my claim(s) shall be processed as amendments or appendages to a formal complaint that I have already filed.

Please print your name here

JANET F JEFFRIES

| Your Signature | Date signed |
| --- | --- |
| | 12/9/03 |

**Please return this form to:**

**MANAGER EEO DISPUTE RESOLUTION**
**U S POSTAL SERVICE**
**P O BOX 9001**
**BELLMAWR NJ 08099-9411**

Counselor's Report
Page 4 of 19

00103



U.S. Postal Service
**Representation/Anonymity**

Case No.
*IC-081-0017-04*

### Representation

The EEO Dispute Resolution Specialist has informed me that I am entitled to representation of my choosing.



RECEIVED
DEC 11 2003
MGR EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT

☒ I authorize to represent me:

*Doris M. Perry*
Name and Title of Representative

*116 W. Franklin Ave.*
Street Address

*New Castle, De 19720 - 2513*
City/State/ZIP + 4

*(302) 324-9743*          *SPerry9968@aol.com*
Area Code and Telephone Number          Email Address

☐ I waive representation at this time.

I understand that I must immediately notify the Manager, EEO Compliance and Appeals, located in my area, in writing, if at any time during the administrative processing of my complaint, I designate a representative and/or change the representative I have designated above. (Employees at Postal Service Headquarters and Headquarters Field Units, and employees of the Inspection Service should notify the EEO Appeals Review Specialist at Headquarters.)

### Anonymity

The EEO Dispute Resolution Specialist has informed me of my right to remain anonymous during the informal processing stage.

☒ I elect to remain anonymous.

☐ I waive anonymity.

### Privacy Act Notice

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Counselee's Signature | Date | Counselor's Report Page _5_ of _17_ |
|---|---|---|
|  | *12/8/03* |  |

PS Form 2584, March 2001

46





**Certification of Receipt – Publication 133**

Privacy Act Notice

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations,

contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

Certification of Receipt – Publication 133

I hereby certify that on this date I received a copy of Publication 133, *What You Need to Know About EEO*, to keep for my personal records.

| Signature of Recipient | Date |
|---|---|
| | 12/4/03 |

**Note:** Recipient, when you receive this form by mail, please sign and return it to the EEO Office at the same time you return your completed PS Form 2564-A, *Information for Precomplaint Counseling.*

Certification of Service – Publication 133

I hereby certify that on this date Publication 133, *What You Need to Know About EEO,*

was mailed to **JANET JEFFRIES**

via Certified Mail No. <u>7001 2510 0001 1376 9201</u>

*or* delivered by hand to _____

RECEIVED
DEC 1 1 2003
MGR EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT

| Signature of Server | Da | Counselor's Report |
|---|---|---|
| *for* Miriam Zippel   Maureen McManus | | Page 9 of 11   December 2, 2003 |

PS Form 2563-A, March 2001

00105

 

ATTACHMENT
Jeffries 1
3 2 / 50 / 597

On 11/11/03 I was verbally assaulted by Delores Thomas, PTF Automation Clerk (by use of profanity, and defamatory references of my family) and physically assaulted (by pushing into me with a tub full of flats) on the work-room floor and subsequently followed by her into the ladies locker room where I was challenged to fight and endured more profanity, vulgarity, and verbal assaults. There are four witnesses to this event. I reported this incident immediately to MDO - Angelo Lambert. Delores Thomas became irate with the MDO when questioned in my presence that evening.

- I told Anne Thomas, my immediate supervisor (in the locker room 11/11/03) that I felt threatened and I wanted to do a statement.
- I told Angelo Lambert - MDO (11/11/03) that I felt threatened.
- I told John Williams - MDO (11/14/03) I felt threatened by her and her friend's retaliation. No action by any of the above managers was taken on my behalf.
- Zero Tolerance Policy was ignored.
- John Williams - MDO, in a meeting with myself and union rep. Doris Perry on 11/26/03, defended Delores Thomas by his statement explaining what she meant by her remarks about my family and admitted that he knew she said them. Clearly a biased opinion.
- John Williams has already let three weeks transpire and has not fully investigated, by not obtaining statements or interviewing all involved.
- (No interviews were conducted as of 11/26/03).
- On 11/26/03 when I voiced my opinion on his handling of this incident, I referred to me hypothetically acting like Delores Thomas and John Williams was quick to remark, "I will fire you Mrs. Jeffries". I am held to a higher standard of behavior then my black co-worker Delores Thomas.
- John Williams wants to have labor review and resolve this incident. I told him they are affiliated with Delores Thomas and her relative, and would be biased in her favor.
- On 12/01/03 out of desperation, I asked Sherry Wiggins-Supervisor for permission to work in her area without divulging any details. I told her I was very stressed and needed to get out of my present work area. She said she would speak to John Williams and to date, neither has responded to my request.
- Please note all management involved are African-American.
- From 11/11/03 until present I continue to work in a hostile environment.

It is the lack of corrective action, based on racism, that has prompted me to seek an EEO resolution.



00106

U.S. Postal Service
**EEO Dispute Resolution Specialist's (DRS) Inquiry Report**

Case No.
**1C-081-0017-04**

### NOTICE OF RESTRICTED USAGE

Access to, and usage of, this EEO report is restricted by both the Freedom of Information Act and the Privacy Act to: (1) the complainant and his or her representative, and (2) government officials who must have access to the files to discharge their OFFICIAL duties. The report must be safeguarded. Willful violations of these requirements are subject to criminal penalties (5 U.S.C. 552a(i)).

**Complainant**

| Name (Last, First, MI) | Social Security No. |
|---|---|
| **JEFFRIES, JANET** | **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** |

| Home Address (No., Street, City, State, ZIP + 4) | Work Address (Facility Name, No., Street, City, State, ZIP + 4) |
|---|---|
| **2148 SEENEYTOWN ROAD** **DOVER  DE 19904-1653** | **DELAWARE P&DC** **147 QUIGLEY BLVD** **NEW CASTLE  DE 19720-9998** |

| Home Telephone No. **(302) 653-5411** | Email Address | Office Telephone No. **(302) 323-2285** |
|---|---|---|

| Position Title **CLERK** | Grade Level **PS05** | Tour **3** | Duty Hours **1550-1200** |
|---|---|---|---|

| Off Days (For Tour I, record of nights) **WED/THURS** | Is EEO Poster 72 on display in Complainant's facility? ☐ Yes, verified on date _____ ☐ No |
|---|---|

| Preference Eligible ☐ Yes  ☒ No | Mixed Case ☐ Yes  ☒ No | MSPB Appeal Filed? ☐ Yes  ☒ No  If Yes, Date Filed: |
|---|---|---|

**Chronology of Informal Process**

| Date of Incident **11/11/2003** | Date of Initial Contact with EEO Office **12/02/2003** | Date of Initial Interview **02/12/2004** |
|---|---|---|

| REDRESS™ Overview ☒ Yes  ☐ No | ADR Election Form Signed ☒ Yes  ☐ No | 60 Day Extension Form Signed ☐ Yes  ☐ No  If Yes, Expiration Date: |
|---|---|---|

| Date Complainant Signed or Received Notice of Right to File  **02/12/2004** | Date DRS Report Requested **02/20/2004** | Date DRS Report Submitted **03/01/2004** |
|---|---|---|

**Basis for Alleged Discrimination**

Check and Particularize Each that Applies

| | |
|---|---|
| ☒ 1. Race (Specify): CAUCASIAN | ☐ 6. Age (Specify Date of Birth): |
| ☐ 2. Color (Specify): | ☐ 7. Physical Disability (Specify): |
| ☐ 3. Religion (Specify): | ☐ 8. Mental Disability (Specify): |
| ☐ 4. Sex (Specify): | ☐ 9. Retaliation (Specify Cited Prior EEO Activity): |
| ☐ 5. National Origin (Specify): | |

Discrimination Claim(s): THE COUNSELEE ALLEGES DISCRIMINATION WHEN ON 11/11/2003, SHE WAS VERBALLY AND PHYSICALLY ASSAULTED BY ANOTHER EMPLOYEE AND MANAGEMENT DID NOTHING ABOUT IT.

