# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JANET JEFFRIES,                          )
                                         )
        Plaintiff,            )
                                         )          Civ. A. No. 06-707-JJF
vs.                                      )
                                         )
JOHN E. POTTER, POSTMASTER               )
GENERAL, UNITED STATES POSTAL            )
SERVICE,                                 )
                                         )
        Defendant.            )


## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
## TO
## MOTION FOR SUMMARY JUDGMENT


Plaintiff JANET JEFFRIES


DATE: July 28, 2008                    By:

                               Herbert G. Feuerhake, Esq.
                               The Law Office of Herbert G.
                                 Feuerhake
                               521 West Street
                               Wilmington, Delaware 19801
                               (302) 658-6101
                               DE Atty. ID # 2590
                               herblaw@verizonmail.com
                               Attorney for Plaintiff Jeffries

# TABLE OF CONTENTS

Table of Authorities                                                            Page ii

Nature and Stage of the Proceedings                                             Page 1

Summary of Argument                                                             Page 1

Statement of Facts                                                              Page 2

Argument                                                                        Page 23

    I. Applicable Legal Standards                          Page 23

    II. Plaintiff Janet Jeffries Exhausted her Administrative
        Remedies                      Page 24

    III. A Prima Facie Case Has Been Established as to
        Race Discrimination and Retaliation    Page 29

    IV. There Exist Genuine Issues of Material Fact on
        Plaintiff's Hostile Environment Claim    Page 35

Conclusion                                                                      Page 36

Certificate of Service                                                          Page 39

# TABLE OF AUTHORITIES

## Cases

### *U.S. Supreme Court*

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)    ……………. Page 33

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)    …………………Page 23

McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)    ………………….. Page 24

Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977) ………………Page 34

United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)   ………………. Page 34

### *Courts of Appeal*

Amro v. Boeing Co., 232 F.3d 790, 797 (10th Cir. 2000)   …………. Page 32

Andrews v. City of Philadelphia, 895 F.2d 1469 (3rd Cir. 1990) ………….Pages 31, 35

Anjelino v. The New York Times Company, 200 F.3d 73 (3rd Cir. 1999) … Pages 24, 25

Antol v. Perry, 82 F.3d 1291 (3rd Cir. 1996)   ……….. Page 24

Atkinson v. Lafayette College, 460 F.3d 447 (3rd Cir. 2006)    ….. Page 24

Cardenas v. Massey, 269 F.3d 251 (3rd Cir. 2001)    ……. Page 31

Chipollini v. Spencer Gifts, Inc., 814 F.2d 893 (3rd Cir. 1987) (en banc), cert. dism. 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)    ….. Page 30

Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107 (3rd Cir. 1996)    ………………….. Pages 33, 34, 35

Hankins v. Temple Univ., 829 F.2d 437 (3d Cir.1987)    …………. Page 23

Hicks v. ABT Assoc. Inc., 572 F.2d 960 (3rd Cir. 1978) ……………. Page 25

Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300 (3d Cir.1995)
.......... Page 23

Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208 (3rd Cir. 1984)    ....Page 25

Jackson v. University of Pittsburgh, 826 F.2d 230 (3rd Cir. 1987), cert. den. 484 U.S.
1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988)    ............. Page 30

Jensen v. Potter, 435 F.3d 444 (3rd Cir. 2006)     ....... Page 33

Jones v. School District of Philadelphia, 198 F.3d 403 (3rd Cir. 1999) ....... Page 32

LaMontane v. American Convenience Products, 750 F.2d 1405, 1410 (7th Cir. 1984)
.................. Page 30

Ostapowicz v. v. Johnson Bronze Co., 541 F.2d 394 (3rd Cir. 1976)  ....... Pages 24, 25

Pa. Coal Ass'n v. Babbitt, 63 F.3d 231 (3d Cir.1995)  .....Page 23

Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3rd Cir. 1999)  ...... Page 31

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3rd Cir. 1997)    ..... Pages 24, 31

Robinson v. Dalton, 107 F.3d 1018 (3d Cir.1997)  ....... Page 24

Sarullo v. U.S. Postal Service, 352 F.3d 789 (3rd Cir. 2003)    ....... Page 30

Sheridan v. E.I. Dupont de Nemours and Company, 100 F.3d 1061 (3rd Cir. 1996)
.................... Page 30

Storey v. Burns International Security Services, 390 F.3d 760 (3rd Cir. 2004)
.......................... Pages 30, 32

Torre v. Casio, Inc., 42 F.3d 825 (3rd Cir. 1994)  ...... Page 32

Vance v. Southern Bell Tel. and Tel. Co., 863 F.2d 1503 (11th Cir. 1989)
.......... Page 31

## *District Courts*

McClean v. Communications Construction Group, LLC, 535 F.Supp.2d 485 (D.Del.
2008)      .............. Page 35

Revis v. Slocomb Indus., 814 F.Supp. 1209, 1215 (D.Del.1993) ..... Page 23

Selden v. National R.R. Passenger Corp., 452 F.Supp.2d 604  (E.D. Pa. 2006)
................... Page 32

## **Statutes**

Fed.R.Civ.P. 56            ……….. Page 23

29 C.F.R. §1604.11         ………… Page 35

## Nature and Stage of the Proceedings

Plaintiff adopts the Nature and Stage of the Proceedings as filed by the
defendant herein. This is Plaintiff's Answering Brief in opposition to the Motion
for Summary Judgment.

## Summary of Argument

1. The materials filed during the EEO process are sufficient to lead to a finding that
Ms. Jeffries exhausted her administrative remedies.

2. Ms. Jeffries's prima facie case has raised genuine issues of material fact with
regard to the presence of: adverse employment actions on the race claims;
materially adverse action  on the retaliation claim; and the existence of disparate
treatment on the retaliation and discrimination claims.

3. Ms. Jeffries has provided a substantial factual record creating, at the least, a
genuine issue of material fact with regard to the hostile environment in which she
has been forced to work.

## Statement of Facts

Plaintiff Janet Jeffries has worked for the United States Postal Service since December of 1993, starting as a "Christmas casual" clerk in the Dover post office, later obtaining a job as a temporary carrier delivering mail, and eventually (September, 2004) becoming a full-time regular employee (Jeffries deposition pages 4-17).[1] On November 11, 2003, the day of the incident that began the chain of events relevant to this case, Ms. Jeffries was working as a part-time regular automation clerk in the Delaware Processing and Distribution Center (located in New Castle, Delaware, and hereinafter designated the Delaware "P&DC"), allocating tubs of mail for rolling down a conveyor or roller belt; at the end of the belt was Delores Thomas, who was processing the tubs (Jeffries deposition, pages 18-19).

On the relevant date, Ms. Jeffries recognized that she could assist Ms. Thomas by "pulling" certain tubs rather than rolling them down the belt, because the equipment corresponding to those tubs was right next to where she was working (Jeffries deposition, pages 18-19). Ms. Thomas objected to this action by Ms. Jeffries and insisted to Ms. Jeffries that the tubs be not pulled but rather rolled down to her; Ms. Jeffries tried to explain that pulling them early would save time, but at Ms. Thomas's insistence Ms. Jeffries ceased pulling them and resumed rolling them down to Ms. Thomas (Jeffries deposition, pages 18-19). What happened next was the genesis moment of the instant litigation, as described at page 19 of Ms. Jeffries's

---

1 The Jeffries deposition is reproduced in its entirety, in "minuscript" format (i.e. four original transcript pages to one minuscript page), in the first part of Defendant's appendix, D.I. # 34-2. Insofar as the pagination of the original transcript, the compressed minuscript pages, and now an additional appendix page number, can get somewhat cumbersome and confusing, for the sake of clarity all references to the Jeffries deposition herein will be to the original deposition page numbers.

Plaintiff has also filed her own appendix this day. Page numbers in plaintiff's appendix have the prefix "A-," as in "A-1,", "A-2," etc., and references to the plaintiff's appendix will be made by the designation "Pl. App."

deposition:

> A.The man at the end of the run that was helping her was very upset because he had to pick them [i.e. the tubs] up and walk all the way back with them, put them in the corresponding equipment.
> Q. Who was that man?
> A. That was Frank Frisby. He made a comment like, Who did this, who rolled these down? I think Delores spoke to him and I said, "Well, Frank, this is the way Delores wanted it done." She blew up into a tirade of cussing and screaming and other people came around to see what was going on and she pushed in to me with a tub in the mid-section. A couple people tried to diffuse her and I was just totally upset . . .

Ms. Jeffries testified that Ms. Thomas's tirade lasted ten to fifteen minutes, then, when Ms.

Jeffries took a break and went to the ladies locker room, the incident continued (Jeffries

deposition, pages 23-24):

> A. I was just sitting there and Delores came in and her intention was to talk to me, gave me a few names, told me what a big baby I was for reporting this and what a bitch I am and then it got really vulgar and I told her so. The two people that were there were like, you know, trying to diffuse her again and she wanted to fight, she wanted to physically fight.
> Q. Who were the two people that were there?
> A. Lynette Marrow and Karen Bayard.
> Q. And when you say you told her that she was being vulgar, did you make any curses or anything like that?
> A. No, I did not curse.
> Q. Was this a heated conversation on both parts?
> A. No. It was heated on her end. She was standing as soon as you walk in the door and I was sitting at the table, drinking water. I think I was going to eat something, but changed my mind on that. I basically was the recipient of all that she wanted to get off her chest.
> Q. This incident was just a verbal.
> A. Right.
> Q. Harassment, I guess?
> A. And she challenged me to fight.
> Q. And, again, you didn't in the ladies locker room did you raise your voice?
> A. No, I did not.
> Q. You said you remained calm.
> A. I did.
> Q. Did you say any angry words to her?

---

followed by the page number, as for example "Pl. App. A-17." As for Part 2 of Defendant's Appendix found in D.I. # 34-3, it will be referenced by its page numbers, from 37-82, as appear therein, e.g. "Def. App. 37."

> A. Anything I responded was in a very peaceful tone. I was trying to keep it as sedated as possible.
>
> Q. How did the incident end?
>
> A. She stormed out cussing and screaming.

That was the end of the original incident,[2] though only the beginning of a long and tortured

history that has led Ms. Jeffries to this Court. Ms. Jeffries's account of this November 11, 2003

incident is corroborated by witnesses. For example, co-worker Karen Bayard (a self-described

"Black Jamaican", see Pl. App. A-71) provided a statement dated 7/15/05 (Pl. App. A-11 to A-

14) including the following passages (in which the undersigned has taken the liberty of correcting

the spelling of "Jeffries" from the incorrect version in the original document):

> My co-worker Janet Jeffries was both verbally and physically attacked on the workroom floor by a black female employee (Delores Thomas). To my knowledge Ms. Thomas has never been disciplined for her actions. I accompanied Mrs. Jeffries to report the incident to management. Afterward we both retired to the locker room and were satisfied that we had done our part by informing management of this clear violation in policy. Ms. Thomas came storming into the locker room and tried to entice Mrs. Jeffries to a fight by using profanity when addressing her and making reference to her children and husband.
>
> While we were still in the l[o]cker room trying to recover from the shock of this unprovoked attack Supervisor Ann Thomas came into the locker room and asked Mrs. Jeffries if she felt threatened. To this Mrs. Jeffries of course replied that she did fe[e]l threatened especially since Ms. Thomas followed her into the locker room after she tried to defuse the situation by walking away. I am still baffled as to why Ms. Thomas was not escorted out of the building. Later that evening I went to the managers' office on my own time to give a statement. I was turned away as they refused to take my statement. I was told that if they needed a statement from me that I would be called into the office at that time. This went against everything I had learned as a supervisor. It has always been my understanding that statements should be given as soon after the incident as possible so that the witness has a fresh recollection of what transpired. I had to insist on giving a statement when I heard they were finally conducting an investigation.
>
> There is such blatant discrimination in this building that I refuse to ever supervise

---

2 See also the account of Ms. Jeffries written the next day, Pl. App. A-58 to A-61, which includes more details on the vulgarities, including Ms. Thomas referring to Ms. Jeffries's "fucking kids," that she didn't need anyone to tell her "how to do her fucking job," and that Ms. Jeffries should "suck her ass." Ms. Jeffries indicates that Ms. Thomas "threw more F's" her way, and does admit in this statement to having responded eventually by saying "F-U" back to Ms. Thomas in response to the stream of "F's". Ms. Jeffries also notes her fears in this letter as to intimidation by Ms. Thomas's clique at work, who she believed had previously vandalized her car.

there again. It seems that whenever the victim is white, nothing is done.

This account is corroborated by other witnesses, for example co-worker Lynette Marrow ("Ms. Jeffries, Ms. Karen Bayard and myself were relaxing inside of the locker room . . . when suddenly Ms. Thomas came through the door, taking us all totally by surprize [sic]. Then she proceeded to berate Ms. Jeffries using humiliating and profane language that both shocked and amazed me. I couldn't believe the scene, it was strange and surreal," Pl. App. A-66; Ms. Marrow is a self-described "African-American," Pl. App. A-68), and co-worker Bobby Ford ("Deloris Thomas was going off on Janet Jeffries. Only thing Janet said was Deloris what's the problem. Deloris kept cursing and yelling at Janet," Pl. App. A-65).

This unfortunate incident might have been corrected and defused at an early stage. What Ms. Jeffries wanted was an investigation by management, and an appropriate response. The long and short of this case, as will also be discussed further below, is that postal service management simply failed to properly handle the situation, and matters began to spiral out of control as the process played itself out. It has now been over four years since the incident occurred, and it remains unresolved. There is an old expression – "it's not the *action* that causes problems, it's the *reaction*" – and that certainly holds true herein. A relatively small (albeit ugly) dispute, left unresolved, festers – the victim is unsatisfied, the perpetrators are emboldened. And the potential for a hostile workplace develops. As we discuss below, the unwillingness to investigate the claim of Caucasian employee Jeffries is indeed revealing as to the discriminatory attitudes with which Ms. Jeffries is faced every day, and is the crux of the claim against the postal service.

*The investigation*

It has been the expressed policy of the postal service to maintain a "violence free

workplace" (Pl. App. A-1 to A-7). Indeed, policy memorandums issued just days before the

above-described incident (Pl. App. A-3 to A-7, memorandums dated October 28, 2003) issued

for the "South Jersey Performance Cluster" of which the Delaware P&DC is a part contain the

following passages:

> All employees must be guaranteed a safe work environment free from hostile and abusive
> behavior and actions ... **THERE WILL BE ZERO TOLERANCE FOR ACTS OR
> THREATS OF VIOLENCE IN OUR WORKPLACE.** This includes, but is not limited
> to: · **Any act of physical violence[;]** · **Any actual, implied or veiled threat, made
> serious or in jest[;]** · **Any type of inappropriate language which would lead to a
> hostile workplace or create an offensive environment[.]** *Each and every act or threat
> of violence from this day forward will elicit an immediate and firm response that could,
> depending on the severity of the incident, include removal from the Postal Service.* No
> one wants to work in an atmosphere of fear and intimidation. It is in everyone's interest to
> have a violence-free environment. We will do whatever it takes to provide that
> environment. It is a right of all our employees.

[Pl. App. A-3, A-4; emphasis in original].

Moreover, Postal Service Publication 45 (Pl. App. A-1 to A-2) states in pertinent part the

following guideline:

> [E]ven a single incident of violence – whether it be a threat, robbery, assault, or homicide
> – is too much. The Postal Service has a Zero Tolerance Policy regarding workplace
> violence. Zero Tolerance means that we will not ignore any incident of verbal or physical
> action on the part of any employee who could cause injury or harm to another. . . .
> Report all threats to management officials. **Your supervisor or manager should
> conduct a prompt, thorough inquiry of your concern,** keep you informed, and take
> appropriate action to resolve the situation. [emphasis added]

In reliance on the protections inherent in (and purportedly offered by) these "Zero Tolerance"

policies, and greatly disturbed by what had transpired with Delores Thomas, Ms. Jeffries reported

the initial actions of Ms. Thomas at the conveyor belt (i.e. pushing the mail tub into her

midsection, and the abusive language) to her "Acting Manager, Distribution and Operations"

(known as an "AMDO," who is essentially the supervisor on duty at the time) Angelo Lambert;

this initial report to Mr. Lambert occurred on the facility floor (not in Mr. Lambert's office) after

the incident at the conveyor belt, but before the incident in the locker room (Jeffries Deposition,

pages 21-23, 25). Ms. Jeffries was present with Mr. Lambert in a later meeting also occurring on

the night of the incident (i.e. November 11, 2003). This later meeting was a more formal

meeting, occurring after the locker room incident, and involved Mr. Lambert, Delores Thomas,

and Ms. Jeffries, and was the meeting during which Karen Bayard knocked on the door and

offered to give a statement (as was described above in a passage from Ms. Bayard's statement),

which Mr. Lambert refused to take (Declaration of Janet Jeffries, Pl. App. A-28; Jeffries

deposition pages 25-29). Mr. Lambert noted in his statement (Pl. App. A-57) about this meeting

that Ms. Jeffries had first brought the dispute to his attention, and that "[w]hile attempting to

work through the differences that were at hand employee Thomas became loud and I had to settle

her down this in turn aggravated employee Jeffries. I then seen at this point that this process was

not going anywhere so I asked each employee if they felt threatened in any way . . . Employee

Jeffries stated that she did feel threatened . . ." Ms. Jeffries identified four eyewitnesses in this

meeting (Bobby Ford, Frank Frisby, Lynette Marrow, and Karen  Bayard), but Mr. Lambert did

no further investigation (Pl. App. A-28). Ms. Jeffries went home after this meeting (Jeffries

Deposition page 29).

    Ms. Jeffries was off work the next two days, returning on November 14, 2003 (Jeffries

Depositon pages 29-30); upon her return, she saw her MDO, John Williams, who was the

"Manager, Distribution and Operations" and was above Mr. Lambert in the hierarchy (Pl. App.

A-29; Jeffries Deposition pages 31-32), and gave him her written statement dated November 12, 2003 (Pl. App. A-29; the statement itself is found at Pl. App. A-58 to A-60). Ms. Jeffries testified that Mr. Williams "seemed concerned," and she believes that he said he was going to contact witnesses (Jeffries Deposition, page 32). Mr. Williams is a self-described "African-American" (Pl. App. A-49).

Mr. Williams apparently obtained a statement from Karen Bayard on November 15, 2003 (Jeffries Deposition, page 34-35). By this time the underlying incident that had begun at the conveyor belt had become common knowledge on the floor of the facility, which was humiliating to Ms. Jeffries, in that she was embarrassed and demeaned that, because she chose to follow the rules, she was made to look like someone who didn't "engage" or fight back (Jeffries Depositon, page 36-37), and, indeed, Mr. Williams told her that Mr. Lambert had told people about the incident (Jeffries Deposition, page 37-38).

The next formal meeting between Ms. Jeffries and Mr. Williams (there were some informal encounters) occurred on November 26, 2003 (Jeffries Deposition, pages 36-41). Ms. Jeffries testified that Mr. Williams approached her on the floor and told her that no one had substantiated her claim, including the last person he had spoken to, Bobby Ford (Jeffries Deposition, page 41). Ms. Jeffries said that she wanted to speak with Mr. Ford and with her union representative, a meeting which occurred that night including union representative Doris Perry, Mr. Ford, Mr. Williams, and Ms. Jeffries (Jeffries Deposition, page 42). Ms. Jeffries's deposition transcript is worth quoting at length at this point (Jeffries Deposition at pages 42-43):

> Q. And what happened at that meeting?
> A. He explained to Bobby Ford that he was there because of my request and he said, "Do you have anything to say to Bobby Ford?" I said, "I just have a question for him. I just

-8-

want to know why you asked me if I was okay and how sorry you were for what took place and am I going to be all right?" He said, "Mr. Williams, I want to change my statement."

So, Mr. Williams gave him a piece of paper and a pen and Bobby Ford wrote a different statement other than I didn't see anything. The conversation got a little confrontational between my union rep and Mr. Williams because he was trying to tell me what Delores Thomas meant by her remarks about my kids, my family. [Doris][3] told him that it was basically out of line.

He said he knew what I was saying and that I was to stay away from Delores. In the event I should even see her in the ladies room I was to leave and that if I acted in any manner in the way that she did he would fire me. He asked me, "Do you know how hard it would be for you to get a job, Mrs. Jeffries?" I said, "No, I don't." It was very – tense.

This notion that Williams would *fire* Ms. Jeffries if she were to act as had Delores Thomas is something that we will return to in a moment. In any event, the revised statement of Bobby Ford appears at Pl. App. A-65. It is a simple one-page statement dated "11-26-03," it notes that it is a "changed statement from 11-17-03," and it states (as previously quoted above) that Ms. Thomas was "going off on Janet Jeffries" and that she "kept cursing and yelling at Janet." Union representative Doris Perry corroborates the testimony of Janet Jeffries in a statement (dated July 15, 2005, and submitted in the EEO process) that is worth quoting at length (see Pl. App. A-8):

On November 26, 2003, Ms. Jeffries came to me for help. I am a shop steward on Tour 3 and she needed help to get a resolution for an assault that happened on November 11, 2003. I arranged a meeting with Mr. Williams, myself, and Ms. Jeffries for later that night. **Mr. Williams said he did not believe the statements he received from the employees who witnessed the incident on 11/11/03.** Fifteen days had transpired with no investigation being done. Ms. Jeffries and I explained that she felt very uncomfortable and threatened by Ms. Delores Thomas. **Mr. Williams tried to explain to us what he believed Ms. Thomas meant by the derogatory remarks she made to Ms. Jeffries.** When Ms. Jeffries explained to Mr. Williams that she was shoved and yelled at and wanted the abuse by Ms. Thomas to stop, Mr. Williams said that he would investigate **but if Ms. Jeffries had acted in the same manner, she would be fired.** Mr. Williams tells us he will talk with Ms. Thomas because **he has witnessed other incidents of Ms. Thomas yelling at managers and other employees. He believes she has a bad attitude and temper.** We discussed the statements given by the witnesses. After Ms. Jeffries read

---

[3] Although the deposition transcript reads "Delores" at this point, plaintiff said "Doris." This is logical, insofar as Delores Thomas was not present at this meeting.

the statement from Mr. Bobby Ford she became upset. Mr. Ford stated he did not witness anything but Mrs. Jeffries said he was the person who asked if she was ok after he saw what had happened. Mr. Williams called Mr. Ford to the office and he arrived with his shop steward, Mr. Ed Thomas. Mr. Ford retracted his original statement and wrote another one. The meeting ended with Mr. Williams stating that he would investigate and get back to us. [Emphasis supplied]

Mr. Williams failed to obtain a statement from Frank Frisby, although Mr. Frisby was an eyewitness to the original occurrence; Mr. Frisby was told by Mr. Williams that he did not have to get involved (Pl. App. A-30). Mr. Frisby is an African-American (Pl. App. A-86). The statements of witnesses Lynette Marrow, Karen Bayard, and Bobby Ford (all cited above) all corroborate Ms. Jeffries's version of events, and are consistent with each other.[4]

It is worthwhile here to examine the above-quoted statement of Doris Perry, and the sworn statement of Mr. Williams himself given to the EEOC (Pl. App. A-46 to A-56), in an effort to begin to delineate the atmosphere in which Ms. Jeffries was working. As noted by Ms. Perry, Mr. Williams stated that he "did not believe" the three witness statements of Karen Bayard, Lynette Marrow, and Bobby Ford; this disbelief is troubling, given that each of these statements is consistent with the others, with no contrary versions other than Ms. Thomas's own statement (Pl. App. A-61 to A-64), which is itself arguably consistent with much of the other statements. Then he tries to "explain" the derogatory remarks of Ms. Thomas, which, given the nature of the remarks as characterized by Bayard, Ford, Marrow, and Ms. Jeffries herself, is more revealing of Mr. Williams's pre-existing bias than of any justification for such problematic remarks (and would seem to indicate that, in fact, he did believe the eyewitness statements

---

4 Ms. Bayard eventually provided three statements during the investigation by Mr. Williams, as discussed at pages 92 to 94 of the Jeffries Deposition. Ms. Jeffries testified that Mr. Williams "lost the statement three times," which impeded the progress of the investigation. Eventually all three statements were received in the EEO record, and can

-10-

describing Ms. Thomas's language and demeanor). This bias is further emphasized by Mr. Williams's startling statement that he would fire Ms. Jeffries if she had acted as Delores Thomas had acted; startling, because he had *not* fired Ms. Thomas for such actions. Moreover, Perry's statement reveals that Williams himself recognized that Delores Thomas had "a bad attitude and temper," and that Williams had witnessed other incidents of Ms. Thomas yelling at postal personnel.

Mr. Williams tries to explain his actions in his EEOC statement. He admits that Ms. Jeffries reported that Ms. Thomas had been "verbally and physically abusive," and that he told her he would investigate (Pl. App. A-49). He states that the complete investigation wasn't concluded until December 3, 2003, when he received a statement from Frank Frisby (no such statement exists in the record, however, as noted above). He indicates that "Labor relations" personnel recommended that Letters of Warning be given to both Ms. Jeffries and Ms. Thomas (Pl. App. A-49 to A-50), and that he intended to follow this recommendation until Ms. Jeffries filed an EEO complaint (A-50). He decided not to file the Letter of Warning with regard to Ms. Jeffries "because I didn't want her to think she received corrective action because she filed an EEO" but he intended to file the Letter of Warning with regard to Ms. Thomas (Pl. App. A-50); it should be noted that this implies his willingness to allow fears of the EEO process to influence and distort his disciplinary rulings, an entirely inappropriate mindset but one clearly in keeping with Ms. Jeffries's assertions about inconsistent and arbitrary rulings emanating from Mr. Williams. He states that in his investigation, Ms. Jeffries related that Ms. Thomas had "hit her with a flat tub" and had "used profanity" (Pl. App. A-50). He states cryptically that the "Zero

---

be found at Pl. App. A-11 to A-13, A-72 to A-74, and A-75.

policy[5] was not followed *as it should have* because of the EEO that preceded and the

untimeliness of the corrective action" (Pl. App. A-51, emphasis added); there is no reason not to

follow the policy due to EEO filings, and any investigatory untimeliness was in fact his *own*

fault. Mr. Williams goes on to claim that he could not determine whether Ms. Thomas had struck

Ms. Jeffries with a flat tub, although Ms. Bayard's statements and Ms. Jeffries's own statements

support that conclusion.


*Disparate Treatment of other employees*

   The cursory nature of the investigation conducted by Mr. Lambert and Mr. Williams is

the starting point for analysis of the hostile and disparate treatment endured by plaintiff Janet

Jeffries. The situation worsened as Ms. Jeffries sought to be moved away from Ms. Delores

Thomas.

   On December 1, 2003, Ms. Jeffries inquired of Sherry Wiggins, Supervisor of Flat

Sorters, as to whether she could be transferred into Ms. Wiggins's area, to alleviate the stress that

Ms. Jeffries was under as she continued to work in Delores Thomas's area; Ms. Wiggins said that

she would have to speak with MDO Williams (Pl. App. A-18-19). Ms. Jeffries never thereafter

heard from Ms. Wiggins (Pl. App. A-19).

   On January 2, 2004, there was an allegation against Ms. Jeffries, made by Delores

Thomas, that Ms. Jeffries had pushed a co-worker, Tasha Palmer.[6] The incident is described in

---

5 This reference to "Zero policy" refers to the Zero Tolerance policy described above; see questions at Pl. App. A-47. The numbering of these questions is incorrect, but Mr. Williams's numbered response "12" on page A-51 corresponds to the twelfth question down on A-47.
6 Although Ms. Palmer is referred to as "Tasha Bryant" at pages 50 to 55 of the Jeffries Deposition, Ms. Jeffries later corrected her reference during the deposition, noting that there are two women named "Tasha" in the plant and

the Jeffries Deposition at pages 50 to 55. The allegation was made to Mr. Williams. Ms. Palmer

denied having been pushed and said, "I did not report this." One of the alleged witnesses is

described as having said, "I'm not going to be a part of this." Ultimately, Ms. Jeffries's union

representative, Doris Perry, described the actions of Mr. Williams in attempting to locate

witnesses and obtain statements as a "witch hunt." While Ms. Jeffries received no discipline as a

result of this incident, the point is a simple one: when Delores Thomas made an accusation

against Ms. Jeffries, there was rapid investigation; when Ms. Jeffries made an allegation against

Ms. Thomas, supported by eyewitnesses, there was slow and shoddy investigation and an effort

by Mr. Williams to explain away comments and actions of Delores Thomas, as well as an

assertion that witness statements were insufficient to support Ms. Jeffries's allegations when in

fact they did support her allegations.

