IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
JANET F. JEFFRIES,               :
                                 :
              Plaintiff,          :
                                 :
     v.                          :  Civil Action No. 06-707-JJF
                                 :
JOHN E. POTTER, POSTMASTER       :
GENERAL, UNITED STATES POSTAL    :
SERVICE,                         :
                                 :
              Defendant.          :
```

Herbert G. Feuerhake, Esquire of THE LAW OFFICE OF HERBERT G.
FEUERHAKE, Wilmington Delaware.

Attorney for Plaintiff.

David C. Weiss, Esquire, Acting United States Attorney and Seth
M. Beausang, Esquire, Assistant United States Attorney of THE
OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

February 19, 2009
Wilmington, Delaware.

Farhan, District Judge

Pending before the Court is a Motion for Summary Judgment (D.I. 33) filed by Defendant John E. Potter, Postmaster General of the United States Postal Service. For the reasons discussed, the Court will grant Defendant's Motion.

## BACKGROUND

### I. Procedural History

Plaintiff Janet F. Jeffries, a Caucasian female, brought this civil rights action against Defendant John E. Potter on November 22, 2006. By her Complaint, Plaintiff alleges she has been subjected to a hostile work environment and workplace discrimination on the basis of race, gender, and national origin by the United States Postal Service (the "Postal Service"), as well as retaliation for having reported such discrimination to her supervisors, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.

Prior to bringing this action, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on February 20, 2004, alleging disparate treatment on the basis of race (Caucasian). That complaint was dismissed by an administrative law judge ("ALJ") on December 16, 2005, for failure to state a claim upon which relief could be granted. Plaintiff appealed that decision to the EEOC's Office of Federal Operations. On August 25, 2006, the EEOC's Office of Federal Operations affirmed the ALJ's decision.

After pursuing remedies at the administrative level, Plaintiff filed this civil action. By Memorandum Opinion and Order dated July 1, 2008 (D.I. 41, 42), the Court dismissed Plaintiff's state law discrimination claims and her demand for punitive damages. Following the Court's partial dismissal, Defendant filed the instant Motion for Summary Judgment.

## II. Factual Background

Plaintiff is currently employed by the Postal Service. Plaintiff began her employment with the Postal Service in December of 1993. (D.I. 45 at 2.) At that time, she was employed on a temporary basis as a "Christmas casual" clerk in the Dover, Delaware Post Office. She later obtained a job delivering mail as a part-time temporary carrier. (Id.) In 1998, Plaintiff began working as a part-time, flexible clerk ("PTF"). Under the contract between the union and the Postal Service, PTFs are not guaranteed a 40 hour work week, are not provided insurance benefits, and may or may not receive two days off per week. (D.I. 34 at 9.)

On November 11, 2003, Plaintiff was involved in two altercations with another employee, Delores Thomas, while working as a PTF automation clerk in the Delaware Processing and Distribution Center located in New Castle, Delaware. (D.I. 45 at 2.) Thomas is an African-American. The first incident occurred while the two women were working within close proximity of one

2

another and lasted between ten and fifteen minutes. During this incident, Plaintiff alleges that she was verbally and physically assaulted by Thomas. (Id. at 2-3.) The second incident occurred when Plaintiff went to the women's locker room following the first incident. According to Plaintiff, Thomas verbally confronted her a second time, and threatened to physically fight her. (Id.) Both incidents were witnessed by numerous co-workers.

Following the two incidents, both Plaintiff and Thomas met with Angelo Lambert, the acting manager for distribution and operations. (D.I. 34 at 5.) As the Manager for Distribution, Lambert was considered the supervisor of both Thomas and Plaintiff. Lambert is an African-American. Lambert heard both Plaintiff's and Thomas' description of the events and told Plaintiff to submit a written statement. (Id.) Plaintiff also gave Lambert a list of witnesses. (Id.) Following the meeting, Lambert sent both women home. (Id.) Plaintiff returned to work two days later and met privately with John Williams, the head Manager for Distribution. Williams is also an African-American. Plaintiff submitted her written statement to Williams, and Williams told Plaintiff that he was going to investigate the incident. (Id. At 6.) Until this point, Plaintiff was satisfied with the way Williams and Lambert had handled the incident. (Id. at app. 8-9.)