Counselor's Report
Page _8_ of _14_

Requested Resolution
PERMANENT TOUR 2 ASSIGNMENT 8 HOURS GUARANTEED, 45 DAYS ADMINISTRATIVE LEAVE, $150,000.00 COMPENSATORY DAMAGES AND ZERO TOLERANCE TO APPLY TO ALL EMPLOYESES.

PS Form 2570, June 2001 (Page 1 of 3)

 

**EEO Dispute Resolution Specialist's Checklist**

Please check All That Apply.

☒ 1. I informed counselee of the impartial role of the Dispute Resolution Specialist in the EEO complaint process, explained the EEO process, and provided counselee with the booklet, *What You Need to Know About EEO* -- an overview of the EEO process in the Postal Service.

☒ 2. I notified counselee of his/her right to be accompanied, represented, and advised by a representative of his/her choice at any stage in the complaint process. If counselee elected representation, I obtained the following information:

Representative's Name: __LOUISE BRINSON_____

Title: __EXPEDITER_____ Telephone Number: __(302) 323-2281_____

Fax No: (____)_____ Email Address: _____

Mailing Address: __248 CORNWEL DRIVE_____

_____BEAR  DE 19701-3128_____

☒ 3. I advised counselee of his/her right to remain anonymous during pre-complaint counseling and he/she DID __X__ / DID NOT ____ waive anonymity.

☒ 4. I explained the privacy act notice. Counselee signed a copy of the notice prior to the interview.

☐ 5. If a mixed case, I informed counselee of the mixed case election procedures in 29 C.F.R. §1614.302.

☐ 6. If age discrimination was alleged, I informed counselee of the alternate procedures available for pursuing age claims, as outlined in 29 C.F.R. §1614.201.

☐ 7. If a sex based claim of wage discrimination was alleged under Equal Pay Act (EPA), I advised counselee of his/her right to bypass the administrative procedure and file a civil action, as outlined in 29 C.F.R. §1614.408.

☐ 8. If discrimination based on disability was alleged I informed counselee of his/her requirement to submit documentation of his/her disability. Documentation HAS ____ / HAS NOT ____ been submitted.

☐ 9. If counselee presented his/herself as an agent of a class, I explained the class complaint procedures and the class agent's responsibilities, as outlined in 29 C.F.R.§1614.204.

☒ 10. I informed counselee of his/her requirement to immediately notify the area Manager, EEO Compliance and Appeals and the EEOC if the representative's or his/her mailing address change.

☐ 11. I explained that I will not be the one who will make the decision on the acceptability of counselee's claim(s); but, there is a possibility that, for the reason(s) I have briefly restated below, the claim(s) will be dismissed in accordance with 29 C.F.R.1614.107.

Counselor's Report
Page _9_ of _14_

PS Form **2570**, June 2001 *(Page 2 of 3)*

00108



On 11/11/03 I was verbally assaulted by Delores Thomas, PTF Automation Clerk (by use of profanity, and defamatory references of my family) and physically assaulted (by pushing into me with a tub full of flats) on the work-room floor and subsequently followed by her into the ladies locker room where I was challenged to fight and endured more profanity, vulgarity, and verbal assaults. There are four witnesses to this event. I reported this incident immediately to MDO - Angelo Lambert. Delores Thomas became irate with the MDO when questioned in my presence that evening.

- I told Anne Thomas, my immediate supervisor (in the locker room 11/11/03) that I felt threatened and I wanted to do a statement.
- I told Angelo Lambert - MDO (11/11/03) that I felt threatened.
- I told John Williams - MDO (11/14/03) I felt threatened by her and her friend's retaliation. No action by any of the above managers was taken on my behalf.
- Zero Tolerance Policy was ignored.
- John Williams - MDO, in a meeting with myself and union rep. Doris Perry on 11/26/03, defended Delores Thomas by his statement explaining what she meant by her remarks about my family and admitted that he knew she said them. Clearly a biased opinion.
- John Williams has already let three weeks transpire and has not fully investigated, by not obtaining statements or interviewing all involved.
- (No interviews were conducted as of 11/26/03).
- On 11/26/03 when I voiced my opinion on his handling of this incident, I referred to me hypothetically acting like Delores Thomas and John Williams was quick to remark, "I will fire you Mrs. Jeffries". I am held to a higher standard of behavior then my black co-worker Delores Thomas.
- John Williams wants to have labor review and resolve this incident. I told him they are affiliated with Delores Thomas and her relative, and would be biased in her favor.
- On 12/01/03 out of desperation, I asked Sherry Wiggins-Supervisor for permission to work in her area without divulging any details. I told her I was very stressed and needed to get out of my present work area. She said she would speak to John Williams and to date, neither has responded to my request.
- Please note all management involved are African-American.
- From 11/11/03 until present I continue to work in a hostile environment.

It is the lack of corrective action, based on racism, that has prompted me to seek an EEO resolution.



RECEIVED

FEB 20 2004

MGR EEO DIS
SOUTH JE    Counselor's Report
Page 10 of 14

CERT # 7003 1010 0004 7860 4210

00109

**Dispute Resolution Specialist's Inquiry**

Brief Summary of Inquiry (If applicable)

**REDRESS**  *(Dispute Resolution Specialist complete this section if counselee participated in ADR)*

| Date of mediation | Disposition |
|---|---|
| | ☐ Resolved     ☐ Not Resolved |

**Summary of Final Interview**

The Counselee was notified of her right to file a formal complaint when she was issued a PS Form 2579-A, Notice of Right to File Individual Complaint and a PS Form 2565, EEO Complaint of Discrimination in the Postal Service.

**Privacy Act Notice**

The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Office Address of Dispute Resolution Specialist (No., Street, City, State, and Zip + 4) **EEO DISPUTE RESOLUTION** P.O. BOX 9001 BELLMAWR  NJ 08099-9411 | Office Address of Manager EEO Compliance & Appeals (No., Street, City, State, and Zip + 4) **EEO COMPLIANCE & APPEALS** PO BOX 3000 WARRENDALE  PA 05095-3000 |
|---|---|
| Specialist's Office Telephone No. **(856)933-4289** | Specialist's Office Hours |
| Signature of EEO Dispute Resolution Specialist *Maureen Ann McManus* | Typed Name of EEO Dispute Re **MAUREEN MCMANUS** |

PS Form 2570, June 2001 *(Page 3 of 3)*

Counselor's Report
Page 11 of 14

004

00110

 **UNITED STATES POSTAL SERVICE**®



# Notice of Right to File Individual Complaint

| TO: Name (First, MI, Last) | Re: Case No. |
|---|---|
| JANET JEFFRIES | 1C-081-0017-04 |

This notice will attest to the fact that on _____**February 10, 2004**_____, I advised you of the actions taken concerning the alleged discrimination that you brought to my attention. If the matters which you raised during the pre-complaint processing stage have not been resolved, you have the right to file a formal complaint within 15 calendar days of the date you received this notice. If you decide to file a formal complaint, your complaint must be put in writing and signed by you or your attorney, if you retain one to represent you. I am providing you with PS Form 2565, EEO Complaint of Discrimination in the Postal Service, for this purpose. The complaint must be delivered to:

> EEO DISPUTE RESOLUTION
> PO BOX 9001
> BELLMAWR NJ 08099-9411

Your complaint will be deemed timely filed if it is received at this address before the expiration of the filing period, or if it bears a postmark that is dated before the expiration of the filing period. In the absence of a legible postmark, it must be received by mail within 5 calendar days of the expiration of the filing period.

An EEO discrimination complaint can be processed only if the complainant alleges he or she has been discriminated against on the basis of race, color, religion, sex, age (40+), national origin, disability or retaliation for past EEO activity. In addition, courts have ruled the complainant has the burden of presenting evidence which would give rise to an inference of discrimination. A complaint must contain the following information:

(1) Your name, address, position, and level;

- If you change your address, you have a regulatory requirement to immediately report the change to the Manager, EEO Compliance and Appeals, in your area. (If you are employed at Postal Service Headquarters, a Headquarters Field Unit or by the Postal Inspection Service, you should notify the EEO Appeals Review Specialist at Postal Service Headquarters.)