Similarly, on January 15, 2004, an African-American co-worker of Ms. Jeffries, Darlene

Commodore, reported that her co-workers were talking about her (Pl. App. A-31). Mr. Williams

moved swiftly to investigate that complaint, taking statements from co-workers that same day,

whereas it took him three weeks to make any meaningful progress in investigating Ms. Jeffries's

complaint (Pl. App. A-31). Ms. Jeffries noted in her statement given to the EEOC, "I know by

virtue of Mr. Williams' conduct, that his reactions to complaints, unfortunately, are race/color

oriented I cannot depend on him to be fair or objective" (Pl. App. A-31).

On approximately January 9, 2004, Ms. Jeffries met with EAP counselor Kim Wayman

(Jeffries Deposition pages 55 to 57; Pl. App. A-19-21). She inquired about making an adjustment

Ms. Palmer was the one who had been the focus of this incident, see Jeffries Deposition at pages 99 to 100. Ms.
Bryant is mentioned below in another context; she reported a different incident, which was swiftly investigated by
Mr. Williams.

to her work situation so that she would not have to "endure the stressful situation of having to

work in such close proximity to Delores Thomas" (Pl. App. A-19). She agreed to have Ms.

Wayman speak to Mr. Williams about such a transfer (Pl. App. A-19); what happened next is

best described by Ms. Jeffries herself:

> Despite being personally informed by EAP Counselor Wayman that I expressed to her
> that I felt threatened, MDO Williams told Ms. Wayman that **he did not believe that I felt
> threatened and he was not going to move me to another area.** MDO Williams not only
> ignored my repeated requests to be reassigned to a different unit, he also disregarded the
> option when presented by the Agency's EAP Counselor. Ms. Wayman provided me with
> this information on January 14, 2004.
>      When Ms. Wayman relayed this information to me, I was devastated. . . . To me,
> it was evident that nothing was going to change and that the management at the Delaware
> P&DC were not going to ensure my safety (mental, physical, or emotional) while on the
> workroom floor nor was Ms. Thomas going to be reprimanded in any way for her
> outrageous behavior. [Emphasis supplied].

Pl. App. A-19 to A-20.

In other words, there was no effort made to expeditiously transfer Ms. Jeffries away from Ms.

Thomas. Indeed, it was not until Ms. Jeffries was converted to a "full-time flexible" ("FTF")

postal job on September 18, 2005 (see Pl. App. at A-25; this was more than ten months after the

original incident on November 11, 2003) that any transfer occurred, and when it did occur, it was

done in a questionable manner, as best described by Ms. Jeffries herself:

> On September 18, 2004, I received a certified letter informing me that I had been
> converted to FTF status and that my tour of duty was being changed to Tour 1. For almost
> every individual who has worked as a PTF for as long as I have, the conversion to a FTF
> should be a happy time. Instead, my elation at being converted to a FTF was
> overshadowed by the fact that I was taken away from my assignment on Tour 3 and
> placed as an Unassigned Regular on Tour 1, an act which did not occur to those converted
> from PTF to FTF in the seven (7) years prior to my conversion to FTF or even since. The
> common tradition for those who receive FTF status is to remain in the position he/she
> held as a PTF for three (3) bidding cycles, until a position which the newly established
> FTF found that he/she was able to bid on. As a result of this involuntary reassignment to
> Tour 1, I suffered a financial loss because those employees still working on Tour 3 were

-14-

given "penalty" time which is the equivalent of double time.

Pl. App. A-25 to A-26.

Ms. Jeffries also discussed this transfer at her deposition, at pages to A-64 to A-78, including the

fact that at least one employee told her that such a transfer could be considered "punishment."

She notes that even though this was finally a transfer away from Delores Thomas, it caused her to

work different hours, disrupting her sleeping patterns. Moreover, she describes a context in

which it is clear that the transfer to Tour 1 was not necessary to properly staff Tour 1; indeed, she

notes that after her transfer there was "plant failure" and "penalty time" (i.e. overtime) on Tour 3

as a result of the transfer of herself and others to Tour 1, while Tour 1 appeared to have no need

for additional employees:

> They had nothing for us to do on Tour 1, nothing at all. We stood around asking for work
> and the supervisors were totally confused. They said, "We don't have anything for you to
> do." So it was very confusing to say the least why we were taken from a tour that was
> abundant in work and work hours and put on a tour that we had nothing to do.

Jeffries Deposition, page 74.

Ms. Jeffries views this transfer as an adverse employment action, and motivated by

discriminatory animus.

In her discovery responses and during the EEO process, Ms. Jeffries identified numerous

African-American employees who were treated differently based upon their race (see Pl. App.

pages A-97 to A-98). The individuals identified below are all African-American, and complained

of violation of postal policies (complaining of improper confrontations, profanity, assault, and/or

physical or verbal abuse). Ms. Jeffries stated that these individuals notified management, and

management then responded with timely investigations (in contrast to her case) and offenders

-15-

were disciplined where appropriate:

· Lynette Marrow. On or about 11/20/02, Ms. Marrow claimed that Darlene Commodore made a defamatory comment about her. She reported the incident to John Williams. He immediately investigated. He took statements from witnesses named by Lynette Marrow.

· Darlene Commadore: As noted earlier in this Statement of Facts, on or about 1/15/04, Ms. Commodoar reported that co-workers were talking about her and she was offended. John Williams immediately called all those involved, named by Darlene Commodore, into the office. All those involved were interviewed that night.

· Eduok Uwah. On or about December 21, 2004, he had a confrontation with an employee, Rich Pochvatilla. He claimed Ron Pochvatilla threatened him. All employees in the vicinity were interviewed immediately following the incident. Ron Pochvatilla was suspended pending investigation.

· Owen Wallace. In or about the end of 2003 or beginning of 2004, he accused employee Richard Wilson of making an offensive statement, and stated that he felt threatened; Richard Wilson was given an immediate two-week suspension.

·Tasha Palmer. She was the alleged victim in the incident reported by Delores Thomas to John Williams, and discussed above; the incident was alleged to have occurred on or about 01/02/04. An immediate investigation (including interviews) occurred. No one substantiated the allegations.

· Eugenia Ross reported that a mail handler, Bill Skibicki, bumped into her. Bill Skibicki was immediately removed from the building, pending investigation (incident occurred in 2002).7

· Andrew Casson was an ET who answers calls on machine malfunctions, reported automation clerk Sharon Abelman for being offensive and abusive with him. She raised her voice, and used profanity towards him. She was immediately removed from the building pending investigation and given approximately a two-week suspension. This occurred January 2005.

· In 2004, Margaret Holmes and Tiketa Watts were working in the Dispatch area when co-worker Felicia Camper confronted them and accused them of reporting her for coming back from a break late. The two clerks were offended and threatened by her and consequently reported the incident to management. An immediate investigation occurred, along with interviews of witnesses.

---

7 Bill Skibicki was later fired, see Def. App. 44.

· Shawn Saunders reported to MDO John Williams on 5/16/04 that she was offended by a conversation she overheard in the ladies locker room. All involved in the conversation, Debblie Callahan, Lynette Marrow, and ISS Clerk named Cindy, were immediately called into the office, following her complaint. They were interviewed and the matter promptly investigated.

· Tasha Bryant is a flat sorter who, on 6/17/03, claimed she felt threatened by another employee. The employee was involved in a legal matter involving drugs. Postal policy was invoked. Tasha Bryant's feelings of threat were taken seriously and the employee, Michele McGuire, was immediately removed from the building, pending investigation.

· In February 2005, Ann Thomas, SDO, and Ronea Paden were joking with a clerk. It became serious and the clerk, Havoline Henry, was escorted from the building, pending investigation. Ann Thomas claimed she felt threatened.

Ms. Jeffries averred in her interrogatory responses that she believed the above situations were treated differently from hers based upon the race of the victims, and she stated that these individual factual accounts were within her knowledge as well as within the knowledge of union representative Doris Perry.

A series of similar incidents and the racially-based and discriminatory responses of management to such incidents is described in the statement of Karen Bayard, Pl. App. A-11 to A-14. She describes in those pages specific instances of Postal Service management actions that are wrongfully and disparately skewed in favor of African-American employees; again, what is perhaps most significant about her statement, is that Ms. Bayard herself (as noted above) is a self-described "black Jamaican." On the issue of Mr. Williams's race-based management style, see also the statement of union representative Doris Perry at Pl. App. A-9, wherein she delineates his tendency to overlook the transgressions of black employees, or to selectively admonish (Ms. Perry uses the phrase "verbally attack") white employees even while black employees are engaging in the same type of conduct.

*Discrimination and hostility in the workplace*

Ms. Jeffries maintained a diary for a period of time, describing her daily experience in the workplace. The diary, which appears at Def. App. 68 to 82, is worth reviewing in full for its snapshot of the circumstances that Ms. Jeffries endured during the period from November 27, 2003 to January 21, 2005; the diary is chronological, except for an addendum on the last page. This diary is of interest not so much for any one particular incident of hostility, but rather for the manner in which workplace hostility manifests itself in an endless series of seemingly minor but nevertheless troubling incidents that can only be stemmed when management demonstrates a willingness to understand and properly address complaints such as Ms. Jeffries's complaint about the November 11, 2003 flat-tub incident with Delores Thomas. When such a complaint is not addressed, the problem grows.[8] Ms. Jeffries's experience is well-summarized in her statement given in the EEO process:

> Every day is a struggle for me as I try to understand why this kind of race/color disparity is left unchecked by management at the Postal Service. Unfortunately, the race/color based discrimination that MDO Williams together with his supporting supervisors (all of whom are African-American) have subjected me to since I complained of an African-American co-worker (Delores Thomas) having acted in a physical and verbally threatening and violent manner towards me and MDO Williams' failure to investigate my complaint of workplace violence and adhere to the Agency's policy of zero tolerance concerning violence in the workplace, as he has adhered and followed when African American employees have brought similar complaints to him, have caused me to suffer devastating and unceasing personal harm.
>
> . . .
>
> To this day, I have not understood any reason for the Agency's Managers (such as

---

[8] See also Ms. Jeffries's note to John Williams of April 23, 2004 (Pl. App. A-14 to A-15), in which she seeks his assistance in finding a remedy for Delores Thomas's attempts of "egging me on" and provoking an incident, and in which she seeks a notification in writing to Ms. Thomas to stay away from Ms. Jeffries, as Ms. Jeffries had herself been instructed to stay away from Ms. Thomas. On this latter point, see Jeffries Deposition page 43 where Ms. Jeffries notes that Williams told her that "in the event I should even see her in the ladies room I was to leave."

MDO John Williams and AMDO Angelo Lambert) not applying the policy of zero
tolerance for acts of violence and threats in the work place equally without regard to an
employee's race/color. My hope is that the EEO Complaint of Discrimination I have filed
will correct the blatant, racially biased discrimination that is the basis of my EEO
Complaint and for which I am seeking relief which includes to be able to work in a
workplace where my race/color will not determine how I will be treated . . .

Pl. App. at A-32 to A-33, A-35 to A-36.

As Ms. Jeffries stated in her deposition, "I have yet to recover. It just feels abusive and I really

don't see an end to it. I hope to get healed when I leave and somehow get back to who I was. . . .

As long as I push it down I'm okay and remain complacent at work and not engage, but it's

humiliating. . . . I've relived this so many times . . . I have to be very tough and strong at work,

but yet be a gentle mother. I can't hold up much longer. I cannot let my guard down at work or I

will probably have to succumb to being fired.  . . . I feel I am being watched all the time. Where

am I? What am I doing? How long are my breaks? These are the questions they ask me all the

time . . ." (Jeffries Deposition at pages 135-137). The Postal Service will likely point out that she

has received no formal discipline of any sort since 2003, but that misses her point here. As she

notes, she has "done nothing wrong" (Jeffries Deposition page 137) that would require discipline.

What she is describing is, rather, an ongoing form of hyper-management, which she asserts is

intended to intimidate her, all stemming from the November 11, 2003 incident:

I had a lot of problems with supervisors all of a sudden. Like if I went to the ladies room I
would be paged immediately, get back to my work area. In contrast Delores Thomas was
all over the floor socializing. Nothing was said to Delores Thomas. It just felt like I was
on the spotlight with a bull's eye and I believe there was collusion, the supervisors.

Jeffries Deposition, page 61; see detailed recitation, Jeffries Deposition pages 111 to 118.

Ms. Jeffries has also suffered direct disparagement. Delores Thomas and other African-

-19-

American employees in her group called Ms. Jeffries a "bitch" often:

> Q. How many times did she call you a bitch directly to you?
> A. Oh, when it took place, 15, 20 times. In the locker room another ten times. In the course of a few days, countless times.
> Q. And who did you go to complain about – you went to Mr. Lambert about the incident on November 11, 2003, right?
> A. Yes.
> Q. You are saying that even after that date she continued to call you a bitch to you?
> A. I heard it from behind me. If she was working the machine on the side of me I would hear it. As far as looking at her face and seeing the word come out of her mouth, sometimes, not every time.
> Q. Did you complain to anybody about that?
> A. I talked to the EAP counselor about that.
> Q. Did you go to anybody else besides the EAP counselor?
> A. Just Mr. Williams. I tried to tell him. He wanted to know who heard it, who saw it. He wanted witnesses, but there are no witnesses.
> Q. You also said you overheard Ms. Thomas, Delores Thomas, say white honky bitch?
> A. From behind me I heard it.

Jeffries Deposition, pages 60-61.

And consider the following passage, which describes the general problem:

> Q. Have you heard any racial comments besides the one time you heard Delores Thomas say white honky bitch?
> A. In reference to this or just in general? I hear it all the time. I hear the N word all the time, but white people can't say it. There was a young man that was just fired by John Williams for saying the N word, but yet in conversations all the time you will hear black employees calling each other the N word.
> Q. But no racial comments have been directed towards you besides that one time you can remember?
> A. I put headphones on and I hear nothing anymore.

Jeffries Deposition, page 138.

Ms. Jeffries is, in other words, doing what is necessary to screen out the negatives in what has

become an extremely hostile workplace for her. As she put it in her deposition, "It's very hard to

be next to a person who has caused you so much anger and humiliation and all of the things that

a person feels when they're treated that way, just that and this. It's a total culmination that was

-20-

uncomfortable for me" (Jeffries Deposition, page 64).

The incidents described in this section, combined with the matters discussed in the two sections ("The investigation" and "Disparate treatment of other employees") immediately preceding this one, provide evidence creating an issue as to the existence of a hostile environment.

*Exhaustion of remedies*

Ms. Jeffries commenced her discrimination claim with the filing of two EEO documents, first the "Information for Pre-Complaint Counseling" (Def. App. A-42 to A-55) and the "EEO Complaint of Discriminatin in the Postal Service" (Def. App. A-41). She clearly identifies, as part of her claim, physical and verbal assault by Delores Thomas, and also clearly identifies the hostile environment in which she worked as forming part of her claim, as follows:

> Please note all management involved are African-American. **From 11/11/03 until present I continue to work in a hostile environment.** It is the lack of corrective action, based on racism, that has prompted me to seek an EEO resolution. [Emphasis supplied]

Def. App. 48. Ms. Jeffries reiterated this in her EEO affidavit, stating that "I felt **threatened by Delores Thomas and her allies' retaliation**" and "[f]rom 11/11/03 until present **I remain in a hostile and stressful work environment**" (Pl. App. A-86). A hostile environment assertion is thus expressly part of her claim, and is substantially delineated by the voluminous materials filed within the EEO process, including her declarations and diary and the various affidavits and statements of witnesses, all of which appear in the appendices and have been discussed above, and all of which were part of the EEO process. It is readily apparent that hostile environment and retaliation claims were part of Ms. Jeffries's EEO claim.

-21-

*Harm suffered by Ms. Jeffries*

The harm suffered by Ms. Jeffries as a result of the facts set forth herein is severe. As

witness Bayard stated (Pl. App. A-11):

> I have seen the change that this has caused to her personality first hand. When Janet first began working here she had an excellent sense of humor; now she seldom laughs. She used to believe that everyone was treated fairly in the postal service; now she feels persecuted. Mrs. Jefferies [sic] had a very outgoing personality and I have watched her become withdrawn and cynical and it saddens me.

## Argument

## I. Applicable Legal Standards

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir.1987)).

-23-

## II. Plaintiff Janet Jeffries Exhausted her Administrative Remedies

A plaintiff must exhaust all administrative remedies before bringing a claim for judicial relief. Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir.1997) (citing McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). The purpose of the exhaustion requirement is not to trap wary plaintiffs, however; rather, "[t]he purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court," Antol v. Perry, 82 F.3d 1291, 1296 (3rd Cir. 1996). "Thus, the effect of the filing requirement is essentially to permit the EEOC to use informal, non-judicial means of reconciling the differences between the charging party and an employer," Anjelino v. The New York Times Company, 200 F.3d 73, 94 (3rd Cir. 1999). The Third Circuit has stated that "`the parameters of the civil action in the district court are defined by the scope of the EEOC investigation *which can reasonably be expected to grow out of* the charge of discrimination," Atkinson v. Lafayette College, 460 F.3d 447, 453 (3rd Cir. 2006) [emphasis added], quoting from Ostapowicz v. v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3rd Cir. 1976), indicating that the actual charge of discrimination is only the point of departure. The Third Circuit has also noted that where "the EEOC ha[s] cognizance of the full scope of the situation during its settlement efforts, the purpose of the notification requirement ha[s] been served," Anjelino, supra, 200 F.3d at 94.

The Anjelino opinion provides an informative discussion of Third Circuit precedent on the exhaustion requirement, including analyses of the leading cases of Ostapowicz, supra (in

which a civil action based upon an original limited charge was allowed to proceed on additional

claims that "may fairly be considered explanations of the original charge and growing out of it,"

Ostapowicz, 541 F.2d at 399, quoted in Anjelino, 200 F.3d at 94), Hicks v. ABT Assoc. Inc., 572

F.2d 960 (3rd Cir. 1978) (in which a *sex* discrimination claim was allowed to proceed in District

Court although it was not raised in an EEOC process focusing on *race* and *retaliation* claims, the

court stating that "charges are most often drafted by one who is not well versed in the art of legal

description . . . [T]he scope of the original charge ***should be liberally construed***," 572 F.2d at

965 [emphasis added], quoted in Anjelino, 200 F.3d at 94), and Howze v. Jones & Laughlin Steel

Corp., 750 F.2d 1208 (3rd Cir. 1984) (Third Circuit reversed district court's determination that

the plaintiff could not amend her complaint to include a claim of retaliation, finding that the

"'new retaliation claim may fairly be considered [an] explanation[] of the original charge'" of

race discrimination, Howze, 750 F.2d at 1212 quoted in Anjelino, 200 F.3d at 94). In Anjelino

itself, the Third Circuit reversed the district court's finding that plaintiff's EEOC charge had not

stated a hostile environment claim, finding that such words as "abusive atmosphere" and other

such "interchangeable" terms were indicia of the hostility present and were sufficient to satisfy

the exhaustion requirement on the sexually hostile environment claim, see generally discussion at

200 F.3d 93-95. Moreover, focusing on the fact that plaintiff's allegations of retaliation related to

actions that occurred *after* the filing of the original charge ("it would have been impossible for

the appellants to have included the retaliatory delistment among their initial charges and original

complaint," 200 F.3d at 96), the Anjelino opinion again reversed the district court and allowed

the retaliation claims to proceed in the post-EEOC civil action despite the absence of precisely

correlated right-to-sue letters.

-25-

Taking these principles into consideration, we turn to the claims made by plaintiff Janet Jeffries in the instant matter.

### A. Exhaustion as to Hostile Environment

Ms. Jeffries has delineated a hostile environment in her various filings during the EEO process, as outlined in detail in the Statement of Facts. To summarize the list of egregious conduct condoned by the Postal Service:

· AMDO Lambert failed to investigate Ms. Jeffries's allegations on the night of the original incident, and failed to remove Ms. Thomas from the workplace that night;

· MDO Williams failed to respond in a prompt fashion to conduct his investigation, as required by the "zero tolerance policy";

· Williams attempted to explain away Delores Thomas's abhorrent statements and conduct when he himself recognized her "bad attitude and temper," as quoted above by union representative Doris Perry;

· Williams refused to believe consistent statements of multiple eyewitnesses;

· Williams stated in the November 26, 2008 meeting that he would fire Ms. Jeffries is she acted as had Ms. Thomas;

· Williams "lost" Karen Bayard's statement three times, which plaintiff submits is indicative of the importance he attached to this investigation;

· Williams admitted in his EEO affidavit that the "zero tolerance" policy was not followed "as it should have" been;

· the failure of the transfer Ms. Jeffries discussed with Ms. Sherry Wiggins (intended to remove her from the threatening behavior of Delores Thomas) to

-26-

ever reach fruition;

· the rapid investigation by Williams of the alleged "push" by Ms. Jeffries of
Tasha Palmer, an incident reported by Delores Thomas and tellingly denied
by Ms. Palmer herself;

· Williams's report to EEO counselor Wayman that he didn't believe Ms.
Jeffries's allegations, and wouldn't transfer her out of the threatening
presence of Delores Thomas;

· when Ms. Jeffries was finally transferred some ten months after the original
incident, it was a part of her conversion to FTF status, and it was a transfer to
a less desirable tour; this transfer appeared to have no relation to the relative
volume of work on the two tours, and actually may have exacerbated work-
volume problems;

· Ms. Jeffries was ordered to limit contact with Ms. Thomas, even to the
extent of leaving the ladies room if Ms. Thomas came in, but there was no
similar instruction given to Ms. Thomas;

· the numerous employees who Ms. Jeffries has identified as constituting
examples of disparate treatment based upon race (insofar as the
investigations of their complaints and the remedies were swift and logical
when the race of the accuser was African-American), supported by the
statements of Karen Bayard and Doris Perry with regard to discriminatory
practices in the workplace;

· the ongoing direct hostility described, such as calling Ms. Jeffries a "bitch";
and

· "hyper-management" making Ms. Jeffries feel as if she wore a "bulls-eye."

All these items together indicated, within the EEO process, that a hostile

environment claim was set forth, and indeed made express reference to both

"hostile environment" and "retaliation" within the confines of her EEO complaint

-27-

and pre-complaint information materials (discussed in the Statement of Facts).

Taking into account the case law cited above, these issues and the manner in which

they were made within the EEO process establish that Ms. Jeffries has exhausted

her remedies on hostile environment.

Defendants make much of the statement of plaintiff's counsel during the

EEO process, as set forth in a brief, purportedly limiting the claim to disparate

treatment. Ms. Jeffries's attorney during that process was in fact forced to work

within the limitations *set by the EEO*. Indeed, he notes that Ms. Jeffries specifically

raised the issue of hostile environment in her filings (see Def. App. 38 to 39), but

that moving forward she was constrained by the EEO interpretation of these filings

as manifested in the "claim which was accepted for investigation" (Def. App. 39.

This court is not constrained by the EEO interpretation, and indeed the fact that the

EEO itself in its own "Notice of Intent to Issue a Decision Without a Hearing" had

interpreted the record as one asserting a hostile environment is actually evidence

that allegations of a hostile environment are of the essence of the matters brought

before the EEO by Ms. Jeffries.


### B. Exhaustion as to Retaliation

The hostility in Ms. Jeffries workplace is ongoing and debilitating, as she has

-28-

noted in her statements to the EEO. Such matters as the failure to transfer away

from Delores Thomas, the less desirable transfer to Tour 1, and instances of hyper-

management, coming on the heels of the EEO filings, and combined with Ms.

Jeffries's reference to "retaliation" in her EEO affidavit, establish that the facts of

this matter establish exhaustion of a retaliation claim. The case law cited above,

which finds that EEO filings are to be construed "liberally" to achieve the purposes

of the anti-discrimination statutes, supports exhaustion of the retaliation claim.

### C. Exhaustion as to Discriminatory Transfer

Ms. Jeffries raised her claim as to the discriminatory transfer to Tour 1 in her

statement filed with the EEO (see Pl. App. A-25 to A-26). This claim falls within

the parameters established by the case law cited above; as to the notion that it

cannot be part of the claim in the EEO because it occurred after the original filing,

the case law as noted looks upon this as a reason to *include* such an allegation

within the reasonable scope of the EEO process where it grows out of the original

charge.

## III. A Prima Facie Case has been Established as to Race Discrimination and Retaliation.

A Title VII plaintiff such as Janet Jeffries "bears the initial burden of establishing a prima

facie case of discrimination by a preponderance of the evidence." Storey v. Burns International Security Services, 390 F.3d 760, 763 (3rd Cir. 2004). While the burden is mandated, however, the *manner* in which the burden is met is not: "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." Sarullo v. U.S. Postal Service, 352 F.3d 789, 797-798 (3rd Cir. 2003). Moreover, the "central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin," Sarullo, supra, 352 F.3d at 798 [internal quotation marks and citation omitted].

It has been noted that "[c]ases charging discrimination are uniquely difficult to prove," Sheridan v. E.I. Dupont de Nemours and Company, 100 F.3d 1061, 1071 (3rd Cir. 1996). "There will seldom be 'eyewitness' testimony as to the employer's mental processes," United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). "Discrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered," Jackson v. University of Pittsburgh, 826 F.2d 230, 236 (3rd Cir. 1987), cert. den. 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). "Discrimination "is often subtle," and an "'employer who knowingly discriminates . . . may leave no written records revealing the forbidden motive and may communicate it orally to no one.'" Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3rd Cir. 1987) (en banc), cert. dism. 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), quoting from LaMontane v. American Convenience Products, 750 F.2d 1405, 1410 (7th Cir. 1984). The challenge to the factfinder is well-framed in the following passage:

> Particularly in the discrimination area, **it is often difficult to**

-30-

> **determine the motivations of an action and any analysis is
> filled with pitfalls and ambiguities**. A play cannot be understood
> on the basis of some of its scenes but only on its entire
> performance, and similarly, **a discrimination analysis must
> concentrate not on individual incidents, but on the overall
> scenario.** As the Court of Appeals for the Eleventh Circuit noted,
> the factfinder in this type of case should not "necessarily examine
> each alleged incident of harassment in a vacuum. What may appear
> to be a legitimate justification for a single incident of harassment
> may look pretextual when viewed in the context of several other
> related incidents. [Emphasis supplied].

Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3rd Cir. 1990), quoting from Vance v.

Southern Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989).

Defendant suggests, in section II of its Opening Brief, that plaintiff has failed to produce

evidence of a prima facie case of discrimination (based on race, gender, and/or national origin)

nor of retaliation. In support of this position, defendant relies on: (1) the purported absence of an

"adverse employment action" for its argument that the race, gender, and national origin claims be

dismissed; (2) the purported absence of a "materially adverse action" for its argument that the

retaliation claim fails; and (3) the purported failure to show that similarly situated employees of a

different race received preferential treatment as an argument supporting dismissal of both the

retaliation and discrimination claims. Plaintiff will counter each of these arguments in turn.

## A. As to the Adverse Employment Action:

The Third Circuit has stated:

> In order to be entitled to relief, a plaintiff must have suffered a
> cognizable injury . . . We have defined "an adverse employment
> action" under Title VII as an action by an employer that is "serious
> and tangible enough to alter an employee's compensation, terms,
> conditions, or privileges of employment." Cardenas v. Massey, 269

-31-

F.3d 251, 263 (3rd Cir. 2001) (quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3rd Cir. 1997).

<u>Storey v. Burns International Security Services</u>, 390 F.3d 760, 764 (3rd Cir. 2004).

The types of "adverse" actions that fall within the definition are not rigidly limited to specified

categories of employer conduct. For example, "[a]n employment decision need not result in a

change in compensation or job title to constitute an adverse employment action," <u>Selden v.</u>

<u>National R.R. Passenger Corp.</u>, 452 F.Supp.2d 604, 609 (E.D. Pa. 2006), citing <u>Torre v. Casio,</u>

<u>Inc.</u>, 42 F.3d 825, 827, 831 n.7 (3rd Cir. 1994). Indeed, as the Third Circuit has stated:

> We often have remarked that the elements of a prima facie case depend on the facts of the particular case. See, e.g., <u>Pivirotto v. Innovative Sys. Inc.</u>, 191 F.3d 344, 352 (3rd Cir. 1999); <u>Torre v. Casio, Inc.</u>, 42 F.3d 825, 830 (3rd Cir. 1994). Thus, a prima facie case cannot be established on a one-size-fits-all basis.