3

On November 26, 2003, following the investigation, Williams advised Plaintiff that he had spoken to all witnesses and that no one had substantiated any of her claims.[1] (Id.) Plaintiff then requested a meeting with one of the witnesses, Williams, and Plaintiff's union representative, Doris Perry. Following the meeting, the witness changed his statement and admitted that he heard an argument between Plaintiff and Thomas, but did not specifically state what was said or comment about whether or not Plaintiff was physically assaulted. (Id. at 7.) During this meeting, Plaintiff contends that Williams told her that she was to avoid Thomas and that if she acted in any way like Thomas did, she would be fired. (Id.)

Following the incidents and the investigation, Plaintiff stated that she felt like she was being targeted by her supervisors. From November 27, 2003 through January 21, 2005, Plaintiff alleges that she was subjected to discrimination and hostility in the work place. (Id. at 8.) According to Plaintiff, she was subjected to supervisory "nitpicking." (Id.) For example, Plaintiff contends that when she would go to the ladies' room she would be paged to return immediately to her work station. Plaintiff also contends that she was reprimanded for

_____

[1] Williams told Plaintiff that no one substantiated her claim, but Plaintiff's union representative, Doris Perry, asserts that Williams said that he did not believe the statements he received from the witnesses which corroborated Plaintiff's version of the events. (D.I. 45 at 10.)

4

going to the water fountain to fill up her water bottle.  (Id.)
However, Plaintiff does not allege that she was formally
disciplined for her conduct.  Plaintiff also claims that this
type of "nitpicking" occurred while Thomas was free to socialize.

On January 2, 2004, Plaintiff was called into a meeting with
Williams in which he told her that it was reported that she had
physically assaulted another employee, Tasha Palmer.  (Id.)  The
incident was reported by Thomas.  Palmer denied the incident, and
the meeting ended with no disciplinary action being taken.  (Id.)
Plaintiff does not claim that she was formally disciplined at any
time subsequent to the two initial incidents.  (Id.)

In addition to Plaintiff's allegation of greater supervisory
scrutiny, Plaintiff contends that she was subject to disparate
treatment by other employees, namely Thomas.  Following the
incidents on the work floor and in the women's locker room,
Plaintiff contends that Thomas called her a "baby," "bitch," and
that someone called her a "white honkey bitch."  (Id. at 9.)
Plaintiff reported these incidents to Williams, but Plaintiff
declined to pursue the matter when Williams asked her for
witnesses.  (Id.)  In January, 2004, Plaintiff, in an effort to
avoid Thomas, asked Williams to transfer her from Tour 3 (the
afternoon shift) to Tour 2 (the day shift), but Williams refused
to transfer Plaintiff.  (Id.)

5

On February 20, 2004, Plaintiff filed her complaint with the EEOC alleging discriminatory treatment based on her race. (Id. at 7.) On September 18, 2004, Plaintiff was promoted from PTF to full-time regular clerk ("FTF") along with four other employees. (Id. at 9.) Thomas was not among those promoted and does not work the night shift. Unlike a PTF, FTFs are guaranteed forty hours of work per week, two days off per week, medical insurance, vacations and the ability to bid on other jobs. (Id.) Following the promotion, Plaintiff and the four other promoted employees were transferred from the afternoon shift to the night shift. (Id.) According to Plaintiff, the Postal Service is required by contract to keep newly promoted FTFs on their prior job and time shift for three cycles to enable them to bid for and receive a permanent job. (Id.) Plaintiff filed a grievance alleging a failure to adhere to the contract, but she does not know what happened to it. It is also unknown whether any of the other promoted employees filed similar grievances.

## STANDARD OF REVIEW FOR SUMMARY JUDGEMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment

6

as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)(citations omitted). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary-judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, (1986).