(2) The specific action or matter complained of, the date of occurrence, and the names of the official(s) who took the alleged discriminatory action at issue in this complaint;

(3) The specific type of discrimination alleged, e.g., race – African American, sex – female, etc.;

- If you allege disability discrimination, the alleged disability must be more than a temporary condition.
- If you allege age discrimination, you must have been at least 40 years of age on the date the alleged discriminatory action occurred.

(4) A brief statement of the facts that led you to believe you were discriminated against and the names of similarly situated individuals whom you believe were treated differently than you.

- If you allege a failure to accommodate a disability or your religion, you must explain the accommodation sought and why you sought it.
- If you allege retaliation, you must show a connection between the action at issue in the complaint you are filing and your past EEO activity. You must also show that when the alleged discriminatory action at issue in this complaint occurred, the management who took the action was aware that you had previously engaged in protected activity.

(5) The name of the EEO Dispute Resolution Specialist who provided you with this notice and the date you received this Notice of Right to File.

**Privacy Act Notice**

Privacy Act Notice. The collection of this information is authorized by The Equal Employment Opportunity Act of 1972; 42 U.S.C. § 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which USPS is a party of has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations,

Contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Dispute Resolution Specialist | Date | Your Signature | Counselor's Report |
|---|---|---|---|
| *Maureen M. Mennes* | 02/10/2004 | *Janet Jeffries* | Page 12 of 14    2/12/04 |

*Dispute Resolution Specialist: If you are mailing this Notice, you must send it by Certified Mail, Return Receipt Requested*

PS Form 2579-A, March 2001

*CERT# 7003 1010 0004 7060 4211*

00111

 

## UNITED STATES POSTAL SERVICE
## EQUAL EMPLOYMENT OPPORTUNITY CASE
## IN THE MATTER OF

### Janet Jeffries, Complainant
### Case No. 1C-081-0017-04

## CERTIFICATE OF SERVICE

I hereby certify that the EEO Dispute Resolution Specialist's Inquiry Report has been
sent by regular mail on this date March 01, 2004, to:

COMPLAINANT:

**JANET JEFFRIES**
**2148 SEENEYTOWN ROAD**
**DOVER  DE 19904-1653**


REPRESENTATIVE:

**MS LOUISE BRINSON**
**248 CORNWELL DRIVE**
**BEAR  DE 19701-3128**


March 01, 2004
DATE

*Maureen M. Moses.*
MAUREEN MCMANUS
MANAGER, EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT EEO OFFICE
P O BOX 9001
BELLMAWR  NJ 08099-9411

Counselor's Report
Page 13 of 13

54



CASE # 1C- 081- 0017- 04                          2/19/04

EEO Complaint of Discrimination in the Postal Service  PLEASE ATTACH:
Omitted in complaint sent 2/18/04  cert# 70031010000470604210
#16 Explain the specific actions or situations that resulted in you alleging that you believe you were
discriminated against (treated differently than other employees or applicants because of you race, color
religion sex, age national origin, or disability.

NAME OF EMPLOYEE          FACTORS THAT DESCRIBE EMPLOYEE
Felicia Camper                    Black Female VS White Male
              She verbally attacked Bo Driggers (white male).  Both were immediately
removed from the building on C.O.P. pending investigation.  Felicia Camper was verbally warned only.

Mike Potalak                     White Male VS White Male
              Mike Potalak pushed, assaulted employee, Bill Landis.  Both were immediately
removed from the building on C.O.P. pending investigation.. Mike Potalak was fired.

Bill Skibicki                     White Male VS Black Female
              Bill S. was accused by Eugenia Ross (black female) of bumping into her.  He
was immediately removed from the building, pending investigation.  Bill Skibicki was fired.

Richard Wilson                   White Male VS Black Male
              Richard Wilson (white male) was accused by Owen Wallace (black male) of
making an "uncalled for" comment  Richard was given an immediate seven (7) day suspension

Michele McGuire                  White Female/Black Female
              Michele McGuire (white female)  was escorted out of the building immediately
following a Verbal Complaint from a fellow co-worker that she (black female) felt threatened by Michele
M. because of a pending legal matter Michele M was involved in.  Michele M. was out of the building
pending investigation.

I was treated differently than other employees in that the incident that I endured was witnessed by four other
employees and written statements were submitted.  This was not mere accusation!  There was no immediate
action taken by MDO Angelo Lambert, and subsequently, MDO John Williams.  In fact,  investigations
were held off until at least fourteen days transpired in order to accomplish the "untimely factor" which the
union would invoke should any action been taken as such.  John Williams admitted his knowledge of this
technicality, in a meeting with a union rep.

THIS ATTACHMENT:  certified mail/return receipt #7003 1010 0001 1227 7635

THANK YOU.
JANET JEFRIES

RECEIVED
FEB 2 3 2004
Counselor's Report                    LUTION
Page 14 of 14                          RICT

55

00113

 

EEO COMPLIANCE AND APPEALS



**UNITED STATES**
**POSTAL SERVICE**

March 31, 2004

Janet Jeffries                                         Agency Case # 1C-081-0017-04
2148 Seeneytown Rd.
Dover, DE 19904-1653

Dear Ms. Jeffries,

We have received your complaint of discrimination filed on February 18, 2004.

**Your complaint has been accepted for investigation. Beginning January 2004, the investigation of EEO complaints will now be processed by a National EEO Services Office. The investigative processing of your case will be handled by an investigator assigned by the national EEO Services Office.**

The scope of the investigation will include the following issue(s) only:

Specific Issue(s): The complainant alleged discrimination based on color (Caucasian) when: on November 11, 2003, she was verbally and physically assaulted by another employee and management failed to take any action.

NOTE: If your complaint involves an allegation of age discrimination, the Postal Service is required by the Age Discrimination in Employment Act of 1967, as amended, to advise you that you may consult with an attorney should you desire to do so before signing any agreement resolving your complaint of age discrimination.

If you do not agree with the defined accepted issue(s), you must provide a written response specifying the nature of your disagreement within seven (7) calendar days of receipt of this letter to Senior EEO Complaints Investigator, at the address below. You are reminded that any notification of disagreement with the defined accepted issues is not an opportunity or forum to raise additional, unrelated allegations of discrimination. Additional unrelated issues must be pursued through established procedures with your local EEO Office.

Please be prepared to go forward with your case and provide an affidavit when the Investigator contacts you in the near future.

The investigation of the accepted issues will be completed within 180 calendar days of the date of your filing of the complaint, except that the complainant and the Postal Service may voluntarily agree, in writing, to extend the time period up to an additional 90 calendar days.

Issues to be investigated
Page 1 of 4



DEPOSITION
EXHIBIT
JEFFRIES-7
CMV-1/28/08

PO BOX 3000
WARRENDALE PA. 15095-3000

00114

 

- 2 -

Should you seek to amend the complaint, the amendment will extend the time for processing an additional 180 days from the date of the amendment with the total allowable time for processing the complaint and all amendments no more than 360 days.

If you have a grievance pending on the same issue(s) as those addressed in your complaint of discrimination, the agency may, at its discretion, defer the processing of this complaint until the grievance procedure has run its course and there has been a final resolution of the grievance. When an investigation is deferred, pending the outcome of the grievance process, the 180-day time period for processing the complaint is stopped temporarily, and does not restart until the grievance is resolved. If your complaint is deferred, you will be notified, in writing, of the options which may be available to you as a result.

When the investigation is completed, you will receive a copy of the investigative report, and you will be notified of your right to a hearing before an Equal Employment Opportunity Commission (EEOC) Administrative Judge or of your right to a final decision by the agency head or designee without a hearing. You may request a final agency decision without a hearing, at the appropriate time, by writing the Manager, EEO Compliance & Appeals, P.O. Box 3000, Warrendale, PA 15095-3000.