<u>Jones v. School District of Philadelphia</u>, 198 F.3d 403, 411 (3rd Cir. 1999) (reversing a grant of

summary judgment where there were genuine issues of material fact involving an allegedly

discriminatory transfer of a teacher).

Both <u>Jones v. School District of Philadelphia</u>, supra and <u>Torre v. Casio Inc.</u>, supra, found

evidence of the prima facie requirement of an adverse employment action present as a result of a

wrongful transfer. Denial of a requested transfer can also constitute an adverse employment

action: "[F]ailure to transfer an employee to a position to which she was qualified can also

constitute an adverse employment action," <u>Selden v. National R.R. Passenger Corp.</u>, 452

F.Supp.2d 604, 609 (E.D. Pa. 2006), citing <u>Amro v. Boeing Co.</u>, 232 F.3d 790, 797 (10th Cir.

2000). There are genuine issues of material fact with regard to the various problems with

transfers cited by Ms. Jeffries, including the failure to transfer away from Delores Thomas and

-32-

the ultimate transfer to a less desirable tour at the time of Ms. Jeffries's elevation to FTF status.

*See* Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107, 115-116 (3rd Cir. 1996)

(Third Circuit held that a material issue of fact existed as to whether a police officer's

"temporary" reassignment from the detective bureau to the road patrol after the officer filed a

complaint with the EEOC was an adverse job action, even though neither the police officer's

rank nor his pay were decreased as a result of the reassignement; summary judgment ruling of

District Court was overturned).

   Moreover, the sustained existence of a hostile environment can itself constitute an

adverse employment action, Jensen v. Potter, 435 F.3d 444 (3rd Cir. 2006), overruled in part on

other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165

L.Ed.2d 345 (2006). It is clear that plaintiff has established the existence of an adverse

employment action. The existence of genuine issues of material fact precluding summary

judgment on the claim of a hostile environment will be discussed in section IV of this brief,

below.


## B. As to the presence of a "materially adverse action" underlying the retaliation claim

   The analysis with regard to this issue is essentially identical to that in the preceding

section, excepting of course that only conduct occurring subsequent to the filing of Ms. Jeffries's

EEO claim would be eligible. Thus the failure to properly handle transfers, the "hyper-

management," and the various items identified as creating a hostile workplace all support the

existence of a materially adverse action underlying the retaliation claim.


-33-

*C. Similarly situated non-caucasian employees received preferential treatment*

The contours of a disparate treatment claim were described in Hampton v. Borough of

Tinton Falls Police Dept., 98 F.3d 107, 112 (3rd Cir. 1996):

> " 'Disparate treatment' . . . is the most easily understood type of discrimination. The
> employer simply treats some people less favorably than others, because of their race,
> color, religion, or [other protected characteristics.] Proof of discriminatory motive is
> critical, although it can in some situations be inferred from the mere differences in
> treatment . . ."

98 F.3d at 112, quoting from Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843,

1854 n.15, 52 L.Ed.2d 396 (1977). Ms. Jeffries, Ms. Bayard, and Ms. Perry all graphically

describe the disparate treatment that was suffered by Ms. Jeffries, and which is pervasive in this

office of the Postal Service, as discussed above. The Statement of Facts delineates the parameters

of the disparate treatment suffered by plaintiff herein. Defendant seems to be asserting that,

because it has been shown that the Postal Service occasionally does the right thing in disciplinary

matters, there can be no finding of disparate treatment. This is incorrect; if disparate treatment

had to be monolithic and total to be actionable, few cases would ever proceed.

Defendant also suggests that, because other workers (some African-American) were

transferred to Tour 1 along with Ms. Jeffries at the time of her elevation to FTF status, there is no

showing of disparate treatment in that transfer. This conclusion ignores the fact that plaintiff has

testified that no such similar transfer had occurred for seven years, and that she estimated there

had been 25 instances of part-time elevations to FTF status during those seven years (Jeffries

Deposition, page 66) without such a similar transfer. Moreover, it ignores the fact that plaintiff

has provided evidence that the effect of this transfer was to transfer workers from an adequately

staffed area to an already over-staffed area, creating the need for "penalty time" (i.e. overtime) on

-34-

her old Tour 3 (as well as "plant failure") and leading to a situation where there was not enough work for the newly employees on Tour 1. A jury could conclude that these odd circumstances were created by a discriminatory intent to penalize Ms. Jeffries, or to isolate her; a genuine issue of fact thus exists on this point. *See generally* Hampton, supra, 98 F.3d at 113-115.

## IV. There Exist Genuine Issues of Material Fact on Plaintiff's Hostile Environment Claim.

Defendant asserts that Plaintiff Janet Jeffries has failed to come forward with evidence in support of her claim for a racially hostile environment. This is incorrect; there are, at the least, genuine issues of material fact in support of this claim.

The determination as to the existence of a racially hostile environment is made on a case-by-case basis after considering the totality of the circumstances. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-84 (3rd Cir. 1990), and 29 C.F.R. §1604.11. In general:

> To state a Title VII claim premised on a hostile work environment, plaintiffs must demonstrate the following: (1) they suffered intentional harassment because of their race; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected plaintiffs; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

McClean v. Communications Construction Group, LLC, 535 F.Supp.2d 485, 489-90 (D.Del. 2008).

Ms. Jeffries raised her concerns with Mr. Williams, and because of his inaction she

ultimately filed an EEO claim in which her complaints are set forth in detail. As related in the

Statement of Facts, Ms. Jeffries has experienced a litany of hostile actions, which are also

summarized above in the discussion of exhaustion of the hostile environment allegations. These

matters establish a racially-based hostile environment claim.

## Conclusion

Ms. Jeffries chose to make a stand in this matter. The original incident on November 11,

2003, as described by the witnesses, was ugly in and of itself. It was not a huge incident: it was

not a brawl, no blood was spilled. But it was a workplace incident that caused Ms. Jeffries to

suffer an assault and personal indignities, and she sought the protections afforded by the Postal

Service's "zero tolerance" policy for workplace incidents. The witness statements that exist

support her version of events on November 11, 2003.

Unfortunately, nothing came of Ms. Jeffries's report; no meaningful response issued

despite supportive witness statements. And the problem that has developed for Ms. Jeffries, as

shown by her poignant statements regarding how she continues to feel on a daily basis, is that

workplace incidents that are not are not dealt with swiftly and fairly have a tendency to fester.

The stream of comments, the hyper-management, the tension; these things begin to build. And

for someone like Janet Jeffries, they create ongoing mental anguish, particularly when compared

to disparate treatment afforded other individuals based upon their different race. The perpetrators

are emboldened; they know the report of Ms. Jeffries was ignored, and she suspects that they *like*

that.

Oftentimes in the workplace, the seemingly minor incivilities of daily antagonism,

-36-

however intentional and ugly their cumulative effect, are often difficult to stop. Things are said

where there are no witnesses, and disparate and hostile incidences that when viewed in full create

an ugly and hostile environment often seem somewhat inconsequential when broken down

incident by incident, like the frame-by-frame analysis of a violent videotape that gradually serves

to inoculate the viewer from the raw emotional impact of a violent beating. In some sense, this is

why the instant matter is important: because Ms. Jeffries can point to specific failures on the part

of Mr. Williams and others that led to her ongoing problems. Ms. Jeffries has suffered a wrong in

this matter, an ongoing wrong, and the failure of the Postal Service to properly handle this matter

quickly and definitively (as it should have) provides a point of departure by which the hostility

and disparate treatment can be analyzed, and remedied. Ms. Jeffries is entitled to her day in court,

so that a jury can decide whether the actions and inactions of the Postal Service and its

employees in this matter were motivated by discriminatory intent.

For all of the reasons hereinabove set forth, it is respectfully submitted that the

defendant's Motion for Summary Judgment should be denied.

Plaintiff JANET JEFFRIES

DATE: July 28, 2008

By: _____

Herbert G. Feuerhake, Esq.
The Law Office of Herbert G.
    Feuerhake
521 West Street

-37-

Wilmington, Delaware 19801
(302) 658-6101
DE Atty. ID # 2590
herblaw@verizonmail.com
Attorney for Plaintiff Jeffries

## Certificate of Service

I hereby certify that a copy of the foregoing ***Plaintiff's Answering Brief In Opposition to Motion For Summary Judgment*** has been filed electronically, and served thereby on opposing counsel, on July 28, 2008, opposing counsel being the following:

Seth Beausang, Esq.
Asst. U.S. Atty.
The Nemours Bldg.
1007 Orange Street, Suite 700
Wilmington, DE 19801

_____
Herbert G. Feuerhake, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JANET JEFFRIES,                       )
                                      )
        Plaintiff,                    )
                                      )        Civ. A. No. 06-707-JJF
vs.                                   )
                                      )
JOHN E. POTTER, POSTMASTER            )
GENERAL, UNITED STATES POSTAL         )
SERVICE,                              )
                                      )
        Defendant.                    )


**PLAINTIFF JANET JEFFRIES'S APPENDIX IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT**


July 28, 2008

Herbert G. Feuerhake, Esq.
The Law Office of Herbert G. Feuerhake
521 West Street
Wilmington, Delaware 19801
(302) 658-6101
Atty. ID No. 2590

## TABLE OF CONTENTS

Materials on "Violence Free Workplace"    …………………………    A-1

Statement of Doris Perry   …………………………………    A-8

Statement of Karen Bayard   …………………………………    A-11

Handwritten Jeffries memo   …………………………………..    A-14

Declaration of Janet Jeffries 11/10/2005   …………………………..    A-16

Declaration of Janet Jeffries  07/20/2005    …………………………………..    A-27

Psychiatric Report re Janet Jeffries   ………………………………..…...    A-37

Investigative Affidavit of Doris Perry …………………………………A-43

Investigative Affidavit of John Williams ……………………………….. A-46

Statement of Angelo Lambert …………………………………………… A-57

Statement of Janet Jeffries 11/12/2003 …………………………………A-58

Statement of Delores Thomas …………………………………………A-61

Statement of Bobby Ford ………………………………………………… A-65

Investigative Affidavit of Lynette Marrow ……………………………… A-66

Investigative Affidavit of James Jeffries ……………………………… A-69

Investigative Affidavit of Karen Bayard …………………………………A-74

Statement of Karen Bayard 01/03/2004……………………………… A-75

EEO Investigative Report ……………………………………………….. A-76

EEO Investigative Affidavit of Janet Jeffries ……………………………A-85

Interrogatory Responses of Janet Jeffries ……………………..……………A-95


**UNITED STATES POSTAL SERVICE**

# Violence-Free Workplace

## ...is everyone's right.
## Workplace Violence Is a Growing Problem in America

- Workplace violence is the second leading cause of death in the workplace.
- Three people are murdered on the job in America every working day.
- Men are victims in three out of four workplace homicides.
- Even so, homicide is the leading cause of death for women in the workplace.

Although the rate of homicides has decreased in recent years, the rate of violent assaults has increased.

### Our Record is Good Compared With That of Private Industry

It's reassuring to know that the incidence of workplace assaults and homicides in the Postal Service is far below average.

Postal work is one of the safest occupations in the job pool. Postal workers are not even a blip on the Department of Labor's scale of occupational fatalities, no matter how the statistics are compiled, by job-related accident or homicide.


U.S. Dept. of La
Bureau of Labor Statistics 19

### Even a Single Incident Is Too Much

However, even a single incident of violence—whether it be a threat, robbery, assault, or homicide—is too much. The Postal Service has a Zero Tolerance Policy regarding workplace violence. Zero Tolerance mea that we will not ignore any incident of verbal or physical action on the part of any employee who could cau injury or harm to another.

## ...and everyone's responsibility.

### The Postal Service is Committed to Providing a Safe Workplace

The Postal Service remains steadfast in its commitment to ensuring a safe workplace environment for all its employees.

Workplace violence remains an urgent threat to employees in every company and organization in America No responsible employer can ignore that reality.

The Postal Service will remain a leader in identifying best practices to prevent acts of violence in the orkplace.

William J. Hender
Postmaster General and C


A-1

Publication 45 - A Violence-Free Workplace

## We Have Strategies for Prevention

- Selection: Hire the right people for the right job in the first place.
- Security: Ensure appropriate safeguards for people and property.
- Communication of Policy: Consistently communicate and enforce postal policy regarding violent and inappropriate behavior.
- Environment and Culture: Create a work environment and maintain a climate that is perceived as fa and free of unlawful and inappropriate behaviors.
- Employee Support: Ensure that managers, supervisors, and employees are aware of the available resources to assist them in dealing with the problems of work and daily living.
- Separation: When separation is necessary, handle the process professionally, including assessing a inappropriate behavior and potentially violent circumstances.

## Managers and Supervisors Are Being Trained

Over 61,000 Postal Service executives, postmasters, managers, supervisors, and union leaders have bee challenged through the Workplace Violence Awareness Program to use skills and techniques that foster professional interactions with employees.

## But You must Help

Your role in creating a violence-free workplace is equally important.

What can you do?

- Choose to behave in a way that promotes a positive work environment—even when you are having bad day. Treat everyone in a professional manner.
- Report all threats to management officials.
  - Your supervisor or manager should conduct a prompt, thorough inquiry of your concern, keep you informed, and take appropriate action to resolve the situation.
  - If unable to contact management official call the Inspection Service (1-800-654-8896).

The Employee Assistance Program is available on a 24-hour, 7-day-a-week basis for all Postal Service employees and their immediate family members.

The EAP provides assistance on a variety of issues, e.g., marital, financial, emotional, chemical dependency, and child and elder care issues.

the easiest access is the toll-free number:
1-800-EAP-4-You
(1-800-327-4968)

# Resources That the Postal Service Provides

- Employee and Workplace Intervention Analyst
- Human Resources
- Union Leadership
- Management Associations
- Threat Assessment Team
- Medical Units
- Inspection Service 24-Hour Number 1-800-654-8896
- Employee Assistance Program



A-2

00054

UNITED STATES POSTAL SERVICE

SOUTH JERSEY PERFORMANCE CLUSTER

October 28, 2003

MEMORANDUM FOR:    All Employees

SUBJECT:    **POSSESSION OF FIREARMS AND OTHER DANGEROUS WEAPONS ON POSTAL PROPERTY**

Please be advised that in accordance with 39 Code of Federal Regulations (CFR) 232-1(1) and the Ethical Code of Conduct, employees are *not* allowed to carry firearms, either openly or concealed, on postal property except for official purposes.

Title 18, United States Code (USC), Section 930, states:

> "...whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both."

A federal facility includes all parts of the facility, including but not limited to, the buildings and the parking lots.

All employees must be guaranteed a safe work environment free from hostile and abusive behavior and actions. It is everyone's responsibility—craft employees and management—to adhere to this policy concerning firearms. Any violation of this policy will result in immediate disciplinary action up to and including removal and may involve criminal prosecution.

Joanna B. Korker
Lead Executive/District Manager

[2]

P. O. Box 9001
Bellmawr, NJ 08099-9996

FAX: 609/933-4440

A-3

00055

**UNITED STATES**
**POSTAL SERVICE**

SOUTH JERSEY PERFORMANCE CLUSTER

October 28, 2003

MEMORANDUM FOR:    All Employees

SUBJECT:    ACTS AND THREATS OF VIOLENCE IN THE WORKPLACE

Acts and threats of violence in the workplace are some of the most serious and frustrating problems facing the Postal Service and its employees. These incidents seriously impact the reputation, credibility and morale of the Postal Service and its employees. In the past the Postal Service has been inconsistent in the handling of these behavioral issues and that has caused, in many cases, a greater problem for the employees who are forced to work in an atmosphere of fear and frustration.

Effective immediately, we must make it absolutely clear to **all** employees that in the future our policy on acts and threats of violence is as follows:

*THERE WILL BE ZERO TOLERANCE FOR ACTS OR THREATS OF VIOLENCE*
*IN OUR WORKPLACE*

This includes, but is not limited to:

- **Any act of physical violence**
- **Any actual, implied or veiled threat, made serious or in jest**
- **Any type of inappropriate language which would lead to a hostile workplace or create an offensive environment**

*Each and every act or threat of violence from this day forward will elicit an immediate and firm response that could, depending on the severity of the incident, include removal from the Postal Service.*

No one wants to work in an atmosphere of fear and intimidation. It is in everyone's interest to have a violence-free environment. We will do whatever it takes to provide that environment. It is a right of all our employees.

We ask for your support and understanding concerning the enforcement of our Zero Tolerance policy. It is designed to provide you with a workplace in which you can feel safe and secure. You deserve no less!

Joanna B Korker

Joanna B. Korker
Lead Executive/District Manager

[4]

PERMANENT POSTING

A-4

00056


**POSTAL SERVICE**

SOUTH JERSEY PERFORMANCE CLUSTER

October 28, 2003

MEMORANDUM FOR:     All Employees

SUBJECT:     `SOUTH JERSEY POLICY ON CONDUCT IN THE WORKPLACE

Despite the fact that there is an existing policy at the national level as well as the Cluster level, complaints concerning the conduct of some employees in the workplace continue to surface.

The subject of harassment, ethnic and derogatory statements, physical and verbal abuse, normally start off jokingly until someone becomes offended and eventually becomes the basis for allegations of discrimination in the work force. Diversities in cultural background, religion and gender are often misunderstood. As a result, they become topics of jokes and slurs sometimes resulting in verbal and physical abuse. Postal Inspection Service investigations of assaults revealed that physical assaults were often preceded by relatively harmless arguments or remarks which escalated into a violent attack. The policy of the United States Postal Service has always been that all employees should enjoy a workplace free of hostility and discrimination. The type of conduct that constitutes harassment is unacceptable and inexcusable in any environment involving the interrelationship of human beings.

The *Employee and Labor Relations Manual*, Section 666.2, outlines the behavior and personal habits of all employees. This section states, in part, that "Employees are expected to conduct themselves during and outside working hours in a manner which reflects favorably upon the Postal Service." It also states: "Employees are expected to maintain satisfactory personal habits so as not to be obnoxious or offensive to other persons or to create unpleasant working conditions."

Several postal unions and management officials have signed joint statements on violence and behavior in the workplace. **We are the first line of defense to ensure a safe and stress-free work environment. Therefore, it is everyone's responsibility to report any and all behaviors that are threatening, intimidating or hostile.** We know the rules and the right thing to do. The Postal Service will not survive if our attitudes towards our peers and our customers remain in a negative and adversary posture. No one can guarantee the prevention or elimination of violence, but we must be prepared. The result of a failure to enforce our rules is costly to everyone.

*Joanne B Korker*

Joanna B. Korker
Lead Executive District Manager

[5]

**PERMANENT POSTING**

A-5

00057

SOUTH JERSEY PERFORMANCE CLUSTER

October 28, 2003

MEMORANDUM FOR:      All Employees

SUBJECT:      POLICY STATEMENT ON EEO, SEXUAL HARASSMENT, and SEXUAL ORIENTATION

 The policy of the South Jersey Performance Cluster on *Equal Employment Opportunity (EEO)* is to create an environment free from discrimination for all employees of the South Jersey District.

 Fair and equitable treatment in all personnel management matters, without regard to race, religion, sex, national origin, age, color, mental or physical disability. Employees exercising their appeal rights will be protected from reprisal.

Recruitment from all segments of society, and selection, and advancement on the basis of skills, knowledge and ability under fair and open competition.

 **Accountability.** All managers and supervisors will join us in carrying out the responsibilities of promoting Equal Employment Opportunity as an integral part of our organization's goals and objectives.

*Sexual harassment* is a form of misconduct that has no place in the workplace. It is the policy of our Performance Cluster to adhere to the attached Postmaster General's guidelines on sexual harassment and sexual orientation. The Postal Service is committed to ensuring a workplace that is free of discrimination and to fostering a climate in which all employees may participate, contribute, and grow to their fullest potential. We recognize and value our diverse workforce and are committed to fair treatment of all employees.

Sexual harassment can cover a wide array of behaviors. It can be words, actions, or most often, a combination of the two. It can range from the crime of rape, to the display of sexist cartoons. It includes obvious things, like an invitation to have sex, or unwelcome, intimate touching, patting, or grabbing. Yet it can also include less obvious behaviors such as repeated comments about a person's appearance, brushing up against someone, displaying sexually explicit pictures, making frequent sexual comments or jokes. Although this behavior may not be directed at a particular person, it is still considered sexual harassment if it is offensive to a person within hearing range.

Sexual harassment is a form of employee misconduct that undermines the integrity of the employment relationship. Like all forms of harassment, it violates the Code of Ethical Conduct. It undermines morale and interferes with productivity of its victims and their coworkers. While it is not the Postal Service's intent to regulate employees' social interactions or relationships freely entered into, conduct constituting sexual harassment will not be tolerated.

Employees making allegations of sexual harassment may seek remedies through Equal Employment Opportunity procedures, grievance/arbitration procedures for bargaining employees under the collective bargaining agreements, appropriate grievance procedures for non-bargaining employees, and by the reporting of conduct involving criminal activity to the Postal Inspection Service. Employees who do not wish to exercise formal avenues to achieve resolution of their grievances may appeal informally to appropriate and impartial supervisors and managers within the organization. An internal management investigation will be conducted and appropriate action taken. Employees who engage in sexual harassment in the workplace can expect serious disciplinary action.

Harassment and disparate treatment based on actual or perceived *sexual orientation* or identity will not be permitted or condoned in the Postal Service. This policy does not alter current standards of conduct and dress for postal employees. All Postal Service employees have the responsibility to support this policy and to take appropriate steps to ensure a workplace free of discrimination against any person based on his or her sexual orientation or identity. Each of us should:

- Treat every co-worker, customer, and supplier with respect and dignity.
- Examine our attitudes and actions toward people who are different from us.
- Speak out when we see harassment and discrimination in our work environment.

Equal Employment Opportunity (EEO) laws and regulations do not provide an avenue to process complaints of discrimination based on sexual orientation or identity; however, employees are encouraged to report any variance from this policy to a management official at the earliest opportunity.

Each manager, supervisor, and employee is expected to adhere to this policy.

*Joanna B Korker*

Joanna B. Korker
Lead Executive/District Manager

[8]

**PERMANENT POSTING**

A-6

```
```

July 15, 2005

To whom it may concern,

    I am writing this letter as a statement showing the disparity of treatment against Ms. Janet Jeffries by MDO, John Williams.

    On November 26,2003, Ms. Jeffries came to me for help. I am a shop steward on Tour 3 and she needed help to get a resolution for an assault that happened on November 11,2003. I arranged a meeting with Mr. Williams, myself, and Ms. Jeffries for later that night. Mr. Williams said he did not believe the statements he received from the employees who witnessed the incident on 11/11/03. Fifteen days had transpired with no investigation being done. Ms. Jeffries and I explained that she felt very uncomfortable and threatened by Ms. Delores Thomas. Mr. Williams tried to explain to us what he believed Ms. Thomas meant by the derogatory remarks she made to Ms. Jeffries. When Ms. Jeffries explained to Mr. Williams that she was shoved and yelled at and wanted the abuse by Ms. Thomas to stop, Mr. Williams said that he would investigate but if Ms. Jeffries had acted in the same manner, she would be fired. Mr. Williams tells us he will talk with Ms. Thomas because he has witnessed other incidents of Ms. Thomas yelling at managers and other employees. He believes she has a bad attitude and temper. We discussed the statements given by the witnesses. After Ms. Jeffries read the statement from Mr. Bobby Ford she became upset. Mr. Ford stated he did not witness anything but Ms. Jeffries said he was the person who asked if she was ok after he saw what had happened. Mr. Williams called Mr. Ford to the office and he arrived with his shop steward, Mr. Ed Thomas. Mr. Ford retracted his original statement and wrote another one. The meeting ended with Mr. Williams stating he would investigate and get back to us.

    On December 18, 2003 I spoke with Mr. Williams about the investigation. He informed me that nothing had been done to date. This had been three weeks since our meeting and Mr. Williams was forcing Ms. Jeffries to work in the same area as Ms. Thomas and the abuse continued from Ms. Thomas and her friends. Mr. Jeffries was very upset and a her personality had changed. She had become depressed and could not believe the system did nothing to protect her. I went to Mr. Williams to request that he move Ms. Jeffries to another area , he told me "No". He believed that all employees should work side by side no matter what transpired. In my opinion he was trying to force Ms. Jeffries to quit or have a breakdown around Ms. Thomas. At the end of this conversation I told Ms. Jeffries to call the EEO phone number that was posted. Mr. Williams had made it clear to me that he was not going to do anything about the abuse by Ms. Thomas. He believed Ms. Jeffries was a Italian-American who had a problem with people of color. The truth was Mr. Williams had a problem disciplining anyone of his own color.

    On many occasions I have witnessed Mr. Williams biased interaction with employees who are not of his race. After Ms. Jeffries called the EEO office and agreed to mediation to resolve the matter, Mr. Williams submitted the investigative material to plant manager, MR. Weldon on December 5,2003. On December 8,2003, Mr. Weldon





told Mr. Williams to send it to labor department and go with their decision. The recommendation from labor was to issue both employees a letter of warning.

On December 30, 2003 we have a mediation hearing with a contract mediator, Ms. Sharon Letts. Present at the meeting are myself, Ms. Jeffries, Mr. Williams. SDO, Ms Ann Thomas, and the mediator. This is when Mr. Williams informs us that labor has recommended that he issue letters of warning to both employees. He tells Ms. Jeffries that he pulled her letter. He has also told me that neither letter will be valid because the union will argue they were untimely. In my investigation I have found that Ms. Thomas was never issued a letter of warning. Mr. Williams agrees in mediation that he has dropped the ball on helping Ms. Jeffries with this situation. He can see how this incident has affected her and he apologizes. He admits that another employee was given a one-week suspension , by him, for verbally confronting a black supervisor. He also admits that Ms. Thomas has had three different instances since he has been the MDO on Tour 3. Mr. Williams agrees with Ms. Jeffries request for a Tour 2 permanent job and continuation of her pay for one month while she tries to put this behind her. Even though Mr. Williams agrees he does not have the authority to sign this agreement. The final decision comes from Plant Manger, Mr. Joe Weldon. I believe the postal service does not enter into the mediation process in good faith. It is to resolve conflicts, but the person making the final decision is never present. The settlement was put in abeyance until we could meet with Mr. Weldon.

Mr. Williams has shown on a number of occasions how he treats employees that are not of his race differently. There are instances where a black employee can be doing something wrong and Mr. Williams will turn his head. On December 14, 2003 there was a black employee who was visibly intoxicated driving a mule in the building. When two white employees reported this to their supervisor, afraid for everyone's safety, the supervisor reported to Mr. Williams. After a number of hours had gone by, Mr. Williams requested the employee to work another area and turn in his mule. No disciplinary action was taken. I have witnesses Mr. Williams entering a work area where all employees are not working. Mr. Williams will verbally attack those employees not of his color. By his own admission a male caucasion was issued a one week suspension for some unkind words to a black supervisor. Mr. Williams has shown from his actions that he feels he can treat people anyway he wants and the postal service will protect him.

I am enclosing copies of my notes that were taken at each meeting with Mr. Williams. If I can answer any questions please feel free to contact me. Thank you for your attention to this matter.

Respectfully,

Doris M. Perry

A-9

A-10

My name is Karen Bayard. I am employed by the United States Postal Service; I was a 204B Supervisor from May of 1999 to January of 2001. I am currently a clerk at the Delaware P&DC. Since working for the postal service I have witnessed numerous incidents that have changed my prospective of race relations at the Delaware P&DC. Until these events took place I was under the assumption that the postal service actually enforced the "no violence on the workroom floor policy". I also used to believe that they treated everyone with dignity and respect. I have since learned that this is not the case.

My co-worker Janet Jefferies was both verbally and physically attacked on the workroom floor by a black female employee (Deloris Thomas). To my knowledge Ms. Thomas has never been disciplined for her actions. I accompanied Mrs. Jefferies to report the incident to management. Afterward we both retired to the locker room and were satisfied that we had done our part by informing management of this clear violation in policy. Ms. Thomas came storming into the locker room and tried to entice Mrs. Jefferies to a fight by using profanity when addressing her and making reference to her children and husband.