7

## DISCUSSION

### I. WHETHER DEFENDANT IS ENTITLED TO SUMMARY JUDGEMENT BASED ON PLAINTIFF'S ALLEGED FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

#### A. Parties' Contentions

By his Motion, Defendant contends that he is entitled to summary judgment on Plaintiff's claims of hostile work environment, retaliation, discriminatory transfer, and discrimination based on national origin and gender, because Plaintiff has failed to exhaust her administrative remedies as required by Title VII. Defendant contends that Plaintiff's EEOC complaint alleges only race discrimination and makes no mention of any other claims. Defendant notes that in her EEOC Complaint, Plaintiff stated that she "continues to work in a hostile environment." (D.I. 34 at app. 51.) However, Defendant contends that this "fleeting reference" to a hostile work environment is insufficient to put either the EEOC or the Postal Service on notice that Plaintiff was pursing a hostile work environment claim, particularly where, as here, Plaintiff specifically denied that she was raising a hostile work environment claim during the EEOC process. (Id. at 16.)

As for Plaintiff's discriminatory transfer claim, Defendant contends that Plaintiff was transferred on September 18, 2004, nearly seven months after she filed her EEOC complaint. Therefore, Defendant contends that the EEOC could not reasonably

8

be expected to investigate Plaintiff's claim of discriminatory transfer.

In response, Plaintiff contends that she delineated her hostile work environment claim in various filings throughout the EEOC process. In support of her argument, Plaintiff lists all the statements made within the EEOC process, which she contends, taken together, demonstrate that she presented a hostile work environment and retaliation claim. (D.I. 45 at 26-28.)

Plaintiff also disputes Defendant's contention that she expressly denied raising a hostile work environment claim. In this regard, Plaintiff contends that she was constrained by the EEOC interpretation of her filings as manifested by the "claim which was accepted for investigation" that she received. (Id.)

As for her retaliation claim, Plaintiff contends that she informed the EEOC of the facts supporting her retaliation claim, specifically the failure to transfer Plaintiff away from Thomas and the instances of strict scrutiny management following the EEOC filings. (Id. at 29.) Plaintiff further contends that these facts, combined with the reference to "retaliation" in her EEOC affidavit, establish that she exhausted her administrative remedies with regard to her retaliation claim. (Id.) As for her discriminatory transfer claim, Plaintiff further contends that this claim should be deemed presented even if the facts giving rise to the claim occurred after the original EEOC filing,

9

because the claim is within the reasonable scope of the EEOC
process and flows from the original charge.

B. Decision

1. *Legal Standard*

Generally, an employee must exhaust all administrative
remedies by filing a complaint with the EEOC before seeking
judicial relief under Title VII. Waiters v. Parsons,729 F.2d
233, 237 (3d Cir. 1984). In determining whether Plaintiff
exhausted her administrative remedies, the relevant test is
"whether the acts alleged in the subsequent Title VII suit are
fairly within the scope of the prior EEOC complaint, or
investigation arising therefrom." Waiters, at 233 F. 2d at 237.

2. *Plaintiff's Hostile Work Environment Claim*

After reviewing the record and the parties' arguments, the
Court concludes that Plaintiff has failed to exhaust
administrative remedies with regard to her hostile work
environment claim. The only support in the record for such a
claim is Plaintiff's statement to the EEOC that, "from 11/11/03
until present I continue to work in a hostile environment."
(D.I. 34 at app. 51.) The Court concludes that this statement is
insufficient to place a hostile work environment claim fairly
within the scope of the prior EEOC complaint and investigation.