You may request a hearing by an EEOC Administrative Judge by notifying, in writing, the District Director of the EEOC at the following address:

ADMINISTRATIVE JUDGE
EEO COMMISSION
PHILADELPHIA DISTRICT OFFICE
THE BOURSE SUITE 400
21 S. FIFTH STREET
PHILADELPHIA PA 19106-2515

You must make your hearing request within 30 calendar days of your receipt of the investigative report and you must provide the Manager, EEO Compliance & Appeals with a copy of that hearing request. If you do not receive your investigative report and notification concerning your appeal rights within 180 calendar days from the date on which you filed your formal complaint, you may request a hearing by writing directly to the EEOC District Office shown above, with a copy to the Manager, EEO Compliance & Appeals, at any time up to 30 calendar days after receipt of the investigative report.

If you are dissatisfied with the Postal Service's final agency decision where there has been no hearing, or with the Postal Service's final action on the decision of an

Issues to be Investigated
Page __2__ of __4__

00115

 

- 3 -

Administrative Judge following a hearing, you have certain appeals rights. You may appeal to the Office of Federal Operations, Equal Employment Opportunity Commission (EEOC), at the address shown below, within 30 calendar days of the date of your receipt of the final agency decision or you may file a civil action in the appropriate U. S. District Court within 90 calendar days of your receipt of the decision. You may also appeal a final action by the Postal Service implementing a decision of an Administrative Judge following a hearing within 30 calendar days of the date of your receipt of that final action or you may file a civil action in an appropriate U. S. District Court within 90 calendar days of the date of your receipt of the final action. Finally, you may respond to an appeal by the Postal Service in connection with its final action not to implement a decision of an Administrative Judge following a hearing or you may file a civil action in an appropriate U. S. District Court within 90 calendar days of the date of your receipt of the final action and appeal.

Any appeal to the EEOC should be addressed to the Office of Federal Operations, Equal Employment Opportunity Commission, P. O. Box 19848, Washington, D. C. 20036-9848. Along with your appeal, you must submit proof to the EEOC that a copy of the appeal and any supporting documentation were also submitted to the Office of EEO Compliance and Appeals, U S Postal Service, Eastern Area, P.O. Box 3000, Warrendale, PA 15095-3000.

After 180 calendar days from the date of filing your formal complaint, you may file a civil action in an appropriate U. S. District Court if the Postal Service has not issued a final decision on your complaint or if no final action has been taken on a decision by an Administrative Judge.

If you decide to appeal to the Office of Federal Operations, EEOC, you may file a civil action in an appropriate U. S. District Court within 90 calendar days after your receipt of the Office of Federal Operation's decision. If you do not receive a decision on your appeal within 180 calendar days from the date of your appeal, you may file a civil action.

*Karen E. Malizia*

Karen E. Malizia
EEO ADR Coordinator

Attachment:
   1.Certificate of Service

Issues to be Investigated
Page 3 of 4

58

00116

 

- 4 -

### UNITED STATES POSTAL SERVICE
### EQUAL EMPLOYMENT OPPORTUNITY CASE
### IN THE MATTER OF

### Janet Jeffries, Complainant
### Agency Case No. 1C-081-0017-04

### CERTIFICATE OF SERVICE

I hereby certify that the Agency's Acceptance of Formal EEO Complaint has been sent by regular mail on this date to:

**COMPLAINANT:**

JANET JEFFRIES
2148 SEENEYTOWN RD
DOVER DE 19904-1653

**COMPLAINANT'S REPRESENTATIVE:**

LOUISE BRINSON
248 CORNWELL DR
BEAR DE 19701-3128

MANAGER EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT
PO BOX 9001
BELLMAWR NJ 08099-9411

MAR 3 1 2004
_____
Date

*Karen E Malizzia*
Office of EEO Compliance and Appeals
U S Postal Service, Eastern Area
PO Box 3000
Warrendale PA 15095-3000

Issues to be Investigated
Page 4 of 4

59

00117

CASE # 1C-081-0617-04

11-26-03

S-T-A-T-E-M-E-N-T-

I Bobby FORD heard Debris Thomas and Janet Jeffries. I don't know what cause the arugment. Deloris Thomas was going off on Janet Jeffries. only thing Janet Said was Delors What's the problem. Deloris Kept cursing & yelling at Janet.

END-of-Statement

*Bobby Ford*

Changed Statement from 11-17-03

FEHSA0-000-631-6699
DEPOSITION
EXHIBIT
JEFFRIES-8
CMN-1/28/08

Exhibit 6
Page 1 of 1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515

| | | |
|---|---|---|
| Janet F. Jeffries,<br>        Complainant, | : | |
| | : | EEOC Hearing No. |
| | : | 170-2005-00177X |
| v. | : | |
| | : | |
| John E. Potter, | : | Agency No. |
| Postmaster General, | : | 1C-081-0017-04 |
| U.S. Postal Service, | : | |
|         Agency. | : | |

## DECISION

An Order To Show Cause ("OSC") was issued on October 7, 2005 which directed the Complainant to show cause why the above-captioned complaint should not be dismissed for her failure to state a claim, pursuant to 29 C.F.R. § 1614.107(a) (1). *See OSC, attached.* The Complainant submitted a timely response to the OSC. *See Complainant's Response to OSC, dated November 10, 2005, attached.*

In the instant matter, the Complainant, Janet Jeffries, a Caucasian Clerk at the Delaware Processing and Distribution Facility of the United States Postal Service ("Agency"), has alleged that beginning on November 11, 2003, she was subject to disparate treatment based on her race, regarding the response of Agency management to her allegation of a work place verbal and physical assault against her by an African-American co-worker.

In the Complainant's Response to the OSC, the Complainant offers the following in opposition to dismissal of the instant matter for failure to state a claim as proposed in the OSC: (1) the complaint was not dismissed by the Agency, (2) she suffered harm from the failure of Agency management to take certain actions and (3) she suffered harm when reassigned to Tour 1 from Tour 3 when her position with the Agency was converted from part-time to a full-time in September 2004.

With regard to item (3) above, this allegation was *not* included in the Complainant's formal complaint filed in the instant matter. *See Investigative File, Formal Complaint.* The Complainant has not properly sought to amend the instant complaint to include this alleged injury in fact. The Complainant must contact an EEO counselor regarding item (3), if she wishes to pursue this allegation as a new discrimination complaint. Unless the Complainant can point to an earlier date upon which she first raised this allegation, the date of her initial contact with the EEO counselor regarding item (3) will be November 10, 2005 – the date of the Complainant's Response to the OSC.

As for item (1) above, a complaint may be dismissed on the bases set forth in the EEOC's regulations by either the agency *or the Administrative Judge on her own initiative after notice to the parties. See 29 C.F.R. § 1614.107 (a) and 29 C.F.R. § 1614.109 (b).* The Agency's processing of the complaint of the complaint does not preclude its dismissal on procedural grounds. *See e.g., Oaxaca v. Roscoe, 641 F.2d 386 (6th Cir. 1981) (no agency waiver of timeliness objection by mere acceptance and investigation of untimely complaint); Hill v. General Service Administration, EEOC Request No. 05890383 (Sept. 12, 1989) (agency can raise timeliness even where processing has been completed and a final decision issued, so long as the final decision found no discrimination).*

Considering the factual allegations presented in the instant matter in a light more favorable to the Complainant with regard to item (2) above, I find that she has not been shown to be aggrieved under the EEOC's regulations which govern the processing of federal sector EEO complaints. Therefore, her allegation of discrimination raised in this complaint fails to state a claim upon which relief could be granted. To establish standing as an "aggrieved employee" within the context of 29 C.F.R. 1614.103, the Complainant must allege, first of all, that she has been injured *in fact. Hackett v. McGuire Bros., 445 F.2d 447 (3rd Cir. 1971).* Specifically, she must allege some direct harm which affects a term, condition, or privilege of employment. *Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205 (1972); see also Nenita Antonio v. Postmaster General, United States Postal Service, EEOC Decision No. 01966356 (July 18, 1997).*