While we were still in the locker room trying to recover from the shock of this unprovoked attack Supervisor Ann Thomas came into the locker room and asked Mrs. Jefferies if she felt threatened. To this Mrs. Jefferies of course replied that she did fell threatened especially since Ms. Thomas followed her into the locker room after she tried to defuse the situation by walking away. I am still baffled as to why Ms. Thomas was not escorted out of the building. Later that evening I went to the managers' office on my own time to give a statement. I was turned away as they refused to take my statement. I was told that if they needed a statement from me that I would be called into the office at that time. This went against everything I had learned as a supervisor. It has always been my understanding that statements should be given as soon after the incident as possible so that the witness has a fresh recollection of what transpired. I had to insist on giving a statement when I heard they were finally conducting an investigation.

There is such blatant discrimination in this building that I refuse to ever supervise there again. It seems that whenever the victim is white nothing is done. This is clearly the case in the injustice done to Mrs. Jefferies. I have seen the change that this has caused to her personality first hand. When Janet first began working here she had an excellent sense of humor; now she seldom laughs. She used to believe that everyone was treated fairly in the postal service; now she feels persecuted. Mrs. Jefferies had a very outgoing personality and I have watched her become withdrawn and cynical and it saddens me.

A white female employee (Elizabeth Scully) was injured on the job when a black male employee threw a bundle of mail that hit her on the back of her neck. She is still suffering from the devastating affects of this injury and must have nerve block therapy on a regular basis to help her cope with the pain. Even though this incident was witnessed by several employees nothing was ever done to discipline the black employee who caused her injury. Why? I can only surmise because she (the victim) was white.





EXHIBIT

11

In the same vane when a white mule driver (William Skibicki) was accused of touching a black female employee (Eugenia Ross) with an apc he was disciplined immediately while the postal service conducted their investigation. Why? I can only surmise because the alleged victim was black. I also found that white employees are held to higher standards and penalized for the same behavior that is tolerated or in some cases even condoned if the employee is black. Examples of this behavior are as follows:

In 2000 I was instructed by MDO John Williams to take the first step in discipling a white male employee (Carl Petruski) for failing to remain in his work area. I refused to write up this employee as I was only the temporary supervisor in that area for one day a week. I felt as though there was a conspiracy against this employee and I wanted no part of it. MDO John Williams was upset with me and told me that we had him.

A black female employee (Eugenia Ross) is seldom in her work area but nothing is ever done to discipline her. I know of two incidents involving her that took place in my presence. In 2003 on Ms. Ross' birthday she was allowed to serve a birthday party dinner on the workroom floor. I watched as she clocked in from lunch and continued to socialize with her co-workers. This was done with the knowledge of her supervisor as she was also partaking of the festivities while Mrs. Jefferies was in the area working. I was so upset that I reported the incident to a union shop steward (Bo Driggers). Mr. Driggers relayed this information to MDO John Williams but, nothing was done about it. Another incident involved Ms. Ross missing from her work area for almost seven hours. She sat in the locker room reading and socializing until the supervisor finally paged her to come to her work area.

The postal service moves quickly to conduct investigations when the alleged victim is black. My examples of this follow. In December 2004 Supervisor Owen Wallace said that he felt threatened by something that a white male employee said. This employee was removed from the area immediately and suspended for two weeks while an investigation was conducted. When a white female employee (Sharon Ableman) was accused of raising her voice in anger against a black male employee (Andrew Casson) she was immediately removed from the premises because he (Andrew) said he felt threatened. When a black female employee (Darlene Commodore) felt that other employees were speaking ill of her MDO John Williams called the said employees into the office within an hour to conduct an investigation. These incidents are trivial compared to what I witnessed Mrs. Jefferies endure yet her case was never given the prompt attention that these cases received.

The most blatant violation of the "no violence on the workroom floor" is when a black supervisor is the one committing the violence as evidenced by the following incidents. In early 2005 a black female supervisor (Chiquita Conkey) grabbed a male employee forcibly by the arm in anger. This was witnessed by several employees but, she was never removed from the building. When a black female 204B (Temporary) supervisor (Louise Crawford) grabbed the arm of a female employee in anger she was not removed from the building.



In the same vane if the supervisor happens to be white then they are disciplined immediately while an investigation is done. This was the case with a white male supervisor (Michael Potalak) who was removed form the premises when he allegedly grabbed a black male employee in anger. He was subsequently sent to New Jersey as a craft employee.

So as you can clearly see from my statements prejudice is rampant in the Delaware P&DC. I hope that as a result of this case there is a re-educating of all employees in this building and that justice will prevail. Prejudice is never justified and is always wrong. By condoning this behavior race relations will always be stressful. Those in power with these feelings will always abuse their authority and this will create a vicious cycle.

7/15/05

A-13

00033



*A Note From:*

4/23/04 FRIDAY
3/28/04 AT 5 PM AT THE CLOCK BY THE
CAFATERIA Delores Thomas CLICKED OUT
FOR LUNCH AND STOOD IN FRONT OF THE
CLOCK READING ALL THE NOTICES. I
HAD TO WAIT UNTIL SHE WAS FINISHED
ANOTHER PERSON ALSO IN LINE
MADE A COMMENT. I DID NOT.

4/1/04 I WAS ASSIGNED TO 127
AT 1130 I WAS ON THE 199 S.D.
Delores THOMAS CAME IN TO THE AREA
& decided to work on THE 199 side
Also I was forced to have the
AREA. I spoke to CC for a remedy
she assigned me to help T-1 until
MY END TOUR.

WAS Delores Thomas given the same
notice AS I WAS? to stay away
from me? AM I to BE expulsed
from ANY place she decides she
wants to BE? is she supervision.



*Janet Jeffries*

A-14

~~for~~ FOR
some REASON SHE HAD IMMUNITY
IN THE PAST?
PLEASE REMEDY THIS ARROGANCE ON
HER PART by NOTIFYING HER
IN WRITING, (PREFERABLY) to please
AVOID ME AND STOP THE BEGGING
ME ON, to some sort of
CONFRONTATION. THIS IS AN
EFFORT ON MY PART to PREVENT, RATHER THAN
ESCALATE MORE violence.

Sincerely



Rec'd 4-23-04 at 12:45 AM

J Williams

A-15

00028

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE

JANET F. JEFFRIES,         :        EEOC HEARING NUMBER
    Complainant            :        170-2005-00177X
                           :
                           :
        v.                 :
                           :
JOHN E. POTTER, POSTMASTER :
GENERAL, UNITED STATES POSTAL :
SERVICE,                   :        AGENCY CASE NUMBER
    Agency                 :        1-C-081-0017-04

### DECLARATION OF JANET F. JEFFRIES

I, Janet F. Jeffries, make the following Declaration in
lieu of affidavit in accordance with the provisions of 28
U.S.C. §1746.   I understand that my Declaration is to be
filed in the above captioned EEO Complaint of
Discrimination and it is the legal equivalent of a
statement under oath.

1.   My birth date is January 6, 1955.

2.   My address is 2148 Seeneytown Road, Dover, DE   19904.

3.   From December 4, 1993 through December 31, 1993, I
worked at the United States Postal Service as a Christmas
casual in the Clerk craft.    From April, 1994 through
the present, I have held various positions with the Postal
Service, the most recent being a Full Time Regular Clerk

1




EXHIBIT
1

("FTR"} - Manual Dispatch Operator, Tour 3, at the Delaware

Processing and Distribution Center, Wilmington, Delaware.

4.    This Declaration supplements the Declaration I executed

on July 20, 2005, in connection with an incident which

occurred on the work floor at the Delaware P&DC on November

11, 2003 involving my co-worker, Delores Thomas and will

focus upon the effects that the discriminatory actions by

the management at the Delaware P&DC had upon me.

5.    On December 2, 2003, I requested an appointment with a

Dispute Resolution Specialist regarding the November 11,

2003 incident.    In PS Form 2564-A, which was mailed to me

by certified mail on December 2, 2003, I provided the

details of my allegations.    I named Managers,

Distribution Operations ("MDO's")  John Williams and Angelo

Lambert as the discriminating officials.    On  December

9, 2003, I completed PS Form 2564-A and attached

documentation to support my claim that I had been

discriminated against because I am a Caucasian, Italian-

American female.

6.    Although I made repeated requests to MDO Williams to

investigate the November 11, 2003 incident involving Ms.

2

A-17

Thomas, no such investigation took place despite the availability of eyewitnesses who were willing to offer statements regarding the incident.

7.    On January 2, 2004, MDO Williams held a meeting for all PTF Clerks at the Delaware P&DC.    Ms. Doris Perry, Automation Clerk, among others, was present.    Ms. Perry has informed me that MDO Williams conducted what appeared to be a "witch hunt" against me, repeatedly asking employees for statements involving an incident reported to him by Ms. Delores Thomas.    Further, in a meeting with MDO Williams, Ms. Perry and myself, on November 26, 2003, Ms. Perry was an eyewitness to MDO Williams' attempt to explain away some of the statements made by Ms. Thomas on November 11, 2003.    Instead of doing what is required of him as an Agency official by taking action against Ms. Thomas, MDO Williams defended Ms. Thomas.    During this meeting on November 26, 2003, Ms. Perry also heard MDO Williams state that he would "fire [me]" if I acted in the same manner as Ms. Thomas had acted towards me.

8.    After the November 26, 2003 meeting with MDO Williams, on December 1, 2003, I finally approached Ms. Sherry

3

A-18

Wiggins, Supervisor - Flat Sorters, to inquire if I could be permitted to work in her area as I was under a great deal of stress in my present assignment.    She informed me that she would have to speak with MDO Williams.    Ms. Wiggins never did respond to my request.

9.    On January 5, 2004, MDO Williams called me into his office to inform me that he had scheduled an appointment with an Employee Assistance Program ("EAP") Counselor for me, adding that it was voluntary on my part.    I informed MDO Williams that I had already taken it upon myself to make an appointment with an EAP Counselor in Dover, Delaware.

10.  On  January 9, 2004, during a meeting with Kim Wayman, EAP Counselor, Ms. Wayman suggested that she contact MDO Williams to inquire about making an adjustment to my work area so that I would not have to endure the stressful situation of having to work in such close proximity to Delores Thomas.    I agreed to have Ms. Wayman speak to MDO Williams on my behalf.

11.  Despite being personally informed by EAP Counselor Wayman that I expressed to her that I felt threatened, MDO

4

A-19

Williams told Ms. Wayman that he did not believe that I felt threatened and he was not going to move me to another area.    MDO Williams not only ignored my repeated requests to be reassigned to a different unit, he also disregarded the option when presented by the Agency's EAP Counselor. Ms. Wayman provided me with this information on January 14, 2004.

12. When Ms. Wayman relayed this information to me, I was devastated.    I went to EAP for assistance, and instead of giving the request for a reassignment to another unit even a little consideration, MDO Williams immediately rejected the suggestion.    This rejection, combined with the non-action of Ms. Ann Thomas, Supervisor, and Acting MDO Angelo Lambert on the day the incident occurred, November 11, 2003, when I informed both of them that I felt threatened by Ms. Thomas' behavior and again informed MDO Williams, on November 14, 2003 that I felt threatened, caused me a great deal of emotional distress.    To me, it was evident that nothing was going to change and that the management at the Delaware P&DC were not going to ensure my safety (mental, physical and/or emotional) while on the

5

A-20

work room floor nor was Ms. Thomas going to be reprimanded in any way for her outrageous behavior.

13. As stated in my July 20, 2005 Declaration, MDO Williams informed me that I would be issued a Letter of Warning ("LOW") in connection with the November 11, 2003 incident. It was, and still remains, incomprehensible to me that issuing a LOW to me would even be considered when I was victimized and targeted by another employee who is well-known within the facility for her bad behavior, violent temper and profane outbursts.

14. Because of the race based discrimination by MDO Williams against me, I sought assistance from medical and mental health providers, as well as utilizing the services of the Agency's EAP.    I began to see Kim Furtado, N.D., on November 13, 2003.  In January, 2004, I sought guidance from EAP.    Finally, in January, 2005, I began sessions with Carol S. Bugglin, Ph.D.  A copy of Dr. Bugglin's April 20, 2005 Medical Report is attached as Attachment 1.

15. As a result of the discrimination, I have had to utilize my Annual and/or Sick Leave.    The reason I was

6

A-21

forced to use my Annual and/or Sick Leave is because, despite my repeated requests to be removed from working in close proximity to Ms. Thomas, while at the same time MDO Williams told me that I should stay as far away from Ms. Thomas as possible.    The stress of having to work in such close proximity to Ms. Thomas, which was unnecessary as I could have been reassigned to another unit, was emotionally draining and terrifying to me.    However, MDO Williams' directive to me that I stay away from Ms. Thomas further aggravated an already tense situation.    MDO Williams' statement placed me under additional, unnecessary stress because I lived in constant fear that any action on my part would be misconstrued by MDO Williams and I would be disciplined, even though I was attempting to be at least reassigned away from Ms. Thomas, as well as having Ms. Thomas' improper conduct sanctioned by the Agency. Instead, I was required to continue working under adverse and dangerous conditions and Ms. Thomas was not even disciplined, despite my complaints to the Agency's management and my clear expressed fear of having to work physically near Ms. Thomas.

<div align="center">7</div>



16. Because of MDO Williams' failure to take action against Ms. Thomas, his failure to reassign me or Ms. Thomas to another location and my being subjected to punishment and disparate treatment by telling me that I would be issued a Letter of Warning for Ms. Thomas' violent and improper conduct towards me while allowing her to continue working without any discipline as he has done with other African-American employees who committed similar acts as Ms. Thomas while disciplining non-African American employees, I was forced to use my Annual and/or Sick Leave, between December 5, 2003 and February 17, 2005, as well as my days off ("drop days") to be away from Ms. Thomas and/or to attend medical and/or mental health appointments resulting from the November 11, 2003 incident and MDO Williams' discriminatory conduct towards me since I informed him of the November 11, 2003 incident.  The specific dates and monetary damages were contained in my response to the Agency's discovery request identified as Interrogatory Number 11, which was attached as Exhibit 2 to my July 20, 2005 "Complainant's Opposition Memorandum to Notice of Intent to Issue a Decision Without a Hearing."

A-23

17.  As I have previously maintained, the Agency's October 28, 2003 "South Jersey Policy on Conduct in the Workplace," which is the Agency's zero tolerance policy was not equally applied when I was victimized by Ms. Delores Thomas on November 11, 2003 on the work floor at the Delaware P&DC. In addition, as I have also previously maintained, MDO Williams continued to violate the Agency's established policy when he continued to have me work in close proximity to Ms. Thomas and used the condition of my employment of being in close proximity to Ms. Thomas as a warning to stay as far away as possible from Ms. Thomas, effectively giving me an ultimatum which was virtually impossible to implement.   When I questioned MDO Williams, in a note dated April 23, 2004, as to whether Ms. Thomas had received the same directive as I - to stay away from me - I did not receive any response.    Finally, on July 15, 2004, after not receiving any acknowledgment of, or response to, my April 23, 2004 note to MDO Williams, I spoke with MDO Ruby Gardner.    It appears that either Ms. Thomas was not given any directive to stay away from me as I was given by MDO Williams to stay away from her, or, in the alternative, if

A-24

00024

Ms. Williams was given the directive she chose to ignore it
and the Agency did not discipline her for her refusal to
adhere to the Agency's policies, rules and regulations.
A copy of my April 23, 2004 note to MDO Williams is
attached as Attachment 2.

18. A further example of the Agency's discriminatory
actions against me was exhibited when I was finally
converted to a Full-Time Flexible ("FTF") position.    On
September 18, 2004, I received a certified letter informing
me that I had been converted to FTF status and that my tour
of duty was being changed to Tour 1.  For almost every
individual who has worked as a PTF for as long as I have,
the conversion to a FTF should be a happy time.    Instead,
my elation at being converted to a FTF was overshadowed by
the fact that I was taken away from my assignment on Tour 3
and placed as an Unassigned Regular on Tour 1, an act which
did not occur to those converted from PTF to FTF in the
seven (7) years prior to my conversion to FTF or even
since.   The common tradition for those who receive FTF
status is to remain in the position he/she held as a PTF,
for three (3) bidding cycles, until a  position which the

10

A-25

00025

newly established FTF found that he/she was able to bid on.
As a result of this involuntary reassignment to Tour 1, I
suffered a financial loss because those employees still
working on Tour 3 were given "penalty" time which is the
equivalent of double time.

19. As previously stated, following is the relief I am
seeking in connection with the EEO Complaint of
Discrimination I filed resulting from the November 11, 2003
incident:

   discrimination/retaliation free workplace,

   restoration of leave, back pay with interest and

   benefits, compensatory damages and reimbursement

   of attorney fees and legal costs.

   I declare, under penalty of perjury pursuant to 28
U.S.C. §1746, that to the best of my knowledge, information
and belief, the above statements are true and correct.

   Executed this 10th day of November, 2005.

                                   Janet F. Jeffries
                                   Complainant
                                   2148 Seeneytown Road
                                   Dover, DE   19904

11

A-26

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE

JANET F. JEFFRIES,                    :        EEOC HEARING NUMBER
        Complainant                   :        170-2005-00177X
                                       :
           v.                          :
                                       :
JOHN E. POTTER, POSTMASTER            :
GENERAL, UNITED STATES POSTAL         :
SERVICE,                               :        AGENCY CASE NUMBER
        Agency                         :        1-C-081-0017-04

### DECLARATION OF JANET F. JEFFRIES

I, Janet F. Jeffries, make the following Declaration in lieu of affidavit in accordance with the provisions of 28 U.S.C. §1746.   I understand that my Declaration is to be filed in the above captioned EEO Complaint of Discrimination and it is the legal equivalent of a statement under oath.

1.   My birth date is January 6, 1955.

2.   My address is 2148 Seeneytown Road, Dover, DE   19904.

3.   I started my postal career on December 4, 1993, and worked until December 31, 1993, as a Christmas casual clerk at the Dover Post Office.   Since then I have held the following positions:

| | |
|---|---|
| April, 1994 - March, 1995 | Hartley Post Office RCR Carrier |
| March, 1995 - March, 1998 | Dover Post Office RCA Carrier |
| March 28, 1998 - January 13, 2003 | Delaware P&DC Flat Sorter,   T-3, Part-Time Flexible Clerk (PTF) |
| January 13, 2003 - September 18, 2004 | Delaware P&DC Automation, |

1

A-27



| | |
|---|---|
| September 18, 2004 | T-3, PTF Clerk Delaware P&DC- Converted to Full Time Regular (FTR) |
| September 18, 2004 - November 26, 2004 | Delaware P&DC Automation, T-1, FTR |
| November 26, 2004 - January 21, 2005 | Delaware P&DC Automation-ISS, T-1, FT Clerk |
| January 21, 2005 - June 11, 2005 | Delaware P&DC Manual 043/Stats., T-1 FT Clerk |
| June 11, 2005 - present | Delaware P&DC Manual Dispatch Opr., T-3, FT Clerk |

4.  I have had a perfect time and attendance record, and have never been issued any disciplinary action. I got along with everyone including management and I feel I was, and am, regarded as a good employee. I trusted and believed in all postal policies and have abided by them during my entire career and have never been disciplined for any infractions or wrongdoing.

5.  On the night of November 11, 2003, I reported to Acting Manager Distribution Operations (AMDO) Angelo Lambert, the violent actions of a co-worker towards me. I gave him the names of Karen Bayard, Lynette Marrow, Bobby Ford and Frank Frisby as eye witnesses. During the meeting in Mr. Lambert's office, we were interrupted. I heard a knock on the door, I heard Karen Bayard speaking to Angelo Lambert insisting on giving her statement. He told her he was not taking any statements, and sternly turned her away. Karen

2

A-28

Bayard told me that night that she wrote it anyway.    It
was not until November 15, 2003, upon her insistence, that
MDO John Williams said he would accept her written
testimony.    He inexplicably lost her statement not once,
but twice.    Ms. Bayard ended up writing three (3)
statements, all eventually were retrieved and copied.

6.  I spoke to MDO Williams on November 14, 2003 and I re-stated
all I had told AMDO Lambert on November 11, 2003, along with
the same list of witnesses and asked him to please
investigate the incident promptly, as I felt threatened by
Ms. Thomas' conduct towards me.

7.  AMDO Lambert gave a statement, dated November 27, 2003,
regarding his preliminary "investigation" of the November
11, 2003 incident.    (If he had followed postal policy,
Delores Thomas should have been removed from the building on
the evening of November 11, 2003.)

8.  On November 14, 2003, I gave MDO Williams my written
statement, dated November 12, 2003.

9.  As I have previously stated, Karen Bayard wrote her
statement on November 11, 2003 but was not allowed to submit
it to MDO Williams until November 15, 2003.    She also
submitted additional statements on December 28, 2003 and
January 3, 2004.

10.  Bobby Ford gave a written statement on November 17, 2003 to

3

A-29

MDO Williams.    Mr. Ford amended his November 17, 2003
statement on November 26, 2003 and submitted it to MDO
Williams on November 26, 2003.

11.  Lynette Marrow dated her statement November 11, 2003,
     amended that statement and left the date on her statement as
     the date of occurrence.    She did not note the submission
     date on her statements.    Ms. Marrow's written statements
     were submitted to MDO Williams.

12.  Frank Frisby was questioned and advised by Angelo Lambert,
     on December 3, 2003, that he did not have to get involved if
     he chose not to.    Consequently, Frank Frisby wrote a "non-
     statement" on December 3, 2003.

13.  Despite my various requests and communications with MDO
     Williams that he promptly investigate the November 11, 2003
     incident where Ms. Thomas acted in a violent and threatening
     manner towards me, he delayed the investigation and he
     ignored the statements of witnesses.    I probably may have
     been better able to deal with MDO Williams' failure to
     promptly investigate my complaint of threatening workplace
     violence if his lack of interest in my complaint was his
     normal reaction to violence in the workplace, but it is not.
     I have observed MDO Williams promptly investigate the most
     minute complaints lodged by other co-workers who are black.
     For example, on January 2, 2004, a black co-worker, Delores

4

A-30

Thomas, falsely reported to MDO Williams that I pushed another co-worker. When Ms. Thomas complained to him, MDO Williams immediately conducted an interview with all the individuals named by Ms. Thomas concerning the January 2, 2004 incident. In contrast, regarding the November 11, 2003 incident, even though I attempted to produce witnesses, and my witnesses were prepared to produce statements regarding the incident, MDO Williams still did not fully investigate and/or process statements from all of my named witnesses before he claimed to have completed the investigation on December 3, 2003. On January 15, 2004, a black co-worker, Darleene Commadore, reported to MDO Williams that her co-workers were talking about her. That very day, he took statements and conducted an investigation. Again, as I previously stated, in contrast, it took him more than three weeks to even review statements concerning my complaint. I know by virtue of Mr. Williams' conduct, that his reactions to complaints, unfortunately, are race/color oriented. I cannot depend on him to be fair or objective. I cannot depend on him to react in the same manner and efficiency that he has when complaints are presented to him by African American employees concerning allegations of misconduct by Caucasian employees. I have observed that it is my race/color that motivates his disparity of treatment

5

A-31

towards me.    I have endured threats of dismissal by MDO

Williams should I ever act like Delores Thomas did towards

me.    The discrimination to which I have been subjected

because of my race/color by MDO Williams and his associate

managers was further aggravated by MDO Williams when he told

me that I would receive a disciplinary action (Letter of

Warning) for something I did not do, while  at the same time

I knew that the person deserving of the disciplinary action

(removal from the facility and, at the very least, a Letter

of Warning) was not receiving any disciplinary action at

all.

14.    I have had my entire mental state altered and negatively

affected by this disparity of treatment.    I was unable to

cope any further with the discrimination and sought

psychiatric help in January, 2005.    All my pain, anxiety

and depression was validated as consistent for having

endured in my workplace what I had under MDO Williams and

his associate managers from the time I complained of the

November 11, 2003 incident.    Every day is a struggle for me

as I try to understand why this kind of race/color disparity

is left unchecked by management at the Postal Service.

Unfortunately, the race/color based discrimination that MDO

Williams together with his reporting supervisors (all of

whom are African American) have subjected me to since I

6

A-32

00006

complained of an African American co-worker (Delores Thomas) having acted in a physical and verbally threatening and violent manner towards me and MDO Williams' failure to promptly and properly investigate my complaint of workplace violence and adhere to the Agency's policy of zero tolerance concerning violence in the work place, as he has adhered and followed when African American employees have brought similar complaints to him, have caused me to suffer devastating and unceasing personal harm.

15. I have had to take unscheduled sick leave and advance annual leave and seek professional attention and treatment from health care providers. The specific dates when I was required to take unscheduled and/or advanced leave, and the dates when I sought medical and/or mental health care, as well as the associated health care expenses, were provided to EEO Investigator Meryl Smith-Green, and are in the Agency's Report of EEO Investigation in my EEO Affidavit (Affidavit A) and Exhibits 12 through 16 which are in the same Report of EEO Investigation that is dated November 1, 2004 and pertains to my EEO Complaint in this case, as well as the information I gave the Agency in response to the Agency's discovery requests.

16. On the dates where I had to take four (4) hours of annual leave because of the discrimination, I suffered financially

7

A-33

as I lost four (4) hours of pay, because Part-Time Flexible employees are only guaranteed four (4) hours of work each day but usually work eight (8) hours per day. For most postal workers, annual leave is used for enjoyment. Unfortunately, my annual leave was used to recover from the constant stress caused by working in close proximity to Ms. Thomas. Despite my various requests to management to not have to work in the immediate area with Ms. Thomas, my requests were denied. Instead of taking my requests seriously, MDO Williams emphatically told me to stay away from Ms. Thomas, using the example that even if I were to be in the ladies room and Ms. Thomas were to come into the ladies room, I was to leave. My use of annual leave for these occasions was anything but enjoyable and caused me to have less time to take off to spend with my family.

17. In order not to exhaust my sick leave and subject myself to disciplinary action for excessive absences, I used my "drop" day/personal time to go to my Doctor appointments. Because of the race/color discrimination and disparate treatment to which I was subjected, I was financially impacted in that I had to seek medical and/or mental health care and incur the cost of prescriptions and/or aids to alleviate the stress and anxiety caused by the discrimination and disparate treatment by Postal officials.

8

A-34

18. I believe that my being forced to use my annual and/or sick leave in order to attend medical and/or mental health appointments due to an unprovoked attack against me on November 11, 2003, for which the identified antagonist, Delores Thomas, continues, to this day, to go unpunished, is unacceptable, improper and discriminatory. Every day that I report to work and see Ms. Delores Thomas, I am reminded of the race/color discrimination and disparate treatment to which I was subjected following the incident which occurred on the work floor of the Delaware P&DC on November 11, 2003.

19. My experiences on the job since I complained to MDO Williams and his associate managers about the November 11, 2003 incident and their failure to follow the Agency policy of Zero Tolerance entitled "South Jersey Policy on Conduct in the Workplace" issued on October 28, 2003 by Joanna B. Korker, Lead Executive District Manager of the South Jersey District, and the disparate treatment to which I was subjected by the named discriminating officials are the reasons for my having filed the EEO Complaint of Discrimination in this case. To this day, I have not understood any reason for the Agency's Managers (such as MDO John Williams and AMDO Angelo Lambert) not applying the policy of zero tolerance for acts of violence and threats in the work place equally without regard to an employee's

9

A-35

race/color.    My hope is that the EEO Complaint of
Discrimination I have filed will correct the blatant,
racially biased discrimination that is the basis of my EEO
Complaint and for which I am seeking relief which includes
to be able to work in a workplace where my race/color will
not determine how I will be treated, restoration of leave,
backpay with interest and benefits, compensatory damages and
reimbursement of attorney fees and legal costs.

I declare, under penalty of perjury pursuant to 28 U.S.C.
§1746, that to the best of my knowledge, information and belief,
the above statements are true and correct.

Executed this 20th day of July, 2005.