Throughout the EEOC process, Plaintiff was given a chance to
include a hostile work environment claim in her filings, but

10

repeatedly declined to do so or took no action. In Plaintiff's EEOC complaint, Plaintiff only indicated that she was alleging discrimination based on race. (D.I. 34 at app. 41.) In the letter she received from the EEOC informing her that her complaint had been accepted for investigation, the specific issue mentioned was discrimination based on race. (Id. at app. 56.) The letter contained a provision which made it clear that if Plaintiff did not agree with the EEOC's characterization of the accepted issues she could inform the EEOC and amend her complaint. Plaintiff made no such amendment, and in fact, disavowed a hostile work environment claim in her opposition memorandum to the "Notice of Intent to Issue a Decision Without a Hearing." Specifically, Defendant states that "the Notice's characterization of Complainant's claim as being 'subject to hostile work environment harassment based on race on November 11, 2003, is unfortunately, not the particular claim which the Complainant has specifically raised in her Complaint." (Id. at app. 38, emphasis added.) Plaintiff goes on to reiterate this point by informing the EEOC that, although she alleged that she "continue[s] to work in a hostile environment," she agrees that the claim accepted for investigation was disparate treatment based on race. (Id.) In the same memorandum, Plaintiff also states that her complaint of discrimination is based on, "[a] claim for disparate treatment and not 'hostile work environment

11

harassment' as referenced in the Notice and the legal analysis in this case should be based on Complainant being treated differently than similarly situated employees of another race." (Id. at app. 40, emphasis added).

The Court's conclusion regarding Plaintiff's failure to exhaust administrative remedies for a hostile work environment claim is also supported by the actions of the ALJ adjudicating Plaintiff's claim. The ALJ issued an "Order to Show Cause" that specifically stated that Plaintiff contended that this was a disparate treatment claim and not a hostile work environment claim.  (Id. at app. 63.)  In the decision following the Order to Show Cause, the ALJ again characterized Plaintiff's claim as one involving disparate treatment and not hostile work environment. (Id. at app. 61.)

As for the investigation arising from the EEOC complaint, the Court notes that the investigative summary states that the issue to be investigated is one of disparate treatment.  Nowhere in the EEOC's summary is a hostile work environment claim mentioned.  (D.I. 45 at app. 79-84.)  In sum, the Court cannot, on this record, conclude that a hostile work environment claim was fairly within the scope of the prior EEOC complaint or the investigation arising therefrom.  Accordingly, the Court will grant Defendant's Motion for Summary Judgement as it pertains to Plaintiff's hostile work environment claim.

### 3. *Plaintiff's Retaliation Claim*

The Court concludes that Plaintiff has failed to exhaust administrative remedies with respect to her retaliation claim. The Third Circuit has rejected a per se rule that all claims of retaliation are ancillary to the original complaint and that no further EEOC complaint must be filed. Waiters, 729 F.2d at 237 n.10. As discussed infra, Plaintiff's complaint to the EEOC involved only disparate treatment. Plaintiff's sole reference to a retaliation claim in the EEOC materials is the single statement that Plaintiff told Williams that she "felt threatened by Delores Thomas and her allies' retaliation." (D.I. 34 at app. 86.) However, the Court concludes that, when read in context, this statement refers to retaliation against Plaintiff for the incident between Thomas and Plaintiff and not any retaliation for participating in a protected activity.[2]

---

[2]     A plaintiff must participate in a protected activity to establish a retaliation claim. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 700-701 (3d Cir. 1995)(finding a general letter of complaint that did not mention discrimination was not a protected activity). Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." See e.g., Sumner v. United States Postal Servs., 899 F.2d 203, 209 (2d Cir. 1990). Nothing in the record establishes that Plaintiff made any complaints regarding acts prohibited under Title VII to management in response to the incidents between her and Thomas.