There is no evidence that the Complainant suffered any personal loss or harm as a result of the action or more precisely, the inaction, she challenges in this matter. While Complainant may have been told that discipline was contemplated against her for conduct on November 11, 2003, the record fails to show that any such discipline was taken against her. Remarks, unaccompanied by concrete action, do not render an individual aggrieved under EEOC regulations. *See for e.g., Cobb v. Secretary, Department of the Treasury, EEOC Appeal No. 01962340 (November 6, 1996).* Moreover, the Complainant has suffered no personal loss or harm affecting a term, condition or privilege of her employment with the Agency by the Agency's failure to take action against the co-worker whom the Complainant alleged to have verbally and physically accosted her on November 11, 2003. Although the Complainant may be seeking recovery for emotional distress and use of leave, the EEOC has held that, when an allegation fails to show that a complainant is aggrieved for purposes of Title VII and the EEOC regulations, it will not be converted into an actionable claim merely because the complainant has requested a specific relief. *Girard v. Department of the Treasury, EEOC Request No. 05940379 (September 9, 1994).*

For the Commission:

_____

LYSTRA A. HARRIS
Administrative Judge

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515
Main Tel. No. (215) 440 - 2800 (Hearings Unit)
Fax No. (215) 440 - 2805
Philadelphia, PA 19106-2515

| | | |
|---|---|---|
| Janet Jeffries,<br>        Complainant, | : | EEOC Hearing No.<br>170-2005-00177X |
| v. | : | |
| John E. Potter,<br>Postmaster General,<br>United States Postal Service,<br>        Agency | : | Agency Case No.<br>1C-081-0017-04 |
| | : | October 7, 2005 |

## ORDER TO SHOW CAUSE

**The Complainant is hereby ordered to show cause why the above-captioned complaint should not be dismissed for failure to state a claim pursuant to 29 C.F.R. § 1614.107(a)(1).**

In the Notice Of Intent To Issue Decision Without A Hearing ("Notice Of Intent") dated July 1, 2005 issued in this matter, it was stated that the claim presented is whether the Complainant, a Caucasian female Automation Clerk, PS-5 at the Delaware Processing and Distribution Center, was subject to hostile work environment harassment based on race on November 11, 2003. In the Complainant's Opposition Memorandum timely submitted in response to the Notice Of Intent, the Complainant contends that the claim presented is not whether the Complainant was subject to unlawful hostile work environment harassment based on race, but whether, beginning November 11, 2003, the Complainant was subject to disparate treatment based on her race, regarding the *response* to her allegation of a work place verbal and physical assault.[1]

Adopting the characterization set forth in the Complainant's Opposition Memorandum, I find that the Complainant has failed to state a claim upon which relief could granted. To establish standing as an "aggrieved employee" within the context of 29 C.F.R. 1614.103, the Complainant must allege, first of all, that she has been injured *in fact. Hackett v. McGuire Bros., 445 F.2d 447 (3rd Cir. 1971).*

---

[1]The Agency timely submitted its Memorandum in Support of a Decision Without a Hearing dated August 1, 2005 which addressed the merits of the claim as stated in the Notice Of Intent.

Specifically, she must allege some direct harm which affects a term, condition, or privilege of employment. *Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205 (1972); see also Nenita Antonio v. Postmaster General, United States Postal Service, EEOC Decision No. 01966356 (July 18, 1997).*

There is no evidence that the Complainant suffered any personal loss or harm as a result of the action she challenges in this matter. The record fails to show for *e.g.*, that the Complainant was disciplined for the conduct at issue which occurred on November 11, 2003. The Complainant has suffered no personal loss or harm affecting a term, condition or privilege of her employment with the Agency by the Agency's failure to take action against another employee. Although the Complainant may be seeking damages for emotional distress, the EEOC has held that, when an allegation fails to show that a complainant is aggrieved for purposes of Title VII and the EEOC Regulations, it will not be converted into an actionable claim merely because the complainant has requested a specific relief. *Girard v. Department of the Treasury, EEOC Request No. 05940379 (September 9, 1994).*

**The Complainant is directed to respond in writing within 10 calendar days to this Order to Show Cause.** Failure of the Complainant to respond within the prescribed time frame may be construed as a waiver of any opposition to the dismissal of this complaint.

FOR THE COMMISSION:

LYSTRA A. HARRIS
Administrative Judge

<u>CERTIFICATE OF SERVICE</u>

For timeliness purposes, it will be presumed that the parties received the foregoing Order To Show Cause within five (5) calendar days after the date it was sent via regular, first class mail. I hereby certify that the foregoing Order To Show Cause has been sent on the date below, to the following:

COMPLAINANT'S REP
Juan J. Laureda
Laureda and Associates, LLC
521 S. 2nd Street
Philadelphia, PA 19147-2417

AGENCY REP.
Michael D. Jones
USPS Law Department
Eastern Area Office
P.O. Box 40595
Philadelphia, PA 19197-0595

COMPLAINANT
Janet Jeffries
2148 Seeneytown Road
Dover, DE 19904


October 7, 2005

_____

Date

_____

LYSTRA A. HARRIS
Administrative Judge

106 LRP 50791

## Janet F. Jeffries, Complainant, v. John E. Potter, Postmaster General, United States Postal Service, Agency

### Equal Employment Opportunity Commission-OFO

Appeal No. 01A61779

Agency No. 1C081001704

Hearing No. 170-2005-00177x

**August 25, 2006**

## Full Text

### Decision

Complainant filed a timely appeal with this Commission from the agency's decision dated December 16, 2005, dismissing her complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. # 2000e et seq. Upon review, the Commission finds that complainant's complaint was properly dismissed pursuant to 29 C.F.R. # 1614.107(a)(l) for failure to state a claim. In a complaint dated February 18, 2004, complainant alleged that she was subjected to discrimination on the basis of race (Caucasian) when she got into a verbal altercation with another employee who allegedly pushed a cart at her, the agency did not properly investigate the incident, and the coworker was not disciplined. The Commission notes that an Administrative Judge (AJ) dismissed the matter for failure to state a claim, finding that complainant did not show that she was aggrieved. The AJ's dismissal was adopted by the agency.

The regulation set forth at 29 C.F.R. # 1614.107(a)(l) provides, in relevant part, that an agency shall dismiss a complaint that fails to state a claim. An agency shall accept a complaint from any aggrieved employee or applicant for employment who believes that he or she has been discriminated against by that agency because of race, color, religion, sex,

national origin, age or disabling condition. 29 C.F.R. ## 1614.103, .106(a). The Commission's federal sector case precedent has long defined an "aggrieved employee" as one who suffers a present harm or loss with respect to a term, condition, or privilege of employment for which there is a remedy. *Diaz v. Dep't of the Air Force,* EEOC Request No. 05931049 (April 21, 1994). In addition, the Commission has held further that where a complaint does not challenge an agency action or inaction regarding a specific term, condition, or privilege of employment, the claim may survive as evidence of harassment if it is sufficiently severe or pervasive to alter the conditions of the complainant's employment. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993). Whether the harassment is sufficiently severe to trigger a violation of EEO statutes must be determined by looking at all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Id.; Enforcement Guidance on Harris v. Forklift Systems, Inc.,* EEOC Notice No. 915.002 (March 8, 1994). We find that complainant failed to show that she suffered a harm or loss with respect to a term, condition, or privilege of employment or that the agency's action rose to the level of a hostile work environment. Neither complainant nor the coworker were disciplined for the incident. Accordingly, the agency's final decision dismissing complainant's complaint is affirmed.

### Statement of Rights -- On Appeal Reconsideration (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2. The appellate decision will have a substantial impact on the policies, practices, or operations of the

agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. # 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. # 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. # 1614.604(c).

## Complainant's Right to File a Civil Action (S0900)

You have the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, filing a civil action will terminate the administrative processing of your complaint.

## Right to Request Counsel (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. # 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. ## 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").



103

11/27 was reported by Delores Thomas and Ruthie Dillard at 6:30 to MDO Angelo Lambert. Delores was telling Angelo I took and extra 15 minutes on lunch. I was behind them, going back to my machine when I heard this. Angelo immediately went to Supv. Mildred Cherry and in turn she came to me questioning me about lunch. I explained I did not take extra time and to check my clock rings. She did and came back later to tell me everything was OK. I asked her if Angelo told her where he got that information. She grinned, like we both know who. They did not ask my partner, Karen Bayard about her time, we left and came back within seconds of each other.