Janet F. Jeffries
Complainant
2148 Seeneytown Road
Dover, DE    19904

10

A-36

# Plaintiff's Appendix

# Part 2



# Psychiatric Access ... for Central Delaware, P.A

**Mark S. Borer, M.D.**
ABPN & AACAP Board Certified
Family Psychiatry

**Carol S. Bugglin, Ph.D.**
Licensed Clinical Psychologist
Psychotherapy & Assessment

April 20, 2005

| | |
|---|---|
| NAME: | Janet F. Jeffries |
| DATE OF BIRTH: | 1/6/55 |
| DATE OF INITIAL EVALUATION: | seen four times from 3/2/05 to 4/20/05 |
| PRESENT FOR EVALUATION: | the patient |
| SOURCE OF REFERRAL: | self |

Janet Jeffries is a 50-year-old, married, Caucasian female who works as a clerk for the U.S. Postal Service. Her husband, James, age 50, is a cable technician. They have two children, Jacqueline, age 23, and a son, Jonathan, age 20, who are both living at home and attending college. Janet took the job at USPS (United States Postal Service) in order to help pay for her children's college tuition.

Ms. Jeffries presents for treatment because she states she has been having "physical problems arising from anxiety and stress over the course of the last year and one-half, from November 2003 to present," after an incident happened at work. Before this "incident," Ms. Jeffries states that she had a good life where she did lots of gardening, states that she loves to clean but can no longer do it, and "everything was good." She reports that she has "two great kids, a decent husband and income, and lives in a decent place," stating that she loves Dover. She also had liked her job. She felt safe and felt that her supervisors would take care of her if anything happened. She had witnessed her supervisors taking care of other people when incidents happened, including when there is any aggression in the work place - that person being dismissed.

In November 2003, Ms. Jeffries had an incident with a co-worker where she was working on a machine and the co-worker, an African-American, was screaming at her and then pushed her into the tubs. She reported this to her supervisor with the expectation that this other person would be disciplined. She reports that her MDO supervisor did not act on it. The MDO supervisor is also an African-American. She was very surprised and taken back that he did not act, but has since come to believe that this was because the place where she works is predominantly Black, her supervisor is Black, and she is White. She states that he has always been right on all the other incidents that happen, but he did not take appropriate action on this one. So far, to take care of her resulting anger, she has gone to the MDO manager and asked for a transfer. She feels that she has had no remedy to the situation at all. It enraged her that nothing was done to the point that she did not want to go back to work.

846 Walker Road * Suite 32-2 * Dover, DE 19904 * 302/674-2265 * Fax 302/674-3321

A-37

Jeffries, Janet F., DOB 1/6/55
Psychological Evaluation, 3/2/05 - 4/20/05

2

She saw an EAP counselor, but felt that she was "just spinning her wheels." Since that time, she feels she has unresolved anger, her feelings of happiness in her family have faded, she has difficulty sleeping, and is unhappy. She dreads work and gets emotionally upset, both going and coming home from work. She is on "high alert" while she is there, since she feels that she continues to be a target. She feels that she is in a "catch 22." It is not a pleasant idea for her to quit, nor is it pleasant for her to stay at work. She had trust and mutual respect with all of her African-American supervisors and states that "color was never an issue for her." She got along with everyone. She was there only to financially aid her children through college. Now, she states it is unbearable to work there. Her mood is mostly sad and she does nothing but sleep, eat, and work. Her conversations center around the incident that has resulted in prejudice against her. She replays the incident over and over again in her head. She cannot succeed in breaking the cycle. She states the feelings are "consuming her as well as destroying her." She feels that she has no closure and no peace. She feels lots of anger and frustration. She had an anxiety attack where she could not swallow and felt she could not breathe. Prior to this incident, she had heard that this supervisor was a racist but he had always been pleasant enough to her. She had never had cause for him to need to protect her before. After this happened, she now understands why people have called him a racist and feels that this is the reason he has not defended her. She has had several meetings with this manager and states that the union urged him to investigate. She states that there was a 14-day window for addressing the complaint.

She has filed an EEO complaint against her MDO supervisor, which is a discrimination claim. She feels helpless in that she does not know how she can fight it, if it happens again. He put her in another "tour," i.e., on night shift, and was told that he said that she would "consider it a punishment." She was not very happy with it but okay because it got her away from him. However, he followed her onto that shift and she feels that he goes out of his way to continue to aggravate her. She feels hopeless and feels that the situation is "depressing as hell." She says her "insides are jittery all the time."

Since this has happened, she feels that things have been done to get her into trouble. She said that her co-workers brought false complaints against her. The person she was supposed to have "pushed" said she never brought up the complaint, but that the complaint was brought up by the woman who pushed her in the original complaint. Ms. Jeffries also reported that there were several witnesses to the event, African-American co-workers who support her side of the event. Despite this, her supervisor still did nothing and treats her as the one who is in the wrong. She states that she works in the New Castle plant where even the casual employees, i.e., seasonal, are predominantly African-American. She says it was extraordinary that there were people willing to speak up on her behalf. She states that hardest thing for her to do is not to react to what is going on. She states that before this happened, she liked this man and respected him because of his title. She always greeted him and was friendly toward him. She states it was a complete shock to find out that this is how he is on the inside.

Other things that have happened have been things that have made her feel that all the supervisors are watching her. She states that she has to itinerary all the time, has to constantly tell all her supervisors what she is doing, where she is doing it, how long it will take, and it all must be



*Jeffries, Janet F., DOB 1/6/55*                                                                                  3
*Psychological Evaluation, 3/2/05 - 4/20/05*

documented. This is a change from prior to this incident. She has also been given heavier work that is usually given to people with less seniority than she, i.e., a flatsorter. When she states this to supervisors, it seems that they change the rules. She states she "feels like an abused child." Ms. Jeffries reports that Mr. Williams is still on her shift and she feels that he is basically laughing in her face. He will go out of his way to approach her, asking how she feels or how she doing today, and it seems that he makes sure that he talks to her. She gets the sense that it is to aggravate her. She has noticed a change in her current supervisor's attitude toward her. She has heard that the New Jersey supervisor was sympathetic to her and wanted to help, but was told to "back off from protecting her" by the district managers.

Medications have included Celexa, but after having taken ½ pill two times and sleeping the entire day and night, she discontinued it. She does take *fluressence*, which is a homeopathic intervention, to help calm her. When she ran out of this, she tried a different homeopathic preparation, *Skullcap* drops, to help with her headaches which she gets due to her stress. She has also run out of this medication.

She states she is allergic to Vioxx, which caused stomach pain.

Ms. Jeffries denies any problem with drinking, drugs or tobacco, either now or in the past.

In review of systems, Ms. Jeffries reports that she gets headaches weekly and had an incident while driving to work where she could not swallow. She reports intermittent heart palpitations or abnormal beats. Her muscles and joints hurt daily.

Ms. Jeffries reports her background as having come from a "lower-middle class urban lifestyle" where she had very close, supportive parents. She had a very loyal sister and brother. She grew up in a Catholic home, had a Catholic education, and she believes that it was "morally sound."

On mental status exam, Ms. Jeffries reports that she could "sleep around the clock" and then she has some days where she cannot sleep. She cannot sleep because she is thinking about her work problems. She does not wake refreshed and her dreams can be replaying the work event. She states she has gained 25 pounds since this incident. She has joined Curves and belongs to the gym. She went a few times and would like to continue it but she feels no energy and cannot get herself to go. She states that her energy is low and her mood is "miserable, depressed, and anxious." She has some withdrawal from others and hopelessness. She does a lot of crying, feels hopeless, and has a decreased level of enjoyment in her usual activities. When stressed, she has thought about hurting herself, but she denies suicidal ideation. She states at times she might fantasize about hurting her MDO manager, she would like to slap him in the face, but she says this is not likely since she has too much control over things like that and she obeys rules, etc. She states there is some verbal aggression in that she feels as though she must control herself so much at work, and it is disturbing, that when she goes home she may take some of it out on her husband. She states he has very broad shoulders and so far has taken it, but she would like to stop that and does not feel he really deserves it. She does have trouble trusting since this incident because she feels that she was betrayed. She feels that her managers might be after her, but also has gotten some validation that this might be

A-39

*Jeffries, Janet F., DOB 1/6/55*                                                                4
*Psychological Evaluation, 3/2/05 - 4/20/05*

true. She states more and more she feels secure only at home and is starting to go out less and is more afraid to go out. More recently, she also complains about back pain and now must see a chiropractor.

**Summary and Assessment:** Janet Jeffries is a 50-year-old Caucasian clerk with the USPS. She is married and has two children who are attending college and still living at home. She reports that there was an incident at her work where an African-American woman approached her, was yelling, screaming, and cursing at her, and pushed her which caused her to fall into some tubs. This was witnessed by other co-workers, also African-American, and was reported to her African-American supervisor. In the past, the supervisor has intervened in situations such as this and the offender has been fired if they have shown any aggression at work. In her case, nothing was done. Despite her co-workers supporting her story and reporting it still nothing was done. This has angered her and made her feel unsafe and unprotected at work. When she started complaining more about nothing having been done, she feels that she was "punished" by being moved to an evening shift and being made to do work that people of less seniority than her usually need to do. This included some heavier work, more physically demanding, which has caused her some physical pain. Additionally, she feels and she has heard that when some other supervisors have tried to be a little kinder or more fair to her, they have also started giving her a more difficult time. Her work is constantly evaluated and reviewed and she needs to prove everything. Her former MDO supervisor, the one with whom she had the problem, also moved to night shift and she feels as though he sometimes goes out of his way to talk with her and, she feels, aggravate her. All this has caused her increased anxiety, depression, and certainly stress. She has more difficulty sleeping, in that she oversleeps and does not get other things done and that, at times, will be unable to sleep because these things are on her mind. She also has gained approximately 25 pounds, her mood is depressed and anxious, and when she gets home she can be more irritable. She has lost enjoyment in things and tends to stick closer to home now. She is less trusting of others and feels that there is not much that she can do about her situation.

So far, to help her difficulties, she has thought that moving to the night shift would at least get her away from her old supervisor, but he moved there after she did. She has thought about possibly quitting her job but this gives her extra income and she does not believe she could get the same amount elsewhere, so she does not want to quit. In addition, she feels that she would think of herself as a failure if she did and that they would win at pushing her out, so she does not want to leave. She also has tried taking some medication, Celexa, but on the two nights in which she took ½ pill, she slept the entire day and night and this caused her to discontinue it. It is recommended at this point that she try a different medication, as it sounds as though she has symptoms that could benefit from medication during this difficult time. She has also thought about getting more exercise and followed through to some extent but she has no energy and, with being on night shift, less opportunity to do this. The other thing she has done has been to continue pushing this incident until she gets some satisfaction and she continues to observe and record what happens to her to give her some feeling of control at the workplace.

At this time, I recommend that Janet try a different medication since I do believe a medication could be of benefit. Dr. Beth Fisher, her primary care physician, has prescribed Cymbalta at 60 mg per

A - 40

*Jeffries, Janet F., DOB 1/6/55*                                                                       5
*Psychological Evaluation, 3/2/05 - 4/20/05*

day. I have encouraged her to workout since that might give her an outlet for some of her stress and this would be healthier for her than overeating. It might also help her reduce some of her weight or at least stop putting on weight. In addition, it would give her some time outside of the house that does not have to do with work and can keep her from developing more agoraphobic features.

One of the things that might be most helpful to Janet at this time would be for her to be moved to a different shift or have her supervisor moved to a shift where they do not run into each other. Ms. Jeffries reports that the EAP counselor requested that Janet be reassigned to "Tour 2," to remove her from the situation, but that request was denied. If the people at work would treat her respectfully and on an equal par with their other hard workers, I think she would do fine. What seems to be most distressing is having to encounter her old supervisor and then the thought that other people might not treat her well because they have been told not to. There is risk, if she keeps feeling persecuted, of longer term disability and more anger and depression. If she could feel that there has been some effort toward someone helping her, this might go to relieve some of the anger, distrust, and feelings of betrayal and help her emotionally and physically in both the short term and the long term.

<u>Diagnostic considerations</u> at this time include:

| | | |
|---|---|---|
| AXIS I | 300.02 | Generalized Anxiety Disorder. |
| | 296.22 | Major Depressive Disorder, Single Episode, Moderate. |
| | | Occupational problem. |
| | | |
| AXIS II | No diagnosis. | |
| | | |
| AXIS III | Current back pain. | |
| | | |
| AXIS IV | Psychosocial stressors are severe in terms of her occupational problems. | |
| | | |
| AXIS V | GAF Scale is currently in the range of 55, with 80-81 likely being the highest level in the past year. | |

Sincerely,

*Carol S. Buggiin, Ph.D.*

Carol S. Buggiin, Ph.D.

CSB/lbl

cc:  Laureda & Associates, 521 S. Second St., Phila., PA 19147
     USPS, Law Department, Eastern Area Office, Attn: M. Gushue, POB 40595, Phila., PA 19197

A-41



**Affidavit Questions**
**Re: Janet Jeffries**
**EEO Complaint 1C-081-0017-04**

1. Please state your name, current position, and your relationship to Janet Jeffries.

2. What is your knowledge of the events which led Janet Jeffries to file a complaint of discrimination February 20, 2004

3. What was your involvement?

4. Is there anything you would like to add to your affidavit?

Affidavit B
Page 1 of 4

A-42

| U.S. Postal Service | | Page No. | No. | Case No. / Case Name |
|---|---|---|---|---|
| EEO Investigative Affidavit *(Witness)* | | 1 | | 1C-081-0017-04/Jef |

| 1. Affiant's Name (Last, First, MI) | | 2. Employing Postal Facility |
|---|---|---|
| PERRY, DORIS M. | | DeLAWARE P+DC |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip +4 | 6. Unit Assigned |
|---|---|---|---|
| CLeRK | 5 | 147 Quigley Blvd. De.19720 4103 New Castl | dispatch |

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1957, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

7. Statement *(Continue on Form 2569 if additional space is required)*  see attached letter

I declare under penalty of perjury that the foregoing is true an

Affidavit B
Page 2 of 4

Affiant's Signature

Doris M. Perry

8/13/04

PS Form 2568-B, March 2001

A-43

 

August 9, 2004

      On November 11, 2003 there was an altercation at the plant between Ms. Delores Thomas and Ms. Janet Jeffries. On November 26, 2003 Ms. Jeffries came to me for help. At this time I was a shop steward on tour 3. I arranged for a meeting with MDO, John Williams, myself, and Ms. Jeffries. Mr. Williams gave me the impression that he did not believe the statements he received from the employees who were present at the time of the incident. Two weeks had gone by with no investigation being done. Ms. Jeffries explained that she felt very uncomfortable and threatened by Ms. Thomas. Mr. Williams tried to explain what Ms. Thomas meant by the derogatory remarks she made to Ms. Jeffries. When Ms. Jeffries explained that she was shoved and yelled at and wanted it to stop, Mr. Williams said he would investigate but if Ms. Jeffries acted in the same manner; she would be fired. After many weeks, letters of warning were issued to both women but Mr. Williams pulled Ms. Jeffries because she had filed an EEO complaint against him.

      At the EEO mediation Mr. Williams admitted his wrong doing and settled with Ms. Jeffries. The mediator had to put this settlement in abeyance because Mr. Williams said he had no authority to make a settlement. All settlements had to be approved by plant manager, Joe Weldon. When we met with Mr. Weldon he proceeded to give us a definition of abeyance and tell us there was no such thing. We feel that Mr. Williams and Mr. Weldon did not act in good faith at the mediation hearing. If the supervisors can not make a settlement than Mr. Weldon should be present at these mediations or they are just for show.

      I told Ms. Jeffries that she should proceed formally with her complaint because Mr. Williams had admitted his guilt in front of a mediator and only felt he got away with it because Mr. Weldon refused to look at the facts and use a loophole to hide the truth.

      I have kept notes from all meetings with Mr. Williams and feel he is looking to make Ms. Jeffries' career at the plant very difficult. He has retaliated in every means possible. The injustice to Ms. Jeffries must be taken care of soon.

                Thank you,

                *Doris M. Perry*

                Doris M. Perry    Affidavit B
                                     Page 3 of 4

A-44

 

| U.S. Postal Service | Case No. |
|---|---|
| Certification | *1C-081-0017-04* |

I have read the proceeding attached statement, consisting of ____ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

> "Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

**Privacy Act Notice**

Privacy Act Notice: The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for the Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service Regulations require all postal employees to cooperate in any postal investigation.

Failure to supply the requested information could result in disciplinary action. (ELM 666)

**Oath/Affirmation**

Subscribed and (sworn) (affirmed) before me on the *13th* day of *August*, 20*04*

*(Affiant, sign in the presence of an EEO Complaints investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | *Doris M. Perry* |

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant, sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed | Affidavit B |
|---|---|---|
| *Doris M. Perry* | *8/13/04* | Page 4 of 4 |

PS Form 2571, March 2001

A-45

PH-A



TH-A

**UNITED STATES POSTAL SERVICE®**
EEO Investigative Affidavit *(Continuation Sheet)*

| Page No. | Pages | Case No. |
|---|---|---|
| 2 | 4 | 1C-081-0017-04 |

inappropriate behavior in the work place. A. Lambert and I discussed the issue with each other and decided to go on the advice of labor. I was approx. the middle of December within the two week window after I received the last statement. During this period, I received a call reference an EEO complaint from T. Jeffries about this incident. They asked if I would mediate this complaint which I agreed to. At this point about a few days later I spoke to labor again, explained to them because Ms. T. Jeffries had filed an EEO, I didn't want to go through with the letter of warning, because I didn't want her to think she received corrective action because she filed an EEO. I asked labor if I could go ahead with the letter of warning for D. Thomas, but I. Morris & D. Kelley-Brown stated it would be untimely and at Step II they would kick it out. Therefore no corrective action was taken on either employee.

4) Ms. T. Jeffries told me that D. Thomas used profanity towards her and hit her with a flat tub. 5) ~~No questions on~~ ~~your affidavit.~~ 5) I informed Ms. Tiffries I'd do an investigation and get back to her. 6) I did meet with Ms. Jeffries, but don't have the exact date recorded. Acting MDO A. Lambert and union official D. Perry was present.

I declare under penalty of perjury that the foregoing is true

Affidavit C
Page 5 of 11

*[signature]* John R. Williams

8/17/04


A-50

| | UNITED STATES POSTAL SERVICE® EEO Investigative Affidavit (Continuation Sheet) | Page No. 3 | No. Pages 4 | Case No. 1C-081-0017-04 |

7) I did meet with D. Thomas and the same people were present that were at the meeting with Ms. Jeffries. I don't recall the exact date. 8) The investigation involved getting statements from every employee mentioned by both employees involved in the incident. Once all statements were obtained, got advice from labor, which was mentioned earlier. 9) No incident report was filed. 10) No safety report was filed. 11) Neither employee was displaced as stated before. 12) The zero policy was not followed as it should have because of the EEO that preceded and the untimeliness of the corrective action. 13) Labor was the only other management informed initially, ~~later~~ later after too much time had elapsed, the plant manager (Mr. Weldon) was made aware of the incident. 14) No other decision makers were involved. 15) I don't discipline the employees, their immediate supervisor would issue the discipline, I would just concur with the discipline. I don't recall any other incidents similar to this one where discipline was taken. 16) Both employees were referred to EAP which both did go for counseling. During the mediation with Ms. Jeffries, I explained to her in detail of the whole investigation and my decision as to why no corrective actions was taken. Based

I declare under penalty of perjury that the foregoing is true and correct.

John C. Williams

11/1/04

Affidavit C
Page 6 of 11

A-51

00149

**UNITED STATES POSTAL SERVICE®**
EEO Investigative Affidavit *(Continuation Sheet)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 4 | 4 | IC-081-0017-04 |

on all statements provided, I could not determine
that anyone observed D. Thomas hitting/striking J. Jeffries
with the Flat tub. J. Jeffries own statement says
what language D. Thomas used toward her, but she
also used inappropriate language toward D. Thomas.
This is the reason it was decided to give both
of them a letter of warning.

I declare under penalty of perjury that the foregoing is true and correct.

John R. Williams                                    8/17/07

Affidavit C
Page 7 of 11

A-52

 

## Meryl Smith-Green

| | |
|---|---|
| **From:** | "Williams, John R - Wilmington, DE" <john.r.williams1@usps.gov> |
| **To:** | "Meryl Smith-Green" <msmithgreen@msn.com> |
| **Sent:** | Saturday, September 04, 2004 9:33 PM |
| **Subject:** | RE: EEO case: Janet Jeffries |

Ms Smith-Green,

Here's my response on the employees mentioned below:

**Felicia Camper** (African American Female):  The only incident I'm aware of is there were two African American female PTF's working in the same operation with her one day, and during the night the supervisor had a discussion with F. Camper for being out of her operation.  F. Camper assumed the two PTF's told the supervisor that she was out of the operation, so she confronted them about the issue.  The two PTF's didn't appreciate the way F. Camper talked to them.  Both PTF's denied saying anything to the supervisor about her, so F. Camper apologized to the PTF's and nothing else was done with this issue.  There's nothing else I'm aware of that's similar to J. Jeffries case with this employee.

**Bo Driggers** (White Male):  B. Drigger was a witness to an incident that happen between Mike Podolak (White Male) and William Landis (White Male).  M. Podolak was a supervisor and W. Landis a mail handler.  An incident occurred where M. Podolak put his hands on W. Landis to prevent him from leaving an area.  B. Driggers observed the incident.  M. Podolak was reduced to a PTF clerk for inappropriate conduct.

**Bill Skibici** (White Male):  This employee was accused of making inappropriate racial comments to an African American female employee.  During the investigation and prior to any discipline being issued, B. Skibici resigned from the postal service.

**Eugenia Ross** (American African Female):  E. Ross was accused by another African American female of using inappropriate language toward her.  E. Ross stated she was talking to another African American male employee, and was not talking about the female.  It couldn't be determined if E. Ross was talking to the female or not, but we did have an official discussion with E. Ross reference how she talk to other employees and entering other operations on the work room floor where she shouldn't be.

**Richard Wilson** (White Male):  R. Wilson was given discipline for violating the zero tolerance policy in the work place.  R. Wilson told supervisor Owen Wallace (African American Male) that he was a sinner, and he was going to bury O. Wallace.  During the investigation R. Wilson said he didn't mean anything by that, and stated O. Wallace took it the wrong way, and he could take it any way he wanted to.  O. Wallace felt threaten by the comments.  R. Wilson was given a 7 day suspension for this behavior.

**Michele McGurie** (White Female):  I wasn't involved with this incident at all.  Apparently she was involve with a drug issue off of postal premise.  The employee was removed from the postal service by Plant manager Joe Weldon (White Male), but through arbitration she got her job back and received all of her back pay.

We had an incident with **Chris Hammond** (African American Male) who failed to follow the instructions of an African American Female supervisor.  Both employees was put in for a removal, but he got his job back through arbitration.  C. Hammond was later removed from the postal service for attendance issues.

Employee **Tanya Rider** (African American Female) and **William Garrett** (African American Male) was involved in a physical altercation.  Both employees was put in for removal from the postal service.  Tanya Rider lost her job, but William Garrett got his job back.  It was determined by the arbitrator that T. Rider instigated the incident and W. Garrett was only protecting himself.

Employee **Ron Pochvitilla** (White male) and **Carlton Reed** (White Male) were involved in a verbal altercation.  Both employees received a seven day suspension for the                   step

Affidavit _C_
Page _8_ of _11_



 

Page 2 of 2

2, union got R. Pochvitilla's suspension reduced to removal from his records if he had no similar incidents in the next six months, but left C. Reed's in place for two years. R. Pochvitilla is a paying union member and C. Reed isn't. R. Povchvitilla has been involved in verbal issues before, therefore management wanted it to remain in his record for two years, but union got it reduced to six months. I instructed labor to remove C. Reed's discipline in three months if he had no similar incidents, because this is the first incident we've had with C. Reed.

I'm not sure of what you're looking for, but I can assure you that I treat every employee with dignity and respect. I'm very fair with all of our employees and do the best I can in all investigations and make my determination based on the evidence provided. Our goal here is to have a violence free work place for everyone.

Thanks,

John W.

-----Original Message-----
From: Meryl Smith-Green [mailto:msmithgreen@msn.com]
Sent: Thursday, September 02, 2004 2:01 PM
To: Williams, John R - Wilmington, DE
Subject: EEO case: Janet Jeffries

Dear Mr. Williams,

After reviewing your affidavit, I have a few more questions. I need your information on this additional information today or tomorrow, if at all possible. or call me at 410-997-9221. If you prefer to e-mail, fine. If not than my fax is 410-997-9573.

Please provide any information on the following employees, including if they were under your supervision?, what is their race what year these situations may have occurred, what was the nature of any problems that existed, and what was done. Does document exist to support an investigation made.
Again:
Complainant's issued is alleged discrimination because of her race when she was assaulted and management failed to take action.

Felicia Camper
Bo Diggers
Mile Potaiak
Bill Skibici
Eugenia Ross
Richard Wilson
Owen Wallace
Michele McGuire

I can be reached at 410-997-9221.

Meryl Smith-Green
EEO Investigator

Affidavit C
Page 9 of 11

A-54

00152

 

Page 1 of 2

## Meryl Smith-Green

| | |
|---|---|
| From: | "Williams, John R - Wilmington, DE" <john.r.williams1@usps.gov> |
| To: | "Meryl Smith-Green" <msmithgreen@msn.com> |
| Sent: | Saturday, September 04, 2004 9:33 PM |
| Subject: | RE: EEO case: Janet Jeffries |

Ms Smith-Green,

Here's my response on the employees mentioned below:

**Felicia Camper** (African American Female): The only incident I'm aware of is there were two African American female PTF's working in the same operation with her one day, and during the night the supervisor had a discussion with F. Camper for being out of her operation. F. Camper assumed the two PTF's told the supervisor that she was out of the operation, so she confronted them about the issue. The two PTF's didn't appreciate the way F. Camper talked to them. Both PTF's denied saying anything to the supervisor about her, so F. Camper apologized to the PTF's and nothing else was done with this issue. There's nothing else I'm aware of that's similar to J. Jeffries case with this employee.

**Bo Driggers** (White Male): B. Drigger was a witness to an incident that happen between **Mike Podolak** (White Male) and **William Landis** (White Male). M. Podolak was a supervisor and W. Landis a mail handler. An incident occurred where M. Podolak put his hands on W. Landis to prevent him from leaving an area. B. Driggers observed the incident. M. Podolak was reduced to a PTF clerk for inappropriate conduct.

**Bill Skibici** (White Male): This employee was accused of making inappropriate racial comments to an African American female employee. During the investigation and prior to any discipline being issued, B. Skibici resigned from the postal service.

**Eugenia Ross** (American African Female): E. Ross was accused by another African American female of using inappropriate language toward her. E. Ross stated she was talking to another African American male employee, and was not talking about the female. It couldn't be determined if E. Ross was talking to the female or not, but we did have an official discussion with E. Ross reference how she talk to other employees and entering other operations on the work room floor where she shouldn't be.

**Richard Wilson** (White Male): R. Wilson was given discipline for violating the zero tolerance policy in the work place. R. Wilson told supervisor **Owen Wallace** (African American Male) that he was a sinner, and he was going to bury O. Wallace. During the investigation R. Wilson said he didn't mean anything by that, and stated O. Wallace took it the wrong way, and he could take it any way he wanted to. O. Wallace felt threaten by the comments. R. Wilson was given a 7 day suspension for this behavior.

**Michele McGurie** (White Female): I wasn't involved with this incident at all. Apparently she was involve with a drug issue off of postal premise. The employee was removed from the postal service by Plant manager Joe Weldon (White Male), but through arbitration she got her job back and received all of her back pay.

We had an incident with **Chris Hammond** (African American Male) who failed to follow the instructions of an African American Female supervisor, and displayed behavior unbecoming of a postal employee. Tour three Manager (African American Male) put employee in for a removal, but he got his job back through arbitration. C. Hammond was later removed from the postal service for attendance issues.

Employee **Tanya Rider** (African American Female) and **William Garrett** (African American Male) was involved in a physical altercation. Both employees was put in for removal from the postal service. Tanya Rider lost her job, but William Garrett got his job back. It was determined by the arbitrator that T. Rider instigated the incident and W. Garrett was only protecting himself.