13

Moreover, the affidavits provided by Plaintiff to support her claims focus on the incident between Thomas and Plaintiff, and do not mention any of the incidents Plaintiff now raises as the basis for a retaliation claim. (Id. at app. 66-74.) In this context, the Court cannot conclude that the mere use of the word "retaliation," without evidentiary support or further elaboration by Plaintiff, is sufficient to put the EEOC and the Postal Service on notice that Plaintiff was raising a retaliation claim. Accordingly the Court will grant the Defendant's Motion for Summary Judgment as it pertains to Plaintiff's retaliation claim.[3]

---

[3]    In the alternative, the Court concludes that even if Plaintiff exhausted administrative remedies with respect to her retaliation claim, Defendant is entitled to summary judgment based on Plaintiff's failure to establish the elements required for a prima facie case of retaliation. A prima facie case of retaliation under Title VII requires a plaintiff to show: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-341 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).   In this case, the Court concludes that Plaintiff has failed to establish that she engaged in protected activity, see infra note 2, and has failed to establish an adverse employment action.  For purposes of a retaliation claim, an adverse employment action is an alleged retaliatory action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. at 68 (internal quotations omitted).  Plaintiff points to her allegations of supervisory nitpicking as evidence of retaliation; however, the Court finds these events to be the type of conduct that the Supreme Court has held is insufficient to establish a claim. Burlington Northern, 548 U.S. at 68.  Plaintiff also points to her transfer to the night shift as evidence of retaliation.  In

14

4. *Plaintiff's Gender and National Origin Claims*

The Court also concludes that Plaintiff did not exhaust administrative remedies with regard to her claims of gender and national origin discrimination. Plaintiff's only mention of national origin and gender discrimination is in her EEOC complaint form responses listing her sex as female and her race as Italian-American. (D.I. 34 at app. 42.) No facts were adduced by Plaintiff to support the inference that she was raising a gender and national origin claim before the EEOC, and as described previously, Plaintiff lists her only claim as a claim of race discrimination. (Id. at app. 41.) In addition, the Court's conclusion is based on the absence of any information related to national origin and gender discrimination in the EEOC materials, including the EEOC's investigative summary, multiple notices, and the ALJ's decision. Accordingly, the Court will grant Defendant's Motion for Summary Judgment as it pertains to Plaintiff's gender and national origin claims.

5. *Plaintiff's Discriminatory Transfer Claim*

Lastly, the Court concludes that Plaintiff did not exhaust administrative remedies with respect to her claim of

---

this case, however, this transfer was made in the context of a promotion and all the other employees receiving the same promotion were transferred to the night shift. Accordingly, the Court cannot conclude that Plaintiff's transfer was a retaliatory adverse action.

discriminatory transfer. As with Plaintiff's previous claims, there is virtually no reference to a discriminatory transfer claim in the EEOC materials. Plaintiff directs the Court to her November 11, 2005 declaration in which she mentions her promotion and transfer as an example of discriminatory action taken against her. (D.I. 45 at app. 25-26.) However, the Court notes that this declaration was made after the conclusion of the EEOC's investigation and after the filing of the investigative report on October 14, 2004. (Id. at app. 76.) Aside from this single statement in her declaration, the only mention of discriminatory transfer that the Court can locate is in the ALJ's decision following an "Order to Show Cause" that was issued to Plaintiff which required her to show that she suffered a direct harm. In that decision, the ALJ indicated that Plaintiff listed the discriminatory transfer as an example of direct harm to avoid dismissing her action. (D.I. 34 at app. 61.) However, the ALJ responded to Plaintiff stating, "that this allegation was not in the formal complaint . . . [and Plaintiff] has not sought to amend her complaint to include this [allegation]. (Id.) Accordingly, the Court cannot conclude that Plaintiff's claim of discriminatory transfer is fairly within the scope of the EEOC complaint or ensuing investigation, and therefore, the Court will grant Defendant's Motion for Summary Judgment as it pertains to Plaintiff's discriminatory transfer claim.

Having addressed the threshold exhaustion issues, the Court turns to whether Plaintiff has established a prima facie case with regard to her exhausted claim of race discrimination.

## II.   WHETHER DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RACE DISCRIMINATION CLAIM

### A. Parties' Contentions

Plaintiff contends that the Postal Service treats its employees differently based on their race.  Specifically, Plaintiff contends that the Postal Service applies its disciplinary policies unevenly to white employees.  According to Plaintiff, African-American employees receive more lenient treatment from supervisors while white employees are subject to stricter rules of conduct.  Plaintiff also contends that she was treated differently because of her race when Defendant failed to transfer her away from Thomas, transferred her to the night shift after her promotion, and allowed her to work in a consistently hostile work environment.