12/2/03 was working on ISS13 and approached by Supv. Ed Uwah. He told me of an incident involving another employee, Ron in 030. Ron asked Ed if he was gay because he caught Ed looking at his backside. Ed was mad and told Supv. Owen Wallace about it. Owen told him to "keep cool," he'd take care of it.

12/8 working with Lynette Marrow ISS#11 I was late getting back to machine because I was at stand-up desk with Supv. Chiquita Conkey telling her my time badge does not work and please check my clock rings. Owen waved for me to go to him, simultaneously I was paged by Supv. Lee Amos. Lee said to me "Lunch is only ½ hr." I told him where I was, he did not believe me and made some undertone comment. Owen waited for my comment with an attitude. I did not reply. Later I was told to go to Dispatch area by Owen along with Lynette. She began to protest. I left.

12/9 #74 with Margaret Holmes. I told Chiquita Conkey the bank mail needed to be moved so we could set up. Saw Tim, the mule driver, he said Chiquita had told him we complained about the bank mail 5 x's. I told him that was not so. He said she must be trying to cause trouble.

00034

2

12/10 asked to come in at 1:30 while I was walking out the door.

12/11 Delores Thomas came in at 1:30, and was not in the day b-4. We were told not to come in on someone's say so. Around 11:20 PM was sent to opr. 030. Delores Thomas immediately jumped out of her seat and began speaking to Supv. Ann Thomas with her hand over her mouth and all the while looking at me. I tried to ignore them.

12/12 I asked Chiquita if I could speak to Doris Perry for a moment. Doris was in the isle. Chiquita got an attitude.

12/18 I was told to relieve Mildred Cherry and Delores Thomas at #70. I felt awkward, did it anyway. John Williams came over while I was feeding on #70 and asked what my note says in regard to days off. He said he could not give me the same days off every week someone complained. He did not want to violate my note. He already did . My last days off were SAT/SUN then the following were MON/TUES.

12/19 came in at 1:30. Stayed until 12:30. All other PTF's left, refused to stay. Karen Bayard and I stayed. I was feeding with John Williams standing behind me the whole time. As soon as the last letter fed, he said "that's it" I was told to leave. K. B. tied out the machine.

12/25/03 Delores Thomas, Anntoinette Rowser in lockeroom at 1:30. I was at my locker getting apron and was paged to work on machine. Around 2:30 I went back to the lockeroom /ladies room they were still there. Neither one was paged.

12/26 BCS#32 with Robert Taylor situated next to Delores Thomas again. (also on Thanksgiving Day) Delores Thomas talking with Angelo Perrone, and Robert Taylor while I was clearing stackers. Owen Wallace came by, completely ignored the group socializing, but made a point of standing for a while watching me.

00035

3

12/27 was told by Chiquita Conkey at 3:30 to start machine, only 10minutes allowed to set up. I was stationed on #77. Delores Thomas was standing at my machine talking with another employee the whole time. Nothing was said to her. She did not move until Chiquita came by again. Delores was talking to John Caputo.

12/28 outside of lockeroom Delores Thomas and Tasha Bryant talking for a while. Nothing was said.

1 /2 Meeting was given with all PTF's. No more profanity will be tolerated. The whole meeting, Delores Thomas, who was sitting in the back of the room continued to make comments. Tasha, Rowser and Latreese were told to stay after the meeting was over. I was paged to come back to the meeting room 15 minutes later. ~~████~~ ~~████~~ Attach #1

1/3 I was assigned to #74 with Eleanor Lockiby. Andrea Donovan asked Eleanor to trade with her. She had a recent problem with Delores Thomas and didn't want to work with her. Eleanor said OK. Within 15 minutes Andrea was called into the office with the Union and Chiquita Conkey. She told me upon returning to the machine she was put on notice about switching because Delores' feelings were hurt. I'm flabbergasted.

1/04/04 worked with Tikita Watts. She made a comment to me about Chiquita's attitude has changed towards me. I told her I was trying to believe it was my imagination. Chiquita came by an said abruptly, "start the machine!" only 10 minutes to set up! She wanted to know why we did not see the mail staged on the side of the machine, it was there all along. I said I didn't see it, it was mixed with the DPS mail. Tiketa commented to me how she sees Delores Thomas and Chiquita Conkey have become best friends. Delores has solicited her help. Chiquita's demeanor has changed towards me.

2004

00036

4

1/5/04 was called into ofc, by John Williams. I told him I would not go to face another

accusation. He told me of an appt. he set up with a EAP counselor, and I did not have to

go if I didn't want to. I told him I had made a previous appt. with an EAP counselor in

Dover. He said the choice was mine. I went to opr. 127 afterwards.

1/09 went to EAP meeting at 3:40-6:30.Kim asked me to ask J Williams to call her.

Worked with Tom Nicastro. Was paged by CC to go to another machine and tie it out.

Was given 2 hours over time. Was sent home by Carol Mitchell via John Williams.

1/11 was sent home early along with Sandy, Latreese, Eleanor, and Carlo rest of crew

stayed per Chiquita Conkey.

1/12 Latreese changed partners. Was scheduled to work with Ruthie Dillard but refused.

Chiquita Conkey re-assigned her with me. We were told that is against the rules. You are

to work with whom you are scheduled. Scheduling is the discretion of the Supv.

1/14 EAP meeting with Kim Wayman. She told me, John Williams will not move me to

another area from Delores Thomas because he does not believe I feel threatened.

1/15 Darlene Commadore reported  Lynette Marrow and K. Bayard for supposedly

talking about her lateness. John Williams conducted a full investigation, that day.

1/18 Darlene Commadore refused to work with Ruthie Dillard. Supv. Lavonne Street,

replied, "No one is supposed to refuse" I was told to work with R. Dillard. On #80.

Later ISS#13 Ruthie/Carlo, ISS#11 Lana/Darlene.

1/22 The meeting started out with introductions Mr. Weldin, myself Doris Perry, Mr.

Williams, and Angelo Lambert. Mr. Weldin, states, no real agreement since it is an

abeyance. Doris disagreed., said John Williams agreed in the mediation meeting and

signed and dated the agreement. Mr. Williams said he never agreed with the contents of

00037

5

the agreement. I said I wanted administrative leave, Mr. Weldin told me to file a c.o.p.

claim. He asked me why I wanted 30 days. I said to get my life in order. This incident

has disrupted my life. Doris asked Mr. Williams why would he sign anything he did not

agree with, the meeting became argumentative. Doris asked me if I was ready to leave I

said, yes. Went to the union ofc and wrote a letter to Maureen McManus.

Spoke to Sharon Letts the mediator to inform her. Maureen was informed that Mr.

Weldin thought we were having another mediation meeting and was looking for Delores

Thomas to attend. Spoke to Maureen McManus, she said she'd call him to inform him

and would send forms to me for formal complaint.

2/2 Around 4PM was working with Margaret Holmes. She left the machine for 4-5

minutes while I was traying the machine up, came back only to take another 5 finding a

selection on her cd player. Chiquita told me to see Doris Perry in the isle for ONE

MINUTE. She came by later and asked if we were done setting up. said no, someone

took the program out. She replied, it was because I was standing around talking! At

6PM I was told by Chiquita that I was supposed to be in opr. 127. She claims she told me

and we were only supposed to set up. Chiquita was very disturbed and sent us to BCS#32

instead. At 6:50 Tasha Palmer, Mike, were at #71 laughing and carrying with Chiquita.

Margaret and I just looked at each other puzzled. She said, "we better start writing this

stuff down".9:30PM John Williams stood at my machine and asked me about my note,

5dayswork/2days off. I told him he already messed that up. He said I can take another NS

day, fri, sat, or sun to accommodate my note or I'll have a 9 day stretch. I did not want to

use all my annual but I have to comply with John Williams per Doris Perry. 11PM I was

pulled off outgoing machine and replaced by Tom Nicastro and Dietra Sosa. Margaret

00038

6

was sent to 030 manual letter cases, I was sent to small parcel, sack Dispatch. Ann

Thomas and Chiquita Conkey came by around 11:20 and told me to go back to the

machine .I asked CC to check the condition of the machine b-4 the regulars left.