Employee **Ron Pochvitilla** (White male) and **Carlton Reed** (White Male) w    Affidavit 𝐶
altercation. Both employees received a seven day suspension for their inap    Page 10 of 11



A-55

00153




rage 2 of 2

2, union got R. Pochvitilla's suspension reduced to removal from his records if he had no similar incidents in the next six months, but left C. Reed's in place for two years. R. Pochvitilla is a paying union member and C. Reed isn't. R. Povchvitilla has been involved in verbal issues before, therefore management wanted it to remain in his record for two years, but union got it reduced to six months. I instructed labor to remove C. Reed's discipline in three months if he had no similar incidents, because this is the first incident we've had with C. Reed.

I'm not sure of what you're looking for, but I can assure you that I treat every employee with dignity and respect. I'm very fair with all of our employees and do the best I can in all investigations and make my determination based on the evidence provided. Our goal here is to have a violence free work place for everyone.

Thanks,

John W.

-----Original Message-----
From: Meryl Smith-Green [mailto:msmithgreen@msn.com]
Sent: Thursday, September 02, 2004 2:01 PM
To: Williams, John R - Wilmington, DE
Subject: EEO case: Janet Jeffries

Dear Mr. Williams,

After reviewing your affidavit, I have a few more questions. I need your information on this additional information today or tomorrow, if at all possible. or call me at 410-997-9221. If you prefer to e-mail, fine. If not than my fax is 410-997-9573.

Please provide any information on the following employees, including if they were under your supervision?, what is their race what year these situations may have occurred, what was the nature of any problems that existed, and what was done. Does document exist to support an investigation made.
Again:
**Complainant's issued is alleged discrimination because of her race when she was assaulted and management failed to take action.**

**Felicia Camper**
**Bo Diggers**
**Mile Potalak**
**Bill Skibici**
**Eugenia Ross**
**Richard Wilson**
**Owen Wallace**
**Michele McGuire**

I can be reached at 410-997-9221.

Meryl Smith-Green
EEO Investigator

Affidavit $\subseteq$
Page $\lfloor$ of $\lfloor$ $\rfloor$



A-56

00154

 

11/27/03

I Angelo Lambert do hereby make the following statement. On November 11th 2003 I
was the MDO for tour three, while making my rounds of the building I was passing by
the flat sorter area when I was approached by employee Janet Jeffries she told me that she
was having a problem with another employee Delores Thomas. I asked employee Jeffries
if her supervisor was aware of the situation and she told me that she didn't know
I was continuing down toward the MDO office I had cut through the lunch room and
while I was in the lunch room employee Thomas came up to me and also said that she
had a problem with employee Jeffries. I told employee Thomas that I was going down to
the MDO office and going to call their supervisor Ann Thomas and have them to report
to me so I could get to the bottom of the problem. When the two employees arrived at the
MDO office I had the both come in and to sit down. I first started off by telling these
employees that everyone is entitled to work in a hostile free environment and free of
violence. I then went on to say that there were times when two employees have had
differences and after sitting down with a neutral party, myself they were able to put these
things behind them and move on. I gave both employees a chance to speak and tell their
accounts as to what took place. After allowing both individuals to speak. I then asked if
everything was said and done. While attempting to work through the differences that
were at hand employee Thomas became loud and I had to settle her down this in turn
aggravated employee Jeffries. I then seen at this point that this process was not going
anywhere so I asked each employee if they felt threatened in any way employee Thomas
reply was no and as far as she was concerned it was all over. Employee Jeffries stated
that she did feel threatened at that point I then stated that based on the fact that one of the
employees had felt threatened I would be required to take specific measures to ensure
safety for all employees. I then told both employees that I was going to end their tours.
They had already worked pass the hours that we were going to work the PTF's on this
day. I then told employee Thomas to leave and that I would get with her the next day as
she was scheduled to work to get a statement from her. I then told employee Jeffries that I
wanted her to write a statement for me because she was scheduled off the next two days. I
also informed both employees that I was now going to turn this information over to my
lead MDO John Williams and that we would be getting back with them after we review
all of the data.

Angelo Lambert
Respectfully

Exhibit 2
Page 1 of 1

A-57

00156

(1)

ON VETERANS DAY I WAS WORKING ON THE FLATSORTER WITH KAREN BRYANT, FRANK ____ LYNETTE MARROW & DELORES THOMAS. AT THE END OF THE NIGHT WE WERE TYING OUT. I TOLD DELORES I HAD STARTED THE CONVEYO BELT & WE CAN START PULLING THE ZONES. SHE SAID WITH A TONE "OK JANET!" SHE SAID JUST PULL THEM I TOLD HER WE CAN THROW THEM OFF SOONER INSTEAD OF LETTING THEM ROLL ALL THE WAY DOWN TO THE END. (WE'D HAVE TO WALK THEM BACK TO THE HAMPER SHE SAID SHE'D DO IT HER WAY. I SAID OK. I PULLED ALL THE TUBS. FRANK CAME OVER TO HELP THROW OFF THE TUBS & ASKED WHY THE ZONES WERE AT THE END OF THE ROLLERS. THEY SHOULD HAVE BEEN THROWN OFF 1ST. SHE SAID SOMETHING TO HIM & I ANSWERED & SAID DELORES WANTED IT DONE THAT WAY. SHE SCREAMED "I WAS TALKING TO FRANK NOT YOU. I TOLD HER I DID NOT NEED HER PERMISSION TO SPEAK. SHE TOLD ME NOT TO SPEAK TO HER LIKE SHE WAS ONE OF MY FUCKING KIDS. I SAID "WHAT DID YOU CALL MY KIDS! SHE WOULD NOT REPEAT; & SAID SHE DOESNOT NEED ANY ONE TO TELL HER HOW TO DO HER FUCKING JOB. & RAN INTO ME WITH THE TUB SHE WAS HOLDING. I TRIED TO DIFFUSE THE SITUATION WHICH                    I HAVE by ASKING HER "WHAT IS WR

Exhibit 3
Page 1 of 3

. YOU

A-58

(2)

SCREAMING she WOULD NOT RELENT. FRANK STOOD
BETWEEN US. She CONTINUED SCREAMING. Bobby
FORD WAS THE MAILHANDLER STANDING NEARBY.
KAREN B. & LYNETTE CAME OVER & TRIED TO
TELL HER to stop Yelling & ASKED HER WHAT THE
LYNETTE PUT HER HAND ON HER SHOULDER SHE PUSHED & I TOLD HER TO T
PROBLEM WAS . She CONTINUED SCREAMING I DON'T
NEED HER to Tell me my FUCKING JOB . She SAID
"I GOT THIS." we LEFT & WENT to THE LOCKER
ROOM for LUNCH BREAK. 9PM. She CAME IN
5 MINUTES LATER calling me A big BABY Because
I TOLD ANGELO LAMBERT ABOUT THE CONFRONTATION.
I SAID "YOU CAN call me whatever you like JUST
DON'T TALK ABOUT MY KIDS IN A demeaning MANNER
She THREW MORE F'S MY WAY I SAID F-U back
She TOLD me I HAD my head STUCK UP THE SUPERVISO
ASS I TOLD her She did too. She TOLD me to
"SUCK HER ASS". I TOLD HER She WAS VULGAR
& to get her boy Friend to DO IT ! She SAID COME ON,'
ANN THOMAS CAME INTO THE LOCKER ROOM LATER &
ASKED me IF I WANTED to DO A STATEMENT & DID
I FEEL THREATED. I SAID YES & WENT TO SEE ANGELO.
HE ASKED me Again. I TOLD HIM I WOULD like him to
MEDIATE & I WOULD TRY Again to FIND OUT WHAT IS
HER problem. HE PAGED her ⬛ The YELLING "FROM her
began again" I ASKED HIM to stop hi Exhibit 3
Page 2 of 3
he ENDED THE MEETING. HE ⬛ ASKED HER to DO A

A-59

(3

STATEMENT - She refused & SAID "Do what you gotta Do". Then SAID she wanted to SPEAK to Him in PRIVATE. He told Her to come in Tomorrow, clock in & come see Him. She was MAD because He would NOT SPEAK to her immediatly. He ASKED me to do A STATEMENT I did UNDER MENTAl DuRESS & I omitted SEVERAl Things Therefore I am writing Now to The best of my KNowledge (AT Home) what took PLACE. Delores Thomas will NoT Come AT me herself but will have her FRIENDS Do I. some of ~~TERMS USED~~ TACTICS ARE WAlking Abruply in FRONT of me so ill Bump into Them AT which Tim They'll SAY I PusHed Them. I CAN EXPECT ATtituD & RETAliATion From her clicke & possibly CAR DAMAGE which I sustained in The PAST DUe to A ConFRONTATION with This SAME Clicke FAVORite SuPERVISOR in The AMT of $2000.00.

~~(signature)~~                                    11/12/03
                        221 50-597

                    2148 SEENEY TowN RD)

                Dover     Exhibit 3
                302 65    Page 3 of 3

            PAY Loc 310 AUTom. ClERK.

A-60

1

Nov. 11, 2003
When we first came to work at
1:30pm. I went to 127 and Janet
Jeffrey was on FSM. She then
came back to 127 area. and some-
one made statement she look like
she got a serious attitude. She
said nothing the entire time
until she started talking to
Mike Rockwell and then Karen
Baynard came back, Aris thomas (SOO)
Came and ask for volunters.
they volunter d don't whether
she was having a bad day or what
I sure wasn't (SOO) Aris thomas
ask for volunters to continue to
run (FSm) I volunter Frank Grisby,
Janet Jeffries, Karen Baynard, Lynette
morrow Everything was fine until
we started turing out machine
and then honestly I don't know
what set her off. She wanted to
know, what my problem was with
her.
Fmsm & 2
SOO Aris thomas
PTF-employees-

Tasha Palmer, Frank Grisby, *Darlene Co
Lynette morrow, *mike Rockwell, *Bobb
Karen Baynard, Dolores Thomas

Exhibit 4
Page 1 of 9

PTF left early.

A-61

00160

November 11, 2003                                    2.

About 8:50pm were tieing out FSM 1
I was the sweeper on zone side
(city) mailhandler Bobby Ford told
me I could not stack 3 rows high
on hampers. I ask him to get me
some more hampers and I let the
tubs continue down conveyer belt.
Janet Jeffries was feeder #2. She ask
why I let zones go down. I told her
I got this. Since I was sweeper. Frank
Truby was at bottom of conveyer. and
stated about zones coming down I told
them Bobby went to get hampers and I
would walk them back up. I got this
Janet Jeffries then yell something. I
told her quick talking to me like
that I am not your child. we both
exchanged heated words. Karen Baynard
Lynette Mellow came from the 199 side
Karen Baynard stated you have to pull
zones first, I again told them I got
this since I was the sweeper. heated
words were exchanged. all three karen,
Janet, Lynette then walk off. with
karen stating come on she got it. I
told them let me finishing tieing out
machine so I can get to lunch. Since
Karen, Janet, Lynette went to break 8-8:15pm.
and Frank + myself continue to run.
and took lunch later. In
meantime Janet Jeffries +

Exhibit 4
Page 2 of 4

A-62

3   Went to Angelo Lambert (moo) complaing
    I was talking about husband & kids.
    I then went unto locker room
    to wash hand. Karen & Janet was
    at table, Lynette was washing
    hands and stated Does just dropped
    it. I said as far as I was concern
    it was dropped. and then Janet Jeffris
    started with heated words & I then
    left when unto Cafeteria and (moo)
    Angelo Lambert. I told him he needed
    to talk with her she is continuing
    verbally, He then called (SOO)
    Ann thomas I told her what
    happen. Janet Jeffry was already
    in office and then ask me
    to come to office about 9:30pm.
    to try resolve I told him as
    far as I was concern it was. I told
① him that I was sweeping let
    City zones go down because mishandle.
    Bobby ford was getting equipment. ②
    I was talking to Frank Fruby
    and how Janet Jeffrey cut in
    exchanging words. which went both
    ways. ③ Janet Jeffry stated she
    didn't know I was waiting for
    equipment. She didn't hear that
    conversation. She was the feeder.
    and then stated she was only
    trying to helped. That was not
    the first time I worked FSM machine.
    and just because they       Exhibit 4    way
                                 Page 3 of 4

A-63

00162

nov. 14,20

someone else might do it 4
differently and long as it is
correct and comfortable for That
person, (moo) Angelo Lambert ask
if I felt threaten ed I told him
No, ask her. She stated, no then
he ask was our dropped Janet Jeffrey
stated Wed, Thurs, I stated Friday
she told me to end Tour 9:45p. I
inform him I going to speak to
Shop Steward. Janet Jeffrey end tour
at 10:00p. I spoke with Shop Steward
mozzett Stancell told her was transpire
we then talk to (moo) Angelo
Lambert. He stated to mozzett Stancell
that he would correct my time
and for me to report to him at
3:40pm on Wednesday. Janet Jeffrey   11·13·03
write her statement that day. Tuesday.
11-11·03. He informed us about 0 toluance
I told him I have no problem ing working
and ask far as I was concern. it was
dropped. Janet Jeffrey made a statement
she not Chiequita Conley. (SDO) that
I had fill TDD. I told Angelo Lambert (on
I still worked under her for 2½ years had
and now present today with no problem. I
don't have to speak to you to do my
job. processing the mail on machine.

Dolores Thomas

Exhibit 4
Page 4 of 4

A-64



11-26-03

S-T-A-T-E-M-E-N-T

I Bobby FORD heard Debris Thomas and Janet Jeffries. I don't know what cause the argument. Deloris Thomas was going off on Janet Jeffries. only thing Janet said was Deloris What's the problem. Deloris Kept cursing & yelling at Janet.                    END-of-Statement

Bobby Ford

Changed statement from 11-17-03

Exhibit 6
Page 1 of 1

A-65



·NOV. 11, 2003
WILM. DE. P&DC

To whom it may concern;

THIS NOTE IS IN RESPONSE TO MDO JOHN WILLIAMS REQUEST
TO PROVIDE MORE OF MY REMEMBERANCES REGARDING THE VETERANS
DAY INCIDENT ON THE FSM 100 INVOLVING MS. JEFFRIES AND MS. THOMAS,
AS REFERENCED IN MY PREVIOUS STATEMENT, I WAS A RELUCTANT WITNESS
TO THE INITIAL ENCOUNTER BETWEEN MS. JEFFRIES AND MS. THOMAS. IN
THAT STATEMENT I SAID WHAT HAD TRANSPIRED ON THE WORKFLOOR
BUT FORGOT TO MENTION WHAT SUBSEQUENTLY TOOK PLACE INSIDE
THE WOMAN'S LOCKER ROOM.

APPROXIMATELY AROUND 9:20 P.M. MS. JEFFRIES, MS. KAREN
BAYARD AND MYSELF WERE RELAXING INSIDE OF THE LOCKER ROOM
ROOM WHEN SUDDENLY MS. THOMAS CAME THROUGH THE DOOR,
TAKING US ALL TOTALLY BY SURPRIZE. THEN SHE PROCEEDED TO
BERATE MS. JEFFRIES USING HUMILIATING AND PROFANE LANGUAGE THAT
BOTH SHOCKED AND AMAZED ME. I COULDN'T BELIEVE THE SCENE.
IT WAS STRANGE AND VERY SURREAL. OF COURSE MS. JEFFRIES
GAVE A BRIEF RESPONSE AND AS QUICKLY AS THE EPISODE BEGAN
IT WAS OVER. THIS IS MY TOTAL RECOLLECTION OF THE INCIDENT
AND I STAND BY ITS TRUEFULLNESS,

YOURS SINCERLY,
Lynette E. Marren
TOUR #3 MAIL PROCESSOR

Exhibit 7
Page 1 of 3

A-66

00169

TUES, NOV. 11, 2003

To whom it may concern;
RE: INCIDENT ON FLAT SORTER 100

I WAS MADE AWARE OF A DISAGREEMENT BETWEEN MS. DELORES THOMAS AND MS. JANET JEFFRIES AS FLAT SORTER 100 WAS TYING OUT THE NIGHT OF NOV. 11, 2003. MS. THOMAS AND MS. JEFFRIES WERE BICKERING ABOUT SOMETHING BUT I DIDN'T KNOW STARTED THE COMMOTION BETWEEN THEM, MYSELF AND OTHERS TRIED TO HELP SETTLE WHATEVER IT WAS THAT CAUSED THE SITUATION; BUT TO NO AVAILE

SPECIFICALLY WHAT THEY SAID TO EACH OTHER I DO NOT KNOW. TO ME IT JUST SEEMED LIKE ANOTHER EMOTIONAL MOMENT BETWEEN TWO WOMEN. IT WAS NOTHING UNUSUAL TO ME, IT HAPPENS ALL THE TIME AT THE DELAWARE P & DC.

Lynette E. Mareen
TOUR #3

Exhibit 7
Page 2 of 3

A-67

00170

 

| U.S. Postal Service | Page No. | No. Pages | Case No/Case Name |
|---|---|---|---|
| EEO Investigative Affidavit *(Witness)* | 1 | | Janet Jeffries 1C-081-0017-04 |

| 1. Affiant's Name (Last, First, MI) | | 2. Employing Postal Facility |
|---|---|---|
| MARROW, LYNETTE E. | | WILMINGTON, DE, P† DC |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip +4 | 6. Unit Assigned |
|---|---|---|---|
| AUTOMATION CLERK | 5 | 147 QUIGLEY BLVD, WILM. DE, 19899 | |

### Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a the Rehabilitation Act of 1973, as amended, 29 U.S.C § 794a; and Executive Order 11478, as amended  This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest  to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation, to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction, and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

### USPS Standards of Conduct

Postal Service regulations require all postal employees to cooperate in any postal investigation.
Failure to supply the requested information could result in disciplinary action. (ELM 666)

7. Statement (Continue on Form 2569 if additional space is required)

1. Please state your name, race, position, postal facility ,telephone number, and your relationship with Complainant.
2. Who took your statement after the incident of November 11, 2003?
3. Do you have any knowledge an investigation or what occurred after the incident?
4. Do you have anything to add ?

(1.) MY NAME IS LYNETTE E. MARROW. I AM AN AFRICAN-AMERICAN MAIL PROCESSOR AT THE WILMINGTON, DE, POSTAL FACILITY. MY TELEPHONE NUMBER IS 856 764-0660 AND THE COMPLAINANT IS MY CO-WORKER.

(2.) MANAGER OF DISTRIBUTION OPERATIONS JOHN WILLIAMS, TOUR #3.

(3.) I WAS NOT TOLD AN INVESTIGATION WAS IN EFFECT.

(4.) NO.

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| Lynette E. Marrow | 08-16-2004 |

PS Form 2568-B, March 2001.

Exhibit 7
Page 2 of 3

A-68

# Plaintiff's Appendix

# Part 3

| U.S. Postal Service | | Page No. | No. Pages | Case No/Case Name |
| EEO Investigative Affidavit *(Witness)* | | 1 | 2 | IC-081-0017-04 |

| 1. Affiant's Name (Last, First, MI) | 2. Employing Postal Facility |
| Jeffries  James  L. | Delaware  P + D C. |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip +4 | 6. Unit Assigned |
| Spouse- | | 2148 Seeney Town Rd Dover DE 19904 | |

**Privacy Act Notice**

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

7. Statement *(Continue on Form 2569 if additional space is required)*

See attached letter

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
| James L. Jeffries | 08-15-2004 |

PS Form 2568-B, March 2001

Exhibit 11
Page 1 of 4

A-69

August 8, 2004

*1C-081-0017-04*

Meryl Smith-Green
USPS Contract Investigator
4955 Columbia Road Suite F
Columbia, Maryland 21044-1660

Dear Ms. Green;

Since the original incident we have seen the toll on my wife Janet's, and from my children's view, their mother's health. We have shared in her pain, anger and frustration for the past eight months and our family life has also suffered. We put our vacation plans aside to assist her in this EEO process, both hoping and praying that it might bring justice and closure.

We know she is going to work with people who mean her harm up to and including management. This is a fact and it is quite unsettling. This gives us at home a feeling of helplessness and frustration.

As Janet's family, we hope the EEO process brings resolution and closure to this injustice so that she and others can have reasonable and equitable treatment at the United States Postal Service.

Thank you for your help.

Sincerely,

James L. Jeffries
Jacqueline Jeffries
Jonathan Jeffries

*Jonatha Jeffries*

Exhibit 11
Page 2 of 4

A-70

00176



| U.S. Postal Service | Page No. | No. Pages | Case No/Case Name |
|---|---|---|---|
| EEO Investigative Affidavit (*Witness*) | 1 | 5 | Janet Jeffries 1C-081-0017-04 |

| 1. Affiant's Name (Last, First, MI) | | 2. Employing Postal Facility | |
|---|---|---|---|
| BAYARD KAREN A | | DELAWARE P↓ DC | |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip #4 | 6. Unit Assigned |
|---|---|---|---|
| CLERK | 5 | 147 QUIGLEY BLVD WILMINGTON, DE 19850 | T-3 pay location 31 |

**Privacy Act Notice**

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794a; and Executive Order *1478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, contracts, licenses, grants or other security or suitability investigations, contracts, licenses, grants or other

benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision the information requested is voluntary for the complainant and for Postal Service employees and other witnesses.

**SPS Standards of Conduct**

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 566)

7. Statement (*Continue on Form 2569 if additional space is required*)

1. Please state your name, race, position, postal facility, telephone number, and your relationship with Complainant.
2. Who took your statement after the incident of November 11, 2003?
3. Do you have any knowledge an investigation or what occurred after the incident?
4. Do you have anything to add?

1- KAREN A BAYARD , BLACK (JAMAICAN) DELAWARE P↓ DC 147 QUIGLEY BLVD WILMINGTON, DE 19850 (302) 323-2215 or (302) 323-2281 MRS JEFFRIES IS MY CO-WORKER

2- I ATTEMPTED TO GIVE ANGELO LAMBERT MY STATEMENT THE DAY THE INCIDENT HAPPENED. EVENTUALLY JOHN WILLIAMS CALLED ME IN SOME DAYS LATER TO GIVE A WRITTEN STATEMENT. I ALSO GAVE HIM THE STATEMENT I WROTE ON THE 11TH OF NOVEMBER WHEN MDU LAMBERT TOLD ME HE DIDN'T NEED MY STATEMENT AND THAT HE'D GET ME KNOW WHEN OR IF HE NEEDED MY STATEMENT.

3- NO I WAS ASKED TO GIVE A WRITTEN STATEMENT NO ONE QUESTIONED ME ABOUT THE INCIDENT

4- I KNOW SEVERAL BLACK EMPLOYEES HAVE MADE FALSE REPORTS (COMPLAINTS) ABOUT MRS JEFFRIES SINCE SHE FILED HER EEO.

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| *Karen A Bayard* | 8/16/04 |

PS Form 2568-B, March 2001

Exhibit 5 Page 1 of 6

I STILL DON'T UNDERSTAND WHY DE[...] REMOVED FROM THE FACILITY AFTER JANET [...] ANN THOMAS SHE FELT THREATENED. EL[...] WAS BLACK AMERICAN EXCEPT JANET WHO WAS THE VICTIM. THEY ONLY SEEM TO APPLY THE RULES WHEN MANAGEMENT SEES FIT. THIS WAS A BLATANT VIOLATION OF THE NO VIOLENCE ON THE WORKROOM FLOOR RULE.

00164

TUESDAY 11/11/03

WE HAD JUST BEGUN TIEING OUT THE 100. LANETT & I WERE ON THE NEAR SIDE WHEN I HEARD DELORIS YELLING & CURSIN AT JANET. FRANK WAS STANDING BETWEEN THEM & TRYING TO GET THE SITUATION TO TONE DOWN. I WALKED OVER TO HEIR SIDE ALONG WITH LANETT. I ASKED WHAT THE HEY WAS GOING ON HERE? THEN JANET TRIED TO EXPLAIN ABOU THE TUBS BUT. DELORIS THEN GRABBED TWO TUBS AND PUSHED HER WAY PAST JANET. JANET THEN SAID SHE TOLD DELORIS TO PULL THE ZONES FIRST. AT THAT DELORIS WENT OFF AGAIN. I TOLD HER NOT TO YELL AT ME AS I WAS NO. YELLING AT HER. I ATTEMPTED TO TELL HER THAT JANET IS JUST TRYING TO HELP HER OUT. SHE YELLED I DON'T NEE HER DAM HELP. LANETT TOLD DELORIS TO CALM DOWN & PLACED HER HAND ON DELORIS' SHOULDER. DELORIS FUUN HER HAND DOWN AND PUSHED HER WAY PAST LANETT. I TOLD DELORIS THE REASON WE PULL THE ZONES FIRST S SO THEY DON'T GO DOWN THE ROLLER AND THAT WA WHAT JANET WAS TRYING TO EXPLAIN. SHE AGAIN EXPLOD AND SAID SHE DIDN'T NEED JANET TO FUCKING TRAIN HER AND THAT SHE COULD THROW OFF THE DAM TU HERSELF SHE SAID I GOT THIS. SO SINCE NOBODY TO CALM HER DOWN & WE HAD COMPLETED OUR TASK I SAID THEN GET IT LETS GO AND JANET, LANETT & I LEFT. WE THEN TOLD THE HDO WHAT HAD TRANSPIRE AND WENT TO THE LOCKERROOM FOR LUNCH. SHORTLY THEREAFTER DELORIS HUFFED INTO THE AGAI BEGAN CREATING A SCENE. SHE SAID WE'RE NOT UNISED ... EAIT RUNNING TO ANGELIC

Exhibit S.
Page 2 of 6

A-72

(HDO) LIKE BABIES. I TOLD HER IN A CALM VOICE THAT WE JUST WANTED HIM TO KNOW WHAT HAPPENED. SHE LOOKED AT JANET AND SAID I'M NOT ONE OF YOUR FUCKING KIDS. JANET ASKED HER NOT TO BRING HER CHILDREN INTO THIS, AND STATED THAT IT WAS BETWEEN DELORIS AND HER. DELORIS THEN SAID JANET YOU CAN KISS MY ASS. JANET REMAINED SEATED AS DELORIS CONTINUED TO YELL AT HER AND TOLD HER TO SUCK IT. JANET LOOKED AT HER & TOLD HER NEVER IN A MILLION YEARS & THAT SHE SHOULD GET HER MAN TO DO THAT. THEN DELORIS SAID AT LEAST TO GOT ONE. JANET AT THAT TIME SAID WHATEVER I'M MARRIED I ASKED DELORIS TO STOP YELLING. SHE MADE ANOTHER INSULT ABOUT JANETS CHILDREN AND SAID SOMETHING TO AFFECT THAT SHE COULD KICK JANETS ASS OR BREAK HER UP (SOMETHING IN THAT VEIN OF THOUGT). DELORIS THEN SAID FUCKING BITCH AND STORMED OUT THE LOCKERROOM & SAID YOU FUCKING BABY.

KAREN BABARD
T-3
CLERK          11/15/03

Exhibit 5
Page 3 of 6

A-73

12/28/03

To whom it may concern:

On October 11, 2003 my fellow co-worker Janet
Jefferies was verbally attacked by another co-worker
(Deloris Thomas) Mrs. Thomas used vulgar language and
then pushed into Mrs. Jefferies with a tub of plate.
This happened on the workfloor by the FSM 100. After
the incident Mrs. Jefferies and I approached the MDO
on duty Angelic Robert and informed him of what
rangpired. We then went on break in the locker room.
Deloris burst into the lockerroom and continued
her verbal attack, taunted Janet and tried to entice
her to fight. Janet endured her family being
slandered and did not move from her seat.
Eventually Deloris left. Janet was extremely upset.
Shortly afterward SPO Ann Thomas who was assigned
the FSM 100 came into the lockerroom and asked
Ms. Jefferies if she was okay. She then said that Angelie
wanted to know if Janet felt threatened by Deloris. Janet
said yes I do feel threatened she followed me in
here. Ann then left and _no_ further actions were taken

Karen Bayard
T-3 clerk
Delaware Pᵉ DC

Exhibit D
Page 4 of 6

A-74

00167

CASE: 7C-08I-0017-04

Janet Harris
Exhibit 17

1/3/04

On Nov 11, 2003 I was working on the FSM 100. Lanette and I were on the inside and Janet, Frank and Deloris were on the outside. I heard Deloris yelling and cursing at Janet so I ran over to the other side. I yelled out what the hey is going on over here?! Frank was standing in between Janet and Deloris trying to keep them apart. Janet tried to explain to me that she was trying to explain to Deloris how to throw off the tubs. Before she could finish Deloris yelled at her I don't need you to explain a damn thing to me I'm not one of your f....ing kids. I'm f....ing grown.' I asked Deloris to calm down and stop cursing when she's speaking to me. She said she had it and pushed into Janet with a full tub. I said hey she get it let's go. So Janet, Lanette and I walked off. Janet & I stopped Angelic and let him know what happened. Then Janet & I went into the lockeroom. Janet, Lanette & I were seated at the far table when Deloris huffed into the lockeroom. She started yelling and cursing at Janet again. She called Janet a f....ing baby and insulted her children and her husband. Deloris tried to entice Janet into a fight. She used extremely vulgar language and stormed out. Shortly afterward Ann Thomas came into the lockeroom. Janet was extremely upset. Ann asked Janet if she was okay and asked if she felt threatened by Deloris. Janet said yes, she followed me in here and started up again.