By its Motion, Defendant contends that it is entitled to summary judgment on Plaintiff's race discrimination claim, because none of the actions she cites constitute an adverse employment action.  With regard to the allegation that the Postal Service applies its disciplinary rules unevenly, Defendant contends that this allegation, in and of itself, is insufficient to establish an adverse employment action because Plaintiff must show that the Postal Service's actions were so serious as to

17

alter the compensation, terms or conditions of her employment.

B.    Whether Plaintiff Established a Prima Facie Case of
      Reverse Race Discrimination

Because Plaintiff's claims are centered on the theory that
African American employees are treated more favorably by the
Postal Service than white employees, Plaintiff's claims are based
on the concept of reverse race discrimination.  Reverse race
discrimination is typically defined as "any discrimination
against a member of a majority group - typically whites and males
- whether or not prohibited by law in any particular case."
Lindemann, Grossman & Weirich, 2 Employment Discrimination Law
2484 n.1 (4th ed. 2007).

To state a claim based on reverse race discrimination, the
plaintiff must still establish a prima facie case of
discrimination under the McDonnell Douglas framework.  Under
McDonnell Douglas, the plaintiff must show that: (1) he or she is
a member of a protected class; (2) he or she is qualified for the
position; (3) he or she suffered an adverse employment action;
and (4) either non-members of the protected class were treated
more favorably than the plaintiff, or the circumstances give rise
to an inference of discrimination.  Sarullo v. United States
Postal Service, 352 F.3d 789, 797 (3d Cir. 2003).  In the context
of reverse discrimination this test is modified to take into
account the fact that the plaintiff is not a member of a
protected class.  While the majority of circuits require the

18

plaintiff to show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority,"[4] the Third Circuit has not adopted this test. Rather, the Third Circuit concluded that "a plaintiff who brings a 'reverse discrimination' suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [his or her] race, color, religion, sex or national origin.'" Iadimarco v. Runyon, 190 F.3d 151, 163 (quoting Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978). Under this test, direct evidence is not required, but there must be sufficient evidence to support an inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999).

Regardless of the aforementioned modification to the prima facie case, the case law still requires an adverse employment action to establish reverse race discrimination. An adverse employment action for purposes of Title VII is an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of

---

[4] See Parker v. Baltimore & Ohio Railroad, 652 F.2d 1012 (D.C. Cir. 1981).

employment." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). In this case, the Court concludes that Plaintiff cannot demonstrate an adverse employment action because none of the actions cited by Plaintiff are sufficiently serious so as to be considered an adverse alteration of Plaintiff's employment status or condition. For example, Plaintiff contends that Defendant's failure to transfer her away from Thomas constitutes an adverse employment action because she was forced to work in proximity with an employee she had difficulty with. However, such ordinary workplace discord is insufficient to constitute a Title VII violation. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998) ("Title VII is not "a general civility code for the American workplace.").

Plaintiff's also contends that her transfer to the night shift is an adverse employment action, but this transfer was temporary and part of a promotion package that provided Plaintiff with substantial benefits. In this regard, other transfer cases are distinguishable because they involve either a loss of pay or benefits or a transfer which could be viewed as having a negative impact on the plaintiff's career equal to a demotion.[5] Because

---

[5]     See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778 (3d Cir. 1998) (finding an adverse employment action where the plaintiff was transferred to a shift which forced him to come in on weekends and left him with less free time); Torre, 42 F.3d 825 (3d Cir. 1994) (finding an adverse employment action where the employer "transferred [the plaintiff] to a dead-end position from which he was terminated shortly thereafter"); Jones v. School

20

Plaintiff has not identified any negative or adverse consequences from her promotionary transfer, the Court concludes that it does not constitute an adverse employment action. Cabral v. Philadelphia Coca Cola Bottling Co., 2003 WL 1421297, *7 (E.D. Pa. March 18, 2003) (holding that denial of leave was not an adverse employment action "because the act itself did not lead to adverse consequences for [p]laintiff").