She said it was OK, she was sure. At 11:55 I went to #70 all the stackers were full. I was

disgusted so was my partner. Margaret H. made a comment to Tom N., he laughed, then

agreed, and left. I worked until1:30 w/o a break since 10PM. I'm in a lot of pain, my end

tour is 2PM. I asked CC for rips and torn envelopes., I got them myself. Owen asked me

if I was ready to pick vacation.

2/3 on #70 was told to set up then go to LMLM table, until7PM. Town Hall meeting was

6:05-6:45, award system was the topic. Still waiting to pick vacation. I reminded Owen at

6:45.PM.  Delores Thomas standing talking to Anita, Chiquita said nothing.

2/4 picked vacation. I asked about Christmas. Owen said all regulars got Christmas. I

asked who. He would not say. Said the schedule will be up on the board, then I'll see.

Found out Mildred Cherry and Karen Bayard picked b-4 me along with others with less

seniority. I tried to talk to Owen about it. He said we can take care of it later.

2/5 was sent to manual flat case 060 at 10PM Ed Uwah would not say why me. I asked

him to put my name in the book. Doris Perry informed me she could not file my

grievance because she was told her area is now  Hockessin. Select group came in at 2:30.

Debbie Callahan, Antoinette Rowser, Mildred Cherry , Eleanor Lockiby.-by Ed Uwah.

2/6 I was asked by C.C. at 11:50 if I wanted OT.  (All others had already been asked 2hrs

b-4 their ET. She said John Williams told her she should have asked me. I said no.

2/11 I spoke to Maureen McManus.  She said the Company cannot give anything in

settlement that would go against Union Contract.  I want to be removed from the tour or

00039

7

bldg. She will set up meeting with John Williams, myself and mediator. She said write

everything down I feel is discriminating no matter how trivial. Because collectively they

paint a picture. She said be careful they may put me on midnight. I said that would be a

punishment. I heard John Williams is going to midnight. She asked me who L. Brinson

was. I told her, a co-worker. She asked if Chiquita Conkey could be there. I said no, I

have enough problems with John Williams' retaliation, she already treats me like trash.

2/11 came in and was scheduled w/K. Bayard. She was in opr 127 and didn't come up to

the desk. Darlene Commadore came in and was put on my machine running box. I told

ED I wanted to see John Williams. He said, Later. I followed him into the office, where

he was telling J. Williams about the situation. I excused myself and began telling him of

the time Darlene refused to work with Dillard (Lavonne Street) and that was OK. I said,

after her false allegations and the allegations of her good friend, Delores Thomas, I did

not want to work with her, we'd probably end up in the office tonight. I told him I carried

the mail for 4 years, this is the 3rd facility I've worked in and have never experienced

anything like this b-4. I'm too old for this nonsense. I was never a problem. I could work

with anyone b-4 the Delores Thomas incident. These problems arose from the Delores

Thomas incident, all her friends trying to get revenge, for her. He agreed. I told him

about the break of confidentiality of mediation-he told me, Angelo Lambert told Delores

Thomas now the whole floor knows. I assured him Doris does not talk, I respect her for

that. I told him I was sorry for how the meeting went with Joe Weldin. I had no options

when Doris decided to leave, Doris and I had spoke about it. He said he would convey

my feelings to Mr. Weldin. He said I don't have to work w/Delores Thomas, Darlene

Commadore and Tasha Palmer. He would send a memo to his Supervisors and would

74

8

hold them accountable. I agreed to split my days off in order to accommodate his scheduling problem, SUN/TUES. Delores Thomas in 030 talking with Mildred Cherry for 15 minutes. No one said a thing.

2/12 #74 with Debbie Callahan. Delores Thomas w/Mona on #75. Delores Thomas left the machine, I counted 11 X's minimum, all over the floor w/gossip, socializing with co-workers. Ed Uwah said nothing to her.

2/13 had a 2:15 appt. with Kim Wayman at the plant, PSDS. We did TFT treatment, it was an extremely tiring and emotional session. Angelo Lambert sent me home, Kim Wayman's suggestion.. He said he would put me on the clock.

2/14 I watched from #75 , Delores Thomas at stand-up desk talking to Chiquita Conkey From 8:15-8:30 then went on break from 9:30-9:55

2/16 I was sent to opr 127. Ann Thomas said she needed 5 people for FSM 100. I told Ann I wasn't scheduled for 127. Those scheduled should go first. She said it doesn't matter. The Last Holiday, I was 127 scheduled person. Ann said I had to go to FSM 100 because I WAS a 127 scheduled person. Did the rules change or does it depend on who's in 127. Delores Thomas, Eleanor Lockiby, Robert Taylor, Tiketa Watts, Sandy K, Frank Frisby, Debbie Callahan, Karen Bayard, Sharon Walker. Ann Thomas picked names out of tray, only 2 left should have been 4, so 2 were never put in to begin with.

2/19 #81 with Carlo Comomot. We both witnessed Delores Thomas leave by isle at 9:55 for break and did not come back until 10:25. Darlene Commadore 10:00-10:30 I left 030 at 11:55. Rowser left at 11:30 saw her in lockeroom at 11:55. Just a note to show, no-one is watched or paged. On the other hand I am on a short leash.

3/5 Darlene Commadore went to 127 because she did not want to work w/Barbara Rowe.

75

00041

9

Owen switched her with K. Bayard so Darlene could work with her friend Mildred

Cherry. Tikita Watts did not have to work OT on the 27th because she was off the next 2

days. I asked to go home on time, b-4 OT was given, because I did not feel well.

Chiquita said she'd check w/ John Williams, then said OK. At 030 Ed tried to send me

to opr 125. Between me and K. Bayard and said for me to go. I asked, why me? He said

he could not release 2 so I should go. I told him my knee was bothering me, I was

released from OT and if he insisted, I would need a form 3971 to go home early. He left

and came back and said, John Williams rescinded the order, I should stay in 030 . Those

scheduled to 127 should go. They were Mildred Cherry, Darlene Commodore, D.

Callahan and John Caputo.

3/6 Brm with Wayne Dickerson on#74. Ann Thomas came by and asked where Wayne

was. I said he's in the men's room. She was irate and said, "you all can't just leave the

machine. You don't do that when Chiquita is here". I was disgusted and told her," I

don't leave the machine, only to get water", (which is 10 feet away) I 'm doing my job,

check the numbers. She started yelling. " That's what I'm doing, MY JOB" I'm talking

about Wayne. Wayne came back and she said nothing to him. I wondered, what was that

all about?

3/11 I came to the stand-up desk to look at schedule to see what machine was vacant. Lee

Amos came by and said I was newsy and to give him that schedule. I explained what I

wanted to know. 6:00 I was sent to ISS side. Owen was talking to Harlan and Tasha

Palmer. I went to wrong machine, Owen screamed, "I said ISS 13 , load it!" Latreese

Howard heard him and kept going to ISS12.

3/11 12:00 PM Eleanor Lockiby approached me at the schedule on the wall and reminded

76

10

me she was in 127 and I should be there, not her. I asked if she was going to complain about it? She said, yes. I went to break at 12:15. Spoke to Ed at 030 and asked if he wanted me to go to 127.I am scheduled there and Eleanor is complaining that I'm in 030. He said, go. I reminded Eleanor that I came here since I scheduled but in the event the flat sorter needs help and she is scheduled to 127 and they send me as always, I'd be sure to bring her with me. I left at 2:AM. Eleanor left early at 1:00AM

3/12 3:40 Chiquita scheduled me to work with Tasha Palmer. I asked her to please change it. Mr. Williams is aware of this. She scratched out Tasha's name. John Caputo was put on #74 w/me. Delores Thomas went directly to Tasha on #72 and began her gossip session, with her hand over her mouth when she spoke. Chiquita said nothing. 4:00-4:15 Delores Thomas in ladies room socializing w/mail handler. 6:00-6:10 Delores Thomas socializing with Taria at water fountain near #78. Chiquita said nothing.7:15 Delores Thomas just standing at stand-up desk reading assorted papers John William and Chiquita walked by and said nothing. 8:40-8:49 Delores Thomas talking with Ronea Paden and Alicia Earl on #78 D. Thomas was supposed to be working on #75. Nothing, was said. 11:45-12:00 I was in 030, John Williams standing with Delores Thomas laughing and talking.