Karen Bayard
T-3 clerk        A-75        Delaware P & DC

TITLE PAGE

| | |
|---|---|
| Janet Jeffries ) <br> 2148 Seeneytown Road ) <br> Dover, Delaware 19904-1653 ) <br> ) <br> ) <br> **Complainant** ) <br> ) <br> ) <br> ) <br> **v.** ) <br> ) <br> John E. Potter, ) <br> Postmaster General ) <br> United States Postal Service ) <br> C/O Eastern Area Operations) <br> Warrendale, PA 15095-3000 ) <br> **Agency** ) | Agency Case No: 1C-081-0017-04 <br> Filed on February 18, 2004 |

Investigative Report

This investigative report was prepared by the undersigned investigator and submitted to the agency on this, 14th day of October 2004

Meryl Smith-Green
EEO Investigator
4955 Columbia Road Suite F
Columbia, Md. 21044-1660

NOTICE OF RESTRICTED USAGE

Access to, and usage of, this EEO complaint file is RESTRICTED by both the Freedom of Information Act and the privacy Act to: (1) the Complainant (and his or her representative) and (2) Government officials who must have access to the files to discharge their OFFICIAL duties. The file and its contents must be safeguarded. Willful violations of these requirements are subject to criminal penalties (5 U.S.C. 552a{1}).

Investigative Summary
Page 1 of 9

A-76

 

JANET JEFFRIES                AGENCY CASE # 1C-081-0017-04

## Index And Exhibits

| Document | Page # |
|---|---|
| Index of File | 2 |
| List of Affidavits | 2 |
| List of Exhibits | 3 |
| Investigative Summary | 4-9 |

## Affidavits

A.   Janet Jeffries          Automation Clerk PS- 05
     Complainant             Delaware Processing & Distribution Center
     Race, (Caucasian)       147 Quigley Blvd.
                             New Castle, Delaware 19850-9997

B.   Doris Perry            Clerk/Shop Steward PS-05
     Witness                Delaware Processing & Distribution Center
     Race, (White)          147 Quigley Blvd.
                            New Castle, Delaware 19850-9997

C.   John Williams          Manager Distributions Operations EAS-19
     Witness                Delaware Processing & Distribution Center
     Race, (African American)  P.O. Box 1000
                            Wilmington, De. 19850-9997

Investigative Summary
Page 2 of 9

A-77

00091

 

JANET JEFFRIES                    AGENCY CASE # 1C-081-0017-04

| Exhibits: | # of Pages |
|---|---|
| 1. PS Form 50 for Janet Jeffries dated 01/24/04 | 1 |
| 2. Statement of Manager Angelo Lambert dated 11/27/03 | 1 |
| 3. Statement of Janet Jeffries dated 11/12/03 | 3 |
| 4. Statement of Delores Thomas dated 11/11/03 | 4 |
| 5. Statements of Karen Bayard, witness dated 11/11/03, 11/15/03, 012/28/03, and 1/03/04 | 6 |
| 6. Statement of Bobby Ford, witness, dated 11/26/03 | 1 |
| 7. Statement of Lynnette Marron, witness, dated 11/11/03 | 3 |
| 8. Employee Labor Relations Manual Section 666.2., Behavior and Personal Habits | 1 |
| 9. October 28, 2003 Zero Tolerance Memorandum | 1 |
| 10. Publication 45, A Violence Free Workplace | 1 |
| 11. Compensatory damages affidavit dated 08/15/04 from Complainant's husband | 4 |
| 12. List provided by Complainant regarding compensatory damages | 1 |
| 13. Billing statement for Janet Jeffries from Kim Furtado, Naturopathic Physician dated 11/13/03 and 03/13/04 | 2 |
| 14. Recommendations for herbs and treatments for Janet Jeffries from Kim Furtado dated 03/13/04 | 1 |
| 15. Medical Prescription provided by Janet Jeffries dated 03/03/04 | 1 |
| 16. Receipts and Invoices provided by Janet Jeffries | 3 |

Investigative Summary
Page 3 of 9



00092

 

JANET JEFFRIES                          AGENCY CASE # 1C-081-0017-04

## INVESTIGATIVE SUMMARY

**Statement of Claims(s) and issues to be investigated:** The Complainant alleged discrimination based on color (Caucasian) when: on November 11, 1993, she was verbally assaulted by another employee and management failed to take any action.

Complainant requests that the Postal Service provide her with a permanent Tour II re-assignment, with a guarantee of eight hours of work, forty (45) days administrative leave, and one hundred and fifty thousand dollars.

**(1) Disparate Treatment Claim:** Management failed to take action when Complainant was verbally and physically assaulted

**Affidavit Testimony (Color, Caucasian):**

Complainant, Janet Jeffries, color (Caucasian) is an Automation Clerk at the Delaware Processing & Distribution Center (P& DC) in New Castle, Delaware. Complainant states that on November 11, 2003, she was verbally and physically assaulted by her coworker, Delores Thomas, race (Black).

Complainant stated Thomas made defamatory references to her family, used profanity on the workroom floor, and then followed her into the ladies locker room and challenged her to a fight. Ms. Jeffries said she told her supervisor, Anne Thomas that she felt threatened, and wanted to do a statement.

Complainant asserts that she reported the incident to Manager of District Operations Angelo Lambert, race (Black) and told him that she felt threatened. She said that she requested a meeting with Ms. Thomas, herself and MDO Lambert, which took place that night. The meeting had to be ended when Thomas began cursing again. Complainant testifies that another meeting was held on 11/26/03, at which time she was accompanied by her Union Representative Doris Perry, race (White), and attended by MDO Lambert, and MDO Williams. At that meeting Complainant said she asked Manager Williams what he would do if she acted like Delores Thomas, and Mr. Williams stated "I would fire you, Mrs. Jeffries".

Complainant testifies that after approximately three weeks, management conducted interviews. She stated she requested to be moved out of the area and to a different tour, but was denied. [Affidavit A]

A-79

Investigative Summary
Page 4 of 9

 

JANET JEFFRIES                              AGENCY CASE # 1C-081-0017-04

*Investigators Note: Doris Perry's response to an affidavit request was "see attached letter" August 09, 2004 statement.*

Doris Perry, Union Shop Steward, race (White), stated that on November 26, 2003, Complainant sought her help regarding an altercation between herself and [coworker] Delores Thomas. Ms. Perry testifies that she arranged for a meeting with John Williams, MDO, complainant, and herself. At this meeting, Ms. Perry related that Ms. Jeffries explained that she felt uncomfortable, and threatened by Ms. Thomas. Ms. Perry stated that at the meeting Mr. Williams "tried to explain what Ms. Thomas meant by the derogatory remarks ". Ms. Perry said that both employees were issued letters of warning, but Williams pulled [retracted] Ms. Jeffries [discipline] because she filed an EEO complainant against him". [Affidavit B]

John Williams, race (African American), MDO at the Delaware P& DC, in Wilmington, Delaware stated that he is the Manager of the tour that Complainant works. Mr. Williams said that Ms. Jeffries informed him of an incident that occurred between her and Ms. Thomas a few days after November 11, 2003. According to Mr. Williams, Complainant told him that Delores Thomas was verbally abusive towards her, used profanity, and hit her with a flat tub. Mr. Williams advised Complainant that he would investigate and get back to her.

Mr. Williams described the investigation that took place, which involved getting statements from witnesses mentioned by Ms. Jeffries and Ms. Thomas. Manager Williams testifies that he met with the Complainant, along with MDO Lambert, and union official D. Perry, and also met with D. Thomas, along with MDO Lambert, and Ms. Perry. Mr. Williams stated that the investigation was concluded on December 3, 2004. He said that after the investigation he met with Labor Representatives I. Morris and D. Kelley-Brown and that their recommendation was to give both employees a Letter of Warning for inappropriate behavior in the work place, however in the middle of December he received information that Ms. Jeffries had filed an EEO complaint, and he decided not to go through with issuing the letter of warnings, because it could appear to be issued as a result of the filing with EEO. He stated that he asked if he should go ahead with a letter of warning for Delores Thomas, but Labor told him it would be untimely, and therefore no corrective action was taken against either employee. Mr. Williams explained that the "zero policy was not followed as it should have because of the EEO that preceded and because the corrective action would be untimely".

Mr. Williams stated that based on his investigation, he could not determine that anyone observed Ms. Thomas hitting/striking Janet Jeffries with a flat tub, and that both employees used inappropriate language.

Manager Williams was asked whether he had disciplined other employees in similar situations, information about the incidents, and subsequent actions. Mr. Williams stated in response to these questions hat he does not recall any similar incidents where similar discipline was taken. [Affidavit C]

Investigative Summary
Page 5 of 9



A-80

 

**Record Evidence:**

PS Form 50 dated 01/24/04 establishes Janet Jeffries as a Flat Sorter Machine Operator at the Wilmington Processing and Distribution Center in Wilmington, Delaware. [Exhibit 1]

Angelo Lambert provided a statement for management investigation dated 11/ 27/03, which reads that on November 11, 2003 he was the MDO on duty. He stated that he was passing by the flat sorter area when he was approached by Ms. Jeffries who told him she was having a problem with another employee, Delores Thomas.

Manager Lambert wrote that employee Thomas came up to him, and told him she was having problems with Complainant Jeffries. Manager Lambert said in his statement that he brought both employees down to his office, and gave each a chance to tell their accounts as to what took place. He writes that while he was attempting to work out their differences, Ms. Thomas became loud, which aggravated Ms. Jeffries, and asked each employee whether they felt threatened; Ms. Thomas said no, Ms. Jeffries said yes, and he arranged for each to provide a signed statement. In his statement, Mr. Lambert said that he informed both employees that he was going to turn over [the information] to lead MDO John Williams. [Exhibit 2]

Janet Jeffries' provided a statement for managements investigation, dated 11/12/03, which states that she was working the Flat sorter [machine] when, Delores Thomas told her "not to talk to her like she was one of her fucking kids". Jeffries related that she asked "what did you call my kids?" and that Thomas did not respond but ran into her with the tub she was holding. Jeffries related that she tried to diffuse the situation by asking Thomas what was wrong. She said in her statement that that Karen B. and Lynette came over and tried to get [Ms. Thomas] to stop yelling, but she continued screaming.

Ms. Jeffries goes on to write that she then went to the Locker Room for her lunch break; Ms. Thomas came in, and called her a big baby, because she had told [MDO] Angelo Lambert about the confrontation. Complainant related that "she threw more F's my way, and I said F-U back". Complainant alleges that Thomas said to her that "she had her head stuck up the Supervisors ass and liked it too". According to Complainant, Thomas told her to "suck her ass", and she told Thomas to" get her boyfriend to do it", after which Thomas said, "come on". Complainant statement states that Ann [Supervisor] came in to the locker room, and asked if she felt threatened, and if she wanted to make a statement. Complainant indicated that she and Ms. Thomas met with Angelo Lambert, but that the "yelling began again" and that Lambert ended the meeting. [Exhibit 3]

JANET JEFFRIES                    AGENCY CASE # 1C-081-0017-04

On 11/11/03 Delores Thomas provided a statement as part of the management investigation. This document shows that Ms. Thomas wrote that that she doesn't know what "set her [Complainant] off when she asked me, what [my] problem was?" She stated that they both exchanged heated words. She went on to write that heated words continued, and Ann Thomas [Supervisor] was called in, and she told her what happened. Thomas wrote that Manager Angelo Lambert asked her if she felt threatened [by Complainant], and she told him no, she had no problem working and that as far as she was concerned it [the issue] was dropped. [Exhibit 4]

Karen Bayard [witness] wrote four statements for the investigation of the incident. On 11/15/03; she wrote that she heard Delores yelling and cursing at Janet, and that she observed Delores grab two tubs [of flats], and push her way past Janet. Ms. Bayard related in her statement that she and Lanett [coworker] went with Complainant to tell MDO Angelo Lambert what had happened.

In a second set of statements made on 12/28/04, Ms. Bayard reiterated that after reporting to MDO Lambert [she, Complainant, and Lanett] went to the locker room for lunch, and that Delores continued to "make a scene", telling Janet, "I'm not one of your fuckin kids". She relates in this statement that Janet asked [Delores] not to bring [my] children into this, and Delores said, "Janet, you can kiss my ass". Ms. Bayard wrote that the Complainant remained seated as Delores continued to yell at her, and told "her to suck it". She related that Janet retorted, "never in a million years, and she should get her man to do it". Ms. Bayard also wrote that Delores made another insult, and said "something to the effect that she could kick Janet's ass, or break her up (something in that vein of thought), stormed out of the locker room, saying fucking bitch, you fucking baby"
Ms. Bayard also wrote that that on the day of the incident, she went down to the MDO's office to give a written and verbal account of what transpired. She wrote that as a former 204B; she knew that witnesses were supposed to give statements so that an investigation could be conducted in a timely manner.
She explained that subsequent to writing her statement, she was told by Lambert that he didn't need a statement from her, but that three days later she was called in to the office to give a statement. In two statement dated 1/03/04, and 08/16/04 by Ms. Lambert reiterates what she had written previously. [Exhibit 5]

Bobby Ford [witness] provided a statement for management's investigation dated 11/26/03. He wrote that he heard Delores and Janet arguing and that Thomas was "going off on Jeffries". Ford wrote that the only thing he heard Janet say was "what's the problem?" and Delores kept cursing and yelling at Janet. [Exhibit 6]

Investigative Summary
Page 7 of 9



 

JANET JEFFRIES                          AGENCY CASE # 1C-081-0017-04

Lynette Marron [witness] provided a statement for management's investigation dated 11/11/03. Ms. Marron wrote that Ms. Thomas and Ms. Jeffries were bickering about something. She wrote that she and others tried to settle whatever it was that caused the situation, and it seemed like another emotional moment between two women, [which was] nothing unusual [as it] happens all the time. In an additional statement written by Lynette Marron on 11/11/03. She added that she observed "Thomas berate Ms. Jeffries inside the locker room, using humiliating and profane language that "shocked and amazed her". [Exhibit 7]

### Applicable Policies:

Employee Labor Relations Manual Section 661.2 outlines the behavior and personal habits of all employees. This section states, in part, "employees are expected to conduct themselves during and outside working hours in a manner which reflects favorably upon the Postal Service". It also states: "Employees are expected to maintain satisfactory personal habits so as not to be obnoxious or offensive to other persons or create unpleasant working conditions." [Exhibit 8]

October 28, 2003 Memorandum For: All Employees states that: There will be zero tolerance for acts or threats of violence in our workplace. The memorandum goes on to say "Each and every act or threat of violence from this day forward will elicit an immediate and firm response that could, depending on the severity of the incident, include removal from the Postal Service". [Exhibit 9]

Publication 45 addresses A Violence Free Workplace, and advises employees to "report all threats to management officials". It advises, "Your supervisor or manager should conduct a prompt, thorough inquiry of your concern, keep you informed, and take appropriate action to resolve the situation". [Exhibit 10]

### Compensatory damages

### Affidavit Testimony

Complainant provided Form 2569-C, EEO Investigative Affidavit for Compensatory Damages. She stated that she has experienced financial difficulties because of the alleged discrimination, including counselor fees, physical and psychological therapy, counselor visit travel expenses, and medications, as well as costs associated with the filing of the complaint.
She stated that she has used annual, sick leave, and extra non-scheduled (non-paid) days off.

Investigative Summary
Page 8 of 9

A-83



JANET JEFFRIES                    AGENCY CASE # 1C-081-0017-04

Complainant states that she has experienced associated symptoms of stress and anxiety, including headaches, muscle pain, chest pain, jaw clenching, and sleeplessness, nervousness, frustration and anger, embarrassment and vulnerability. According to Complainant her symptoms are intermittent, and occur at various levels of intensity. Complainant said that she has been taking medication to relieve jaw pain.

Complainant's husband, daughter, and son provided a statement, which said that they have seen a toll on Ms. Jeffries health, and stated that, "We have shared in her anger, frustration and pain, and our family life has suffered [Exhibit 11]

Record Evidence (Compensatory Damages):

Complainant provided a list of dates and costs of visits to Kim Furtado, N.D, and a Naturopathic Physician. [Exhibit 12]

Billing statements from Kim Furtado, N.D, dated 11/13/03 in the amount of $175.00, and 03/13/04 in the amount of $123.00. Statements show that both bills were paid. [Exhibit 13]

Kim Furtado, N.D provided a list of recommendations to complainant regarding her health. These recommendations included herbal remedies, guided imagery for relaxation, and Tai Chi classes. [Exhibit 14]

Pharmacy prescription for Janet Jeffries dated 03/03/04 [Exhibit 15]

Receipts and Invoices provided by Janet Jeffries dated 03/15/03 and 03/10/03, for "de-stress" aids [Exhibit 16]

Investigative Summary
Page 9 of 9

A-84

00098

(CERT# 7002 '0 ___ 2982 2669)

| U. S. Postal Service | | Page No. | Pages | Case No. |
|---|---|---|---|---|
| EEO INVESTIGATIVE AFFIDAVIT (COMPLAINANT) | | 1 | 3 | IC-081-0017-04 |

| 1. Affiant's Name (First, Middle, Last) | | 2. Employing Postal Facility |
|---|---|---|
| JANET F. JEFFRIES | | DELAWARE P&DC. |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip +4 | 6. Unit Assigned |
|---|---|---|---|
| CLERK | 5 | 147 QUIGLEY BLVD NEW CASTLE DE 19720-4103 | AUTOMATION |

## Privacy Act Notice/USPS Standards of Conduct

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## Important Information Regarding Your Complaint

This PS Form 2568-A, EEO Investigative Affidavit (Complainant), and the other form mentioned below, are being provided for you to use to fully respond to the accompanying questions. Mail or deliver your completed statement to the EEO complaints investigator within 15 calendar days of the date you received the forms. Use PS Form(s) 2569, EEO Investigative Affidavit (Continuation Sheet), as needed, to complete your written statement. Remember to number the top of each page and sign and date the bottom of each page of your statement. If you return your statement by mail, the return envelope must be postmarked on or before the 15th calendar day after the date that you received the affidavit forms.

Failure to complete your statement and return the forms within the allotted time period could result in your complaint being dismissed based upon your failure to proceed. EEOC complaints processing regulation, 29 C.F.R. 1614.107(a)(7), states, in part, [A complaint may be dismissed] "Where the agency has provided the complainant with the written request to provide relevant information or otherwise proceed with the complaint, and the complainant has failed to respond to the request within 15 days of its receipt, or the complainant's response does not address the agency's request, provided that the request included a notice of the proposed dismissal."

7. Statement A(Continue on Form 2569 if additional space is required)

1) JANET F. JEFFRIES
   AUTOMATION CLERK
   GRADE 5
   TOUR III
   FEMALE
   CAUCASIAN
   2148 SEENEYTOWN RD
   DOVER DE 19904-1653
   EMPLOYED 10 YEARS

2)3)   SEE ATTACHED: SUMMARY; DESCRIPTION OF
   INCIDENT AND ANSWERS TO QUESTIONS

I declare under penalty of perjury that the foregoing is true and correct

| Affiant's Signature | Date |
|---|---|
|  | 8/8/04 |

PS Form 2568-A, March 2001

Affidavit A
Page 1 of 10

A-85




EEO INVESTIGATIVE AFFIDAVIT (complainant) pg. 2  Case No. 1C-081-0017-04

Janet F. Jeffries        Attached Summary: Description of Incident

2)3) On 11/11/03 I was verbally assaulted by clerk Delores Thomas (by use of profanity and defamatory references of my family) and physically assaulted (by pushing into me with a tub of flats) on the workroom floor and subsequently followed by her into the ladies locker room. She challenged me to fight and continued the verbal assaults. I immediately reported this incident to MDO Angelo Lambert.

- At my request a meeting with Angelo Lambert and Delores Thomas was conducted that night. She insisted on a private meeting with him and he agreed to a private meeting with her the next day. There was preferential treatment towards Delores Thomas and his consent was improper. Delores Thomas began cursing again. The meeting had to be ended.
- I told Anne Thomas, my immediate supervisor, in the locker room (11/11/03) that I felt threatened and wanted to do a statement.
- I told MDO Angelo Lambert (11/11/03) that I felt threatened.
- I told MDO John Williams (11/14/03) I felt threatened by Delores Thomas and her allies' retaliation.
- The Zero Tolerance Policy was ignored by management.
- MDO John Williams, in a meeting with myself, union rep. Doris Perry, and mail handlers Ed Thomas, and Bobby Ford (11/26/03), defended Delores Thomas by his statement explaining what she meant by her remarks about my family and admitted that he knew she said them. Already he had a biased opinion of the incident.
- In this same meeting I voiced my opinion on management's handling of this incident, I referred to me hypothetically acting like Delores Thomas. John Williams threatened me with this remark, "**I would fire you Mrs. Jeffries**".

  * n.b. Delores Thomas was immune to punishment John Williams deemed suitable for me under the same circumstances. I am held to the Zero Tolerance Policy set forth by the USPS, my black co-worker, Delores Thomas, is not.
- Approximately three weeks transpired before any interviews were done. Karen Bayard (clerk) volunteered a statement, but was denied by Angelo Lambert. Frank Frisbee (clerk) was assured he did not have to do a statement if he did not want to get involved (USPS ELM 666.6 states that, "Employees will cooperate in any postal investigation"), yet MDO Angelo Lambert encouraged the opposite. Frank Frisbee was an eye witness (Frank Frisbee tour 1, MDO Bob Weidman 302-323-3754).
- **Please note all management as well as employees involved in this work operation on the night of 11/11/03 are African American.**
- I requested to be moved out of the area to Tour 2 which John Williams denied.
- I requested to Sherry Wiggins (Flat-sorter Supervisor) to work in her area. My request was ignored. From 11/11/03 until present I remain in a hostile and stressful work environment.

It is the lack of corrective action based on racism that has prompted me to seek an EEO resolution.

Affidavit A
Page 2 of 10

8/9/04

A-86

00131

 

EEO INVESTIGATIVE AFFIDAVIT (complainant) pg. 3  Case No. 1C-081-0017-04
Janet F. Jeffries        Affidavit Answers

4) I reported the incident on 11/11/03 to MDO Angelo Lambert and supervisor Anne Thomas and wrote two statements 11/11/03 and 11/12/03 given to MDO Angelo Lambert.

5) Yes.        Lynette Marrow (clerk)- supervisor Chiquita Conkey 302-323-3775
        Karen Bayard    (clerk)- supervisor Chiquita Conkey 302-323-3775
        Bobby Ford (mail handler) - supervisor Sherri Wiggins 302-323-2296
        The witnesses above heard the screaming and yelling of profanity by
Delores Thomas.  Karen Bayard witnessed the physical assault.

6) No.

7) The night of this incident I was working in the flat sorter area.  Anne Thomas was the supervisor 302-323-2257.  She was not at her desk and did not hear the incident of 11/11/03 as it was taking place.

8)        MDO Angelo Lambert 603-427-6202
        MDO John Williams 302-323-3754, or 302-323-2254
        Chiquita Conkey 302-323-3775

9) Supervisor/Manager mentioned in #8, Chiquita Conkey approximately two years, Angelo Lambert and John Williams approximately six years.

7) *Of the employees who work in your duty station doing the same job as you?  How many are African American?  How many are Caucasian?*
Answer:  On the night of the incident at the flat sorter area, all employees are African American.  In general, DBCS area, approximately 10 out of 16 employees are African American.

10)        MDO Angelo Lambert 603-427-6202.
        MDO John Williams 302-323-3754 or 302-323-2254
        Supervisor Anne Thomas 302-323-2257
        MDO Ruby Gardner 302-323-3754 or 302-323-2254

*DORIS PERRY*
*(302 - 983 - 9990)*
*cell     )*

11) The family of Janet Jeffries letter attached.
        Edna Yoder reflexologist, (massage therapy) 302-734-9314
        222 Central Church Rd.
        Dover, DE  19904
    Kim Furtado N. D. 302-945-2107
        35252 Hudson Way Unit 2
        Rehoboth, DE  19971
    Kim Wayman, MSW, M.Ed, LCP, CEAP (EAP) 302-323-8109
        42 Reads Way
        New Castle, DE  19720

12)
• I respectfully request that you interview all my witnesses who gave written testimony, and contact for interview or affidavit all those mentioned in #11.
• I would like to submit copies of their statements along with a letter from Ms. Doris Perry.
• I am attaching a copy of the USPS Zero Tolerance Policy.

*" END of STATEMENT "*

*8/3/04*

Affidavit A
Page 3 of 10

A-87

00132



Meryl Smith Green
EEO Investigations
4955 Columbia Road
         Suite F
Columbia, MD 21044


Case Number 1C-081-0017-04
Enclosed/Sent by Certified Return Receipt Mail # 7002-1000-0005-7982-2069
P.S. Form Number 2571
P.S. Form Number 2568-A pages 1-3
Statements;    Myself (Janet Jeffries)
               Lynette Marrow
               Karen Bayard
               Bobby Ford
               Frank Frisbee
NO STATEMENT ENCLSD. Doris Perry  302-324-9743 (HME)    302-783-9990 (cell)
All available USPS policy on Zero Tolerance
APWU "Facing Workplace Violence"
P.S. Form 2569-C pages 1-4
Letter from immediate family of Janet Jeffries
List of doctor appointments/annual leave
Copy of bill receipts
Listed therapy
Description of guided imagery
Rx
Release forms


8/8/04

Affidavit A
Page 4 of 10

A-88



(*CERT# TC 12 XXX 0005 7982 2069*)

**U.S. Postal Service**
**Certification**

Case No.

*IC - 081 - 0017-04*

I have read the proceeding attached statement, consisting of _3_ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

**Privacy Act Notice**

Privacy Act Notice: The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for the Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service Regulations require all postal employees to cooperate in any postal investigation.

Failure to supply the requested information could result in disciplinary action. (ELM 666)

**Oath / Affirmation**

Subscribed and (sworn) (affirmed) before me on the _____ day of ___ *N A* ___, 20 ___

*PER: MERYl SmiTH GREEN*

_(Affiant, sign in the presence of an EEO Complaints Investigator.)_

Signature of EEO Complaints Investigator          Signature of Affiant

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct.

_(Affiant, sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)_

| Signature of Affiant | Date Signed |
|---|---|
|  | *8 / 8 /04* |

PS Form 2571, March 2001

Affidavit
Page _5_ of _10_

A-89

(CERT# 7002 1000 000   982 0009)

**UNITED STATES**
**POSTAL SERVICE®**

# EEO Investigative Affidavit for Compensatory Damages
*Note: Not applicable to Age Discrimination in Employment Act (ADEA) claims*

| Name | Case No. | Page No. | No. of pages |
|------|----------|----------|--------------|
| JANET F. JEFFRIES | 1C-081-0017-07 | 1 | 4 |

## Instructions for the Complainant

During an investigation into alleged discrimination, the Postal Service is required to gather evidence regarding appropriate remedies, which may include compensatory damages. The remedy that you are seeking to resolve this complaint includes your claim that you are entitled to receive a monetary award. Therefore, you must provide testimony and evidence concerning the nature, extent and severity of the harm you suffered due to the alleged discriminatory conduct. PS Form 2569-C contains a number of questions and/or statements regarding your claim for damages. Please read the questions or statements carefully before responding. If you need additional space, please use an additional sheet(s). Any additional sheet(s) must show the number of this form (Form 2569-C), the item number(s) to which it pertains, a page number and the total number of pages submitted for this form. *You must declare under penalty of perjury that the information you provide on this form including any attached sheets is true and correct.*

1. I experienced financial difficulties because of the discriminatory act(s) alleged in my complaint.

   ☒ Yes        ☐ No

   If yes, provide full explanation. Please include description and cause of difficulty (or difficulties) when occurred, duration of occurrence, and how severe.