Plaintiff also contends that a hostile work environment can constitute an adverse employment action; however, a hostile work environment must be severe and pervasive to be actionable. Cavor v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2008). Stated anther way the "conduct must be extreme to amount to a change in the terms and conditions of employment." Id. (quoting Faragher v. City of Boca Ratton, 524 U.S. 775, 788 (1998)). Factors relevant to this inquiry include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

_____

District of Philadelphia, 198 F.3d 403 (3d Cir. 1999) (finding an adverse employment action where the plaintiff was transferred to a school district where the school had a reputation for being difficult and he was unable to teach his desired subject) ; Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107 (3d Cir. 1996) (the plaintiff's transfer from detective bureau to road patrol was an adverse employment action where transfer was supposed to be temporary but the plaintiff was never transferred back).

performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

In this case, Plaintiff refers to supervisory nitpicking and sporadic use of abusive language by co-workers. However, the Court concludes that this type of conduct is insufficient to rise to the level of a hostile work environment and is more akin to the ordinary trials and tribulations of the work place.[6] Burlington, 548 U.S. at 68. Plaintiff also claims that in the few days following the incident between her and Thomas, Thomas called her a "bitch" and a "baby," and an unidentified person called her a "white honkey bitch." However, such sporadic use of abusive language does not rise to the level of a hostile work environment.[7] Burlington, 548 U.S. at 68; Meritor Sav. Bank, FSB v. Vinson, 477 US 57, 67 (1986) (noting that the "mere utterance of an ethnic or racial epithet which engenders offensive feelings

_____

[6]    The incidents of supervisory nitpicking Plaintiff complains of include being told that lunch is only a half hour when she returned late to her work station, being looked at by a supervisor while others were socializing, Williams looking at her and laughing and then "haughtily" saying "hello," and being told to hurry up because she was taking to long to set up her work station. (D.I. 34 at app. 65-82.) The Court concludes that none of the instances cited by Plaintiff are sufficient alone or collectively to amount to a hostile work environment.

[7]    The Court further notes that, had Plaintiff exhausted her hostile work environment claim, see infra Section I(B)(2) of the Discussion section of this Memorandum Opinion, the claim would not have survived summary judgment, because Plaintiff has failed to establish a prima facie case of a hostile work environment as discussed above.

in an employee" is insufficient to violate Title VII); Bolden v.
PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) (requiring "more than
a few isolated incidents of racial enmity" or "sporadic racial
slurs" to establish a Title VII violation).

With regard to the instances of alleged uneven application
of disciplinary policies, the Court also concludes that such
conduct, in the circumstances of this case, is insufficient to
constitute the adverse employment action required to establish a
prima facie case of discrimination. With regard to her
confrontation with Thomas, both Plaintiff and Thomas were
subjected to the same treatment following the incident in that
both were required to meet with Lambert and both were sent home.
Where, as here, the Plaintiff did not suffer any discipline, the
Court cannot conclude that she suffered an adverse employment
action. See Witcher v. Sodexho, 247 Fed. Appx. 328, 331 (3d Cir.
2007) (holding that even if policies regarding abusive language
and confronting supervisors were unevenly applied, the company
did not discipline plaintiff, suspend him without pay or
otherwise sanction him and therefore, the plaintiff could not
demonstrate an adverse employment action for purposes of the
prima facie case).

Because Plaintiff has failed to establish an adverse
employment action, the Court concludes that Plaintiff has not
established a prima facie case of discrimination. Accordingly,

the Court will grant Defendant's Motion for Summary Judgment with
regard to her claim of reverse race discrimination.

## CONCLUSION

For the reasons described the Court will grant Defendant's
Motion for Summary Judgment with respect to Plaintiff's claims of
hostile environment, retaliation and workplace discrimination
based on race, gender, and national origin in violation of Title
VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.

An appropriate Order will be entered.