3/17 Wayne Dickerson came in on his day off by mistake, Lee Amos let him work. I was on #80 with Debbie Callahan. Lee came over to me and said "Miss, we have a lot of mail, keep this machine running!" I said, "We have a jam, and I am not the sweeper". At the same time Delores Thomas was on and off her work area the entire time. Debbie Callahan made a comment to me.

3/18 Eleanor Lockiby was in 030. She should have been in 127, I did not report her. Ed

00043

11

came looking for her and someone told him where she was. He left her there.

3/20 I spoke to John Williams about other employees reporting me for trivia things like where I'm scheduled etc. I referred to an employee (name I withheld) all over the floor Socializing and gossiping while I am being monitored on a constant basis. I talked about supervisors socializing with certain employees then showing partiality. Kim Wayman suggested I bring this to John William's attention.

3/21 #74 w Debbie Callahan. #78 is Delores Thomas and Mildred Cherry. Again, I am working in close proximity of Delores Thomas. Delores Thomas has not left her machine. She put an APC in front of her to block the view for both of us.

3/24 I am on #75 Delores Thomas is on #74 we are next to each other again. Saw Chiquita talking in the isle with Delores Thomas chit, chat-4:15-4:35. Again saw Delores Thomas at water fountain with Ed Thomas, Ann Thomas' husband. She left her partner on the machine 4:38. No problem.

3/28 5:00PM at clock near cafeteria. Delores Thomas clocked out. I went towards clock, she would not move and began to read notices on clock. I had to use another clock. I said nothing. Another person called her a "B" as she walked away. I wrote a note to John Williams about this (attached).

3/31 Darlene Commadore and Lynette Marrow were scheduled to work together. Darlene refused. Ed changed the schedule for her immediately (I had to go to John Williams) At 5:30 PM Delores Thomas passed me and made some kind of noise and then a comment. Something about leaving alone, I suppose that was directed at me.

4/11 I was assigned to opr 127 by Chiquita Conkey. I was on the 199 side when Delores Thomas came into the area and stood next to me. I immediately left the area and went to

00044

12

Chiquita Conkey. I told her I was forced out. She asked me if I wanted to leave? I said

no because I had been sent home early on Thurs. night. John Williams sent me home

while others received OT. I wanted to know if Delores Thomas was told to stay away

from me as I was told by John Williams to stay away from her? I went to #70 to help T-1

set up.

I left at 12:10. I felt as if I was being challenged by Delores Thomas and that she felt she

had the power since I had to leave. I plan on speaking to John Williams on Wed.

5/16 8:00 break in ladies room. Myself, Lynette Marrow, Debbie Callahan, Cindy were

having a conversation about politics, the present war, Vietnam and formal education for

postal management. Shawn Saunders sister of Sheri Wiggins, was sitting in the corner of

locker room. Shawn Saunders, unbeknown to me after break went to the MDO's office

after break and reported our conversation. She claimed she was offended by me, I was

making racial statements. One of the co-workers called into the office told me this

account. They were all called in separate and asked by Mr. Williams, "did Janet Jeffries

make a racial slur against black men?" No one agreed with Shawns' statement. One

person told me she overheard Shawn and another employee talking about this later in the

lockeroom, Shawn was advised to confront me, she declined and responded I would file a

claim against her like I did about Delores Thomas. I called Steve Collins at 2:40 on

5/17 he said forget it don't worry he would talk to John Williams and call me.

5/27 filled out 3971 and went to union ofc. (Courtland Stinson) I wanted him to check

the book for an opening fri, sat, or sun. I needed to take another day off because they

scheduled wrong again. I work 5 with 2 off. Courtland and Chiquita approached me and

we spoke at #79, on 8:00 break. I felt like I did something wrong by her line of

79

13

questioning. Why are you requesting annual? I told her about previous arrangement where John Williams asked me to take another day off in order to solve his scheduling errors. Chiquita was looking at me with disbelief. She said my note was invalid because she remembered seeing I had worked more than 5 days b-4. She and Courtland wanted to see my note. I gave it to them. I said my goal is to work 5 days with 2 off and I will not answer any more questions. I will speak to John Williams on 5/28 and hopefully settle what is now a PROBLEM.

6/3 I was speaking to John Williams in the isle. He wanted me change my day off. Sherry Wiggins SDO came over and began to listen to the conversation. I looked at her. She lunged her face at me, with an attitude. I finished my conversation and left.

6/4 I called Steve Collins APWU president. I told him about Sherry Wiggins. I told him her sister had put a false claim in on me and now I have to deal with her vendetta. Steve took the complaint.

On 7/15/04 spoke to Ruby Gardner about it. It took from 4/23-7/15 for Management to address my complaint. Ruby asked me for details, she did not know what the issue was. I discussed the incident ,in regard to Delores Thomas, that occurred on 11/11/03 I told her John Williams did nothing about it. He ordered me to stay away from her. I was upset because I felt Delores was not told the same thing or else she was just trying to start again. She was upset that the incident went unpunished and assured me it would not have gone that way if she was MDO when that took place. I told her my opinion. The incident went unpunished because of discrimination. She agreed, wanted copies of my EEO and assured me it could be settled. She would talk to Mr. Weldin in the A.M. and Get back to me. I never heard anything further from her.

00046

14

9/17  I was leaving opr 127 to ET.  John Williams was walking towards me to opr 127.

He looked at me, laughed out loud and said a haughtily," Hello, Mrs. Jeffries."

9/18 I received a certified letter of conversion and being re-assigned to T-1

From September 18, 2004 until November 26 worked on Dbcs. Donna White and John

Riley supvr's. uneventful.

10/8   Had some harassment from Ed Uwah about begin tour and reporting to him.

Ed yelled at me at the end of #81 that he was going to mark me AWOL.  I should go

upstairs and ask Mr. Larrimore for a change in begin tour.  Went immediately to MDO

Bob Weidman., Resolved.

Ann Thomas continues to make comments of how hard it is going to be during the

holidays.  All I will be doing is sleeping. I'll miss it all. Laughing.

11/26/04 New Bid Job ISS Sdo Ann Thomas/Pat Hawkins.

From November 26, 2004 until January 21, 2005 I have listened to Ann Thomas continue

to make comments on all the disadvantages of tour 1, Christmas will be a blur. How sad,

she is for me,  I'm going to miss it. Laughing the whole time she's talking to me.

January 21, 2005 New Bid Job 043 Manual/Utility Stats Program

ATTACH # 1

\*     01/02/04 I was accused by an anonymous person of pushing a coworker. I was interrogated by John Williams immediately after the incident was reported at a meeting on the same day. In the presence of managers Angelo Lambert and Chiquita Conkey, witnessed by union rep. Doris Perry (Doris Perry statement attached). The entire meeting was humiliating, I felt like I was on trial.

\*     There were no written statements, no eye witnesses supporting this individual's accusation prior to me being called into the office. Nevertheless I was still called in against the union rep's advice. This was a formal "day in court" all based on hear*say. Mr. Williams stated he investigates all claims. The meeting mentioned above was in preparation for discipline and/or removal. Mr. Williams was trying to fulfill his previous threat of firing me if I acted in any similar way to Delores Thomas.

\*     01/05/04 John Williams called me into the office scheduled me for an EAP appointment. I asked John Williams who his anonymous informant was, he told me it was Delores Thomas.

\*     01/09/04 in a counseling session with Kim Wayman, she suggested to me that she speak to John Wiliams about removing me from the area. She thought it would be helpful and I agreed. I am under constant surveillance by John Williams.

00048