   SEE ATTACHED
   FOR FULL EXPLANATION

2. I experienced personal medical problems because of the discriminatory act(s) alleged in my complaint.

   ☒ Yes        ☐ No

   If yes, provide full explanation. Please include description and cause of problems, when occurred, duration of occurrence, and severity.

   SEE ATTACHED
   FOR FULL EXPLANATION

3. I obtained psychological or psychiatric counseling because of the discriminatory act(s) alleged in my complaint.

   ☒ Yes        ☐ No

   If yes, provide full explanation. Include description of when, the cause, its extent and severity.

   SEE ATTACHED
   FOR FULL EXPLANATION

4. I have had to take medication because of the discriminatory act(s) alleged in my complaint.

   ☒ Yes        ☐ No

   If yes, list type of medication, reason for the medication, and the cost of the medication.

   SEE ATTACHED
   FOR FULL EXPLANATION

Affidavit A
Page 6 of 10

A-90

00135

| Name | Case No. | Page No. | No. of pages |
|------|----------|----------|--------------|
| JANET F. JEFFRIES | 1C - 081 - 0017 - 04 | 2 | 4 |

5. Did any of the difficulties for which you checked "Yes" in items 1-4 exist prior to the act(s) of discrimination alleged in your complaint?

☒ Yes       ☐ No

If yes, please complete question 6 below.

6. Describe for each pre-existing condition how that condition was made worse by the act(s) of discrimination alleged in your complaint. Begin each description with the item number of page 1 (items 1 through 4) to which it pertains.

7. Is there any other information or evidence regarding your claim for entitlement to compensatory damages that you want to include with this affidavit?

☒ Yes       ☐ No

If yes, please provide a full explanation of the information you wish to include. Attach additional pages if necessary.

SEE ATTACHED
FOR FULL EXPLANATION

---

### IMPORTANT!

You must attach or provide the investigator with copies of documentation, such as bills, doctor's statements, pharmacy bills, statements from other persons, or other paperwork relevant to the difficulty that you claim is related to the discriminatory act(s) alleged in your complaint. If you do not have copies of your documentation, you may provide the original to the investigator who will copy relevant records and return the original documents to you. Alternatively, for medical information and records, you may provide a signed authorization from your health care provider to the investigator permitting him/her to obtain information directly from your health care provider or pharmacy. Or, you may sign a medical information release provided by the investigator if you prefer.

### Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for the Postal Service employees and other witnesses.

---

I declare under penalty of perjury that the foregoing, including any attached sheets in two ~~~~ ~t.

Affiant's Signature

Affidavit A
Page 7 of 10

5/8/04

A-91




## Attachment to EEO Investigative Affidavit for Compensatory Damages

Full Explanation:

1. Since the discriminatory act occurred I have incurred certain medical expenses, (physical as well as psychological), which would have not otherwise occurred. These expenses will continue and will be necessary in the foreseeable future.

These medical:      Counselor fees
                       Physical and Psychological Therapy
                       Counselor visit travel expenses (New Castle, and Rehoboth DE)
                       Rx's

as well as the cost
relating to the filing
of this complaint:     Stationary
                       Postage
                       Certified fees
                       Return Request fee
                       Copying fees

and:                Annual leave used
                       Sick leave used
                       Extra non-scheduled (non-paid) days off

are some of the relating financial difficulties which are now a priority absorbed into my financial responsibilities and have no expected end, in the foreseeable future.

2. I am experiencing associated symptoms of stress and anxiety.

| | |
|---|---|
| Headaches | Emotional Distress: |
| Muscle Pain | sleeplessness, |
| Jaw Clenching | nervousness, |
| Chest Pain | frustration & anger, |
| | embarrassment & vulnerability |

These symptoms are intermittent and occur at various levels of intensity since the discrimination towards me occurred. I deal with one or more of these symptoms daily and am able to cope with the help of remedies prescribed by my health care providers.

James Rogge DDS has prescribed Valium for short term use to relieve the jaw pain associated with jaw clenching caused by stress.

Edna Yoder, reflexologist/massage therapy visits are one every two to four weeks for relief of muscle pain exasperated by stress at work due to this incident.

Affidavit A
Page 5 of 10

< / 0 / 0 Y

A-92

00137




3. Kim Furtado N.D. (counselor) has prescribed guided imagery to help "build an environment to promote health in the midst of challenges to this at work". She has also prescribed remedies for physical problems (see attached list from Kim Furtado).

I have seen Kim Wayman (EAP counselor) on eight occasions. Kim Wayman has offered effective treatment for emotional distress caused by the injustice and discrimination alleged in my complaint.

4. I have taken herbal as well as pharmaceutical remedies (please see Rx sheet from Kim Furtado attached for explanations).
    Skullcap for headaches
    Flower Essence for nervous anxiety
    Destress Tabs for stress
    Detox factors to relieve pain and tendency to headaches under stress
    Valium for relief of jaw clenching pain from stress

5. Neck pain and lower back pain due to accident in 2000.

6. Neck and lower back pain are no longer a problem.

I mention this because I have seen the reflexologist and received massage therapy in the past and did not want there to be any confusion as to why I am seeing her now.

7. It is very difficult to cover the full range of loss I have incurred. They are tangible as well as intangible. My life as well as my family's has been altered as a result of this incident. The negative impact can not be measured.

I have provided documentation from all the health care professionals I have seen and I will also enclose any and all pertinent information available.

Affidavit A
Page 9 of 10

8/8/04

A-93

00138

page 1 -2-

CASE # 1C-08l-0017-04

Answers to Questions 1, 2, 3, 6, 7, 8, 9, 10

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| African American | | All Black | | Caucasian | | All Black | | |
| Eugenia Ross | Clerk | Ann Thomas | | Bill Skibicki | Mail Handler | D.R. Royster | Fired | 2002 |
| Tasha Bryant | Clerk | Sheri Wiggins | | Michele McGuire | Clerk | Lyonne Street | Fired pndg. outcome of trial | 2003 |
| Owen Wallace | Supv. | | | Richard Wilson | Clerk | Owen Wallace | 2 week supsension | end '03 bgn '04 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Caucasian | | All Black | | African American | | All Black | | |
| Bo Diggers | Clerk | Ann Thomas | | Felicia Camper | Clerk | Ann Thomas | Temporary letter of warning | 2003 |
| Myself - J. Jeffries | Clerk | Ann Thomas | | Delores Thomas | Clerk | Ann Thomas | NO ACTION TAKEN | 2003 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Victim: White | | | Offender: White | | | |
| Bill Landis | Mail Handler | Mike Potolak-wht | Mike Potolak-wht | Supv. | Fired | 2003 |

9/8/04

Affidavit A
Page 10 of 10

A-94

00139

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JANET JEFFRIES,                          )
                                         )
      Plaintiff,                   )
                                         )     Civ. A. No. 06-707-***
vs.                                      )
                                         )
JOHN E. POTTER, POSTMASTER               )
GENERAL, UNITED STATES POSTAL            )
SERVICE,                                 )
                                         )
      Defendant.                   )


### Plaintiff Jeffries's Responses to Interrogatories and Request for Production

Plaintiff Janet Jeffries, by and through her undersigned counsel, does hereby respond to

defendant's "Defendant's First Set of Interrogatories Directed to the Plaintiff" and "Defendant's First

Request for Production of Documents" as follows:

*Interrogatories:*

1. Identify each and every adverse employment action which forms the basis of your
   complaint.
         **ANSWER**: See declarations of Janet Jeffries dated July 20, 2005 and November
   10, 2005, contained in the production response, for a detailed description of the parameters of
   her claim, including the underlying pushing incident, the failure to investigate it properly, and
   the inappropriate transfer of Ms. Jeffries to "Tour 1." In general, she continues to be
   victimized by: the ongoing hostility in the workplace requiring that Ms. Jeffries be careful at
   all times, for example always having a witness with her in case an incident develops; and the
   failure to supply her with a transfer to a facility away from Delores Thomas and John
   Williams.

-1-



2.  Set forth in detail all facts that support each and every allegation that the Postal Service or any of its employees discriminated against you because of your race.

      **ANSWER**: See answer to #1, as well as the witness statements discussed herein and supplied in the request for production.

3.  Identify by name every supervisory/managerial level employee who allegedly played a role in discriminating against you on account of race, and for each person so identified, describe the actions and/or inactions on their part that you believe constituted race discrimination.

**ANSWER**: Dolores Thomas: She was not a supervisory person, but her actions were discriminatory and precipitated this claim. She attacked plaintiff with a mail tub at the Delaware P&DC ("Processing and Distribution Center") on November 11, 2003, for no reason, and engaged in a tirade that continued for approximately thirty minutes, as described in paragraph 7 of the Complaint. Has subsequently acted in a cold and hostile manner toward plaintiff.

Angelo Lambert: Mr. Lambert was the MDO ("Manager, Distribution and Operations") on duty on November 11, 2003. Plaintiff reported the attack by Dolores Thomas to Mr. Lambert, but Mr. Lambert failed to properly investigate the matter in a timely fashion, as was required by relevant postal regulations and policies, including the policy set forth in USPS Publication #45 (entitled "A Violence Free Workplace"; a copy is attached hereto) and the October 28, 2003 memorandum issued (a mere two weeks before I was attacked by Dolores Thomas) by Joanna B. Korker, Lead Executive District Manager of the South Jersey District of the USPS (entitled "South Jersey Policy on Conduct in the Workplace"; a copy is attached hereto). Mr. Lambert failed to follow-up obtaining statements from witnesses that plaintiff had identified.

      Mr. Lambert witnessed, firsthand, in our meeting on 11/11/03, the profanity, offensive conduct and violent manner exhibited by Delores Thomas, to the extent that the meeting had to be ended. Angelo Lamber for the second time ignored the violation of Postal Policy and in fact arranged a private meeting with Delores Thomas for the following day. Angelo Lambert and Delores Thomas are Black and preferential treatment was given to her. She should have been removed from the building immediately pending investigation. Lambert was notified twice that I felt threatened, first by Ann Thomas SDO and then subsequently by myself at the meeting, again violating postal policy. There was blatant inequality displayed by MDO Angelo Lamber.

John Williams: Mr. Williams was the LMDO (Lead Manager, Distribution and Operations) over Mr. Lambert. He failed to follow the same policies and regulations as Mr. Lambert, essentially dropping the ball in pinning down the investigatory details of the incident involving Ms. Dolores Thomas. He lost witness statements, and otherwise impeded progress, as he admitted at the EEO



mediation.

Although he received my explanation of 11/14/03 regarding the 11/11/03 incident, John Williams failed to take any action against Delores Thomas for her profanity, offensive conduct and violent actions towards me. John Williams hindered the investigation of this incident. In contrast, I was threatened by John Williams twice. Unlike his conduct toward Ms. Thomas, Mr. Williams acted in a threatening and harassing manner towards me when he threatened to fire me if I acted in any way similar to Delores Thomas.

Also, in allegations put forth by Delores Thomas to John Williams involving another co-worker, Tasha Palmer, John Williams conducted a prompt and official investigation. This time there was no delay or minimizing of the gravity of the situation. And the alleged victim in this case was Black. Postal policy was thus applied in a discriminatory fashion. MDO John Williams has shown that he is capable of enforcing (and willing to enforce) postal policy when the alleged victim is black.

4. Identify by name each and every similarly situated Postal Service employee who was treated differently than you by the Postal Service on account of race, and explain in detail how they were treated differently than on account of race.

**ANSWER:** The individuals identified below are all black, and complained of violation of postal policies (complaining of improper cnfrontations, profanity, assault, and/or physical or verbal abuse. They notified management, and management responded in timely manner with investigations, unlike in my case, and disciplined where appropriate.

Lynette Marrow. On or about 11/20/02, she claimed that Darlene Commodore made a defamatory comment about her. She reported the incident to John Williams. He immediately investigated. He took statements from witnesses named by Lynette Marrow.

Darlene Commodore: On or about 1/15/04, she reported that co-workers were talking about her and she was offended. John Williams immediately called all those involved, named by Darlene Commodore, into the office. All those involved were interviewed that night.

Eduok Uwah. On or about December 21, 2004, he had a confrontation with an employee, Rich Pochvatilla. He claimed Ron Pochvatilla threatened him. All employees in the vicinity were interviewed immediately following the incident. Ron Pochvatilla was suspended pending investigation.

Owen Wallace. In or about the end of 2003 or beginning of 2004, he accused employee Richard Wilson of making an offensive statement, and stated that he felt threatened; Richard Wilson was given an immediate two-week suspension.

Tasha Palmer. She was the alleged victim in an incident reported by Delores Thomas to John Williams; the incident was alleged to have occurred on or about 01/02/04. An immediate

-3-

A-97

investigation (including interviews) occurred. No one substantiated the allegations.

Eugenia Ross reported that a mail handler, Bill Skibicki, bumped into her. Bill Skibicki was immediately removed from the building, pending investigation (incident occurred in 2002).

Andrew Casson was an ET who answers calls on machine malfunctions, reported automation clerk Sharon Abelman for being offensive and abusive with him. She raised her voice, and used profanity towards him. She was immediately removed from the building pending investigation and given approximately a two-week suspension. This occurred January 2005.

In 2004, Margaret Holmes and Tiketa Watts were working in the Dispatch area when co-worker Felicia Camper confronted them and accused them of reporting her for coming back from a break late. The two clerks were offended and threatened by her and consequently reported the incident to management. An immediate investigation occurred, along with interviews of witnesses.

Shawn Saunders reported to MDO John Williams on 5/16/04 that she was offended by a conversation she overheard in the ladies locker room. All involved in the conversation, Debblie Callahan, Lynette Marrow, and ISS Clerk named Cindy, were immediately called into the office, following her complaint. They were interviewed and the matter promptly investigated.

Tasha Bryant is a flat sorter who, on 6/17/03, claimed she felt threatened by another employee. The employee was involved in a legal matter involving drugs. Postal policy was invoked. Tasha Bryant's feelings of threat were taken seriously and the employee, Michele McGuire, was immediately removed from the building, pending investigation.

In February 2005, Ann Thomas, SDO, and Ronea Paden were joking with a clerk. It became serious and the clerk, Havoline Henry, was escorted from the building, pending investigation. Ann Thomas claimed she felt threatened.

All of the above were afforded protection under the Postal Policy in regard to Violence Free Workplace, Acts of Thre3ats of Violence in the Workplace, Conduct in the Workplace, and Zero Tolerance for acts or Threats of Violence in our Workplace. All the claimants, above are black. They were treated differently than me because they are black, in my opinion.

The above accounts are within my personal knowledge, and are known by union representative Doris Perry, APWU.

5.  Set forth in detail all facts that support each and every allegation that the Postal Service or any of its employees discriminated against you because of your gender.

**ANSWER**: See answer to #2 above. Because precise attribution of the motives of defendant personnel awaits completion of depositions, plaintiff cannot at this stage specifically identify the

-4-



motivation for individual actions. In general, plaintiff believes that race/color was the predominant motivation behind discriminatory actions, although that belief may change as the evidence is developed.

6. Identify by name every supervisory/managerial level employee who allegedly played a role in discriminating against you on account of your gender, and for each person so identified, describe the actions and/or inactions on their part that you believe constituted gender discrimination.

**ANSWER**: See answer to #3 above. Because precise attribution of the motives of defendant personnel awaits completion of depositions, plaintiff cannot at this stage specifically identify the motivation for individual actions. In general, plaintiff believes that race/color was the predominant motivation behind discriminatory actions, although that belief may change as the evidence is developed.

7. Identify by name each and every similarly situated Postal Service employee who was treated differently than you by the Postal Service on account of gender, and explain in detail how they were treated differently than you on account of gender.

**ANSWER**: Again, a specific answer to this question awaits further elaboration through depositions. If it appears that the reason that I was treated differently than the individuals identified in the response to #4 above was a motive of gender discrimination, than that would be added to what is, predominantly, a race/color claim.

8. What is your race and national origin?

**ANSWER**: Caucasian and Italian-American.

9. Set forth in detail all facts that support each and every allegation that the Postal Service or any of its employees discriminated against you because of your national origin.

**ANSWER**: See answer to #2 above. Because precise attribution of the motives of defendant personnel awaits completion of depositions, plaintiff cannot at this stage specifically identify the motivation for individual actions. In general, plaintiff believes that race/color was the predominant motivation behind discriminatory actions, although that belief may change as the evidence is developed.

-5-



10. Identify by name every supervisory/managerial level employee who allegedly played a role in discriminating against you on account of your national origin, and for each person so identified, describe the actions and/or inactions on their part that you believe constituted discrimination due to your national origin.

**ANSWER**: See answer to #3 above. Because precise attribution of the motives of defendant personnel awaits completion of depositions, plaintiff cannot at this stage specifically identify the motivation for individual actions. In general, plaintiff believes that race/color was the predominant motivation behind discriminatory actions, although that belief may change as the evidence is developed.

11. Identify by name each and every similarly situated Postal Service employee who was treated differently than you by the Postal Service on account of national origin, and explain in detail how they were treated differently than you on account of origin.

**ANSWER**: See answer to #4 above. Because precise attribution of the motives of defendant personnel awaits completion of depositions, plaintiff cannot at this stage specifically identify the motivation for individual actions. In general, plaintiff believes that race/color was the predominant motivation behind discriminatory actions, although that belief may change as the evidence is developed.

12. Set forth in detail all facts that support each and every allegation that the Postal Service or any of its employees retaliated against you because of your prior EEO related activity.
**ANSWER**: The atmosphere has remained hostile, particularly with regard to my fears as to Delores Thomas, and I have been unable to obtain desired transfers to other locations. In addition, my transfer to Tour 1was discriminatory, particularly in light of the fact that Tour 3 was required to go on double time when I and three others (including one of my witnesses in this matter, Karen Bayard) were shifted to Tour 1.

I was also particularly upset when John Williams swiftly investigated Delores Thomas's allegation that I had pushed Tasha Palmer, in contrast to the slow and ineffective manner in which he investigated my claims as set forth in this case (i.e. the incident where Delores Thomas attacked me). I believe this contrast was due to Mr. Williams's retaliatory and discriminatory motives.

13. Identify by name every supervisory/managerial level employee who allegedly played a role in retaliating against you on account of your prior EEO related activity, and for each person so identified, describe the actions and/or inactions on their part that you believe constituted retaliation.



**ANSWER**: Mr. Williams, as described in No. 12 above; and any management personnel who was involved in either my transfer to Tour 1, or who was involved in preventing my transfer to another facility.

14. Identify all prior EEO related activity for which Postal Service management or employees allegedly retaliated against you for having participated in?
**ANSWER**: The filing and pursuit of the instant claim.

15. Of the Supervisors and/or Managers you identified as having retaliated against you, identify by name which Supervisors and/or Managers were aware of your prior EEO related activity, and state in detail every fact which supports your belief that these was aware of this prior EEO activity.
**ANSWER**: Mr. Williams; I have direct knowledge that he knew about my EEO filing.

16. Describe in detail every fact that you believe supports the allegation you make in Paragraph No. 24 of your District Court Complaint that your assignment to a "graveyard tour" for a 9-10 month period in 2004-2005 was done for discriminatory and/or retaliatory reasons.
**ANSWER**: This is the "Tour 1" transfer referred to above. A transfer of this nature from Tour 3 to Tour 1 had not taken place before, and left Tour 3 shorthanded.

17. Identify every act of harassment that forms the basis of your hostile environment claim.
**ANSWER**: See my two Declarations referred to in Interrogatory answer #1 above, as well as my diary produced in the production responses. The atmosphere at work is hostile and oppressive on an ongoing basis; for example, I always feel that I must have witnesses to accompany me, so that I can protect myself against unsubstantiated claims against me, or attacks against me.

18. For each act of harassment identified in your previous answer, identify the date it occurred and the name of the individual who you believe engaged in the harassing behavior.
**ANSWER**: See documents referred to.

19. Explain in detail how you have lost wages as a result of the alleged discrimination and retaliation identified in your District Court Complaint.
**ANSWER**: Time off related to medical visits and stress. Possible loss due to failure to obtain promotion.



20. List in detail all relief you are seeking in connection with your claims, including the amount of back pay and other monetary damages you seek and your method of calculating such amounts.

**ANSWER**: See attached sheet. Recoverable attorneys fees, including at the EEO level, are as yet undetermined, but are believed to be in the range of $30,000.00 to $35,000.00.

21. Identify all witnesses, including any expert witness, you intend to call at trial, and provide addresses for each person identified.

**ANSWER:** Plaintiff's best information at this time:

Bobby Ford: Delaware P & DC, P.O. Box 1000, Wilmington, DE 19850

Doris Perry: 116 W. Franklin Avenue, New Castle DE 19720-2513. Telephone: 302-324-9743

Karen Bayard – 3407 Stone Gate Boulevard, Elkton, MD 21921. Telephone: 410-996-9711

John Williams: Delaware P & DC, P.O. Box 1000, Wilmington, DE 19850. Telephone 302-323-3754

Angelo Lambert: 345 Heritage Avenue, Unit 100, Portsmouth, NH 03801. Telephone: 603-427-6202

Kim Wayman: 42 Reeds Way, New Castle, DE 19720. Telephone: 302-323-8109

James Jeffries: 2148 Seeneytown Road, Dover, DE 19904-1653. Telephone: 302-653-5411

22. For each witness identified in response to interrogatory No. 21, state in detail the substance of their proposed testimony at trial.

**Answer:**
Bobby Ford was a mail handler in the vicinity during the incident involving myself and Delores Thomas. He wrote a statement of his knowledge, contained in the production response.

Karen Bayard was in the vicinity when the incident occurred between myself and Delores Thomas. She wrote a statement of her knowledge, contained in the production response.

-8-



Lynette Marrow was in the vicinity when the incident occurred between myself and Delores Thomas. She wrote a statement of her knowledge, contained in the production response.

Doris Perry is a Union Shop Steward and was involved in all meetings that transpired between myself and management in regards to the incident which took place between myself and Delores Thomas; see her statement in production response.

John Williams was in charge of investigating the incident which took place between myself and Delores Thomas; see his statement in production response.

Angelo Lambert was informed by myself and a witness in regards to the incident that took place between myself and Delores Thomas.

Kim Wayman was given personal knowledge of the facts pertaining to my allegations in my complaint via counseling between her and I.

23. Identify all persons with personal knowledge of any of the facts contained in your responses to these interrogatories.

**ANSWER**: The witnesses, plus anyone who has reviewed the file; other postal employees may have witnessed the interactions that take place on a daily basis, but the principle knowledgeable people have been identified above.

24. Identify all documents that contain any facts contained in your responses to these interrogatories, and all documents that you relied on in order to answer these interrogatories.
**ANSWER:** See production responses.

_**Production Responses:**_

1. All documents you intend to introduce at trial or any hearing on this matter.
ANSWER: Not yet determined.

2. All reports prepared by any expert you intend to call as a witness at trial or any hearing on this matter.
ANSWER: See report of Dr. Carol Buglin, produced herewith. At this time, no experts have been selected for testimony at trial, however.

-9-


A-103

3. [Omitted]

4. All articles, papers, studies, and/or learned treatises relied upon or utilized by any expert you intend to call as a witness at trial or any hearing on this matter.

ANSWER: To be supplied when testifying experts, if any, are selected.

5. A curriculum vitae for each expert witness you intend to call at trial or any hearing on this matter.

ANSWER: To be supplied when testifying experts, if any, are selected.

6. All documents which you have received from or provided to individuals whom you intend to call as witnesses, expert or otherwise, at trial or any hearing on this matter.

ANSWER: None, beyond materials produced this day (including witness statements taken in conjunction with EEO investigation).

7. All documents, including but not limited to correspondence, between you and any Postal Service employee which relate, evidence, or refer to any of the claims at issue in this matter.

ANSWER: None, beyond materials produced this day.

8. All documents you consulted in preparing your answers to the interrogatories served simultaneously with this document request.

ANSWER: See in general the entire production response.

9. All documents which pertain to or support, in any way, your claim that the Postal Service discriminated against you on the account of your gender.

ANSWER: Race/color bias is the predominant issue in this case. If gender bias becomes apparent after depositions are taken, it will be added to the claim.

10. All documents which pertain to, or support, in any way, your claim that the Postal Service discriminated against you on the account of your race.

ANSWER: See witness statements and postal service policies produced this day.

-10-

A-104

11. All documents which pertain to or support, in any way, your claim that the Postal Service
   has discriminated against you on the account of your national origin.
ANSWER: See answer to # 9 above; national origin claims will be added if they become
apparent.


12. All documents which pertain to or support, in any way, your claim that the Postal Service
   retaliated against you on the account of your prior EEO related activity.
ANSWER: No documents are in my possession beyond those produced establishing the
background of the underlying claims.


13. All documents which pertain to or support, in any way, your claim that other similarly
   situated Postal Service employees were treated differently than you on account of race.
   ANSWER: Allegations have been described in answers to interrogatories; any documents are
   in the possession of Postal Service.


14. All documents which pertain to or support, in any way, your claim that other similarly
   situated Postal Service employees were treated differently than you on account of gender.
   ANSWER: Allegations have been described in answers to interrogatories; any documents are
   in the possession of Postal Service.


15. All documents which pertain to or support, in any way, your claim that other similarly
   situated Postal Service employees were treated differently than you on account of national
   origin.
   ANSWER: Allegations have been described in answers to interrogatories; any documents are
   in the possession of Postal Service.

A-105

16. All documents which pertain to or support, in any way, your claim that other similarly situated Postal Service employees were treated differently than you on account of your participation in prior EEO activity.
ANSWER: Allegations have been described in answers to interrogatories; any documents are in the possession of Postal Service.

17. All documents which pertain to or support, in any way, your claim that you were subjected to a hostile work environment.
ANSWER: My Declarations and diary, produced in the production response. Otherwise, allegations have been described in answers to interrogatories; any documents are in the possession of Postal Service.

18. All documents, including but not limited to healthcare records, notes, reports, test results, invoices, and billing statements, which support your claim that you suffered emotional distress and/or mental anguish as a result of the Defendant's actions.
ANSWER: See report of Dr. Bugglin, and medical bills produced.

19. All documents which in any way support or relate to your claim that you suffered a loss of wages as a result of the Defendant's actions.
ANSWER: Beyond my interrogatory answer, records would be in possession of Postal Service.

20. All documents which in any way support or relate to your claim that you suffered any other damages as a result of the Defendant's actions.
ANSWER: No other documents are in my possession beyond those produced.

Plaintiff JANET JEFFRIES

DATE: January 11, 2008

-12-

A-106

By: _____

Herbert G. Feuerhake, Esq.
The Law Office of Herbert G.
    Feuerhake
521 West Street
Wilmington, Delaware 19801
(302) 658-6101
DE Atty. ID # 2590
herblaw@verizonmail.com
Attorney for Plaintiff Jeffries

-13-

A-107

By: _____
Herbert G. Feuerhake, Esq.
The Law Office of Herbert G.
Feuerhake
521 West Street
Wilmington, Delaware 19801
(302) 658-6101
DE Atty. ID # 2590
herblaw@verizonmail.com
Attorney for Plaintiff Jeffries

-13-

A-108

Signature under oath of responding party:

I, Janet Jeffries, do hereby affirm that the above responses to production requests are true and correct, to the best of my knowledge, and that all responsive materials have been identified and/or produced.

Janet Jeffries

A-107

Signature under oath of responding party:

    I, Janet Jeffries, do hereby affirm that the above responses to interrogatories are true and correct, to the best of my knowledge.

Janet Jeffries

A-110

**Certificate of Service**

I hereby certify that I have caused the foregoing *Plaintiff Janet Jeffries's Appendix in Opposition to Motion for Summary Judgment* to be electronically filed on July 10, 2008,

including electronic service upon:

Seth Beausang, Esq.
Asst. U.S. Atty.
The Nemours Bldg.
1007 Orange Street, Suite 700
Wilmington, DE 19801

_____
Herbert G. Feuerhake, Esq.